IN THE UNITED STATES DISTRICT COURT
OF THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PARSONS & WHITTEMORE ENTERPRISES CORPORATION, )
)
)
Plaintiff, )
)
vs. )
)
CELLO ENERGY, LLC, formerly known )
as Forest Energy Systems, LLC; BOYKIN )
TRUST, LLC; JACK W. BOYKIN, an )
individual, ALLEN W. BOYKIN, an )
individual, and BIOFUELS OPERATING )
COMPANY, LLC, )
)
)
Defendants. )

CASE NO. CV-07-0743-KD-B

## **COMPLAINT**

Parsons & Whittemore Enterprises Corporation ("P&W") states the following complaint against Cello Energy, LLC (f/k/a Forest Energy Systems, LLC ("FES")) (referenced in this complaint as "Cello"), Boykin Trust, LLC ("Boykin Trust"), Jack W. Boykin ("Jack"), Allen W. Boykin ("Allen") (with all four of these defendants sometimes referred to as the "Boykin defendants"), and Biofuels Operating Company, LLC ("Biofuels").

### **Introduction**

1.     This is an action for injunctive and declaratory relief.  P&W invested $2.5 million and promised conditionally to invest another $10 million in FES, now Cello, for the exclusive right to participate with the Boykin defendants in the commercial development of technology that allows the production of synthetic fuel from cellulosic and polymer-based material.  After accepting P&W's investment, the Boykin defendants entered into an agreement with Biofuels,

the effect of which would be to provide Biofuels with access to the technology that was the basis for P&W's investment, and a disguised equity interest in Cello, all in violation of Cello's obligations to P&W under agreements it made with P&W before and at the time of P&W's investment. The Boykin defendants then unilaterally, and without notice to P&W, changed the articles of organization of Cello and caused Cello to adopt an operating agreement consistent with Cello's agreement with Biofuels but in violation of P&W's rights under P&W's agreements with Cello. P&W asks the court to enjoin the defendants from violating P&W's rights under P&W's agreements and to declare any provision of the restated articles of organization, the operating agreement, and the agreement between Cello and Biofuels null and void to the extent that it violates or conflicts or interferes with P&W's rights under P&W's agreements with Cello.

### Jurisdiction

2.     The court has subject matter jurisdiction of the complaint pursuant to 28 U.S.C. § 1332 in that the plaintiff P&W is diverse in citizenship from all defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

### The Parties

3.     The plaintiff P&W is a corporation organized under the laws of the State of Delaware with its principal place of business in Rye Brook, New York. P&W is, therefore, a citizen of the States of Delaware and New York.

4.     The defendant Cello is a limited liability company organized under the laws of the State of Alabama with its principal place of business in Baldwin County, Alabama. Upon information and belief, Cello's sole member is defendant Allen or defendant Boykin Trust. In either event, Cello is a citizen of the State of Alabama.

5.     The defendant Boykin Trust is a limited liability company organized under the laws of the State of Alabama with its principal place of business in Baldwin County, Alabama. Boykin Trust's members are defendant Allen, Lois E. Rambo, and Lois C. Boykin, who are resident citizens of the State of Alabama.  Boykin Trust is, therefore, a citizen of the State of Alabama.

6.     The defendant Jack is a resident citizen of Baldwin County, Alabama, and identified in various documents as the chairman of Cello, FES, and Boykin Trust.  Jack is also an applicant for a patent on technology that is the basis for P&W's investment in Cello.  Jack is sued in his individual capacity because he negotiated the agreement between Cello and Biofuels for Cello, made representations to P&W as are more particularly set forth herein, and as an applicant for a patent in the technology that is the basis of P&W's investment in Cello, is presumed to have knowledge regarding the technology, which Cello has contracted to disclose and use in violation of P&W's rights.

7.     On information and belief, the defendant Allen is a resident citizen of Baldwin County, Alabama, and, with Jack, an applicant for a patent on technology that is the basis for P&W's investment in Cello.  Allen is sued in his individual capacity because as an applicant for a patent on the technology that is the basis of P&W's investment in Cello, he is presumed to have knowledge regarding the technology, which Cello has contracted to disclose and use in violation of P&W's rights.

8.     The defendant Biofuels is a limited liability company organized under the laws of the State of Alabama, with its principal place of business in Menlo Park, California.  Upon information and belief, Biofuels is wholly owned by BioOils, LLC, which is wholly owned by Red Sky, LP, whose general partner is VK Services, LLC, whose sole member is Vinod Khosla,

3

a resident citizen of the State of California.   Biofuels is, therefore, a citizen of the State of California.

## Facts

9.      Cello is the owner of a research and production technology for manufacturing synthetic fuel from carbon containing cellulosic material such as wood chips, grasses, and crop residues, as well as old tires (the "Technology").

10.      Earlier this year, P&W began discussions with Cello regarding the Technology. On February 27, 2007, Cello, Boykin Trust and P&W entered into a Nondisclosure Agreement preparatory to their cooperation in the construction and operation of a plant in Baldwin County to manufacture synthetic fuel using the Technology, and the construction and operation of other synthetic fuel plants at other locations in the future, and, in order to protect their respective confidential and proprietary information.   A true and correct copy of the Nondisclosure Agreement is attached hereto and incorporated by reference as Exhibit A.

11.      In the Nondisclosure Agreement, Cello and Boykin Trust agreed, *inter alia*, as follows:

        a.      Not to disclose to third parties the existence of the Nondisclosure Agreement, the Technology, or any other Cello proprietary information relating to the Technology without a written modification of the Nondisclosure Agreement signed by each party thereto;

        b.      To hold any proprietary information disclosed by a party in confidence pursuant to the Nondisclosure Agreement; and

c.      To be bound by the Nondisclosure Agreement for a period of ten
(10) years.

12.     After further discussions, P&W determined to invest in Cello.  P&W offered
Cello a $2.5 million nonrefundable payment in return for an option to acquire a 33 1/3% interest
in Cello for the aggregate amount of $12,500,000, including the $2,500,000 initial payment.  The
option could be exercised at any time after the initial payment and before the expiration of 90
days after the first commercial production and sale of fuels meeting ASTM standards for fuel oil,
diesel fuel oil, and automotive engine fuel.  Cello accepted the offer and the parties executed a
Letter Agreement dated April 19, 2007 (the "Letter Agreement") and an Option Agreement of
the same date (the "Option Agreement") setting forth the terms and conditions.  True and correct
copies of the Letter Agreement and the Option Agreement are attached hereto and incorporated
by reference as Exhibits B and C, respectively.

13.     Cello and Boykin Trust agreed in the Letter Agreement and Option Agreement,
*inter alia*, as follows:

a.      To provide P&W with full and transparent disclosure of the entire
Technology pursuant to the Nondisclosure Agreement;

b.      That P&W would provide engineering and construction management
services for the Cello project at Bay Minette;

c.      That P&W would provide cellulosic material containing raw material from
trees and woody shrubs for the Cello project at Bay Minette.

d.      That upon the execution of the Option Agreement, P&W would have the
potential to become a minority owner of Cello and would immediately

5

have all of the rights of a minority owner as provided in the Option Agreement.

e.  Not to sell, pledge, or otherwise transfer any equity interest in Cello;

f.  Not to merge, consolidate, dissolve, subdivide, combine, reclassify or recapitalize Cello and/or any ownership interests in Cello without prior written approval of P&W;

g.  Not to sell or license most of Cello's assets without prior written approval of P&W; and

h.  Not to sell, license, assign or otherwise transfer all or any part of the Technology without the prior written approval of P&W.

14.  The overall purpose of the Nondisclosure Agreement, Letter Agreement, and Option Agreement (collectively referred to as "the P&W Agreements") is to provide P&W with an interest in Cello, the company that owns the Technology, and to protect that interest by, *inter alia*, keeping the Technology within Cello.

15.  At a September 19, 2007 meeting held in Claiborne, Alabama, that coincided with a Cello board meeting, Jack advised that he would be sending P&W a sample manufacturing agreement for its review, as well as a draft of a proposed operating agreement for Cello. Jack further indicated that the name of the company may need to be changed from FES to Cello because of an existing entity with the same or similar name. P&W suggested alternative names in response, to which Jack replied that he would consider P&W's suggestions. It was not until the October 10, 2007 Cello board meeting that P&W learned that each of these documents – the Manufacturing and Financing Contract ("MFC"), the Operating Agreement, and the Restated Articles of Organization, reflecting, among other things, a name change – had already been

executed, notwithstanding Jack's express statements to the contrary on September 19, 2007. The MFC was executed on September 12, 2007 (seven (7) days prior to Jack's misrepresentation, and the day before Biofuels was formed as a limited liability company); the Operating Agreement was executed on September 18, 2007 (one (1) day prior to Jack's misrepresentation); and the Restated Articles were executed on September 14, 2007, and filed in the probate court on September 17, 2007 (five (5) days and two (2) days prior to Jack's misrepresentation). True and correct copies of the MFC, the Operating Agreement and the Restated Articles of Organization are attached hereto and incorporated by reference as Exhibits D, E, and F, respectively. Each of these documents interferes and conflicts with the rights of P&W as set forth in the P&W Agreements.

16.     The MFC purports to provide financing and operational services for three plants, including the Bay Minette plant, to be constructed by Cello to manufacture cellulosic fuel. In reality, the MFC is a disguised transfer of equity, in which Biofuels would get exclusive use of the Cello Technology for 20 to 40 years[1] and 49% of the adjusted gross revenue from the sale of cellulosic fuel manufactured in the plants, in return for (a) a staged capital contribution of $12.5 million now and an additional $12.5 million (described by the MFC as "project fees") upon commencement of construction of second and third plants, and (b) performance of modest and inexpensive operational and maintenance responsibilities -- all in violation of the spirit and letter of Cello's obligations to P&W under the P&W Agreements. Cello has received Biofuels' $12.5 million initial contribution.

17.     Although Biofuels and Cello freely admit that they attempted to "draft around" Cello's agreements with P&W, the provisions of the MFC interfere and conflict with P&W's

---

[1] The 20 year MFC may be renewed for five additional years four times at Biofuels' option.

rights under the Nondisclosure Agreement, Letter Agreement, and Option Agreement. Specifically, the following provisions of the MFC are inconsistent with and violate the P&W Agreements, and P&W's rights thereunder:

| Applicable MFC Provisions | Violated Letter Agreement ("LA"), Option Agreement ("OA"), and Nondisclosure Agreement ("NDA") Provisions |
|---|---|
| **A.** § III(1) – "[Cello] will make available to Biofuels and to BioFuel's Operating Company affiliates all [Cello] Technology necessary and appropriate for the operation, and maintenance of the Plants constructed in accordance with this Contract. . . ." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . assignment or transfer of all or any part of the [Cello] Technology . . . ." <br><br> NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |
| **B.** § IV(1) – "[Cello] including its affiliates is responsible for the design, engineering, and construction activities in a Project . . . ." | LA ¶ 6 – "[P&W] agrees to provide engineering and construction services for the [Cello] project at Bay Minette, Alabama on a cost-plus basis . . . [P&W] agrees (1) to provide construction management for the entire [Cello] project at Bay Minette, Alabama (2) to provide engineering management and detailed engineering for the [Cello] project up to the input of the reactors and (3) to provide engineering management (with detailed engineering to be performed by others) for the reactor and subsequent portions of the [Cello] Project." |
| **C.** § IV(1)(E) – "[Cello] will site, permit, design, engineer and construct each Plant . . . . [Cello]' siting, permitting, design, engineering and construction of each Plant shall be performed in cooperation and coordination with Biofuels or its affiliates; provided, however, that the final decision on these matters shall be in the reasonable discretion of | LA ¶ 6 – "[P&W] agrees to provide engineering and construction services for the [Cello] project at Bay Minette, Alabama on a cost-plus basis . . . [P&W] agrees (1) to provide construction management for the entire [Cello] project at Bay Minette, Alabama (2) to provide engineering management and detailed engineering for the [Cello] project up to the |

| | |
|---|---|
| [Cello]." | input of the reactors and (3) to provide engineering management (with detailed engineering to be performed by others) for the reactor and subsequent portions of the [Cello] Project."<br><br>OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . major capital expenditures of the Company other than those proposed in the project plan; and related party transactions in excess of $100,000. . . ." |
| **D.** § IV(1)(F)(i)(a) – "[Cello] or its affiliates shall contribute capital (as equity) into a Project in the amount set forth in Exhibit B . . . ." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . major capital expenditures of [Cello] other than those proposed in the project plan; and related party transactions in excess of $100,000. . . ." |
| **E.** § IV(1)(F)(ii) – "each Operating Company [a wholly-owned subsidiary of Biofuels] may grant a security interest in its rights under an O&M Agreement to the Lender(s) . . . ." | OA ¶ 8 – "prior written approval of [P&W] shall be required for merger, consolidation, or dissolution; subdivision; combination or reclassification of shares; recapitalization; sale or licensing of most of the Company's assets; sale, licensing, assignment or other transfer of all or any part of the [Cello] Technology . . . ." |
| **F.** § IV(1)(F)(v) – "Except by mutual agreement of the parties, no financing for a Project may require a guarantee or endorsement of the Project Debt by [Cello], Biofuels, or any of each of their respective affiliates, or by the individual or corporate owners of [Cello] or Biofuels, that extends beyond the granting of a security interest in the physical assets of that Project or the O&M Agreement." | OA ¶ 8 – "prior written approval of [P&W] shall be required for merger, consolidation, or dissolution; subdivision; combination or reclassification of shares; recapitalization; sale or licensing of most of the Company's assets; sale, licensing, assignment or other transfer of all or any part of the [Cello] Technology . . . ." |
| **G.** § V(4) – "Pursuant to the O&M Agreement, Operating Company shall (i) purchase all Feedstock for the Project . . . ." | LA ¶ 7 – "[P&W] agrees to provide cellulose containing raw material from trees and woody shrubs for the [Cello] project at Bay Minette, Alabama on a cost plus 10% basis with no overhead charged. . . . [Cello] will source the balance of the needed raw materials directly." |

| | |
|---|---|
| **H.**  § V(5) – "Project Company [a wholly-owned subsidiary of [Cello]] shall provide Operating Company with all access that is reasonably necessary or appropriate for the performance of its rights and duties under the O&M Agreement including all operating instructions and training." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . assignment or transfer of all or any part of the [Cello] Technology . . . ." <br><br> NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |
| **I.**  § V(6) – "[Cello] shall provide Project Company and Operating Company with the [Cello] Technology and [Cello] Proprietary Information necessary or appropriate to allow Project Company and Operating Company to each perform its respective obligations under the O&M Agreement. . . . Operating Company shall use the [Cello] Proprietary Information solely for the purpose of operating and managing the Project . . . ." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . assignment or transfer of all or any part of the [Cello] Technology...." <br><br> NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |
| **J.**  § V(7) – "Operating Company shall have the right, acting in cooperation with and on behalf of the Project Company, during the course of an O&M Agreement, to install additions, improvements or modifications to a Project constructed and operated pursuant an [sic] O&M Agreement . . . ." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . major capital expenditures of the Company other than those proposed in the project plan; and related party transactions in excess of $100,000. . . ." |
| **K.**  § V(8) – "For the First Project (Bay Minette), Operating Company shall purchase all wood chips, saw dust, and bushy wood materials used as Feedstock from the Alabama River Pulp Company at a price that is equal to its actual cost plus ten percent (10%); provided, however, that if either Operating Company or Project Company reasonably determines that such price is not competitive with other sources, the parties shall cooperate | LA ¶ 7 – "[P&W] agrees to provide cellulose containing raw material from trees and woody shrubs for the [Cello] project at Bay Minette, Alabama on a cost plus 10% basis with no overhead charged. . . . [Cello] will source the balance of the needed raw materials directly." |

| | |
|---|---|
| in determining alternate market rate sources of Feedstock for the First Project." | |
| **L.** § VI(1) – "[Cello] represents that, as of the Effective Date, it owns or controls [Cello] Technology, including [Cello] Patent Rights and [Cello] Proprietary Information and has the unencumbered right to provide such [Cello] Technology for operation of the Plants contemplated in this Contract." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . assignment or transfer of all or any part of the [Cello] Technology . . . ." <br><br> NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |
| **M.** § VI(4) – "Each Project Company is responsible for the design, permitting, construction, and ownership of its respective Plant and associated Project . . . ." | LA ¶ 6 – "[P&W] agrees to provide engineering and construction services for the [Cello] project at Bay Minette, Alabama on a cost-plus basis . . . [P&W] agrees (1) to provide construction management for the entire [Cello] project at Bay Minette, Alabama (2) to provide engineering management and detailed engineering for the [Cello] project up to the input of the reactors and (3) to provide engineering management (with detailed engineering to be performed by others) for the reactor and subsequent portions of the [Cello] Project." |
| **N.** § VII(1) – "With respect to [Cello] Proprietary Information, Biofuels agrees: (a) to treat as confidential the [Cello] Proprietary Information that has or may hereafter be made available to it by [Cello], directly or indirectly; (b) to limit access to any [Cello] Proprietary Information received from [Cello], directly or indirectly . . . (c) not to disclose [Cello] Proprietary Information received from [Cello], directly or indirectly . . . (d) not to use [Cello] Proprietary Information received from [Cello] in any way other than for the purposes of this Contract." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . assignment or transfer of all or any part of the [Cello] Technology . . . ." <br><br> NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |

| | |
|---|---|
| **O.** § VII(3) – "[Cello] Proprietary Information may not be disclosed to other parties . . . without prior written consent of [Cello], which shall not be unreasonably conditioned, withheld or delayed, and if disclosed shall only be disclosed under suitable confidentiality agreements approved by [Cello]." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . assignment or transfer of all or any part of the [Cello] Technology . . . ."<br><br>NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |
| **P.** § IX(3) – "This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, any party may assign this Contract, and this Contract shall survive any transfer or change in the ownership of a Project; provided, however, that: . . . (c) any permitted assignment of this Contract by [Cello] to another party shall ensure, as a condition of such assignment, that the O&M rights of Biofuels under this Contract will be maintained . . . ." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . assignment or transfer of all or any part of the [Cello] Technology...."<br><br>NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |
| **Q.** § IX(11) – "This Contract is not to be construed as granting or implying a grant of any license or other rights under Intellectual Property Rights owned or controlled by a party except as, and to the extent, expressly granted herein." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . assignment or transfer of all or any part of the [Cello] Technology...."<br><br>NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |

18. The P&W Agreements confer certain rights on P&W in return for its initial investment of $2.5 million. Among other things, the Option Agreement vests P&W with the rights of a minority interest holder in Cello immediately upon execution of the Option

Agreement. These rights are memorialized in paragraph 8 of the Option Agreement. Accordingly, although P&W is not a "Member" of Cello, Cello may not act in a manner inconsistent with the P&W Agreements. Nevertheless, on September 18, 2007, without the knowledge or consent of P&W, Cello adopted the Operating Agreement of Cello Energy, LLC ("Operating Agreement"), which interferes and conflicts with, or has the potential to interfere or conflict with, P&W's rights under the P&W Agreements.

19.    Specific provisions of the Operating Agreement that conflict with the P&W Agreements include:

| **Applicable Operating Agreement Provisions** | **Violated Letter Agreement ("LA"), Option Agreement ("OA"), and Nondisclosure Agreement ("NDA") Provisions** |
|---|---|
| **A.** ¶ 8(b) – "The Board of Directors shall determine whether [Cello] requires additional capital in order to carry on its business. If the Board of Directors determines such additional capital is required, such additional capital shall be contributed by the Members pro rata and in proportion to their respective Percentage Interests in [Cello]." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . major capital expenditures of [Cello] other than those proposed in the project plan; and related party transactions in excess of $100,000. . . ." |
| **B.** ¶ 10 – "The Members agree and acknowledge that [Cello] owns certain confidential and proprietary information and trade secrets. The Members covenant and agree . . . (2) that members, managers, directors, employees, agents, and consultants of [Cello] shall not use said confidential and proprietary information and trade secrets except for the benefit of [Cello] . . . ." | NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |
| **C.** ¶ 12 – "All distributions of cash or other property shall be made to the Members in accordance with that Member's Percentage Interests." | OA ¶ 8 – "prior written approval of [P&W] shall be required for . . . sale, licensing, assignment or transfer of all or any part of the [Cello] Technology . . . ." <br><br> NDA ¶ 6 – "[Cello] agrees not to disclose to |

| | |
|---|---|
| | third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto." |
| **D.** ¶ 14 – "No Member shall transfer, assign, pledge, or otherwise dispose of or encumber all or any portion of its interest in [Cello] without the prior written consent of other Members holding a majority ownership interest." | OA ¶ 8 – "The Common Stock of the Company may not be sold, pledged, or otherwise transferred."<br><br>"[P]rior written approval of [P&W] shall be required for merger, consolidation, or dissolution; subdivision, combination or reclassification of shares; recapitalization; sale or licensing of most of [Cello]'s assets; sale, licensing, assignment or transfer of all or any part of the [Cello] Technology . . . ." |
| **E.** ¶ 15 – "An assignee of a Member's interest can become a Member only if the other Members holding a majority ownership interest consent. . . ." | OA ¶ 8 – "The Common Stock of the Company may not be sold, pledged, or otherwise transferred."<br><br>"[P]rior written approval of [P&W] shall be required for merger, consolidation, or dissolution; subdivision, combination or reclassification of shares; recapitalization; sale or licensing of most of [Cello]'s assets; sale, licensing, assignment or transfer of all or any part of the [Cello] Technology . . . ." |
| **F.** ¶ 17 – "Each Member may, upon reasonable request and at such Member's own expense, inspect and copy any Company records during the ordinary business hours of [Cello] . . . The Members agree that all requests to inspect records must be made to the custodian of records designated by the Chief Executive Officer, in his discretion." | LA ¶ 3 – "Simultaneously with payment of the $2.5 million consideration for the Option Agreement, [Cello] will provide total and full transparent disclosure of the entire [Cello] Technology to [P&W] pursuant to the nondisclosure agreement entered into by [Cello] on February 27, 2007." |
| **G.** ¶ 19 – "If an action proposed by the Managers cannot be implemented because unanimous consent of the Members cannot be obtained . . . and the Member represented by | OA ¶ 8 – "prior written approval of [P&W] shall be required for merger, consolidation, or dissolution . . . ." |

14

| | |
|---|---|
| the majority of the Board of Directors concludes that it is not reasonably practicable to carry on the business of [Cello] . . . that Member may bring an action for dissolution . . . . Before bringing the action for dissolution, the Member shall meet with the other Members . . .to attempt settlement of any underlying dispute between the Members." | |
| **H.**  ¶ 20(a)(1) – "In the event that [Cello] is dissolved . . . (a) . . . capital contributions will be returned in the order as follows: (1) All intellectual property . . . owned by [Cello] based, in whole or in part, on the intellectual property contributed to [Cello] by and on behalf of Boykin Trust, LLC, . . . shall, to the full extent allowed by law, . . . become the sole property of, Boykin Trust, LLC." | LA ¶ 4 – "Fundamental to the basis of this agreement is the joint and several warranty, undertaking, and representation of [Cello] and [Boykin Trust], that all the intellectual property in present existence or created in the future relating to the [Cello] Technology . . . has been permanently and irrevocably assigned by the inventors, and all necessary parties, to and is owned by Forest Energy Systems LLC, free and clear of all liens and claims of any nature, including, but not limited to, licenses or other assignments." |

20.     In addition to these expressly conflicting provisions, the provision of the Operating Agreement pertaining to the powers and duties of the Board of Directors undermines P&W's right under the Option Agreement "to select four (4) of the twelve (12) members of the Board of Directors" by relegating the Board of Directors' role to that of mere "policy pertaining to the governance of [Cello]." See Option Agreement ¶ 8; Operating Agreement ¶ 13(b)(3). By virtue of placing the governing authority of Cello in the hands of managers, Cello seeks to deprive P&W of its bargained-for right to have a role in the governance of the company. See Operating Agreement ¶ 13(a)(1) ("[M]embers of the Board of Directors who are not managers shall have no authority to manage, to act for, or to bind the Company.").

21.     On September 17, 2007, Cello also adopted, without notice to or input from P&W, Restated Articles of Amendment to Articles of Organization (the "Restated Articles"). At the time Cello (then FES) entered into the Option Agreement and received P&W's capital

contribution of $ 2.5 million, the Articles of Organization ("Articles") stated in pertinent part as follows:

## ARTICLE III

### *Purposes*

The purpose for which the Company is formed is to engage in any lawful act or activity for which limited liabilities companies may be organized pursuant to the Act.

\* \* \* \*

## ARTICLE VI

### *Admission of Additional Members*

Upon the *unanimous* written consent of the members, the Company may permit the admission of additional members and the terms and conditions of their admission shall be set forth in the Company's Operating Agreement.

Articles of Organization dated June 30, 2004 (emphasis added).

22.    On or about September 17, 2007, Cello purported to adopt the Restated Articles. The Restated Articles differ substantially from the original Articles and conflict with the P&W Agreements as follows:

| Applicable Restated Articles | Violated Letter Agreement ("LA"), Option Agreement ("OA"), and Nondisclosure Agreement ("NDA") Provisions |
| --- | --- |
| **A.** Article III – "The purpose of the Limited Liability Company to engage in any lawful act or activity for which limited liability companies may be organized under the act, including but not limited to . . . contracting with others for the production of synthetic fuels and operation of synthetic fuel plants . . ." | OA ¶ 8 – "prior written approval of [P&W] shall be required for merger, consolidation, or dissolution; subdivision; combination or reclassification of shares; recapitalization; sale or licensing of most of [Cello]'s assets; sale, licensing, assignment or transfer of all or any part of the [Cello] Technology . . . ."<br><br>NDA ¶ 6 – "[Cello] agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification |

| | of this Agreement signed by an authorized representative of each party hereto." |
|---|---|
| **B.**  Article VI – "The member or members of the Limited Liability Company can admit one or more additional members." | OA ¶ 8 – Additional Common Stock of the Company, except for the Shares issued through the exercise of this Option shall not be issued. "[P]rior written approval of [P&W] shall be required for merger, consolidation, or dissolution; subdivision, combination or reclassification of shares; recapitalization; sale or licensing of most of [Cello]'s assets; sale, licensing, assignment or transfer of all or any part of the [Cello] Technology . . . ." |
| **C.**    Article VIII – "The limited liability company is to be managed by one or more managers, who may be referred to by other designations as specified in an Operating Agreement.   An Operating Agreement can provide for the creation of classes or groups of members or managers having such relative rights, powers, and duties as may be created in the Operating Agreement." | OA ¶ 8 – "prior written approval of [P&W] shall be required for merger, consolidation, or dissolution; subdivision, combination or reclassification of shares; recapitalization; sale or licensing of most of [Cello]'s assets; sale, licensing, assignment or transfer of all or any part of the [Cello] Technology . . . ." |

23.    Moreover, Paragraph 6 of the Letter Agreement provides that P&W will "provide engineering and construction services for the [Cello] project at Bay Minette, Alabama" and that P&W will "provide construction management for the entire [Cello] project at Bay Minette, Alabama."  Nevertheless, on October 1, 2007, at a construction meeting for the Cello project at Bay Minette, Alabama, Jack stated that he had selected third-party engineers to perform the engineering duties for Cello and advised that P&W was to have no direct contact with the engineers that he had selected.  Simultaneously, Jack named Allen as the construction manager.  These acts would deprive P&W of the opportunity to perform its agreed upon duties under the Letter Agreement.

24.     The defendants' actions clearly interfere with P&W's rights under the P&W Agreements.   The defendants' actions are willful and intentional and have caused and will continue to cause P&W irreparable harm.

### Count One

25.     P&W realleges and incorporates by reference as if fully set forth herein the preceding paragraphs of the complaint.

26.     Unless the defendants' actions are enjoined, P&W will suffer irreparable harm for which there is no adequate remedy at law.  Specifically:

a.      Confidential and proprietary information regarding Cello's Technology which Cello and Boykin Trust agreed to keep confidential among Cello, Boykin Trust, and P&W will be disclosed by the Boykin defendants and used by Biofuels;

b.      The value of P&W's interest in Cello, the exclusive owner of the Technology, will be diminished in an amount that is not readily ascertainable because of the speculative nature of a start-up business using new technology;

c.      P&W's equity interest in and profits from Cello will be diluted by over 40%, the precise amounts of which are not readily ascertainable because of the speculative nature of a start-up business using new technology;

d.      P&W will be effectively squeezed out of the opportunity to work with Cello in the construction and operation of future plants and unable to contribute further its business and engineering expertise to build value for Cello;

e.      P&W will be deprived of its contractual rights to provide engineering and construction management services for the Bay Minette plant and, as a consequence, will lose

overhead coverage and the opportunity to develop expertise in the construction of cellulosic fuel manufacturing plants; and

f.   P&W will continue to have contractual responsibility for engineering and construction management services and the risks associated therewith without being allowed to perform the work necessary to assure safety and suitability for the purpose intended.

WHEREFORE, the premises considered, P&W respectfully requests of this Court as follows:

a.   To issue a preliminary injunction prohibiting the defendants from performing under the MFC, since such performance interferes with P&W's rights under the P&W Agreements;

b.   To issue a permanent injunction prohibiting the defendants from performing under the MFC, since such performance interferes with P&W's rights under the P&W Agreements;

c.   To issue a preliminary injunction prohibiting Cello from expending or committing to expend any moneys received from Biofuels pursuant to the MFC, so as to assure that such moneys are available to Biofuels in the event that this court determines that all or part of the MFC is null and void;

d.   To issue a preliminary injunction prohibiting Cello and Boykin Trust from breaching their obligations under the P&W Agreements;

e.   To issue a permanent injunction prohibiting Cello and Boykin Trust from breaching their obligations under the P&W Agreements;

f.   To issue a preliminary injunction prohibiting Biofuels from interfering with P&W's rights under the P&W Agreements; and

19

g.      To issue a permanent injunction prohibiting Biofuels from interfering with P&W's rights under the P&W Agreements.

h.      To issue a preliminary injunction prohibiting the defendants from performing under the Operating Agreement and Restated Articles, since such performance interferes with P&W's rights under the P&W Agreements;

i.      To issue a permanent injunction prohibiting the defendants from performing under the Operating Agreement and Restated Articles, since such performance interferes with P&W's rights under the P&W Agreements;

j.      To award costs and attorney's fees to P&W pursuant to the express terms of ¶ 10 of the Option Agreement; and

k.      To grant P&W such other, further, and different relief to which P&W is entitled.

### Count Two

27.     P&W realleges and incorporates by reference as if fully set forth herein the preceding paragraphs in this Complaint.

28.     There is a justiciable controversy between P&W and the defendants in that P&W contends that the MFC interferes with, conflicts with, and breaches the obligations of Cello and Boykin Trust to P&W under the P&W Agreements, and the defendants contend that it does not.

WHEREFORE, the premises considered, P&W requests this Court:

a.      To enter a judgment declaring as null and void the MFC and/or the provisions of the MFC that violate P&W's rights under the P&W Agreements;

b.      To enter a judgment declaring that Cello cannot perform its obligations under the MFC without breaching its obligations under the P&W Agreements;

c.  To award costs and attorneys' fees to P&W pursuant to the express terms of ¶ 10 of the Option Agreement; and

d.  To grant P&W such other, further, and different relief to which P&W is entitled.

### Count Three

29.  P&W realleges and incorporates by reference as if fully set forth herein the preceding paragraphs in this Complaint.

30.  There is a justiciable controversy between P&W and the defendants in that P&W contends that the Operating Agreement and Restated Articles interfere and conflict with, and breach the obligations of Cello and the Boykin Trust to P&W under the P&W Agreements, and Cello and the Boykin Trust contend that they do not.

WHEREFORE, the premises considered, P&W requests this Court:

a.  To enter a judgment declaring as null and void the Operating Agreement and/or the provisions of the Operating Agreement that violate P&W's rights under the P&W Agreements;

b.  To enter a judgment declaring as null and void the Restated Articles and/or the provisions of the Restated Articles that violate P&W's rights under the P&W Agreements;

c.  To award costs and attorneys' fees to P&W pursuant to the express terms of ¶ 10 of the Option Agreement; and

d.  To grant P&W such other, further, and different relief to which P&W is entitled.

Respectfully submitted this 16th day of October, 2007.

_____

One of the Attorneys for Plaintiff
Parsons & Whittemore Enterprises
Corporation

21

OF COUNSEL:

David R. Boyd  (Boydd0717)
W. Joseph McCorkle, Jr. (McCow3914)
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL 36101
334/834-6500
334/269-3115
dboyd@balch.com
jmccorkl@balch.com

Eric Getty  (GettJ2925)
Balch & Bingham LLP
Post Office Box 306
Birmingham, AL  35201
205/251-8100
205/226-8798 (fax)
egetty@balch.com

John N. Leach (LeacJ2634)
Helmsing, Leach, Herlong, Newman
  & Rouse, P.C.
P. O. Box 2767
Mobile, Alabama  36652
(251) 432-5521
(251) 432-0633 (fax)
jnl@helmsinglaw.com

# EXHIBIT   A

02-27-2007 15:55    JWBASSOCIATESLLC 12516262069

PAGE2

# NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement ("Agreement") is entered into and effective as of February 27, 2007, by and among:

**FOREST ENERGY SYSTEMS, LLC**, an Alabama limited liability company with its principal place of business at 30212 Co. Rd. 49, Loxley, Alabama, 36551 ("FES");

**BOYKIN TRUST, LLC**, an Alabama limited liability company wholly owned by members of the Boykin family ("BT");

**PARSONS & WHITTEMORE ENTERPRISES CORP.** a Delaware corporation, with offices located at 4 International Drive, Suite 300, Rye Brook, New York, 10573 ("P&W"); and

**ALABAMA RIVER PULP COMPANY, INC.**, an Alabama corporation, with offices off Highway 84/County Road 39, Claiborne, Alabama 36470 ("ARP").

## RECITALS

A.    ARP, a wholly-owned subsidiary of P&W, is a manufacturing and marketing organization responsible for the manufacturing and sale of cellulosic pulp used in the manufacture of paper products.

B.    P&W and ARP own and have the unencumbered right to disclose to FES certain proprietary and/or confidential information including any production plans and testing and analysis performed or paid for by P&W and/or its Affiliates.

C.    FES, a wholly-owned subsidiary of BT, intends to develop, own, and operate a synthetic fuel plant in Baldwin County, Alabama (the "Plant") at which site FES will produce liquid products ("Synthetic Fuels") that will be used as the fuel source for among other things engines, boilers, and heating systems.  The Plant and Synthetic Fuels together constitute the project (the "Project").

D.    FES is the owner of research and production technology developed over the span of 12 years.  The technology consists of chemical process procedures and a mechanical equipment system design, which together produce a specific blend of chemicals which may be used as a fuel source for diesel and gasoline type internal combustion engines and jet turbine type combustion engines.  This combination of chemical processes and mechanical processing system design will enable the Synthetic Fuels to be produced in a cost effective manner.  The chemical process and mechanical design is confidential and proprietary to FES (the "Process Information").

E.    ARP and FES have been discussing the Project pursuant to a Nondisclosure Agreement signed on February 12, 2007, between ARP and FES; and the companies would now like to

explore in further detail the technology and procedures by which the companies may cooperate with regard to the Project as well as the construction and operation of other Synthetic Fuels plants at other locations in the future.

F.      As used herein, "party", "receiving party" and "disclosing party" mean, respectively, each and every party hereto who may receive or disclose proprietary information hereunder, regardless of the use of the singular rather than the plural form "parties".  A "P&W Affiliate" means P&W and any other company in which P&W owns, directly or indirectly, at least fifty percent (50%) of the issued and outstanding voting securities.

THEREFORE, in consideration of the premises and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

## AGREEMENT

1.  As used herein, "FES Proprietary Information" means all business and technical information of any nature which has been, or is in the future, disclosed in writing or orally by FES, including:

      (a) pricing, schedules, suppliers, product plans, proposal information, product costs, and similar business data;

      (b) drawings, designs, specifications, "know-how", and similar technical data;

      (c) testing information, analysis reports; or analysis relating to the Synthetic Fuels or the process used to create the Synthetic Fuels;

      (d) testing information related to operation of the Synthetic Fuels Plant;

      (e) information disclosed under the prior NDA;

      (f) financing terms and conditions; and

      (g) patents and patent applications

which is clearly designated at the time of disclosure as proprietary or confidential by stamp or legend or, if disclosed orally or visually, followed by a memorandum describing the information provided within ten (10) days of such disclosure.

2.  As used herein, "P&W Proprietary Information" means all business and technical information of any nature which has been, or is in the future, disclosed including:

      (a) information disclosed by ARP to FES, under the prior NDA which is still in effect, and

      (b) P&W product plans, suppliers, schedules, costs, and similar business data;

which is clearly designated at the time of disclosure as proprietary or confidential by stamp or legend or, if disclosed orally or visually, followed by a memorandum describing the information provided within ten (10) days of such disclosure.

3.  Receiving party will use the disclosing party's Proprietary Information only for working with each other on evaluation of the Project (the "Purpose").  Neither party will disclose the other party's Proprietary Information to: (a) any third party, in whole or in part, by any means

whatsoever, without the express prior written consent of the disclosing party or (b) to any foreign national where such disclosure may constitute an export under the laws or regulations of the United States.

4. Receiving party will utilize the same degree of care to preserve and protect the disclosing party's Proprietary Information from disclosure that they use to protect their own Proprietary Information, which will not be less than reasonable care.

5. Proprietary Information protected under this Agreement shall not include information that (a) is or hereafter becomes available to the public through no fault or disclosure by the receiving party; (b) is known to the receiving party prior to disclosure or receipt from the disclosing party; (c) is disclosed with the prior written consent of the disclosing party; (d) is independently developed by the receiving party without reliance on the disclosing party's Proprietary Information; (e) is received by the receiving party from a third party reasonably believed by the receiving party to have a right to make such a disclosure; or (f) is disclosed pursuant to a valid order of the court or other governmental body.

6. In order to avoid any potential conflicts with any research and development activities being conducted by P&W and certain P&W Affiliates, FES agrees to provide only such information to P&W as is needed to evaluate the Project and the Synthetic Fuels production process and to determine:

    a) that such process will provide sufficient volume to meet the fueling requirements of the Plant as well as the designed capacity for sale of Synthetic Fuels;

    b) the costs associated with such process;

    c) the financial viability of the Project;

    d) the resolution of any environmental issues raised by the Project; and

    e) the detailed analysis of the array of potential products of the Project.

FES agrees that it has not to date shared with P&W or any P&W Affiliate the Process Information or any other FES Proprietary Information relating to the technical process for creating Synthetic Fuels. FES agrees not to disclose to third parties the Process Information or any other FES Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto.

7. Proprietary Information disclosed under this Agreement shall be and remain the property of the disclosing party. Any disclosure of Proprietary Information under this Agreement shall not constitute prior publication nor public use regarding patent eligibility.

8. Neither party is obligated to disclose Proprietary Information by reason of this Agreement. The parties believe in good faith that the Proprietary Information to be provided hereunder is accurate, and neither party, in making such disclosures, assumes liability for consequential damages if the receiving party uses or otherwise relies on this Proprietary Information.

9. Nothing herein shall be construed as a grant of a license or conveyance of any rights under any discoveries, inventions, patents, trade secrets, copyrights, industrial property rights or know-how belonging to any party hereto.

10. Nothing in this Agreement will be construed as forming a joint venture, partnership, teaming, leader-follower, or other collaborative business venture.

11. This Agreement shall be effective for a period of ten (10) years.  At the end of such period, upon the request of a disclosing party, the receiving party shall return or certify as destroyed, as directed, all Proprietary Information received hereunder and any copies thereof.

12. This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama, applicable to agreements among Alabama residents made and to be performed within such State.  Should any portion of this Agreement be held unenforceable or in conflict with the law of any applicable jurisdiction, the validity of the remaining provisions shall not be affected thereby.

13. Parties agree that this Agreement is also of a confidential nature and neither Party will discuss with any third party the nature of any negotiations between FES and P&W pursuant to this Agreement.

14. Notwithstanding the above, P&W and FES may disclose Proprietary Information to those of its Affiliates, officers, employees, agents, and representatives (all of the foregoing, with respect to any such person or entity, including such person's attorneys and accountants, collectively, the "Representatives") who (a) will have access to the Proprietary Information in the ordinary course of their duties, or (b) will have a need to receive, review, or use the Proprietary Information in connection with the evaluation of the Project.  Parties to this Agreement represent that all Affiliates will hold any Proprietary Information disclosed by a party in confidence pursuant to this Agreement.  The party wishing to disclose Proprietary Information to an unrelated representative such as a consultant or non-attorney advisor will notify the other party prior to any such disclosure and require such unrelated party to sign a confidentiality agreement.  Such representative will hold the Proprietary Information in confidence under terms at least as restrictive as those in this Agreement.

15.  This Agreement contains the entire agreement of the parties and supersedes all prior oral or written agreements regarding the subject matter hereof except for the Nondisclosure Agreement signed on February 12, 2007, between ARP and FES which is still in effect.  This Agreement may not be assigned, modified or transferred to a new party without the prior written consent of both parties, which consent may be withheld for any reason.  Prior written consent includes, at a minimum, a written instrument referring to this Agreement and signed by authorized representatives of each party.

4

IN WITNESS WHEREOF, the parties cause this Agreement to be executed by their duly authorized representatives below:

PARSONS & WHITTEMORE ENTERPRISES CORP.     FOREST ENERGY SYSTEMS, LLC.

By: _____            By: _____

Printed                                   Printed
Name:   George F. Landegger               Name:   Jack Boykin

Title:   Chairman                         Title:   Chief Executive Office

Date:    February 27, 2007                Date:   _____


ALABAMA RIVER PULP COMPANY, INC.          BOYKIN TRUST, LLC

By: _____            By: _____

Printed                                   Printed
Name:   George F. Landegger               Name: Jack Boykin

Title:   Chairman                         Title:  _____

Date:    February 27, 2007                Date:   _____

5

# EXHIBIT  B

04-20-2007 09:09   FORESTENERGYLLC   12516262069                                    PAGE2

# *Parsons & Whittemore* ENTERPRISES CORPORATION



4 INTERNATIONAL DRIVE · RYE BROOK, NEW YORK 10573

TELEPHONE (914) 937-9009
TELECOPIER (914) 937-2259

GEORGE F. LANDEGGER
CHAIRMAN

April 19, 2007

Dr. Jack W. Boykin
Director
Forest Energy Systems, LLC
P.O. Box 426
Montrose, AL 36559

Gentlemen:

This letter agreement confirms our mutual understanding of the business relationship among our companies going forward.

1.  The Boykin Family Trust (the "Trust") and its wholly owned subsidiary Forest Energy Systems LLC, an Alabama LLC ("FES") (the Trust and FES hereinafter referred to as "FES") in consideration of the payment set forth in the Option Agreement of even date herewith grant Parsons & Whittemore Enterprises Corp., any of its subsidiaries, affiliates and/or any entity the majority of which is owned or controlled by George F. Landegger (all of which hereinafter referred to as "Parsons & Whittemore") the opportunity to become partners [on the terms set forth herein] in current and future efforts by FES and any of its subsidiaries and affiliates to pursue the production of fuels from various raw materials including, but not limited to, tires, plastics, agricultural residues, cellulose-containing materials, etc., through methods referred to hereafter as the "FES Technology", including any derivatives or enhancements thereof.

2.  After fulfillment of the condition precedent in paragraph 4, in return for the payment of $2.5 million to FES, receipt of which is hereby acknowledged, for use in the project plan as presented to Parsons & Whittemore by FES for construction of a fuel oil production factory to be built in Bay Minette, Alabama, FES simultaneously grants to Parsons & Whittemore pursuant to the Option Agreement attached hereto, an Option Agreement to acquire 33.33% of the equity of FES. The complete terms and conditions of the Option Agreement are set forth in the attached Option Agreement. To the extent that the terms set forth herein conflict or are contrary to the terms and conditions set forth in the attached Option Agreement, the terms and conditions of the Option Agreement shall control. This Option Agreement will be valid for a period beginning upon execution and ending three (3) months after the refinery being engineered and built in Bay Minette, Alabama, is physically completed and has passed standard ASTM tests attached to the Option Agreement for the production of fuel oils, diesel fuel oils, and gasoline.

3.    Simultaneously with payment of the $2.5 million consideration for the Option Agreement, FES will provide total and full transparent disclosure of the entire FES Technology to Parsons & Whittemore pursuant to the nondisclosure agreement entered into by FES on February 27, 2007. Full disclosure includes, but is not limited to, detailed drawings and process descriptions, research reports and notes, trial and test results, pilot plant operating data and economic data, economic analysis, raw material and refined product market studies, third party product evaluations, and off take agreements.

4.    Fundamental to the basis of this agreement is the joint and several warranty, undertaking, and representation of FES and the Trust, that all the intellectual property in present existence or created in the future relating to the FES Technology for the production of fuels from various raw materials, including, but not limited to, tires, plastics, agricultural residues, and cellulose-containing materials, etc., has been permanently and irrevocably assigned by the inventors, and all necessary parties, to and is owned by Forest Energy Systems LLC, free and clear of all liens and claims of any nature, including, but not limited to, licenses or other assignments. Documentary evidence of such assignment and ownership by Forest Energy Systems LLC signed by an authorized representative of the owners of the technology and of the patent applicants including Mr. Jack W. Boykin in form satisfactory to Parsons & Whittemore is a condition precedent to the payment of the $2.5 million consideration for the Option Agreement.

5.    FES hereby undertakes to construct a renewable fuels production facility of approximately 20 million gallons per year production capacity at Bay Minette, AL (the "FES project"). FES undertakes to complete the FES project, start up, and produce fuels meeting the ASTM standards for fuel oils (D 396), diesel fuel oil (D 975), and automotive spark-ignition engine fuel (D 4814) [gasoline]. Mr. Jack W. Boykin agrees to remain Chairman and Chief Executive Officer of FES to assist in the Company's achievement of successful startup, its subsequent operations and the future expansion of FES. FES will seek to obtain and be the beneficiary of keyman insurance on Mr. Jack W. Boykin in the amount of $10 million.

6.    Parsons & Whittemore agrees to provide engineering and construction services for the FES project at Bay Minette, Alabama on a cost-plus basis. A set fee of 10% but no overhead will be added to detailed engineering for that part of the facility for which Parsons & Whittemore is responsible, equipment procurement and contractors' fees. Parsons & Whittemore personnel will be charged at salary plus fringes plus 100%. Parsons & Whittemore agrees (1) to provide construction management for the entire FES project at Bay Minette, Alabama (2) to provide engineering management and detailed engineering for the FES project up to the input of the reactors, and (3) to provide engineering management (with detailed engineering to be performed by others) for the reactor and subsequent portions of the FES Project. FES Management will have final authority on all decisions regarding the project.

7.    Parsons & Whittemore agrees to provide cellulose containing raw material from trees and woody shrubs for the FES project at Bay Minette, Alabama on a cost plus 10% basis with no overhead charged. The services of Parsons &

Whittemore personnel will be charged at salary plus fringes plus 100%. FES will source the balance of the needed raw materials directly.

8.   In addition, Parsons & Whittemore personnel will be available to review with FES management potential sites for building additional production facilities in the U.S. and worldwide based on the Bay Minette, Alabama model.

9.   The parties hereto represent and warrant that they have the authority to execute this letter agreement.

Very truly yours,

Parsons & Whittemore Enterprises Corp.

By: _____
     George F. Landegger, Chairman

Accepted and Agreed:

Forest Energy Systems, LLC

By: _____
     Jack W. Boykin, Chairman

Boykin Family Trust

By: _____
     Jack W. Boykin

# EXHIBIT  C

04-20-2007 09:10   FORESTENERGYLLC   12516262069                    PAGE5

# OPTION AGREEMENT

### As of April 19, 2007

### To Purchase Shares of Common Stock of Forest Energy Systems LLC, an Alabama LLC, (the "Company")

Number of Shares; Exercise Price; Term.   This certifies that, in consideration of the payment of $2,500,000, Parsons & Whittemore Enterprises Corp., a company owned or controlled by it, or a company the majority of which is owned by or controlled by George F. Landegger (collectively the "Option Holder") is entitled, upon the terms and subject to the conditions hereinafter set forth, at any time after the date hereof and at or prior to three (3) months after the first commercial production and sale of fuels meeting the ASTM standards as set forth on Exhibit A for fuel oil, diesel fuel oil, and automotive spark-ignition engine fuel, whichever is later (the "Expiration Time"), but not thereafter, to acquire from the Company certain newly issued fully paid and nonassessable shares (the "Shares") of voting common stock of the Company (the "Common Stock") at an exercise price of $10,000,000 (the "Exercise Price"). Such Exercise Price reflects the basic agreement to sell 33.33% of the equity of the Company to the Option Holder for an aggregate price of $12,500,000. Thus, if hypothetically the Company had 1,000 shares of voting Common Stock outstanding just prior to the exercise of this Option, then the Company would issue 500 new shares to the Option Holder upon exercise. So, as a result of the exercise of this Option, the Option Holder would then own one-third (1/3) of the total outstanding voting Common Stock of the Company after exercise. The $2,500,000 paid for this Option shall be credited as one part of such $12,500,000 aggregate price. Thus, at the time of exercising this Option, the Option Holder shall be obliged to pay $10,000,000. The $2,500,000 paid for this Option shall be applied by the Company to the construction costs of the facility that the Company hereby undertakes to build in Bay Minette, Alabama for the production of 20 million gallons per year of renewable fuels meeting the ASTM standards set forth on Exhibit A. Simultaneously with the payment of the $2.5 million price for this Option, the Company will provide total and full transparent disclosure of the entire FES Technology as defined hereafter to the Option Holder and/or its affiliates pursuant to the nondisclosure agreement entered into by the Company on February 27, 2007. Full disclosure includes, but is not limited to, detailed drawings and process descriptions, research reports and notes, trial and test results, pilot plant operating data and economic data, economic analysis, raw material and refined product market studies, third party product evaluations, and off take agreements. Fundamental to the basis of this Option is the joint and several warranty, undertaking, and representation of Forest Energy Systems, LLC and the Boykin Family Trust ("BT"), that all the

OAP&WAOption Agreement - FES - V5 - 04-17-07.doc

intellectual property relating to the technology for the production of fuels from various raw materials, including, but not limited to, tires, plastics, agricultural residues, cellulose-containing materials (the "FES Technology") has been assigned to and is owned by Forest Energy Systems, LLC, free and clear of all liens and claims of any nature, including, but not limited to, license or other assignment. This undertaking endures beyond the termination of this Option. Documentary evidence of such assignment and ownership in form satisfactory to the Option Holder is a condition precedent to the payment of the $2,500,000 consideration for this Option.

1. The number of Shares and type of security are subject to adjustment as provided herein, and all references to "Shares" shall be deemed to include any such adjustment or series of adjustments.

2. Cash Exercise. The purchase rights represented by this Option are exercisable by the Option Holder or its successors and assigns at any time prior to the Expiration Time, by the surrender of this Option duly completed and executed on behalf of the Option Holder, at the office of the Company in Montrose, Alabama (or such other office or agency of the Company as it may designate by notice in writing to the Option Holder at the address of the Option Holder appearing on the books of the Company), and upon payment of the Exercise Price for the Shares thereby purchased (by cash, certified or cashier's check, or wire transfer payable to the order of the Company, at the time of exercise in an amount equal to the purchase price of the Shares thereby purchased). Thereupon, the Option Holder as the holder of this Option shall be entitled to receive from the Company a stock certificate in proper form representing the number of Shares so purchased.

3. Issuance of Shares. Certificates for Shares purchased hereunder shall be delivered to the Option Holder within a reasonable time after the date on which this Option shall have been exercised in accordance with the terms hereof. All Shares that may be issued upon the exercise of this Option shall, upon such exercise, be duly and validly authorized and issued, fully paid and nonassessable. The Company agrees that the Shares so issued shall be and shall for all purposes be deemed to have been issued to the Option Holder as the record owner of such Shares as of the close of business on the date on which this Option shall have been exercised or converted in accordance with the terms hereof.

4. No Fractional Shares or Scrip. No fractional Shares or scrip representing fractional Shares shall be issued upon the exercise of this Option.

5. No Voting Rights as Shareholders. This Option does not entitle the Option Holder as a holder hereof to any voting rights as a shareholder of the Company prior to the exercise hereof.

6. Loss, Theft, Destruction or Mutilation of Option. Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Option, and in the case of loss, theft or destruction, of indemnity or

04-20-2007 09:10    FORESTENERGYLLC    12516262069                                    PAGE7

security reasonably satisfactory to it, and upon reimbursement to the Company of all reasonable expenses incidental thereto, and upon surrender and cancellation of this Option, if mutilated, the Company will make and deliver a new Option of like tenor and dated as of such cancellation and re-issuance, in lieu of this Option.

7.  Saturdays, Sundays, Holidays, etc. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday or a Sunday or shall be a legal holiday, then such action may be taken or such right may be exercised on the next succeeding day not a Saturday or a Sunday or a legal holiday.

8.  Protective Covenants. Upon the signing of this Option, the Option Holder will have the potential to become a minority shareholder of the Company. It is mutually understood that a minority shareholder is inherently in a vulnerable position. Thus it is agreed by the Company, BT and their Boards of Directors that upon the signing of this Option, that certain customary minority shareholder protections will become effective and the Option Holder shall immediately have all the rights of the Minority Shareholder (the "Minority Shareholder") as used in this paragraph. Specifically, the Common Stock of the Company may not be sold, pledged, or otherwise transferred. Additional Common Stock of the Company, except for the Shares issued through the exercise of this Option shall not be issued. Common Stock of the Company shall not be redeemed. Furthermore, prior written approval of the Minority Shareholder shall be required for merger, consolidation, or dissolution; subdivision, combination or reclassification of shares; recapitalization; sale or licensing of most of the Company's assets; sale, licensing, assignment or other transfer of all or any part of the FES Technology; bankruptcy filing, pension creation, contribution to individual pensions in excess of 5% of the individual's annual salary, bonus payments in excess of 25% of the individual's annual salary, substantial compensation increases, loans to shareholders or employees, major capital expenditures of the Company other than those proposed in the project plan; and related party transactions in excess of $100,000. In addition, the Minority Shareholder shall be entitled to select four (4) of the twelve (12) members of the Board of Directors of the Company. This requirement for Minority Shareholder approval shall endure after the exercise of this Option as if made a part of the articles and by-laws of the Company, which shall not be amended without Minority Shareholder approval. The Company, BT and their Boards of Directors agree to reflect these Minority Shareholder protections in an Operating Agreement for FES promptly upon the exercise of this Option.

9.  Governing Law. This Option shall be binding upon any successors or assigns of the Company. This Option shall constitute a contract under the laws of Alabama and for all purposes shall be construed in accordance with and governed by the laws of said State, without giving effect to the conflict of laws principles of Alabama.

10. **Attorneys' Fees.** In any litigation, arbitration or court proceeding between the Company and the Option Holder, the prevailing party shall be entitled to reasonable attorneys' fees and expenses incurred in enforcing this Option.

11. **Amendments.** This Option may be amended and the observance of any term of this Option may be waived only with the written consent of the Company and the Option Holder.

12. **Notice.** All notices hereunder shall be in writing and shall be effective (a) on the day on which delivered if delivered personally or transmitted by telex or telegram or telecopier with evidence of receipt, (b) one business day after the date on which the same is delivered to a nationally recognized overnight courier service with evidence of receipt, or (c) five business days after the date on which the same is deposited, postage prepaid, in the U.S. mail, sent by certified or registered mail, return receipt requested, and addressed to the party to be notified at the address indicated below for the Company, or at the address for the Option Holder as the holder set forth in the registry maintained by the Company or at such other address and/or telecopy or telex number and/or to the attention of such other person as the Company or the Option Holder may designate by ten-day advance written notice.

13. **Entire Agreement.** This Option contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous arrangements or undertakings with respect thereto.

14. **Transfer.** This Option and the rights granted hereby are transferable by the Option Holder or any successors or assigns.

    **IN WITNESS WHEREOF,** the Company has caused this Option to be executed by its duly authorized officer.

Forest Energy Systems, LLC

By: _____
      Jack W. Boykin, Chairman

Boykin Family Trust

By: _____
      Jack W. Boykin

Parsons & Whittemore Enterprises Corp.

By: _____
      George F. Landegger, Chairman

4

# EXHIBIT A

ASTM D 4814, Standard Specification for Automotive Spark-Ignition Engine Fuel [gasoline]

ASTM D 975, Standard Specification for Diesel Fuel Oils

ASTM D 396, Standard Specification for Fuel Oils

# EXHIBIT  D

# Manufacturing and Financing Contract

This Manufacturing and Financing Contract ("Contract") for the financing and operation of plants for the manufacture of synthetic fuels is made and entered into this ___ day of September, 2007, (the "Effective Date") by and between Forest Energy Systems, LLC ("FES") and BioFuels Operating Company, LLC ("BioFuels").

## I.    The Parties

1.    FES is a limited liability company organized and existing under the laws of the State of Alabama.

2.    FES or its affiliates desire to have constructed and to have operated Plants for production of Synthetic Fuels using FES Technology.

3.    BioFuels is a limited liability company organized and existing under the laws of the State of Alabama.

4.    BioFuels or its affiliates have access to financial resources adequate to carry out the terms provisions and requirements of this Contract, including making commercially reasonable efforts to arrange financing for construction of Plants using the FES Technology pursuant to the terms of this Contract.

## II.    Definitions

For the purposes of this Contract, the following terms have the following meanings:

"Feedstock" means raw materials, chemicals and other materials, which are used as feed in a Plant, including but not limited to tires, plastics, agricultural products and residues, and cellulose-containing materials.

"FES Patent Rights" means past, present and future patents and patent applications in any country, which patents and patent applications are owned or controlled by FES, in which the claims of such patents or patent applications cover subject matter within the FES Technology.

"FES Proprietary Information" means information and know-how developed or acquired by, or for the benefit of, FES relating to FES Technology, which will be made available to BioFuels, its affiliates, or a third party in connection with this Contract or the O&M Agreement, which is subject to Intellectual Property Rights owned, controlled, or acquired by FES.

"FES Technology" means technology developed or acquired by FES for the production of Synthetic Fuel by conversion of a Feedstock. FES Technology includes FES Proprietary Information and FES Patent Rights made available in accordance with this Contract. FES Technology also shall include any improvements or modifications that may be developed, acquired, realized or implemented hereafter, pursuant to this Contract.

"Gross Revenue" means payments and other compensation received from sale or other disposition of Output from a Plant.

"Intellectual Property Rights" means patents, patent applications, copyrights (whether registered or unregistered), trade secrets, know-how, and other intellectual property rights (other than trademarks and similar rights), whether protected, created, or arising under the laws of the United States or any other jurisdiction, including, but not limited to, any of the foregoing with respect to inventions, discoveries, methods, processes, compositions, or writings.

"O&M Agreement" means an Operating and Maintenance Agreement entered into between the parties or their respective affiliates in accordance with this Contract.

"Output" means Synthetic Fuel, metallic and non-metallic by-products, electric power, and any other product produced or generated in connection with the operation of a Plant, each of which is capable of use or sale, together with renewable energy certificates, green energy certificates, emission credits, emission offsets, and the like received in connection with a Project.

"Plant" means any facility engineered, constructed, or operated based on or using the FES Technology for the production of Synthetic Fuels, by-products, or electric power.

-2-

"Project" means the construction and operation of a Plant in accordance with this Contract, together with financing, engineering, permitting, and other associated activities.

"Project Debt" means debt incurred by FES or its affiliates through Lenders arranged by BioFuels or its affiliates to provide adequate funds to engineer, obtain governmental permits, construct, start-up, and initially operate a Project before sufficient Gross Revenue is expected to be generated to fund continued operation of the Project.

"Synthetic Fuel" means primarily hydrocarbon-based materials, which may contain oxygenated hydrocarbons, useful as fuel, which are derived from sources other than by direct conversion of crude petroleum or natural gas.

### III.    Use of FES Technology

1.      FES will make available to BioFuels and to BioFuel's Operating Company affiliates all FES Technology necessary and appropriate for the operation, and maintenance of the Plants constructed in accordance with this Contract and each O&M Agreement; provided, however, that FES Technology and FES Proprietary Information shall at all times remain sole property of FES during and after the term of the Contract and each O&M Agreement.

2.      Any additional Intellectual Property Rights, which are created or developed during the course of performance of this Contract or an O&M Agreement and which relate to the FES Technology is and shall become the sole property of FES.  All inventions and discoveries made by BioFuels or an Operating Company, or by any of their respective officers, employees or agents, in connection with activities undertaken pursuant to this Contract or an O&M Agreement shall be promptly and fully made known to FES. BioFuels agrees to assign or cause to be assigned, and hereby assigns, all Intellectual Property Rights to such inventions and discoveries to FES, and agrees that any such officers, employees or agents will execute any necessary documentation, including but not limited to assignments, consents, affidavits, applications for Letters Patent in the United States of America and countries foreign thereto, and any papers that may be needed to perfect ownership of such Intellectual Property by FES.  BioFuels agrees to create, and at all times maintain, contractual obligations and adequate procedures with its affiliates (including each Operating Company), and its and their

-3-

respective officers, agents and employees that will enable BioFuels to carry out the terms of this paragraph. For the avoidance of doubt, the parties acknowledge and agree that affiliates of BioFuels are or may be involved in the design, engineering, construction, financing, operation or management of biofuels production facilities using third-party technology, that any Intellectual Property Rights that are developed or becomes known to any such affiliate in connection with those activities shall not be subject to the provisions of this paragraph, and that prior to using any knowledge, processes, or products subject to such Intellectual Property Rights in connection with its performance under this Contract or an O&M Agreement BioFuels will (a) disclose the existence of any such Intellectual Property Rights to FES, and (b) use such Intellectual Property Rights only pursuant to a license or other form of appropriate agreement.

3.     All literary, artistic or other material (including but not limited to reports, computer programs, manuals, or photographs) created by BioFuels or its affiliates and their respective officers, employees, and agents solely in connection with performance of the Contract or an O&M Agreement are deemed works made for hire and shall belong exclusively to FES, with FES having the right to obtain and hold in its own name such copyrights. To the extent that any of said literary, artistic or other material may not, by operation of law, be works made for hire, BioFuels shall, upon a request by FES, assign to FES ownership of copyright in such material.

### IV.   The Projects

1.     The parties agree that pursuant to this Contract a minimum of three (3) Plants will be designed, engineered, constructed, operated, and maintained. Each Plant will constitute a separate Project. The parties acknowledge that FES including its affiliates is responsible for the design, engineering, and construction activities in a Project and BioFuels including its respective affiliates is responsible for financing, operation, and maintenance activities in each Project.

A.  BioFuels agrees to pay to FES a project fee of $25 million to be used for the design, engineering, permitting, financing and construction of the first three Projects (the "Project Development Fee"). The Project Development Fee shall be paid in three installments. The first installment, in the amount of $12.5 million, shall be paid in full as of the Effective Date of this Contract, and shall be used by FES or its affiliates solely for the

-4-

design, engineering, permitting, and construction of the first Project. The second installment in the amount of $6.25 million shall be paid in full at such time as FES commences the design and engineering for the second Project, and shall be used by FES or its affiliates solely as equity in connection with the financing of the second Project. The third installment in the amount of $6.25 million shall be paid in full at such time as FES commences the design and engineering for the third Project, and shall be used by FES or its affiliates solely as equity in connection with the financing of the third Project.

B.      The first Project shall be constructed in accordance with the standards set forth in Exhibit A. All subsequent Projects pursued under this Contract shall be constructed in accordance with the standards set forth in Exhibit A, unless the parties specifically agree otherwise. The parties acknowledge and agree that the first, second, and third Projects are process demonstration plants, and that adjustments and/or modifications to the existing and subsequent Plants may be required to meet the requirements set forth in Exhibit A (which may be modified by mutual agreement of the parties). Thereafter, the parties agree that the commencement of design for the fourth and any subsequent Project (each such Project, an "Additional Project") shall occur only when the parties confirm that all prior Projects meet or exceed the standards set forth in Exhibit A ( the "Acceptance Criteria"), unless otherwise mutually agreed.

C.      In consideration of its payment of the Project Development Fee, BioFuels shall have the right, pursuant to the terms of this Contract and each O&M Agreement, to operate, maintain and manage any Plants that are designed, constructed or operated within twenty (20) years of the Effective Date of this Contract (such right, the "O&M Right"), subject to Par. IX.4. of this Contract.

D.      Upon expiration of the O&M Right, the parties agree to evaluate and seek to reach an agreement in good faith as to whether this Contract should be amended with respect to the construction and operation of any future Plants.

E.      FES will site, permit, design, engineer and construct each Plant, using and incorporating FES Technology and FES Proprietary Information in accordance with the standards set forth in Exhibit A. The first Plant shall be constructed on a 20 acre site owned by FES in Bay Minette, Alabama.

-5-

FES' siting, permitting, design, engineering and construction of each Plant shall be performed in cooperation and coordination with BioFuels or its affiliates; provided, however, that the final decision on these matters shall be in the reasonable discretion of FES.

F.   (i) Without liability on the part of FES, and as further specified in the O&M Agreement, BioFuels or its affiliates shall use commercially reasonable efforts to arrange, directly, through an affiliate, or otherwise through other non-affiliated third party lenders (collectively, "Lenders,"), and make available to FES any and all financing necessary for the acquisition of equipment and the construction, testing, and start-up of operations of each Project. In connection with such financing, (a) FES or its affiliates shall contribute capital (as equity) into a Project in the amount set forth in Exhibit B (the "Project Company Capital"), and (b) BioFuels or its affiliates shall endeavor to obtain from Lenders traditional Project Debt financing, in the amount and at the interest rate range set forth in Exhibit B.

(ii) In order to arrange such financing, each Operating Company (as such term is defined below) may grant a security interest in its rights under an O&M Agreement to the Lender(s), as further specified in the O&M Agreement. In the event that the Lender(s) exercise its rights pursuant to any security agreement granting such security interest, the Lender(s) shall be entitled to exercise only such rights as are granted to the Operating Company pursuant to the O&M Agreement, which rights shall not include any rights in the FES Technology, FES Proprietary Information, or FES Patent Rights. Payment of the Project Debt shall eliminate any interest of the Lender(s) in the Project.

(iii) The loans for a particular Project may be secured by the physical assets of that Project, but there shall be no cross-collateralization of Projects. FES agrees that the Lender(s) may have a security interest in the specific Project for which Project Debt is obtained, and agrees that this security interest may consist of typical mortgages and security interests on the entire Project; provided, however, that the security interest shall not include any right or interest in the FES Technology, FES Proprietary Information, or FES Patent Rights.

(iv)  FES agrees to execute all documents required to carry out the purpose and intent of this Contract that may be requested by the

-6-

Lender(s), to the extent such documents are consistent with such purpose and intent.

(v) Except by mutual agreement of the parties, no financing for a Project may require a guarantee or endorsement of the Project Debt by FES, BioFuels, or any of each of their respective affiliates, or by the individual or corporate owners of FES or BioFuels, that extends beyond the granting of a security interest in the physical assets of that Project or the O&M Agreement.

(vi) The documentation of any security interest in any Project assets and contract rights shall include the right (but without obligation) of FES to pay off the Project Debt and receive a full cancellation and release of any security interest and/or assignment of contract rights.

## V.    Operating and Management Agreement

1.    FES may for each Project form a different single purpose entity ("Project Company") in the form of a limited liability company in the State in which a specific Project is located. Each Project Company will be a wholly-owned subsidiary of FES. If FES does not form such a single purpose entity for a Project, FES will be considered the Project Company for such Project.

2.    Project Company shall own each Plant and all assets that are part of each Project, shall own or lease the property on which the Plant located, and shall insure and pay all applicable taxes imposed by any local and state authority on the the property and the physical assets of such Plant.

3.    BioFuels shall for each Project form a different single purpose entity ("Operating Company") in the form of a limited liability company in the State in which the specific Project is located. Each Operating Company shall be a wholly-owned subsidiary of BioFuels.

4.    Project Company and Operating Company shall enter into a separate O&M Agreement for each Project, identical in form and content as contained in Exhibit C hereto, except as may be modified to reflect any Project-specific terms or provisions set forth in this Contract. Project Company and Operating Company shall at all times be considered to be independent contracting parties, and nothing in this Contract or any O&M

-7-

Agreement shall be deemed to create a partnership or joint venture between Project Company and Operating Company, or any of their affiliates. Pursuant to the O&M Agreement, Operating Company shall (i) purchase all Feedstock for the Project, and (ii) operate, maintain, and manage the Project in accordance with recognized industry standards and governmental laws and regulations for efficiency, safety and environmental protection.

5.    Operating Company shall, upon substantial completion of each Plant (the date of which shall be confirmed in writing between Project Company and Operating Company), operate and manage the Plant on behalf of and for the benefit of Project Company. In connection with the above, Project Company shall provide Operating Company with all access that is reasonably necessary or appropriate for the performance of its rights and duties under the O&M Agreement including all operating instructions and training.

6.    FES shall provide Project Company and Operating Company with the FES Technology and FES Proprietary Information necessary or appropriate to allow Project Company and Operating Company to each perform its respective obligations under the O&M Agreement. This Contract and the O&M Agreement do not in any way assign, license or grant any rights to Project Company or Operating Company in the FES Technology or the FES Proprietary Information. Operating Company shall use the FES Proprietary Information solely for the purpose of operating and managing the Project, shall endeavor by all reasonable means to protect and maintain the FES Patent Rights and FES Proprietary Information, and shall not represent or state to anyone that it has acquired any interest in the FES Patent Rights, FES Proprietary Information, or FES Technology by virtue of the O&M Agreement.

7.    Operating Company shall have the right, acting in cooperation with and on behalf of Project Company, during the course of an O&M Agreement, to install additions, improvements or modifications to a Project constructed and operated pursuant an O&M Agreement, in order to:

A.    decrease the costs of operating, and/or maintaining the Project; and/or

B.    increase the safety, reliability, output, efficiency, and profitability of the Project.

-8-

The parties shall reasonably cooperate with each other with respect the financing, design and construction of any such additions, improvements, or modifications; provided, however, that Project Company shall have ultimate right to approve or disapprove any such addition, improvement or modification which would either increase the amount of the Project Debt or require an appropriation from the Gross Revenue earned by the Project, provided further, however, that such approval may not be unreasonably conditioned, withheld or delayed.

8.      Operating Company or its affiliates shall contract for and procure all Feedstock, and electric power and other utilities, necessary for the operation of each Project.  For the First Project (Bay Minette), Operating Company shall purchase all wood chips, saw dust, and brushy wood materials used as Feedstock from the Alabama River Pulp Company at a price that is equal to its actual cost plus ten percent (10%); provided, however, that if either Operating Company or Project Company reasonably determines that such price is not competitive with other sources, the parties shall cooperate in determining alternate market rate sources of Feedstock for the First Project.

9.      Project Company will handle the sale of all of the Output of a Project constructed pursuant to an O&M Agreement, with the cooperation and assistance of the respective Operating Company.  The parties agree that both the quantity of and price charged for any Output that is sold from any Plant constructed pursuant to this Contract shall be determined by the applicable Project Company based on then-existing market conditions in cooperation and coordination with the applicable Operating Company with respect to production scheduling.  Project Company and Operating Company will seek in good faith to sell the Output from a Plant to qualified parties in a manner that reasonably maximizes the Gross Revenue received in connection with the Project.

10.    For accounting purposes, each Project shall be operated as a separate profit center.  Discrete accounting records will be maintained for each Project.  The proceeds of all sales of all Output shall be paid to Project Company (except to the extent otherwise required by any Lender), and placed into a clearing account for the Project generating the sales.  Project Company shall maintain books and records for the operation of the Project with the full cooperation and assistance of the Operating Company.  All sales of Output will require full payment of the invoiced amount within

-9-

forty-five (45) days, without any discount for early payment, and will be limited to buyers with adequate financial status to meet the required payment terms. Project Company shall pay out from the clearing account any and all revenue received from the sale of the Output of a specific Plant each month in the following order:

    A.    payment of utility and Feedstock expenses incurred in connection with the operation of the Project;

    B.    payment of principal and interest on any Project Debt for the Project.

    C.    payment to Project Company of 51% of any Gross Revenue remaining after payment of the expenses listed in V.10.A and B herein, to be its sole property; and

    D.    payment to Operating Company of the remaining 49% of any Gross Revenue remaining after payment of the amounts described in V.10. A and B herein as an O&M Fee.

11.    Operating Company shall pay from the O&M Fee all normal operating expenses (including normal maintenance expenses) of the Project from the O&M Fee, with the exception of utility and Feedstock expenses (which shall be paid in accordance with V.10.A above), and capital or maintenance upgrades to the Project (which shall be paid for by Project Company and may incur additional Project Debt). Operating Company shall maintain books and records, including but not limited to accounting records, with regard to the payment of any operating expenses for each Project, and shall maintain discrete accounting records pertaining to each Project. The parties shall freely and openly share all accounting data pertaining to each Project. All such records and books of account must be retained for at least three (3) years.

12.    At the request of a party to the O&M Agreement, the other party shall permit a mutually agreeable independent accountant selected by the requesting party (mutual agreement not to be withheld unreasonably) upon reasonable prior notice, to examine at reasonable intervals and during the regular business hours all records and books of account of the audited party relating to the O&M Agreement and the applicable Project. The requesting party is responsible for the expenses of the selected accountant. The right of

-10-

each party to audit the books and records of the other party shall be limited to the clearing account and books and records pertaining to the Project.

13.     It is the intent of the parties that any Federal or State tax credits or deductions generated, and any rebate or incentive payments made by any Federal or State agency, in connection with the ownership, construction or operation of, and manufacturing and sale of Output from any Project shall be treated as Gross Revenue for such Project. Any Federal or State grants, loans or loan guarantees issued in connection with the Project shall inure to the benefit of the Project. Any such grant shall be applied to Gross Revenue for such Project; and any such loan or loan guarantees shall be applied to Project Debt. The parties agree that to the extent necessary or desirable, the provisions of this paragraph shall be implemented on a three-year "look-back basis" (through a reconciliation process performed on an annual or other basis) by a qualified accountant that is mutually selected and paid for by the parties.

## VI.    Representations, Liabilities, Responsibilities, and Insurance

1.     FES represents that, as of the Effective Date, it owns or controls FES Technology, including FES Patent Rights and FES Proprietary Information and has the unencumbered right to provide such FES Technology for operation of the Plants contemplated by this Contract. FES represents that, as of the Effective Date, it has no knowledge of a claim made by a third party with respect to Intellectual Property Rights owned or controlled by a third party, which affects use of FES Technology for the production of Output as contemplated under this Contract.

2.     BioFuels represents that BioFuels or its affiliates have or can acquire the knowledge and technical skills required for the operation of the Plants contemplated by this Contract. BioFuels further represents that BioFuels has at least twenty-five million dollars (US$25,000,000) in available capital to be used for the purposes of this Contract.

4.     Each Project Company is responsible for the design, permitting, construction, and ownership of its respective Plant and associated Project, and shall maintain or cause to be maintained sufficient comprehensive general liability, builder's risk, automobile, and workers compensation insurance to cover any loss, damage, claim, injury or other casualty of

-11-

whatsoever kind or by whomsoever caused (irrespective of negligence or fault, whether sole, concurrent, active, passive, comparative, strict, contractual or vicarious) with respect to such design, permitting, construction and ownership of the Project. Such insurance shall cover all claims (including defense of such claims and attorney's fees and expenses) made against Operating Company or its affiliates, or any of its respective officers, directors, employees, or agents, and to their respective successors and assigns, with respect to such Plant.

5.      Each Operating Company is responsible for the operation and maintenance of its respective Plant, and agrees to maintain or cause to be maintained sufficient comprehensive general liability, operator's, automobile, and workers compensation insurance to cover any loss, damage, claim, injury or other casualty of whatsoever kind or by whomsoever caused (irrespective of negligence or fault, whether sole, concurrent, active, passive, comparative, strict, contractual or vicarious) with respect to such operation or maintenance of each Project. Such insurance shall cover all claims (including defense of such claims and attorney's fees and expenses) made against Project Company or its affiliates, or any of its respective officers, directors, employees, or agents, and to their respective successors and assigns, with respect to such Plant.

6.      Each party to an O&M Agreement agrees to provide evidence of required insurance coverage to the other party, and (to the extent permitted by law) to name the other party as an 'additional insured" on each such insurance policy obtained by the party.

## VII.  Confidentiality

1.      With respect to the FES Proprietary Information, BioFuels agrees:

    (a)      to treat as confidential the FES Proprietary Information that has or may hereafter be made available to it by FES, directly or indirectly;

    (b)      to limit access to any FES Proprietary Information received from FES, directly or indirectly, to only those of its employees, officers, and directors, or to those employees, officers, and directors of each respective Operating Company, who

-12-

reasonably require such FES Proprietary Information for the purpose of this Contract, and who are obligated to maintain such FES Proprietary Information as confidential in the manner and to the extent provided hereunder;

(c)   not to disclose FES Proprietary Information received from FES, directly or indirectly, to any third party without the express, prior written authorization of FES; and

(d)   not to use FES Proprietary Information received from FES in any way other than for the purposes of this Contract.

2.   Nothing contained in this Contract in any way restricts or impairs a party's right to use, disclose, or otherwise deal with any information that:

(a)   at the time of disclosure is available to the public or thereafter becomes generally available to the public by any means through no act of the party receiving the disclosure;

(b)   was in its possession prior to the time of the disclosure hereunder; or

(c)   was independently made available to it as a matter of lawful right by a third party who does not have a restriction on use or disclosure.

3.   FES Proprietary Information may not be disclosed to other parties, including actual or prospective Lenders, contractors, vendors, and consultants without the prior written consent of FES, which shall not be unreasonably conditioned, withheld or delayed, and if disclosed shall only be disclosed under suitable confidentiality agreements approved by FES.

4.   The obligations of this Article continue in full force and effect notwithstanding the expiration or termination of this Contract.

### VIII. Addresses and Notices

The addresses of the parties are as follows:

FES:

Forest Energy Systems, LLC.
P.O. Box 426
Montrose, Alabama 36559

-13-

Attn:  Allen W. Boykin, President
Telephone: 251-626-7470
Facsimile:  251-626-2069

BioFuels:

BioFuels Operating Company, LLC
3000 Sand Hill Road
Building Three, Suite 170
Menlo Park, California 94025
Attn: Doug Cameron, President
Telephone: (650) 376-8511
Facsimile: (650) 376-8561

Notices required or permitted to be given or submitted under this Contract must be in writing and sent by express courier (e.g., Federal Express, DHL, US Postal Express Mail) with signature receipt requested to the party entitled to receive the notice or statement at its above address or at such other address as may most recently have been notified by such party to the other party.  Such notices alternatively may be given or made by facsimile at the addressee's most recently-notified facsimile number with a confirmation copy sent by express courier to the other party.  Notices are deemed given on the date that they are actually received by the recipient as confirmed by a signature receipt, confirmation facsimile, return e-mail, or similar authenticable evidence.

## IX.   Term, Assignment, Termination and Severability

1.      The term of this Contract commences upon the Effective Date, and unless extended or otherwise terminated in accordance with this Contract, continues in full force for twenty (20) years from the Effective Date.

2.      If a party is in material breach of this Contract, the non-breaching party may give written notice to the other specifying the particulars of such breach.  If the breaching party has not rectified such breach within sixty (60) days after such notice, the non-breaching party may terminate this Contract by giving written notice thereof to the other party.

3.      This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, any party may assign this Contract, and this Contract shall survive any transfer or change in the ownership of a Project; provided, however, that

-14-

(a)   neither party may assign this Contract without the prior written consent of the other party, which consent shall not be unreasonably conditioned, withheld or delayed;

(b)   BioFuels shall provide FES with a ninety (90) day right-of-first offer in connection with any proposal by BioFuels to sell, assign, or transfer its interest in this Contract to an unrelated third party;

(c)   any permitted assignment of this Contract by FES to another party shall ensure, as a condition of such assignment, that the O&M Rights of BioFuels under this Contract will be maintained at no additional cost to BioFuels under terms and conditions no less favorable to BioFuels as those contained in this Contract and the then-existing O&M Agreements; and

(d)   any purported assignment of this Contract, except as permitted herein, is null and void.

4.   The parties acknowledge that Forest Energy has entered into a Letter of Understanding and Option Agreement (collectively, the "P&W Option"), both dated as of April 19, 2007, that provide certain rights to Parsons & Whittemore Enterprises Corp. ("P&W"). It is the intent of both parties that neither this Contract nor the O&M Agreement interfere with or otherwise conflict with the rights granted to P&W under the P&W Option. In the event that it is determined that there is such a conflict, then the P&W Option shall govern, and the parties to this Contract will renegotiate the term, provision, agreement or condition that is in conflict so as to achieve as nearly as possible the purpose and intent of this Contract.

5.   In connection with the execution of each O&M Agreement, FES and BioFuels agree that BioFuels, upon and after its formation, shall indemnify Project Company, FES, the Boykin Family Trust, its shareholders, Allen W. Boykin, and Jack W. Boykin (collectively, the "Indemnitees") from any claim by P&W alleging that the execution of the O&M Agreement constitutes a breach of the P&W Option, as further set forth in Exhibit D attached hereto (the "Indemnity").

6.   In the event that any provision contained in this Contract or the O&M Agreement is held to be invalid, illegal or unenforceable in any respect, such illegality or unenforceability shall not affect any other provision of this Contract or the O&M Agreement, which thereafter shall be construed as if such invalid, illegal or unenforceable provision had never been contained

-15-

herein; provided, however, that in lieu of such term, clause or provision that is held to be invalid, illegal or unenforceable, the parties shall add by mutual agreement as a part of this Contract or the O&M Agreement a term, clause or provision as similar in terms to such illegal, invalid or unenforceable term, clause or provision as may be possible, valid, legal and enforceable and to the extent the remaining provisions satisfy the purpose and intent of this Contract.

7.    This Contract shall be governed by and construed in accordance with the laws of the State of Alabama, excluding any choice of law rules which may direct the application of the laws of another jurisdiction. All judicial actions taken with respect to this Contract or any rights or obligations under this Contract must be brought in a State Court located in Baldwin County, Alabama, or in Federal Court located in Mobile, Alabama.

8.    If a dispute arises out of or in connection with this Contract between FES and BioFuels, such parties agree to attempt in good faith to resolve such dispute by negotiations between executives who have authority to settle the dispute in question within thirty (30) days after a notice of the dispute given by one party to the other party. Within sixty (60) days after the notice of the dispute and upon mutual agreement of FES and BioFuels, the parties may endeavor to settle the dispute by mediation administered by a mutually-agreed third party before initiating any other proceeding. Except as may be required by law, neither a party nor a mediator may disclose the existence, content, or results of any mediation hereunder without the prior written consent of both parties.

9.    This Contract may be executed in one or more counterparts, each of which will be deemed an original. Delivery of all pages of this Contract by facsimile transmission shall be effective as delivery of a manually executed counterpart.

10.    This Contract and the O&M Agreement contain the entire understanding of the parties hereto with respect to the development of Projects, and supersedes all prior understandings and proposals, whether written or oral, between the parties with respect to the Project.

11.    This Contract is not to be construed as granting or implying a grant of any license or other rights under Intellectual Property Rights owned or controlled by a party except as, and to the extent, expressly granted herein

-16-

12.    This Contract may be amended or modified only by a written instrument, of equal formality signed by the duly authorized representatives of the respective parties.

13.    The headings used herein to identify Articles, Paragraphs, Exhibits and Attachments are used solely for the convenience of the parties and are not intended to be used in the construction or interpretation of the provisions of this Contract.

14.    If a party to this Contract agrees to waive any breach of any provision of this Contract by another party, such waiver does not excuse at any time other breaches of the same provision or breaches of any other provisions of this Contract.

15.    BioFuels and FES at all times are independent contracting parties. None of the parties to this Contract is or will be a partner, joint venturer, agent or representative of any other party under this Contract or the O&M Agreement.  None of the parties to this Contract nor their respective affiliates have a right, power or authority to enter into any contract or incur any obligation, debt or liability on behalf of the other party or its respective affiliates, without the specific, written approval of such other party.

16.    This Contract has been made solely for the benefit of, and is binding on, the parties and their respective successors and assigns.

-17-

IN WITNESS WHEREOF, the parties have caused this Contract to be duly executed in their respective names by their duly authorized representatives as of the date and year first written above.

BioFuels Operating Company, LLC

By: _____
_____, President

Forest Energy Systems, LLC
By: _____
Allen W. Boykin, President
09/12/07

-18-

# EXHIBIT A

It is the objective of the process and the Project to produce fuels which qualify as either Gasoline, #2 Diesel, or Standard Fuel Oil. The Projects shall produce fuels, electricity or other products from various raw materials including, but not limited to, tires, plastics, agricultural products and residues, and cellulose-containing materials.

The first Project shall be located at Bay Minette, AL, and shall be capable of producing approximately 20 million gallons of fuels per year.

The second Project and the third Project each shall be capable of producing at least 40 million gallons of fuels per year.

If a Project conforms to the standards, criteria and benchmarks set forth in the correspondence from FES to BioFuels or its affiliates, then that Project will have achieved the Acceptance Criteria.

-19-

## EXHIBIT B
## ADDITIONAL COMMERCIAL TERMS

### A.   Initial Project Development and Financing Terms

1.   Project cost is estimated at $12.5M.

2.   Project Development Fee shall be the amount of $12.5M.

3.   FES Capital (comprised of the Project Development Fee) shall be the amount of $12.5M.

4.   Project Debt shall be in an amount to be mutually determined, with an interest rate in a commercially reasonable range, based on market conditions.

### B.   Construction of Additional Projects

1.   Second Project

    a.   Project cost is estimated at $25M.

    b.   Project Development Fee shall be the amount of $6.25M.

    c.   Project Capital (comprised of the Project Development Fee) shall be in an amount of $6.25M.

    d.   Project Debt shall be in an amount necessary to finance the construction of the Project, on terms to be mutually determined and with an interest rate in a commercially reasonable range, based on market conditions.

2.   Third Project

    a.   Project cost is estimated at $25M.

    b.   Project Development Fee shall be the amount of $6.25M.

    c.   Project Capital (comprised of the Project Development Fee) shall be the amount of $6.25M.

-20-

     d.    Project Debt shall be in an amount necessary to finance the construction of the Project, on terms to be mutually determined and with an interest rate in a commercially reasonable range, based on market conditions.

    3.    <u>All Additional Projects after the Third Project</u>

     a.    Estimated Project cost will be mutually determined.

     b.    Project Debt shall be in an amount necessary to finance the construction of the Project, on terms to be mutually determined and with an interest rate in a commercially reasonable range.

     c.    Any required Project equity shall be comprised of a Project Development Fee (to be paid by BioFuels to FES, and used by FES as Project Capital) and FES Capital (to be paid by Forest Energy independent of any Project Development Fee), each of which shall be in an amount that is mutually determined; provided, however, that with respect to the sum of such respective amounts, the Project Development Fee shall comprise 49% and the FES Capital shall comprise 51% of such sum. The Parties agree to use commercially reasonable efforts to minimize the amount of Project equity that is required in connection with the development of any Additional Project, with the initial expectation that no more than 20% of the total cost of the Project shall be comprised of equity.

-21-

## EXHIBIT C

## FORM OF O&M AGREEMENT

1.    Each Project shall be governed by a separate O&M Agreement, the sole parties to which shall be the specific Project Company and Operating Company.

2.    Each O&M Agreement shall be identical in form and content to the Contract, except as follows.

    a.    The provisions of the O&M Agreement shall be modified only to the extent necessary to reflect the specifics of and parties to each individual Project, and shall also include the following provisions.

        i.    Force Majeure.  As used in this Agreement, an "Event of Force Majeure" shall mean any act or event that prevents the affected Party from performing its obligations (other than the payment of money) under this Agreement or complying with any conditions required to be complied with under this Agreement if such act or event is beyond the reasonable control of, and does not arise out of the negligent act or omission of, the affected Party and such Party has been unable by the exercise of due diligence to overcome or mitigate the effects of such act or event.  If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of an Event of Force Majeure, that Party shall be excused from whatever performance is affected by the Event of Force Majeure to the extent so affected; provided, however, that: (a) the non-performing Party gives the other Party prompt written notice (but in any event no later than seven (7) days after the occurrence) describing the particulars of the occurrence; (b) the suspension of performance is of no greater scope and of no longer duration than is reasonably required by the Event of Force Majeure; and (c) the non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party, and to continue to perform its obligations hereunder and to correct or cure the event or condition excusing performance.

        ii.    Limitation of Liability.  Notwithstanding anything to the contrary contained in this Agreement, neither Operating Company nor Project Company shall be liable, whether in contract, in tort, or otherwise, for any special, punitive, exemplary, indirect, incidental or consequential damages whatsoever, including but not limited to, loss of profits, business

-22-

interruptions and claims of customers or other third parties, for any reason whatsoever.

     b.    The provisions of the following Paragraphs and Exhibits in the Contract shall be modified or deleted as appropriate.

     i.    Paragraph IV.1 – references to multiple Projects, the Project Development Fee, and the O&M Right.

     ii.    Paragraph V.1 and .3 – references to formation of Project Company and Operating Company.

     iii.    Paragraph VI.1 – FES' representations in the contract will be binding on the Project Company, and Project Company shall also represent that FES has made available to Project Company all FES Technology necessary or appropriate for the design, engineering, permitting, construction, operation, maintenance and management of the Project.

     iv.    Paragraph VI.2 – Operating Company will represent that it has or can acquire the knowledge and technical skills required for the operation of the Project, and has adequate funds which can be used for the purposes of the O&M Agreement.

     v.    Paragraph IX.1 – the term of the O&M Agreement shall commence on and as of its effective date and shall expire on the last day of the calendar month in which the twentieth (20th) anniversary of the commercial operation of the Project occurs.  Operating Company shall have the right to renew the O&M Agreement for four (4) five-year renewal terms each such option to be exercisable upon one (1) year's prior written notice to Project Company.

     vi.    Paragraph IX.5 – this Paragraph shall be omitted.

     vii.    Paragraph IX.7—the O&M Agreement shall be governed by the law of the State in which the Project is located.

     viii.    Exhibit A – this Exhibit will only provide details for the specific Project.

     ix.    Exhibit B – this Exhibit will only provide details for the specific Project.

-23-

x.    Exhibit C -- this Exhibit will be omitted.

xi.    Exhibit D -- this Exhibit will be omitted.

USIDOCS 6355597v1

# EXHIBIT D

## INDEMNITY

1.    BioFuels, upon and after its formation, shall indemnify, defend and hold harmless FES, the Boykin Family Trust, its shareholders, and Allen W. Boykin, and Jack W. Boykin (collectively, the "Indemnitees") from and against any and all liability, claims, damage, loss, or expense (including reasonable attorneys' fees) resulting from any claim by Parsons & Whittemore Enterprises Corp. ("P&W") alleging that the execution of the O&M Agreement constitutes a breach of the Option Agreement (a "Claim").

2.    The Indemnitees shall provide the BioFuels with written notice of any Claim by Parsons within ten (10) days of its receipt thereof.

3.    BioFuels shall control the defense and settlement of any Claim, using the qualified counsel of its choice.

4.    Indemnitees shall, at their sole cost and expense, provide reasonable assistance to BioFuels in connection with the defense of any Claim.

5.    Indemnitees shall have the right, at its sole cost and expense, to retain separate counsel to monitor BioFuels's defense of any Claim.

6.    BioFuels shall have the right to settle any Claim without the prior approval of Indemnitees, unless such settlement would materially prejudice or adversely impact Indemnities, in which case Operating Company must obtain the prior approval of the Indemnitees (which approval shall not be unreasonably conditioned, withheld or delayed).

-25-

# EXHIBIT  E

# Operating Agreement
## *of*
## Cello Energy, LLC

THIS OPERATING AGREEMENT (the "Operating Agreement") is made as of September 18, 2007, by Boykin Trust, LLC, as sole Member of Cello Energy, LLC (the "Company"). This Operating Agreement constitutes a written agreement of the Members governing the affairs of the Company and the conduct of its business, under the Alabama Limited Liability Company Act § 2(k), ALA. CODE § 10-2-2(k). This Operating Agreement supersedes any and all previous operating agreements.

**The securities offered hereby, if any, have not been registered under the Securities Act of 1933, as amended (the "Federal Securities Act"), the Alabama Securities Act of 1990, as amended, or the securities laws of any state, and are being offered and sold in reliance on exemptions from the registration requirements of the Federal Securities Act and various applicable state laws. In addition, the transfer of the securities is subject to the restrictions on transfer and other terms and conditions set forth in this Operating Agreement. These securities may not be offered for sale, pledged, hypothecated, sold, assigned, or transferred except in compliance with the terms and conditions of this Operating Agreement. Further, these securities may not be offered for sale, pledged, hypothecated, sold, assigned, or transferred unless such transfer is under circumstances which, in the opinion of legal counsel acceptable to the Company, do not require that the securities be registered under the federal act or any applicable state securities laws, or such transfer is pursuant to an effective registration statement under the federal act or any applicable state securities laws.**

WHEREAS, the Member operates a limited liability company organized and existing under the Alabama Limited Liability Company Act , ALA. CODE § 10-12-1 to -57 (the "Act"); and

WHEREAS, the Member desires to set forth the rights, duties, and responsibilities of Members with respect to such limited liability company; and

WHEREAS, the Member desires to provide for the capacity to add one or more new Members and to set forth their respective rights, duties, and responsibilities with respect to that limited liability company.

NOW, THEREFORE, for and in consideration of the mutual promises, obligations, and agreements contained in this Operating Agreement, and other good and valuable consideration, the

Cello Energy, LLC                                                      Operating Agreement

receipt and sufficiency of which are hereby acknowledged by the Member, the Member, intending to be and being legally bound, does hereby agree as follows:

**1. Name of Company.** The name of the Company is Cello Energy, LLC. The Company is organized and exists under the laws of the state of Alabama, and has previously operated as Forest Energy Systems, LLC, and before that as Freeport Industries, LLC.

**2. Principal Office, Registered Office, and Registered Agent.** As of the effective date of this Operating Agreement the mailing address of the Company is P.O. Box 39, Daphne, AL 36526; the Company's registered agent at that address is Allen W. Boykin; and the Company's registered office is 9056 Merritt Lane, Daphne, AL 36526. The registered agent and the registered office may be changed from time to time by the Members.

**3. Names and Addresses of the Members.** The sole Member of the Company, and its name and address, is:

• BOYKIN TRUST, LLC, 714 East St., Moulton, AL 35650.

**4. Term.** The term of the Company commenced upon the filing of Articles of Organization with the probate judge of the county in which the Company's initial registered office is located. The term is perpetual, until dissolved under one of the provisions of this section of this Operating Agreement or by operation of law:

The Company shall be dissolved upon the occurrence of one or more of the events described in the Alabama Limited Liability Company Act § 37, ALA. CODE § 10-12-37 (1999) that require dissolution. No events shall require dissolution of the Company other than those events specified in the statute except as provided in Paragraphs 19 and 20 of this Operating Agreement.

**5. Continuation.** Upon the occurrence of any event which would dissolve the Company pursuant to the Act, the Company can avoid dissolution if, within 120 days, either (1) the Board of Directors votes to continue the business of the Company or (2) the remaining Members elect to continue the business of the Company.

**6. Purpose.** The purpose of the Company shall be

(i) to develop and explore alternative energy sources; to develop, own and operate one or more synthetic fuel plants; to produce synthetic fuels for use as a fuel source for among other things engines, boilers, and heating systems; to develop and promote the use of synthetic fuels; to build, operate, and maintain factories, refineries, and processing plants; to accumulate capital for the operation and expansion of the business; to buy materials and to sell fuels produced; to import and export raw materials and fuels produced; to obtain all necessary regulatory approvals; to engage in business anywhere in the world; to perform all acts reasonably attendant upon and necessary to effect these purposes; and

(ii) to do any other lawful act permitted of the Company under the Act.

Cello Energy, LLC                                                    Operating Agreement

### 7. Membership Interests.

*(a) Percentage Interests.*  A Member is a person or entity holding an interest in the Company.  A Member's interest in the Company is evidenced by a certificate of limited.liability company interest issued by the Company.  The certificate of limited liability company interest can be designated a share or shares for purposes of indicating that Member's Percentage Interest.  As of the effective date of this Operating Agreement, the percentage interest of Boykin Trust, LLC, is 100 percent.

*(b) Option Agreement.*  As of the date of this Operating Agreement, the Company is entirely owned by its sole Member, Boykin Trust, LLC, a limited liability company organized and existing under the laws of the state of Alabama.  The Company and its Member have entered into an agreement with Parsons & Whittemore Enterprises Corp., as reflected in the Letter Agreement and Option Agreement attached hereto as Exhibit A.  Pursuant to the terms of that agreement Parsons & Whittemore Enterprises Corp. acquired an option to purchase 33.33% of the equity of the Company.  If and when Parsons & Whittemore Enterprises Corp. exercises the option reflected in that Letter Agreement and Option Agreement, the percentage interest of the Members of the Company shall be as specified in that Letter Agreement and Option Agreement, and shall be reflected by issuance of certificates of limited liability company interest of 500 shares to Parsons & Whittemore Enterprises Corp. and 1000 shares to Boykin Trust, LLC.  The Company acknowledges, ratifies, and affirms the provisions of that Letter Agreement and Option Agreement, including protective covenants and provisions regarding the management and operation of the Company.  To the extent, and only to the extent, that any terms, conditions, or provisions of the Letter Agreement and Option Agreement are inconsistent with this Operating Agreement, the terms, conditions, and provisions of the Letter Agreement and Option Agreement take precedence and govern the operation of the Company.  If at any time Parsons & Whittemore Enterprises Corp. has not exercised and no longer has the right to exercise the option as provided in the Letter Agreement and Option Agreement attached hereto as Exhibit A, then this paragraph (the sole paragraph under item 7(b)) will be void and have no effect as to the operations of the Company.

### 8. Contributions of Capital.

*(a) Accounting for Capital.*  The Company shall maintain or cause to be maintained adequate books and records, kept in accordance with Generally Accepted Accounting Principles, to document the capital contributions of Members to the extent required by federal, state, or local tax laws and regulations.

*(b) Additional Capital.*  The Board of Directors shall determine whether the Company requires additional capital in order to carry on its business. If the Board of Directors determines such additional capital is required, such additional capital shall be contributed by the Members pro rata and in proportion to their respective Percentage Interests in the Company.  The Members shall have no obligation to contribute or lend any capital whatsoever except as expressly provided in this Subsection 8(b).

*(c) No Third Party Beneficiaries.*  The obligation of the Members to contribute capital is solely for the benefit of the other Members and the Company, and no third party shall have the right to enforce such obligation.

**(d) *Capital Accounts.*** Separate capital accounts shall be maintained for each Member. Such capital accounts shall be maintained in accordance with applicable Internal Revenue Service Regulations.

**(e) *Interest on and Return of Capital Contributions.*** No Member shall be entitled to interest on, or to a return of, its capital contributions, except as specifically provided herein.

**9. Intellectual Property.** Contributions to the Company by and on behalf of Boykin Trust, LLC, as a Member include intellectual property including patents and related know-how, trade secrets, and confidential and proprietary information. Members acknowledge the sufficiency of the contribution of Boykin Trust, LLC, to support its ownership interest in the Company.

**10. Confidentiality.** The Members agree and acknowledge that the Company owns certain confidential and proprietary information and trade secrets. The Members covenant and agree (1) that the Company and its Members shall take reasonable measures to protect the confidentiality of such confidential and proprietary information and trade secrets, (2) that Members, managers, directors, employees, agents, and consultants of the Company shall not use said confidential and proprietary information and trade secrets except for the benefit of the Company, (3) that ownership of said confidential and proprietary information and trade secrets shall be as provided in this Operating Agreement, (4) that if the Company is dissolved then the ownership of said confidential and proprietary information and trade secrets shall be as provided for in this Operating Agreement as regards the dissolution of the Company, and (5) that if the Company is dissolved the former Members, managers, directors, employees, agents, and consultants of the Company shall not use said confidential and proprietary information and trade secrets except to the extent they acquire the right to use such confidential and proprietary information and trade secrets upon dissolution. Such confidential and proprietary information and trade secrets shall not include information that becomes generally known to those outside of the Company through no fault of persons subject to this or any other obligation of confidentiality to the Company.

**11. Allocations of Profits and Losses.** All allocations of profits and losses for tax purposes shall be made to the Members in accordance with that Member's Percentage Interest.

**12. Distributions to Members.** All distributions of cash or other property shall be made to the Members in accordance with that Member's Percentage Interests. Distributions shall be made only when approved by the Board of Directors. No Member has the right to demand or receive a distribution in any form other than cash. No distribution shall be made if prohibited by the solvency tests of the Alabama Limited Liability Company Act § 29, ALA. CODE § 10-12-29 (1999).

The Company may need to accumulate substantial capital for continued growth, expansion, and development of new technologies and markets. The Board of Directors and managers and officers of the Company shall have the authority to take steps necessary to accumulate earnings for continued capital expansion and to take steps necessary to address any tax consequences of accumulating earnings.

Cello Energy, LLC                                                    Operating Agreement

### 13. Management.

#### (a) Members.

(1) *Management by Managers.*  The Company shall be managed by Managers (including the officers authorized by this Operating Agreement and such other managers as the Managers designated herein, in their discretion may from time to time create).  Members of the Company and members of the Board of Directors who are not managers shall have no authority to manage, to act for, or to bind the Company.

(2) *Meetings of and Notice to Members.*  A meeting of Members can be called by the Board of Directors, or by members who are owners of a majority percentage interest in the Company.  The person or persons calling the meeting may in their discretion set the time and place for such meetings.  Each Member shall be sent notice ten (10) days in advance of meetings, which notice may be waived by the Member.

(3) *Actions Requiring Member Approval.*  To the full extent permitted by the Act, any action requiring approval of the Members may be approved by a vote of a majority of the percentage interest in the Company.

#### (b)  Board of Directors.

(1) *Qualifications.*  A director shall be a natural person of the age of at least nineteen (19) years.  A director need not be a resident of the state of Alabama and need not be a Member of the Company.

(2) *General Standards for Directors.*  A director shall discharge his or her duties as a director: (i) in good faith; (ii) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (iii) in a manner the director believes to be in the best interests of the Company.  In discharging his or her duties, a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by: (i) one or more Managers or employees of the Company whom the director reasonably believes to be reliable and competent in the matters; or (ii) legal counsel, public accountants, or other persons as to matters the director reasonably believes are within the person's professional or expert competence.  A director is not acting in good faith if he or she has knowledge concerning the matter in question that makes otherwise permissible reliance unwarranted.  A director is not liable for any action taken as a director, or any failure to take any action, if the director performed the duties of his or her office in compliance with this paragraph.

(3) *Powers and Duties.*  No individual director shall have any authority as a director to act for or on behalf of the Company, except that a director who also holds a position as a Manager or employee may act in that director's capacity as a Manager or employee.  The Board of Directors shall deal with matters of policy pertaining to the governance of the Company.  The Business of the Company shall be conducted by the managers of the Company under the general supervision of the Board.

(4) *Composition of the Board and Selection of Directors.*  The Board of Directors shall consist of not less than three (3) nor more than twelve (12) persons selected by the Members.  Each Member shall annually appoint a number of directors proportionate to that Member's Percentage Interest.  A Member appointing more than one director may indicate the respective seniority or ranking of the directors that said Member appoints.  Members may re-appoint the same director or directors to successive terms and directors may succeed themselves on the

Cello Energy, LLC                                           Operating Agreement

Board of Directors.  Directors shall serve for one fiscal year or until their replacement is appointed.  Each Member may at any time replace any director it has appointed or appoint a new director to replace a director it had previously appointed.  The appointment of the director shall be effective when communicated by the Member in writing to the Board of Directors or to the Chief Executive Officer or to any person designated by the Board of Directors to receive written communication of the appointment of directors.

If and when Parsons & Whittemore Enterprises Corp. exercises the option reflected in the Letter Agreement and Option Agreement attached hereto as Exhibit A, then there shall be twelve (12) directors and Boykin Trust, LLC, shall have the right then to designate and appoint eight (8) directors and the Parsons & Whittemore Enterprises Corp. shall have the right to then designate and appoint four (4) directors

*(5) Chairman.*  The Board of Directors shall select a chairman to preside over meetings and may designate a secretary to prepare minutes.  Unless and until a successor is elected, Mr. Jack Boykin is hereby designated and will serve as Chairman of the Board of Directors and Chief Executive Officer.

If and when Parsons & Whittemore Enterprises Corp. exercises the option reflected in the Letter Agreement and Option Agreement attached hereto as Exhibit A, then Mr. Jack Boykin will continue to serve as Chairman of the Board of Directors and Chief Executive Officer as provided and to the extent required in paragraph 5 of the said Letter Agreement.

*(6) Regular Meetings.*  The Board of Directors shall meet at least quarterly.  Directors may attend meetings in person or by telephone or other electronic means.  The Board of Directors may in its discretion select a time and place for regular meetings or may at any meeting set the time and place for the next meeting.  Regular meetings of the Board of Directors may be held either within or without the State of Alabama.  No notice shall be required of regular meetings of the Board of Directors.

*(7) Special Meetings and Notice.*  The Chairman of the Board or a majority of the directors may call a special meeting of the Board of Directors.  Notice of any special meeting shall be given at least three (3) days in advance of such meeting .  Notice of any special meeting of the Board of Directors may be waived either before or after the time stated in such notice.  A waiver of notice in writing signed by the Director entitled to such notice shall be equivalent to the giving of such notice.

*(8) Voting.*  Each director shall have one vote.  All directors attending a meeting (whether in person or by telephone or by other electronic means) can vote.  Directors not in attendance may vote by proxy given to another director appointed by the same Member.  If at any meeting not all of the directors appointed by a Member are in attendance, and if that Member has designated respective seniority and/or ranking of its appointed directors, the senior-most, highest-ranking director appointed by that Member shall be permitted to vote by proxy for other directors appointed by that Member and not in attendance and who have not given an express proxy to another director appointed by that Member.

*(9) Quorum.*  A majority of the directors shall constitute a quorum.  Directors present in person or participating by telephone or by other electronic means or represented by proxy shall be counted for purposes of determining a quorum.

Cello Energy, LLC                                    Operating Agreement

*(10) Action Without Meeting.*  Action required or permitted to be taken at a Board of Directors' meeting may be taken without a meeting if the action is taken by all members of the board.  The action must be evidenced by one or more written consents describing the action taken, signed by each director, and included in the minutes or filed with the Company records reflecting the action taken.  Action taken under this paragraph (the sole paragraph of item 13(b)(10) is effective when the last director signs the consent, unless the consent specifies a different effective date.

*(c) Officers and Managers.*

*(1) Chief Executive Officer.*  The Board of Directors shall appoint a Chief Executive Officer ("CEO") to manage the day to day operations of the Company.  Mr. Jack Boykin shall serve as Chief Executive Officer until such time as the Board of Directors shall choose a successor.  The CEO shall serve for one fiscal year or until a replacement is appointed.  The same person may be reappointed as CEO for subsequent years and the same person may succeed himself as CEO.  The CEO shall be a manager within the meaning of the Act.  Subject only to the terms of this Operating Agreement, the CEO shall have the power to manage the business of the Company to the full extent permitted by the Act.

*(2) President and Chief of Operations.*  The Board of Directors shall appoint a President and Chief of Operations, whose authority will be the same as that of the CEO.  Subject only to the terms of this Operating Agreement, the President and Chief of Operations shall have the power to manage the business of the Company to the full extent permitted by the Act.

*(3) Other Officers.*  The CEO and/or President and Chief of Operations may in their discretion, appoint other Managers and/or officers including a Company Secretary, a Treasurer, one or more Vice Presidents, and any other such officers as they determine are needed to conduct the business of the Company.  Officers appointed by the CEO and/or President shall have such powers as are delegated to those officers by the CEO and/or President.  Such officers shall be managers of the Company within the meaning of the Act, with such management powers as may be granted to them by the Board of Directors, subject to any limitations on their power adopted by the Board of Directors in its discretion.

**14. Transferability of Interests.** No Member shall transfer, assign, pledge, or otherwise dispose of or encumber all or any portion of its interest in the Company without the prior written consent of other Members holding a majority ownership interest.  Any permitted assignee of a Member's interest in the Company must accept and agree in writing to be bound by all the terms and provisions of this Operating Agreement and all amendments thereof.  Transfer of interest is further subject to the covenants, provisions, conditions, and limitations stated in the Letter Agreement and Option Agreement attached hereto as Exhibit A, when and to the extent those covenants, provisions, conditions, and limitations are applicable by their terms.

**15. Admission of Additional Members and Right of Assignee To Become Member.** An assignee of a Member's interest can become a Member only if the other Members holding a majority ownership interest consent.  Members may consent to an assignment of a Member's interest pursuant to item 14 above without consenting to admission of the assignee as a Member pursuant to this item 15, but in any event the assignment of a Member's interest and the admission of new Members each require the consent of existing Members.

Effective September 18, 2007

**16. Banking.** All funds of the Company are to be deposited in a Company bank account in such financial institution as may be selected by the CEO.

**17. Books and Records.** The Company shall keep at its principal office (i) a current list of the names and addresses of each Member; (ii) copies of records enabling a Member to determine the relative voting rights of the Members; (iii) a copy of the Articles of Organization and all amendments thereto; (iv) copies of the Company's federal, state, and local income tax returns, if any, for the three most recent years; (v) a copy of this Operating Agreement and all amendments thereto; and (vi) copies of the Company's financial statements, if any, for the three most recent years. Each Member may, upon reasonable request and at such Member's own expense, inspect and copy any Company records during the ordinary business hours of the Company.

The Members agree that all requests to inspect records must be made to the custodian of records designated by the Chief Executive Officer, in his discretion. The Members agree that the penalty provided for in the Alabama Limited Liability Act § 15, ALA. CODE § 10-12-16, shall be assessable only when the duly designated custodian of records willfully refuses to produce existing records in his possession, custody, or control.

Financial statements including a balance sheet statement of net worth, an income and expense report, and a statement of cash flows shall be prepared at least annually. All accounting shall be on an accrual basis.

The Board of Directors shall have the authority to appoint one or more persons to maintain the books and records.

**18. Competing Activities.** Members shall not engage in business activity in direct competition with the Company. Members shall not use intellectual property including patents and related know-how, trade secrets, and confidential and proprietary information of Company for any purpose other than the furtherance of the business of the Company.

**19. Judicial Dissolution.** If an action proposed by the Managers cannot be implemented because unanimous consent of the Members cannot be obtained pursuant to item 13(a)(3), and the Member represented by a majority of the Board of Directors concludes that it is not reasonably practicable to carry on the business of the Company in conformity with the Articles of Organization and this Operating Agreement, that Member may bring an action for dissolution of the Company under the Alabama Limited Liability Act § 38, ALA. CODE § 10-12-38 (1999). Before bringing the action for dissolution, the Member shall meet with the other Members or with representatives of the other Members to attempt settlement of any underlying dispute between the Members. The Members agree to attempt settlement based on the principles embodied in the General Standards for Directors established under item 13(b)(2).

**20. Dissolution and Termination.** In the event that the Company is dissolved, the assets shall be distributed in accordance with Section 10-12-41 of the Code of Alabama.

(a)     Pursuant to such Section 10-12-41, capital contributions will be returned in the order as follows:

(1) All intellectual property including patents and related know-how, trade secrets, and confidential and proprietary information owned by the Company based, in whole or in

part, on the intellectual property contributed to the Company by and on behalf of Boykin Trust, LLC, including contributions or assignments by members of the Boykin family shall, to the full extent allowed by law, be distributed in kind and returned to, and become the sole property of, Boykin Trust, LLC. All other Members agree to preserve the confidentiality of such intellectual property after dissolution of the Company and not to use such proprietary information, including patents and related know-how, trade secrets, and confidential information for any purpose.

(2) Cash capital contributions made by Members other than Boykin Trust, LLC shall be returned to those Members who made said cash capital contributions.

(3) Cash capital contributions made by the Boykin Trust, LLC shall be returned to Boykin Trust, LLC.

(b)      Any remaining assets of the Company shall be distributed to the Members in accordance with their respective Member's Percentage Interests.

**21. Waiver of Right of Partition.** Each Member hereby waives any right it may have to cause any of the assets of the Company to be partitioned among the Members, or to file any complaint or institute any proceeding at law or in equity to cause such partition.

**22. Investment Intent.** Each Member hereby represents, warrants, and acknowledges that:

(a) The Member is acquiring an interest in the Company solely for the Member's own account for investment purposes and not with a view or interest of participating, directly or indirectly, in the resale or distribution of all or any part thereof;

(b) The Member's interest in the Company is to be issued and sold to the Member without registration and in reliance upon certain exemptions under the 1933 Securities Act, the 1990 Alabama Securities Act, and other applicable state securities laws;

(c) The Member has received a copy of this Operating Agreement and has had an opportunity to review it or have it reviewed by the Member's representative;

(d) The Member's investment in the Company has a high degree of risk, and the Member has the net worth to sustain such risk; and

(e) The Member(s) shall make no transfer or assignment of the Member's interest in the Company except in compliance with the 1933 Securities Act, the 1990 Alabama Securities Act, and other applicable securities laws and this Operating Agreement.

The Members acknowledge and agree that a legend reflecting the restrictions imposed upon the transfer of their membership interests under this Operating Agreement, the 1933 Securities Act, the 1990 Alabama Securities Act, and any other applicable state securities laws has been placed on the first page of this Operating Agreement, and shall be included on any certificate of limited liability company interest issued to Members.

**23. Indemnification.** The Company shall indemnify directors, officer, and managers from liability for activity performed in the line and scope of their duties on behalf of the Company.

**24. Insurance.** The Board of Directors may provide for the purchase of reasonable insurance for the benefit of the Company or for the protection of officers, directors, employees, agents, and managers.

**25. Effective Date.** The effective date of this Operating Agreement is September 18, 2007.

**26. Miscellaneous.**

*(a) Notices.* Any notice, election, or other communication provided for or required by this Operating Agreement must be in writing and sent by express courier (e.g., Federal Express, DHL, US Postal Express Mail) with signature receipt requested to the party entitled to receive the notice or statement at its above address or at such other address as may most recently have been notified by such party to the other party. Such notices alternatively may be given or made by facsimile at the addressee's most recently-notified facsimile number with a confirmation copy sent by express courier to the other party. Notices are deemed given on the date that they are actually received by the recipient as confirmed by a signature receipt, confirmation facsimile, return e-mail, or similar authenticable evidence.

*(b) Modifications.* No change or modification of this Operating Agreement shall be valid or binding upon the Members, nor shall any waiver of any term or condition in the future, unless such change or modification or waiver shall be in writing and signed by all of the Members.

*(c) Binding Effect.* This Operating Agreement shall inure to the benefit of, and shall be binding upon, the Members, their legal representatives, transferees, heirs, successors, and assigns.

*(d) Construction.* This Operating Agreement shall be interpreted and construed in accordance with the laws of the State of Alabama. The titles of the Sections herein have been inserted as a matter of convenience for reference only and shall not control or affect the meaning or construction of any of the terms and provisions hereof. Use of the singular includes the plural and use of the plural includes the singular.

*(e) Pronouns.* All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural, as the identity of the person or entity may require.

*(f) Entire Agreement.* This instrument contains all of the understandings and agreements of whatever kind and nature existing between the parties hereto with respect to this Operating Agreement and the rights, interests, understandings, agreements, and obligations of the respective parties pertaining to the continuing operations of the Company.

*(g) Severability.* Each provision of this Operating Agreement shall be considered severable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable, or illegal under any existing or future law, such invalidity, unenforceability, or illegality shall not impair the operation of or affect those portions of this Operating Agreement which are valid, enforceable, and legal.

Cello Energy, LLC                                          Operating Agreement

IN WITNESS WHEREOF, this Operating Agreement has been executed and is effective as of the date first set forth above.

MEMBERS:

Boykin Trust, LLC

By _____

Allen W. Boykin,
as a member of Boykin Trust, LLC

# EXHIBIT  F

BALDWIN COUNTY, ALABAMA
JUDGE ADRIAN T. JOHNS
Filed/cert. 9/17/2007 9:42 AM
TOTAL      $   28.00
2 Pages

# Articles of Amendment to Articles of Organization

Pursuant to the Alabama Limited Liability Company Act § 11, ALA. CODE § 10-12-11 (1999), the undersigned hereby adopts the following Articles of Amendment to the Articles of Organization

**Article I.**     The name of the Limited Liability Company is as follows:

before the filing of this amendment, Forest Energy, LLC

**Article II.**    The date of filing of the articles of organization is as follows:

The articles of organization here amended were originally filed June 15, 2004, and previously amended on May 26, 2005.

**Article III.**   The following amendment was adopted in the manner provided for by the Alabama Limited Liability Act:

*Article I of the Articles of Organization is amended to provide:*

The name of the Limited Liability Company is **Cello Energy LLC.**

*Article III of the Articles of Organization is amended to provide:*

The purpose of the Limited Liability Company to engage in any lawful act or activity for which limited liability companies may be organized under the act, including but not limited to developing and promoting renewable energy sources; producing and promoting synthetic fuels; building, having built, owning, and/or operating synthetic fuel processing plants; developing and promoting the development of new technologies and securing appropriate intellectual property protections for new technology; and contracting with others for the production of synthetic fuels and operation of synthetic fuel plants..

*Article VI of the Articles of Organization is amended to provide:*

Page 1 of 1

The member or members of the Limited Liability Company can admit one or more additional members. The limited liability company can specify additional the terms and conditions of admission of new members in an Operating Agreement.

*New Article VIII, Management, is added to the Articles of Organization*

The limited liability company is to be managed by one or more managers, who may be referred to by other designations as specified in an Operating Agreement. An Operating Agreement can provide for the creation of classes or groups of members or managers having such relative rights, powers, and duties as may be created in the Operating Agreement.

The names and mailing addresses of the manager or managers who are to serve as managers until their successors are elected and begin serving are:

*Jack Boykin*  
*P.O. Box 342*  
*Montrose, AL 36559*

*Allen W. Boykin*  
*30212 County Road 49*  
*Loxley, Alabama 36526*

**Article IV.   Approval.**

This amendment, consistent with the Alabama Limited Liability Company Act, was approved by a majority vote of the members entitled to vote or in accordance with the requirements set forth in the articles of organization and prescribed by law.

Date: *14 September 2007*

by **Boykin Trust, LLC,**  
*as the sole member of Forest Energy Systems, LLC*

by and through **Allen W. Boykin**  
*as member of Boykin Trust, LLC*

_____  
**Signature**

This instrument prepared by:  
The Segrest Law Firm  
301 King Street  
P.O. Box 780791  
Tallassee, AL 36078  
334-252-0036

Page 2 of 2

BALDWIN COUNTY, ALABAMA
JUDGE ADRIAN T. JOHNS
Filed/cert. 10/ 9/2007  3:02 PM
TOTAL        $   20.00
     2 Pages



This document prepared by
The Segrest Law Firm
P.O. Box 780791
Tallassee, AL 36078
334-252-0006

# Restated Articles of Amendment to Articles of Organization

Pursuant to the Alabama Limited Liability Company Act § 11, ALA. CODE § 10-12-11 (1999), the undersigned hereby adopts the following Restatement of the Articles of Amendment to the Articles of Organization to correct certain clerical errors in the Articles of Amendment to the Articles of Organization filed on the 17th day of September, 2007.

**Article I.**     The name of the Limited Liability Company is as follows:

before the filing of this amendment, Forest Energy Systems, LLC.  (The Articles of Amendment to Articles of Organization filed on the 17th day of September, 2007, incorrectly identified the name as "Forest Energy, LLC.")

**Article II.**    The date of filing of the articles of organization is as follows:

The Articles of Amendment to Articles of Organization, hereby restated, were filed in the Probate Office of Baldwin County, Alabama on the 17th day of September, 2007.

The Articles of Organization, amended by the Articles of Amendment, were originally filed June 15, 2004, and previously amended on May 26, 2005.

**Article III.**   The following amendment was adopted in the manner provided for by the Alabama Limited Liability Act:

*Article I of the Articles of Organization is amended to provide:*

The name of the Limited Liability Company is Cello Energy LLC.

*Article III of the Articles of Organization is amended to provide:*

The purpose of the Limited Liability Company to engage in any lawful act or activity for which limited liability companies may be organized under the act, including but not limited to developing and promoting renewable energy sources; producing and promoting synthetic fuels; building, having built, owning, and/or operating synthetic fuel processing plants; developing and promoting the development of new technologies and securing appropriate intellectual property protections for new technology; and contracting with others for the production of synthetic fuels and operation of synthetic fuel plants..

*Article VI of the Articles of Organization is amended to provide:*

Page 1 of 1

The member or members of the Limited Liability Company can admit one or more additional members. The limited liability company can specify additional the terms and conditions of admission of new members in an Operating Agreement.

*New Article VIII, Management, is added to the Articles of Organization*

The limited liability company is to be managed by one or more managers, who may be referred to by other designations as specified in an Operating Agreement. An Operating Agreement can provide for the creation of classes or groups of members or managers having such relative rights, powers, and duties as may be created in the Operating Agreement.

The names and mailing addresses of the manager or managers who are to serve as managers until their successors are elected and begin serving are:

*Jack Boykin*                          *Allen W. Boykin*
*P.O. Box 342*                       *9056 Merritt Lane*
*Montrose, AL 36559*          *Daphne, AL 36526*

(The Articles of Amendment to Articles of Organization as filed on the 17th day of September, 2007 incorrectly listed the address for Allen W. Boykin.)

**Article IV.    Approval.**

This amendment, consistent with the Alabama Limited Liability Company Act, was approved by a majority vote of the members entitled to vote or in accordance with the requirements set forth in the articles of organization and prescribed by law. This Restatement of the Articles of Amendment is filed for the sole purpose of correcting clerical errors noted herein which occurred in the Articles of Amendment to the Articles of Organization filed on the 17th day of September, 2007.

Date: 17 Sept 2007

by **Boykin Trust, LLC,**
*as the sole member of Forest Energy Systems, LLC*

by and through **Allen W. Boykin,**
*as member of Boykin Trust, LLC*

**Signature**