**IN THE UNITED STATES DISTRICT COURT
OF THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PARSONS & WHITTEMORE** | ) | |
| **ENTERPRISES CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. CV-07-0743-CG-B** |
| | ) | |
| **CELLO ENERGY, LLC, formerly** | ) | |
| **Known as Forest Energy Systems, LLC;** | ) | |
| **BOYKIN TRUST, LLC; JACK W. BOYKIN;** | ) | |
| **an individual; ALLEN W. BOYKIN, an** | ) | |
| **individual; and BIOFUELS OPERATING** | ) | |
| **COMPANY, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AS PROPOSED BY THE DEFENDANTS, JACK BOYKIN,
ALLEN BOYKIN, CELLO ENERGY, LLC AND BOYKIN TRUST, LLC**

The Court conducted a seven-day hearing on a Motion for Preliminary Injunction filed by

Parsons & Whittemore Enterprises Corporation ("P&W") against Cello Energy, LLC ("Cello");

Boykin Trust, LLC, ("Boykin Trust"); Jack W. Boykin, an individual; Allen W. Boykin, an

individual; and BioFuels Operating Company, LLC ("BioFuels").  The Motion asks this Court to

enjoin Cello from constructing a plant for fuel production using a project fee paid by Biofuels.

The Court heard testimony from witnesses George F. Landegger, David G. Borden, James

Matheson, Jack Wesley Boykin, David I. Bransby, Ph.D., Ryan Katofsky, Robert W. McCleod,

Howard B. Rockman, Samir Kaul, and Jeffrey Mark Vermilyea.  The Court also considered

evidentiary exhibits as reflected in the record of the case.

1

**FINDINGS OF FACT**

1.  The defendant, Cello is a limited liability company organized under the laws of the State of Alabama.  At all times germane to this litigation, and until a name change that occurred on September 17, 2007, it was named Forest Energy Systems, LLC (FES)[1].  (Cello Ex. 18). Jack Boykin is the Chairman and Chief Executive Officer of Cello.

2.  Jack Boykin was born in Sylacauga, Alabama, graduated from Sylacauga High School and attended Auburn University.  (Boykin Direct, Prelim. Inj. Tr. 406, November 26, 2007).  He graduated from Auburn as a chemical engineer and then served in the United States Navy as an officer.  (Boykin Direct, Prelim. Inj. Tr. 407, November 26, 2007).  He worked for El Paso Natural Gas as a production manager; worked for Monsanto as a process and engineering manager; and worked for Ciba-Geigy, reaching a level of Chief Engineer and Engineering Manager.  (Boykin Direct, Prelim. Inj. Tr. 407, November 26, 2007).  He then worked for Vertek Corporation as vice president over three of their companies.  He then established his own company in 1997 and has been in private business since that time.  (Boykin Direct, Prelim. Inj. Tr. 407, November 26, 2007).

3.  He has served as Chair of the State Ethics Commission and as Chairman of the Board of Huntingdon College in Montgomery.  (Boykin Direct, Prelim. Inj. Tr. 407, November 26, 2007).  He served on the Board of Directors of Florida Institute of Technology University.  He served as Chair of the Auburn Engineering Alumni Association.  (Boykin Direct, Prelim. Inj. Tr. 407-408, November 26, 2007).  Mr. Boykin testified that he has had experience in constructing chemical plants and that he has constructed well over twenty different chemical plants.  (Boykin

---

[1] Because Forest Energy Systems, LLC (FES) executed many of the documents in this case before the name was changed to Cello Energy, LLC, the names Cello and FES will be used interchangeably.  Both represent the same entity.

Direct, Prelim. Inj. Tr. 408, November 26, 2007).  His construction work has been in China, Europe and South America, as well as the United States.  He has built chemical plants that manufacture pharmaceuticals, agricultural chemicals, polymers, plastics and a variety of special chemicals used in perfume and cosmetic industries.  (Boykin Direct, Prelim. Inj. Tr. 408, November 26, 2007).

4.  The Plaintiff, P&W is a corporation organized under the laws of the State of Delaware, with its home offices in the State of New York.  It is the parent company of numerous subsidiaries, including Alabama River Pulp Company, Inc. ("ARP"), a corporation organized under the laws of the State of Alabama.  George Landegger is its chairman and chief executive officer.  (Landegger Direct, Prelim. Inj. Tr. 6, November 19, 2007).  Regarding the duties and responsibilities of the chairman and chief executive officer of P&W, he testified that the chief executive is responsible for all the company does or fails to do.  (Landegger Direct, Prelim. Inj. Tr. 6, November 19, 2007).  He is also a shareholder.  (Landegger Direct, Prelim. Inj. Tr. 6-7, November 19, 2007).  Mr. Landegger lives in Connecticut.  (Landegger Direct, Prelim. Inj. Tr. 5, November 19, 2007).  His connection with the State of Alabama includes large industrial interests in the pulp and paper industry.  He also has a home in Alabama, his mother's former retirement home, in Claiborne.  (Landegger Direct, Prelim. Inj. Tr. 5, November 19, 2007).

5.  P&W is primarily involved in the pulp and paper business and has additional investments in real estate and in other forms of endeavor in different places around the country and the world.  (Landegger Direct, Prelim. Inj. Tr. 7, November 19, 2007).  P&W has been in business since 1853, and has its principal place of business in Rye Brook, New York, which is close to Westchester Airport.  (Landegger Direct, Prelim. Inj. Tr. 7, November 19, 2007).  It is incorporated in Delaware.  (Landegger Direct, Prelim. Inj. Tr. 7, November 19, 2007).

3

6.  P&W has investments in several Alabama businesses (Landegger Direct, Prelim. Inj. Tr. 8, November 19, 2007), including ownership of two large pulp mills in Claiborne, Alabama; ARP, and Alabama Pine Pulp Company.  (Landegger Direct, Prelim. Inj. Tr. 9, November 19, 2007).  P&W has various chip mills in the State of Alabama as well, which are very capital intensive industries.  The paper industry is often said to be the second most capital intensive industry, after the nuclear power industry.  (Landegger Direct, Prelim. Inj. Tr. 9, November 19, 2007),

7.  The Defendant BioFuels  is a limited liability company organized under the laws of the State of Alabama.  BioFuels is wholly owned by BioOils, LLC, which is wholly owned by Red Sky, LP ("Red Sky").  The general partner of Red Sky is VK Services, LLC, and the limited partner is KFT Trust.

8.  Mr. Samir Kaul has an ownership interest in the defendant BioFuels Operating, LLC. (Kaul Direct, Prelim. Inj. Tr. 1031, November 30, 2007).  Mr. Kaul earned a B.S. and a Master's degree in biochemistry from the University of Maryland and worked on genomic sequencing projects before attending Harvard Business School, where he received his MBA in 2002.  He then went to work for a venture capital firm in Boston.  (Kaul Direct, Prelim. Inj. Tr. 1031–36, November 30, 2007).  Venture capital firms help move new technologies from the initial stages of development to commercialization.  (Kaul Direct, Prelim. Inj. Tr. 1036, November 30, 2007).

9.  Mr. Kaul now works at Khosla Ventures, a venture capital fund (financed by Mr. Khosla's family funds) formed by Vinod Khosla, David Weiden, and Mr. Kaul in about 2006, that invests primarily in early stage technology companies both in renewable fuels and in traditional technology areas.   (Kaul Direct, Prelim. Inj. Tr. 1030, 1040, November 30, 2007). Khosla Ventures has invested in technology at all stages of development, but its primary focus

4

has been technology in its very early stages of development, before more traditional sorts of financing are available.  (Kaul Direct, Prelim. Inj. Tr. 1030, November 30, 2007).

10.  Mr. Kaul has served as CEO of five or six different start-up companies in new technologies, in which capacity he has negotiated contracts, executed non-disclosure agreements, and drafted licenses.  (Kaul Direct, Prelim. Inj. Tr.1039, November 30, 2007).

11.  Mr. Kaul testified that Vinod Khosla is a very successful venture capitalist associated with such well known projects as Sun Microsystems, Google, and AOL.  (Kaul Direct, Prelim. Inj. Tr. 1041, November 30, 2007).  He is also very prominent in discussions concerning alternative and renewable fuels, having been a keynote speaker at many gatherings and having testified before Congress.  (Kaul Direct, Prelim. Inj. Tr. 1042–44, November 30, 2007).  Khosla Ventures has a strong focus on renewable energy.  (Kaul Direct, Prelim. Inj. Tr. 1044–47, November 30, 2007).  It has invested in about 60 companies, about 35 of which are renewable energy, and about a dozen of which are biofuels.  (Kaul Direct, Prelim. Inj. Tr. 1051, November 30, 2007).  It has controlling interest in only about five.  (Kaul Direct, Prelim. Inj. Tr. 1052, November 30, 2007).

12.  As a venture capitalist at Khosla Ventures, Mr. Kaul does two primary things.  (Kaul Direct, Prelim. Inj. Tr. 1046, November 30, 2007).  One is work with the existing companies in which Khosla Ventures has invested, to help them succeed.  (Kaul Direct, Prelim. Inj. Tr. 1046, November 30, 2007).  A second is to look for new opportunities to in which invest.   (Kaul Direct, Prelim. Inj. Tr. 1046, November 30, 2007).

13.  As part of Mr. Kaul's day-to-day activities, he has occasion to value companies, potential investments, technologies, and such things as debt equity or alternative means of financing.  (Kaul Direct, Prelim. Inj. Tr. 1046, November 30, 2007.)  Different types of financing include debt financing, secured by collateral, and higher-risk equity financing, where the investor

5

participates in the appreciation of the value of the company.  (Kaul Direct, Prelim. Inj. Tr. 1047, November 30, 2007).  Other types pf financing include grants and operating and management agreements common in the service industry.  (Kaul Direct, Prelim. Inj. Tr. 1047–50, November 30, 2007).

14.    Because Khosla Ventures has so many investments concerning renewable energy, it has great resources and expertise in that area.  (Kaul Direct, Prelim. Inj. Tr. 1053, November 30, 2007).  It has access to the top people at the investment banks, to various government officials, to different corporations and strategic partners, and to very good people that it can recruit for those companies — like John Melo for Amorous Biofuels, Mark Noetzel for Cilion, and Bruce Jamerson for mascoma.  (Kaul Direct, Prelim. Inj. Tr. 1053–55, November 30, 2007).  Khosla Ventures has successfully granted funds and additional financing for companies it has backed. (Kaul Direct, Prelim. Inj. Tr. 1055–56, November 30, 2007).

### A. Development and Ownership of the Process and Technology

15.    Over a period of several years prior to the events giving rise to this litigation, the defendants, Jack and Allen Boykin developed a process for the conversion of cellulosic material, used tires and plastics into fuels.  (Cello Ex. 1; Boykin Direct, Prelim. Inj. Tr. 410-413, November 27, 2007).  The process, which has been referred to as "Process  Information" has been assigned by Jack and Allen Boykin to Cello Energy, LLC.  All documents and contracts involved in this litigation make it clear that the Process Information is the sole property of the Cello Energy, LLC.

16.    Mr. Boykin testified that he first conceived the idea of the technology involved in the present case in the early 1990's (Boykin Direct, Prelim. Inj. Tr. 411, November 27, 2007).  He developed the process in his research laboratory (Boykin Direct, Prelim. Inj. Tr. 413, November 27, 2007).  Development of the process required 8 or 9 years of work (Boykin Direct, Prelim. Inj.

Tr 413, November 27, 2007).  Mr. Boykin indicates that he spent a great deal of money developing the technology (Boykin Direct, Prelim. Inj. Tr. 414, November 27, 2007).  In 2003, he built a semi-works plant in Pritchard which was operated in order to prove the concept dealing with part of the chemistry (Boykin Direct, Prelim. Inj. Tr. 413, 414, November 27, 2007).  Tests of the product were conducted at the University of Rostock in connection with a proposal to work with Caterpillar Company (Boykin Direct, Prelim. Inj. Tr. 414, November 27, 2007).

17.  Mr. Boykin testified that it is important that the raw material for the process not use food oil and that the process manufactures a fuel that is consistent with actual fuel that is now used in the market place (Boykin Direct, Prelim. Inj. Tr. 416, 417, November 27, 2007).  His process differs from other processes that produce ethanol.  The process is anhydrous in that it does not use water base solvent or large amounts of water (Boykin Direct, Prelim. Inj. Tr. 418, November 27, 2007).

18.  Without identifying the catalyst, Mr. Boykin indicated that his process involves the use of the catalyst (Boykin Direct, Prelim. Inj. Tr 419, November 27, 2007).  He testified that the plant design is a continuous plant as opposed to a "batch" process.   Therefore, the process does not require large reactors (Boykin Direct, Prelim. Inj. Tr. 419, November 27, 2007).  Both the mechanical procedure and the chemistry involved in the process are trade secrets.  (Boykin Direct, Prelim. Inj. Tr. 420, November 27, 2007).  The raw material used includes chipped up pine trees, haze, straw, and non-food portions of agricultural produce.  The process can also use common hay and switch grass (Boykin Direct, Prelim. Inj. Tr. 421, November 27, 2007).

19.  The semi-works plant was destroyed by Hurricane Ivan (Boykin Direct, Prelim. Inj. Tr. 425, November 27, 2007).  It was a demonstration plant, but the Boykins had planned to continue to operate and produce a product of commercial value.  (Boykin Direct, Prelim. Inj. Tr. 425, November 27, 2007).  After the plant was destroyed by Ivan, the Boykins continued to try

7

to develop plans to fund and build the plant in Bay Minette. (Boykin Direct, Prelim. Inj. Tr. 425, November 27, 2007). Capital costs for building the plant was estimated at $10,000,000.00, but required overhead costs increased the total project to $12,500,000.00 (Boykin Direct, Prelim. Inj. Tr 426, November 27, 2007).

20. All parties seem to be in agreement that the process for the conversion of cellulosic material, used tires and plastic into fuels is extremely important. If the technology works as the management of Cello believes it will work, there is tremendous economic potential for Cello. Development of the technology is also very important to the public. There is a tremendous need nationally and internationally for the development of this technology.

### B. Introductions by Dr David Bransby

21. David I. Bransby testified that he is a professor in agriculture at Auburn University. He is an immigrant from South Africa, having immigrated in 1987. Initially, he was hired to do research in livestock production and teaching in forages. After beginning work at Auburn he started working the field of bioenergy some twenty years ago. He earned a Bachelor's Degree and Ph.D. in Grass Land Science in South Africa and a Master's Degree in agronomy at the University of Missouri. He also has a Masters Degree in Market Research and Advertising from South Africa. He received the Auburn University award for excellence in outreach last year. Although present in Court with the approval of his department head and dean, he does not speak for Auburn University in any way. (Bransby Direct, Prelim. Inj. Tr. 739-741, November 28, 2007).

22. A part of his interest in bioenergy is work with farmers on agricultural products. He is interested in switch grass as a potential fuel source (Bransby Direct, Prelim. Inj. Tr. 746, November 28, 2007). Dr. Bransby's qualifications as an expert were acknowledged by the plaintiff (Bransby Direct, Prelim. Inj. Tr. 748, November 28, 2007). Dr. Bransby serves on the

advisory boards of three companies, including Range Fuels, and has Non Disclosure Agreements with each of them (Bransby Direct, Prelim. Inj. Tr. 748, 749, November 28, 2007). He has worked with Governor Riley in the State of Alabama and has twice briefed President Bush on energy matters. (Bransby Direct, Prelim. Inj. Tr. 749, 750, November 28, 2007). Dr. Bransby testified that he was the co-author of the Feasibility Study which is in evidence as Cello Ex. 33. The other author is Ken Meuhlenfeld (Bransby Direct, Prelim. Inj. Tr. 753, November 28, 2007). Mr. Meuhlenfeld is also a professor at Auburn University. David Bransby has done a number of feasibility studies (Bransby Direct, Prelim. Inj. Tr 753, 754, November 28, 2007). Jack Boykin furnished preliminary information for the study as requested by Dr. Bransby, but did not participate in writing the report (Bransby Direct, Prelim. Inj. Tr 754, 755, November 28, 2007). The information that he obtained from Mr. Boykin is typical of feasibility studies that he has done (Bransby Direct, Prelim. Inj. Tr. 755, November 28, 2007).

23. Dr. Bransby has known Mr. Boykin for approximately a year (Bransby Direct, Prelim. Inj. Tr. 756, November 28, 2007). He was introduced to Mr. Boykin by Dr. Richardson who was then president at Auburn University. (Bransby Direct, Prelim. Inj. Tr. 757, November 28, 2007). He signed a confidentiality agreement with Jack Boykin which he has honored (Bransby Direct, Prelim. Inj. Tr. 757, November 28, 2007). Dr. Bransby has found Mr. Boykin to be very concerned about maintaining confidentiality of his technology (Bransby Direct, Prelim. Inj. Tr. 758, November 28, 2007). Dr. Bransby never saw the semi-works plant (Bransby Direct, Prelim. Inj. Tr. 758, November 28, 2007). Dr. Bransby indicated that a man named Ben Thorpe had attempted to discuss Jack Boykin's technology with him. Subsequent investigation by Dr. Boykin revealed that Thorpe is now associated with Flambeau River BioFinery LLC, a biofuels business similar to Range Fuels (Bransby Direct, Prelim. Inj. Tr. 759, 760, November 28, 2007).

9

24. Dr. Bransby has been working with feed stocks for twenty years. There are millions of tons of feed stocks available. The country cannot move forward in fuel production because we do not have an effective conversion technology (Bransby Direct, Prelim. Inj. Tr. 760, November 28, 2007). Based on his investigation, he formed the opinion that Jack Boykin's technology is believable (Bransby Direct, Prelim. Inj. Tr. 760, November 28, 2007). He agreed to help Mr. Boykin find funding sources (Bransby Direct, Prelim. Inj. Tr. 761, November 28, 2007). Dr. Bransby is of the opinion that conventional financing is not available for a project like the proposed Cello plant at Bay Minette (Bransby Direct, Prelim. Inj. Tr. 761, November 28, 2007). This is because the technology is not mature (Bransby Direct, Prelim. Inj. Tr. 761, November 28, 2007). The predominant form of financing for projects such as the Bay Minette project is venture capital (Bransby Direct, Prelim. Inj. Tr. 762, November 28, 2007).

25. Dr. Bransby introduced Jack Boykin to Alabama River Pulp (Bransby Direct, Prelim. Inj. Tr. 763, 764, November 28, 2007). He had no part in the negotiations and exchanges that occurred between them (Bransby Direct, Prelim. Inj. Tr. 765, November 28, 2007). Dr. Bransby provided a non technical explanation for the Boykin technology (Bransby Direct, Prelim. Inj. Tr. 766, 767, November 28, 2007). All of this activity is a part of the faculty outreach program (Bransby Direct, Prelim. Inj. Tr. 762, November 28, 2007). Dr. Bransby testified that the capital costs of production using the Boykin technology are just a fraction of anything else that Dr. Bransby has seen. The level of energy produced is very high. The materials that are used in the technology are very flexible, and there is very little adverse impact to this technology (Bransby Direct, Prelim. Inj. Tr. 769, 770, November 28, 2007).

26. Dr. Bransby rates the technology as Nobel Prize winning technology (Bransby Direct, Prelim. Inj. Tr. 771, November 28, 2007). He believes that the technology is feasible (Bransby Direct, Prelim. Inj. Tr. 772, November 28, 2007). He has shared his optimism about

the technology with President Bush (Bransby Direct, Prelim. Inj. Tr. 772, November 28, 2007).

Dr. Bransby believes that the chance of the Cello technology working is 9 out of 10 (Bransby

Direct, Prelim. Inj. Tr. 773, November 28, 2007).

### C.  Initial Negotiations Pursuant To Nondisclosure Agreements

27.  Mr. Boykin testified that Dr. David Bransby became familiar with Mr. Boykin's

work last fall.  (Boykin Direct, Prelim. Inj. Tr. 433, November 27, 2007).  Dr. Bransby is one of

the national experts on BioFuels and the systems that he used to make biofuels and the raw

materials for BioFuels (Boykin Direct, Prelim. Inj. Tr. 434, November 27, 2007).  Dr. Bransby

visited with Mr. Boykin at Mr. Boykin's home.  (Boykin Direct, Prelim. Inj. Tr. 435, November

27, 2007).  He arranged for the President of Auburn University and the Dean of Engineering and

the head of mechanical engineering to visit at Dr. Boykin's home to discuss the technology.

(Boykin Direct, Prelim. Inj. Tr. 434, November 27, 2007).

28.  In February of 2007, Dr. Bransby mentioned the existence of the Boykin's

technology to Greg Martin of Alabama River Pulp.  (Landegger Direct 9, Boykin Direct 438,

Bransby Direct 751, Prelim. Inj. Tr.).  After obtaining permission from Jack Boykin, Professor

Bransby furnished Mr. Boykin's contact information to Greg Martin of ARP.  (Bransby Cross,

Prelim. Inj. Tr. 798, November 28, 2007).  Greg Martin contacted Jack Boykin to arrange a

meeting.

29.  Greg Martin invited Jack Boykin to make a presentation at ARP in Claiborne,

Alabama, "based on conversations with various professors at Auburn University."  (Landegger

Direct, Prelim. Inj. Tr. 9, November 19, 2007.)  On February 12, 2007, the parties executed a

one-page non-disclosure agreement ("NDA").  (Landegger Direct, Prelim. Inj. Tr. 9–10,

November 19, 2007), signed on behalf of FES and ARP and related entities.  The first NDA was

"for the purpose of enabling Recipient to have some basic understanding of FES's program."

11

(Plaintiff's Exhibit 1)  Landegger testified that Jack Boykin considered his technology to be confidential, which is why the parties executed a confidentiality agreement or nondisclosure agreement before the initial meeting.  (Landegger Direct, Prelim. Inj. Tr. 11, November 19, 2007).

30.   After entering into the first NDA (Cello Exhibit 2), Jack Boykin met with representatives of ARP on February 15, 2007, at the offices of ARP where he made a presentation concerning his proprietary information.  (Landegger Direct, Prelim. Inj. Tr 9, November 19, 2007).  Mr. Boykin's understanding was that the initial meeting was to be between himself and Greg Martin (Boykin Direct, Prelim. Inj. Tr. 440, November 27, 2007), and he planned to make a standard power point presentation (Boykin Direct, Prelim. Inj. Tr. 441, November 27, 2007).  When he got to the meeting there were numerous representatives of ARP present.  (Boykin Direct, Prelim. Inj. Tr. 441, November 27, 2007).  At the meeting with Alabama River Pulp, Mr. Boykin made the power point presentation as planned (Boykin Direct, Prelim. Inj. Tr. 443-444, November 27, 2007).  In the presentation, Mr. Boykin described the project.  For P&W, the presentation coincided with an earlier scheduled management meeting.  According to Mr. Landegger, the purpose of the initial meeting was for P&W entities to be in a position to learn from Jack Boykin regarding his technology and for both sides to determine whether there was a potential for mutual collaboration.  (Landegger Direct, Prelim. Inj. Tr. 10, November 19, 2007).  Jack Boykin introduced Landegger, conceptually, to the work that Jack Boykin was doing in the area of bio-fuels.  (Landegger Direct, Prelim. Inj. Tr. 9, November 19, 2007.)  The meeting on February 15, 2007 was attended by George Landegger who is CEO of both ARP and P&W.  (Landegger Direct 9; Boykin Direct 440-441, Prelim. Inj. Tr.; Cello Exhibit 29).  At that meeting, Mr. Boykin also presented a second power point presentation that dealt with raw material and sales.  (Boykin Direct, Prelim. Inj. Tr. 446-447, November 27, 2007)

31.   George Landegger testified that Jack Boykin explained to the P&W entities that he, together with his son Allen, had invented a system whereby cellulosic material of various kinds, including woody material and tire pieces, pieces of tire, could be processed rather inexpensively and produce transportation fuel such as gasoline or diesel that would be used on the road and qualify under the American Standard Testing Method as proper fuel.  (Landegger Direct, Prelim. Inj. Tr. 11, November 19, 2007).  He described this as what he referred to as "Mr. Boykin's technology."  (Landegger Direct, Prelim. Inj. Tr. 11, November 19, 2007).

32.   George Landegger had a very high level of interest in what Jack Boykin described. (Landegger Direct, Prelim. Inj. Tr. 12, November 19, 2007.)  He testified that if Jack Boykin was able to do what he said he could do, it was a breakthrough of the first order with regard to the manufacture of fuel at a cost that was extremely inexpensive compared with imported fuel. (Landegger Direct, Prelim. Inj. Tr. 12, November 19, 2007.)  Also, from P&W's strategic point of view, it looked like an outstanding match for its engineering, construction, operating, and process know-how and a fascinating and potentially extraordinary diversification for P&W as well.  (Landegger Direct, Prelim. Inj. Tr. 12-13, November 19, 2007.)

33.   After the meeting, Jack Boykin and George Landegger talked about P&W's participating in the Forest Energy Systems company and its development.  (Landegger Direct, Prelim. Inj. Tr. 13, November 19, 2007).  Jack Boykin told Landegger that he had spent 25 million dollars of his own money developing the technology over a period of years.  (Landegger Direct, Prelim. Inj. Tr. 13, November 19, 2007).  Landegger indicated to Jack Boykin that Landegger was inclined to invest 12 and a half million dollars.  (Landegger Direct, Prelim. Inj. Tr. 13, November 19, 2007).  Jack Boykin was offering a 30% interest, but Landegger thought it was 33½%  in the company, which would be the repository of the technology.  (Landegger Direct, Prelim. Inj. Tr. 13, November 19, 2007.)  Jack Boykin wanted to build the first plant in

13

Bay Minette (Landegger Direct, Prelim. Inj. Tr. 13, November 19, 2007), which is literally just

down the road from P&W's Alabama subsidiary.  (Landegger Direct, Prelim. Inj. Tr. 14,

November 19, 2007).

34.  On Monday, February 19, Jack Boykin forwarded a paper by email to George

Landegger.  (Plaintiff's Exhibit 2.).  Mr. Landegger described Plaintiff's Exhibit 2 as a

"proposal" that Jack Boykin sent to P&W outlining the primary points of an "agreement"

reflecting Jack Boykin's views after considering the private discussions between Jack Boykin

and George Landegger, at the end of the more public meeting on February 15th.  (Landegger

Direct, Prelim. Inj. Tr. 14, November 19, 2007.)  It is dated February 19th and has a total of 14

points.  (Plaintiff's Exhibit 2; Landegger Direct, Prelim. Inj. Tr. 14, November 19, 2007.)  The

document describes itself neither as a "proposal" nor as an "agreement", but instead as "purely a

conceptual writing."  (Plaintiff's Exhibit 2; Landegger Direct, Prelim. Inj. Tr. 14, November 19,

2007).  Mr. Landegger testified as to his understanding of that proposal.  (Landegger Direct,

Prelim. Inj. Tr. 14, November 19, 2007.)  He state that the initial "purely conceptual writing"

included the suggestion that "P&W engineering division may provide the process and detail

mechanical engineering design for the first and future plants if it so chooses at an agreed upon

fee."  (Plaintiff's Exhibit 2.)

35.  P&W responded to Jack Boykin's purely conceptual writing very quickly with a draft

letter of intent two days later, on Wednesday, February 21.  (Landegger Direct, Prelim. Inj. Tr.

16, November 19, 2007).  That draft letter of intent reflected all of the points that were in Jack

Boykin's proposal and added a few others.  (Landegger Direct, Prelim. Inj. Tr. 16, November 19,

2007.)  For example, P&W wanted an undertaking that all technology would reside inside the

Forest Energy Systems in which P&W was going to invest.  (Landegger Direct, Prelim. Inj. Tr.

16, November 19, 2007).

36.  Plaintiff's Exhibit 3 is a cover letter and the "Letter of Intent", both authored by George Landegger.  (Plaintiff's Exhibit 3; Landegger Direct, Prelim. Inj. Tr. 17, November 19, 2007.)  The cover letter describes the enclosure as "a revised draft Letter of Intent" and indicates it is being supplied for Mr. Boykin to review.  (Plaintiff's Exhibit 3.)  It acknowledges that the draft will need to be " fleshed out and possibly modified and drafted in detail."  (Plaintiff's Exhibit 3.)  The cover letter also indicated that, in connection with the "due diligence process" (which never became a part of any agreement between the parties) and a meeting perhaps as early as the next Monday (three business days later), P&W was "awaiting a more detailed mutual confidentiality agreement."  (Plaintiff's Exhibit 3.)

37.  Mr. Landegger testified that he was proposing P&W invest the 12.5 million dollars needed to build the plant and receive a one-third interest, crediting Jack Boykin with having invested 25 million dollars already.  (Landegger Direct, Prelim. Inj. Tr. 18, November 19, 2007.)  Boykin Trust, LLC, would own the rest.  (Landegger Direct, Prelim. Inj. Tr. 19, November 19, 2007.)  FES would be the owner of the technology because P&W wanted the technology to reside in the company in which it was purchasing a one-third interest.  (Landegger Direct, Prelim. Inj. Tr. 16, November 19, 2007).  It provided that FES "anticipates filing all necessary and appropriate patent applications," which was important to P&W because this technology, if successful and not patented, would have been exposed to being copied rather easily, and it had unique features that needed to be patented in order to protect their value.  (Landegger Direct, Prelim. Inj. Tr. 19, November 19, 2007).

38.  According to Mr. Landegger, the February 21 proposal P&W sent to Jack Boykin asked for a 60-day due diligence period, although Mr. Landegger said he thought it was to have been 90 days.  (Landegger Direct, Prelim. Inj. Tr. 17, November 19, 2007).  At the initial meeting on February 15, Jack Boykin had wanted not to reveal some details of the technology,

such as the catalyst used.  (Landegger Direct, Prelim. Inj. Tr. 20, November 19, 2007).  Due diligence in this context meant transparency regarding the technology and a 60-day period in which P&W could satisfy itself that theoretically, at least, this technology would work. (Landegger Direct, Prelim. Inj. Tr. 16, November 19, 2007).

39.  Mr. Landegger testified that the proposal provided that upon investment, P&W be given special minority shareholder rights and that many matters of corporate governance would require supermajorities, such as issuing new shares, dissolving/recapitalizing loans to shareholders and capital expenditures.  (Landegger Direct, Prelim. Inj. Tr. 20, November 19, 2007).  Those matters could not be decided simply by the two-thirds shareholder but would require Landegger's approval.  (Landegger Direct, Prelim. Inj. Tr. 20, November 19, 2007).

40.  The parties never agreed to or executed the proposal described in the Letter of Intent dated Feb. 21, 2007.  (Landegger Direct, Prelim. Inj. Tr. 21, November 19, 2007.)  According to Landegger, Jack Boykin said that on reflection, he felt that he would be unable to prove the technology to P&W satisfactorily within the 60-day due diligence period.  (Landegger Direct, Prelim. Inj. Tr. 22, November 19, 2007)  Landegger said that Jack Boykin told him that he felt that time was very critical in order to move forward, and that Jack Boykin had decided to build the plant himself using his own money.  (Landegger Direct, Prelim. Inj. Tr. 22, November 19, 2007.)  That was later, however, after the parties had had entered into the more detailed nondisclosure agreement, and engineering meetings were ongoing.  (Landegger Direct, Prelim. Inj. Tr. 22, November 19, 2007).   Mr. Boykin testified that the proposal made by P&W (Cello Exhibit 4) was unacceptable to Mr. Boykin because it would have revealed the technology to a group of advisors, including possible competitors and would have required super majorities on certain issues (Boykin Direct, Prelim. Inj. Tr. 454, November 27, 2007). The sixty day due diligence was not the real problem (Boykin Direct, Prelim. Inj. Tr. 454, November 27, 2007).

16

The words *super majority* were included in the Landegger proposal, but were not included in the documents that the parties executed (Boykin Direct, Prelim. Inj. Tr. 455, November 27, 2007).

41.   On February 26, 2007, Jack Boykin emailed to George Landegger a proposed comprehensive Non-Disclosure Agreement that would have included not only ARP, but also P&W and its subsidiaries and affiliates.  (Cello Exhibit 5).  The proposed Nondisclosure Agreement provided for disclosure of certain "Proprietary Information," (Cello Exhibit 5) but did not provide for disclosure of the *Process Information* as described in Recital D of the Agreement.  (Cello Exhibit 5).  *Process Information* includes the technical process for the production of fuel.  (Cello Exhibit 5).   Paragraph six (6) of the Non-Disclosure Agreement as proposed by Jack Boykin limited the amount of disclosure that was to be made by FES and the Boykin interests to the minimum amount of *Proprietary Information* necessary for P&W to effectively evaluate the project.  (Cello Ex. 5) It specifically provided that FES had not and would not disclose the Process Information to P&W without a written modification of the Agreement.  (Cello Ex. 5).  The document identified as Cello Ex. 5 is the version of the Non-Disclosure that Mr. Boykin sent to Mr. Landegger.   (Boykin Direct, Prelim. Inj. Tr. 457, November 27, 2007).  The form itself for the Non-Disclosure Agreement as proposed by Mr. Boykin was based on an agreement that Mr. Boykin had entered into with Caterpillar.  (Boykin Direct, Prelim. Inj. Tr. 457, 458, November 27, 2007).  The Caterpillar Agreement contained a clause (paragraph 6) which limited the amount of disclosure that would be made to Caterpillar (Boykin Direct, Prelim. Inj. Tr. 457, November 27, 2007).  The purpose of the clause taken from the Caterpillar Agreement and included in the proposed agreement with P&W was to avoid possible claims by P&W that it infringed the technology of the Boykins (Boykin Direct, Prelim. Inj. Tr. 458, November 27, 2007).

42.  The following day, February 27, 2007, George Landegger made changes in the Non-Disclosure Agreement and emailed it back to Jack Boykin.  (Landegger Cross, Prelim. Inj. Tr. 130, 131, November 20, 2007).  The changes were not "tracked changes" so as to highlight the actual changes that were made and the email from Landegger to Boykin did not point out the specific changes, but made a general reference to the fact that changes had been made.  (Landegger Cross, Prelim. Inj. Tr. 131-132, November 20, 2007)  One of the changes that P&W made in the Non-Disclosure Agreement was the addition of language in paragraph number six (6) to provide that FES would not disclose its own technology "to third parties".  (Landegger Cross, Prelim. Inj. Tr. 132, November 20, 2007; Cello Exhibit 7).  That paragraph continued to provide that FES had not and, but for the addition of those three words, that it would not disclose the *Process Information* to P&W without a written modification of the Nondisclosure Agreement.  (Cello Ex. 7)  There was no actual discussion between George Landegger and Jack Boykin about the changes to the Non-Disclosure Agreement.  (Landegger Cross, Prelim. Inj. Tr. 132, November 20, 2007).  P&W paid nothing for the Non-Disclosure Agreement.  (Landegger Cross, Prelim. Inj. Tr. 138, November 20, 2007).  The stated purpose of the Non-Disclosure Agreement was to discuss ways that the parties could work together for the building of plant at Bay Minette using the technology**.**  (Recitals C and E, Cello Ex. 7).

43.  Mr. Boykin does not remember receiving a cover sheet with the agreement (Boykin Direct, Prelim. Inj. Tr. 460, November 27, 2007).  Mr. Boykin did not realize at the time that the three words had been added (Boykin Direct, Prelim. Inj. Tr. 460, 461November 27, 2007).  Mr. Boykin did not knowingly bind himself not to disclose his own technology (Boykin Direct, Prelim. Inj. Tr. 462, November 27, 2007).  The Agreement says nothing about *P&W* not disclosing its own technology, (Boykin Direct, Prelim. Inj. Tr. 462, 463, November 27, 2007) so there was no mutuality.  (Boykin Direct, Prelim. Inj. Tr. 463, November 27, 2007).  The Non-

Disclosure Agreement provides that the proprietary information will continue to belong to Cello Energy, LLC (Boykin Direct, Prelim. Inj. Tr. 464, November 27, 2007).  The Agreement specifically provides that Mr. Landegger and P&W are not given permission to use the information for anything (Boykin Direct, Prelim. Inj. Tr. 464, November 27, 2007).

44.  Landegger initially testified that this second nondisclosure agreement "was actually originally sent to us by Dr. Boykin and remained essentially the same except to add Boykin Trust." (Landegger Direct, Prelim. Inj. Tr. 23, November 19, 2007.)  He testified that paragraph 6 as signed was "an exact copy of the draft that Dr. Boykin sent to us and there is no typographical error." (Landegger Direct, Prelim. Inj. Tr. 25, November 19, 2007)  He testified that the Jack Boykin's "draft nondisclosure agreement" was the document sent to them a day or two before. (Landegger Direct, Prelim. Inj. Tr. 27, November 19, 2007.)  As to Mr. Boykin's opportunity for input on that nondisclosure agreement, Landegger says that Jack Boykin drafted it and that P&W "marked up his draft and sent it back to him the next day." (Landegger Direct, Prelim. Inj. Tr. 32, November 19, 2007.)

45.  On Tuesday, February 27, 2007, the parties executed and exchanged by facsimile signed copies of the second Nondisclosure Agreement.  (Plaintiff's Exhibit 4; Landegger Direct, Landegger Direct, Prelim. Inj. Tr. 22, November 19, 2007; Cello Ex. 7).  Paragraph 6 of the signed copies contained the words "to third parties" that Mr. Landegger had inserted into the document, but continued to provide that FES had not disclosed the Process Information to P&W and (but for the added three words) would not do so without a written modification of the Agreement.  (Cello Ex.7).  The letter dated March 26 from Landegger to Boykin proposed, in paragraph 6, that full disclosure of the Boykin technology would not occur until *after* payment of the option price.  (Plaintiff's Exhibit 6.)

19

46. Landegger said that the second Nondisclosure Agreement provided that neither party would disclose anything it learned from the other party without the permission of the disclosing party, and that Cello would not disclose its technology or even the existence of the agreement and negotiations to any third party without P&W's permission. (Landegger Direct, Prelim. Inj. Tr. 23, November 19, 2007).

47. According to Landegger the agreement not to disclose to third parties was important to P&W because P&W had bargained for or was bargaining for exclusive access to the technology. (Landegger Direct, Prelim. Inj. Tr. 24, November 19, 2007.) If P&W and Cello reached agreement, P&W would not want Jack Boykin or someone else to "go to some technical conference somewhere and with justified pride describe what had been accomplished." (Landegger Direct, Prelim. Inj. Tr. 24, November 19, 2007.) P&W felt that the technology was sufficiently revolutionary and that it would be likely to be copied if at all possible. (Landegger Direct, Prelim. Inj. Tr. 24, November 19, 2007) Landegger said it was important to P&W that these matters remain confidential within the "marriage" between FES/Cello and P&W. (Landegger Direct, Prelim. Inj. Tr. 24-25, November 19, 2007.) He insists that language in the Nondisclosure Agreement would not have obliged Cello not to try and move forward with its developments and its technology if Cello and P&W could not reach agreement. (Landegger Direct, Prelim. Inj. Tr. 28, November 19, 2007).

48. Mr. Howard Rockman, a patent lawyer and expert in the area of Intellectual Property, testified that the Nondisclosure Agreement as drafted by Jack Boykin did not in any way prevent Cello from disclosing its own technology to third parties, but instead restricted the types of information Cello would disclose to P&W at that preliminary stage in negotiations. (Rockman Direct, Prelim. Inj. Tr. 1003–1007, November 30, 2007). This type of restriction is included in a Nondisclosure Agreement for the protection of the receiving party, to avoid claims

20

by the owner of the trade secret that the receiving party has misappropriated the technology. (Rockman Direct, Prelim. Inj. Tr. 1004, November 30, 2007)  It allows the receiving party to receive business information to evaluate the commercial viability of the project (described the NDA as "production" as opposed to "technical" information), without risking taint to its own research in which it may be engaged.  *Id.*  The extraneous "to third parties" phrase inserted by P&W would, under the terms of the agreement, prohibit Cello from disclosing its own technology to any other entity for a period of ten years, regardless of whether Cello and P&W ever went any further than these initial overtures.  (Rockman Direct, Prelim. Inj. Tr. 1005–1006, November 30, 2007.)  That language is ambiguous because it makes no sense in the context of the paragraph in which it was inserted.  (Rockman Cross, Prelim. Inj. Tr. 1023–1026, November 30, 2007.)  The agreement included no reciprocity, no consideration, for this unilateral gag provision imposed on Cello.  (Rockman Direct, Prelim. Inj. Tr. 1006–1007, November 30, 2007).

49.  Mr. Landegger testified that the ten-year term of the non-disclosure agreement did not mean that Cello could not disclose its own technology for ten years because, according to him, the non-disclosure agreement would become moot if the parties reach no further agreement. (Landegger Direct, Prelim. Inj. Tr. 26, November 19, 2007.)  If P&W and Cello had not reached an agreement and had walked away from each other, the issue would have become moot. (Landegger Direct, Prelim. Inj. Tr. 25, November 19, 2007.)

50.  After signing the second nondisclosure agreement, the parties continued to discuss the project.  (Landegger Direct, Prelim. Inj. Tr. 28, November 19, 2007).  On March 7, 2007, George Landegger wrote to Jack Boykin describing his company's extensive experience in building plants around the world.  In that letter, he also indicated that he felt that he could be

helpful in obtaining the loans that would be necessary for the construction of plants.  (Cello Ex. 8).

51.  On April 4, 2007, George Landegger submitted a formal proposal for the purchase of an Option to acquire an interest in FES.  He proposed a payment of $2,500,000.00 for an Option that P&W could exercise by paying an additional $10,000,000.00.  The proposal outlined the period of time during which P&W could exercise the Option.  The April 4, 2007, documents proposed a loan of $2,500,000.00.  The loan would have been secured by a security interest in all assets of FES, including the Intellectual Property (Landegger Cross, Prelim. Inj. Tr 171-172, November 20, 2007; Cello Ex. 21).  The estimated cost of construction of the Bay Minette plant was $10,000,000.00, and the proposed loan would not have enabled FES to construct the Bay Minette plant.  The loan proposal, which would have tied up all Cello's assets and virtually eliminated any possibility of additional financing was rejected by Mr. Boykin.  (Boykin Direct, Prelim. Inj. Tr. 471-472, November 27, 2007).

52.  Negotiations ensued in which the parties exchanged proposals and counter proposals with tracked changes pertaining to both the Option Agreement and a proposed Letter Agreement that would accompany the Option Agreement.  (Cello Ex. 36)  Mr. Landegger says he did not intend the letter agreement to provide Cello with the option to use P&W's engineering and construction management services for the Bay Minette facility, but instead intended it to be an undertaking that P&W would do the engineering and construction, and in the process that his engineers and builders would become expert in this exciting technology.  (Landegger Direct, Prelim. Inj. Tr. 36-37, November 19, 2007).  The initial proposal, prepared by P&W would have provided that P&W "hereby undertakes to provide engineering and construction management" for the project, (Cello Ex. 36, paragraph 6) and would have required Jack Boykin to "devote the majority of his working efforts to the business of FES."  (Cello Ex. 36, paragraph 5)  The final

version of the Letter Agreement, signed by the parties on April 19, 2007 after stating that P&W

"*agrees* to provide engineering and construction services," defining the rates for those services,

and limiting P&W's work on reactors, provided that "FES management will have final authority

on all decisions regarding the project," and required that Jack Boykin "remain Chairman and

Chief Executive Officer of FES." (Cello Ex. 7, paragraph 5)

### D. The Option Agreement and Letter Agreement

53.   After the parties reached an agreement on the Letter Agreement and Option Agreement, Mr. Landegger wrote a confirming cover letter, and asked Jack Boykin to sign and return the agreements.  (Plaintiff's Exhibit 7.)  In that letter, he acknowledged that Jack Boykin was counting on financing from the Federal Land Bank Association, and agreed that Landegger would consult with Cello about alternative sources of financing to implement the project if those funds were not available within 30 days.  (Plaintiff's Exhibit 7.)

54.   According to Mr. Boykin, Mr. Landegger knew at the time that the Option was signed that additional financing would be required (Boykin Direct, Prelim. Inj. Tr 466, 467, November 27, 2007).  He was specifically aware of the pending loan application with the Federal Land Bank (Boykin Direct, Prelim. Inj. Tr 467, November 27, 2007).  Mr. Landegger acknowledged in writing in a letter dated March 7, 2007, (Cello Ex. 8).  Mr. Boykin informed Mr. Landegger that in order to go forward with a deal with him, Mr. Boykin would have to arrange financing for the plant and have it pretty much secured (Boykin Direct, Prelim. Inj. Tr 466, 470, November 27, 2007).

55.   Despite the fact that the Nondisclosure Agreement was executed two months before the Option Agreement and Letter Agreement, Mr. Landegger contends that the three agreements each cover a different although very important aspect of an overall agreement: the option agreement covers various aspects of corporate governance; the letter agreement is operational; detailing in the nondisclosure agreement is to protect us and FES/Cello from disclosures of a secret technology.  (Landegger Direct, Prelim. Inj. Tr. 38, November 19, 2007.)

56.   On April 19, 2007, the parties entered into the agreements in which P&W purchased an Option to acquire a one third equity interest in Cello.  To exercise the option, P&W must pay an additional $10 million "at any time after the date hereof and at or prior to three (3) months

after the first commercial production and sale of fuels meeting the ASTM standards…." (Cello Ex. 10, p.1)  Both the Option and the Letter Agreement made it clear that the option could be exercised not only by Parsons & Whittemore Enterprises Corporation, but by any affiliated or subsidiary company controlled by George Landegger.  (Cello Ex. 10, p.1; Cello Ex. 11, paragraph 1).  The Option Agreement refers to all those entities collectively as the "Option Holder".  (Cello Ex. 10, p.1)  The Letter Agreement refers to the entire group of companies controlled by George Landegger as "Parsons & Whittemore".  (Cello Ex. 11, paragraph 1)  Despite these provisions in the agreements, Mr. Landegger considers P&W the sole option holder, and that ARP is not a party and is not an option holder.  (Landegger Direct, Prelim. Inj. Tr 40, November 19, 2007.)

57.  In contrast to paragraph six (6) of the Nondisclosure Agreement dated February 27, 2007, which made no provision for the disclosure of the *Process Information* to P&W, the Option Agreement and Letter Agreement provided that FES would make "full transparent disclosure" of its technology.  (Cello Ex. 10, p. 1; Ex. 11, Paragraph 3)  Mr. Landegger testified that the Letter Agreement "incorporates expressly" the Nondisclosure Agreement.  (Landegger Direct, Prelim. Inj. Tr 36, November 19, 2007.  The Option Agreement and Letter Agreement referred to, but did not incorporate by reference the Nondisclosure Agreement of February 27, 2007.  (Cello Ex. 10, p. 1; Ex. 11, Paragraph 3).  No mention is made in the Option Agreement or Letter Agreement of any obligation that FES not disclose its own technology.  The suggestion that the "full and transparent disclosure would be made "pursuant to the Nondisclosure Agreement dated February 27, 2007, is strange, since that agreement provided for limited disclosure, and made no provision at all for disclosure of the *Process Information*.

58.  Paragraph eight (8) of the Option Agreement describes protective covenants for the stated purpose of protecting the interest of P&W as a potential minority shareholder.  (Cello Ex.

10, paragraph 8)  In the course of testimony, George Landegger specifically referred to these rights as "governance" rights.  (Landegger Direct, Prelim. Inj. Tr 39-44, November 19, 2007)  The Option required that these Minority Shareholder rights be reflected "in an Operating Agreement for FES" upon exercise of the option.  (Cello Ex. 10, paragraph 8).  Those minority shareholder rights were to "become effective" on the signing of the agreement and the agreement further provided "the Option Holder shall immediately have the rights of the Minority Shareholder" as used in paragraph 8.  (Cello Ex. 10, paragraph 8)

59.  The protective covenants placed general restrictions on major capital expenditures "other than those proposed in the project plan".  (Cello Ex. 10, paragraph 8)  The project was the plant at Bay Minette.  (Cello Ex. 11, paragraph 5)  The protective covenants also restricted sales of equity interest in Forest Energy Systems, LLC.  (Cello Ex. 10, paragraph 8)  The Option Agreement restricted the right of Forest Energy Systems, LLC, to license the proprietary information without the approval of P&W.  (Cello Ex. 10, paragraph 8)  The protective covenants do not make any mention of FES not being allowed to disclose its own technology.

60.  The Letter Agreement, after reiterating some of the provisions of the Option Agreement, made additional provisions for contractual arrangements between P&W and FES, as separate entities, concerning the construction of the plant at Bay Minette.  (Cello Ex. 11, paragraph 8) (Cello Ex. 11, paragraph 6)  According to Landegger, the letter agreement outlines the procedures by which P&W was going to build a plant in Bay Minette and provide certain engineering construction and procurement services for that.  (Landegger Direct, Prelim. Inj. Tr 36, November 19, 2007.)  The Letter Agreement made no provision for continuing contractual arrangements between P&W and FES, after the construction of the Bay Minette plant.  All that it

says is that P&W's engineers would be "available to review with FES management" other possible sites.  (Cello Ex. 11, paragraph 8)[2]

    61.  There was no detailed contract outlining the construction and engineering services to be provided by P&W.  (Boykin Direct, Prelim. Inj. Tr. 482-483, November 27, 2007). The entire agreement of the parties touching on the subject of engineering and construction services was contained in a single paragraph.  (Cello Ex. 11, paragraph 6) That paragraph concluded with the sentence, "All final decisions concerning the project shall be made by Forest Energy Systems, LLC, management."  The Option Agreement specifically required that Jack Boykin remain as CEO of Forest Energy Systems, LLC.  (Cello Ex. 11, paragraph 5)  The provisions contained in the Letter Agreement are not the customary documents used in the industries in connection with engineering and management service contracts (Boykin Direct, Prelim. Inj. Tr. 4823, November 27, 2007).  The usual contracts are 30-40 pages listing who does what and what responsibilities lay where (Boykin Direct, Prelim. Inj. Tr. 482, November 27, 2007).  The Agreement by P&W to furnish feed stock is not exclusive (Boykin Direct, Prelim. Inj. Tr. 483, 484, November 27, 2007).

    62.  Neither the Option Agreement nor the Letter Agreement provided for P&W to hire the personnel for the plant; run the plant; maintain the plant; provide accounting services for Cello; be in charge of the management of Cello, be in charge of acquisition of raw material or be in charge of sales for Cello.  Neither the Option Agreement nor the Letter Agreement provided any contractual right to P&W, as a separate entity to have any role in any future plants to be constructed after the Bay Minette Plant.  Neither the Option Agreement nor the Letter

---

[2] After the completion of the plant, the contractual provisions also called for Forest Energy Systems, LLC, to purchase certain raw material from Parsons & Whittemore Enterprises Corporation.  Since the preliminary injunction that is requested relates to the construction of the plant, any issue pertaining to the furnishing of raw materials after completion of construction is premature at this time.

Agreement granted to P&W as a separate entity any rights in the process information or any of the technology developed by the Boykins.  Neither the Option Agreement nor the Letter Agreement granted to P&W as a separate entity the right to construct plants using the technology.

### E. The Patent Applications

63.  After the Option Agreement and Letter Agreement were signed on April 19th, P&W and FES, immediately proceeded with applications for patents to protect the process information. (Landegger Direct, Prelim. Inj. Tr. 45-47, November 19, 2007).  Jack and Allen Boykin made provisional applications for patents to protect the proprietary information on May 4, 2007. (Boykin Cross, Prelim. Inj. Tr. 642, November 28, 2007).  They assigned their interest in the patent applications to Forest Energy Systems, LLC  (Landegger Cross, Prelim. Inj. Tr. 152, November 20, 2007).

64.  Representatives of P&W were privy to the information contained in the patent applications.  (Boykin Direct, Prelim. Inj. Tr. 552, November 27, 2007; Landegger Direct, Prelim. Inj. Tr. 37, November 19, 2007).  P&W arranged for its own attorneys, Stroock, Stroock & Lavan to handle the patent applications.  (Boykin Direct, Prelim. Inj. Tr. 493, November 27, 2007). Mr. Landegger says he arranged for two patent attorneys to come to Alabama and meet with Jack Boykin and for his own scientific people to learn about the technology, to be in a position to conduct a detailed search for prior art, and to assist Jack Boykin in the filing of a patent application, which was indeed filed on behalf of FES sometime in June or July. (Landegger Direct, Prelim. Inj. Tr. 46, November 19, 2007).  A scientist for P&W made suggestions concerning the content of the patent applications.   (Boykin Cross, Prelim. Inj. Tr. 653-654, November 28, 2007).

65. The non-provisional patent application was filed with the United States Office of Patents and Trademarks in June, 2007. (Landegger Direct, Prelim. Inj. Tr. 50, November 19, 2007). Jack Boykin testified that the chemistry for the process is completely revealed in the patents. (Boykin Direct, Prelim. Inj. Tr. 422, November 27, 2007). Nothing was left out of the description in the patent. (Boykin Direct, Prelim. Inj. Tr. 423, November 27, 2007) On Tuesday, June 5, Jack Boykin sent Matt Siegel and Landegger a fax attaching the filing receipt establishing a filing date on May 4, 2007, on the provisional application. (Landegger Direct, Prelim. Inj. Tr. 49, November 19, 2007; Plaintiff's Exhibit 14.) The fax indicated that FES had received in the mail the Official Provisional Patent Confirmation Number. (Landegger Direct, Prelim. Inj. Tr. 49, November 19, 2007; Plaintiff's Exhibit 14.) The technology and Process Information described in the patents will become available to the public 18 months after the date of filing the provisional applications. That will be November 4, 2008.

## F. Engineering Work

66. After receiving the Option money, the parties engaged in construction and engineering meetings (Boykin Direct, Prelim. Inj. Tr. 498, November 27, 2007). These meetings were usually attended by ARP engineers and occasionally by Mr. Matheson or Mr. Landegger (Boykin Direct, Prelim. Inj. Tr. 498, November 27, 2007). Cello was billed for the services of the ARP engineers. The meetings were, in preparation for the construction of the plant at Bay Minette. (Boykin Direct, Prelim. Inj. Tr. 438, November 27, 2007) Forest Energy Systems, LLC, made full and complete disclosure of its technology pursuant to the terms of the Option Agreement and Letter Agreement. (Boykin Direct, Prelim. Inj. Tr. 489, November 27, 2007)

67. Jeffrey Mark Vermilyea testified. He is vice-president of engineering and technical at Alabama River Companies, where he is responsible for the engineering and the technical activities of the Alabama River Companies and also works for P&W and any of the affiliates that

29

he is instructed to in both engineering and technical.   (Vermilyea rebuttal, Prelim. Inj. Tr. 1147–48, November 30, 2007).  He has worked in the pulp and paper industry for 21 years, and Alabama River Company is the fifth company for which he has worked.  He has a bachelor of science in pulp and paper science and technology from North Carolina State, and an MBA from Old Dominion University.  (Vermilyea rebuttal, Prelim. Inj. Tr. 1147, November 30, 2007).

68.  Mr. Vermilyea's  role in P&W's venture with Cello is two-phased.  (Vermilyea rebuttal, Prelim. Inj. Tr. 1148, November 30, 2007).  At the beginning he was working on the "transparency" P&W was to see under the option agreement.  His role was also to lead P&W's project team to help engineer the front end, both the design engineering and engineering management of the whole facility, minus the reactor section and the construction management of the facility.  (Vermilyea rebuttal, Prelim. Inj. Tr. 1148, November 30, 2007.)  He expected that project team to also provide engineering management over the Washington Group, which had been chosen to do the reactor portion of the project.

69.  Mr. Vermilyea's minutes of the meeting on May 4 confirm that Jack Boykin is to have final say on all decisions, just as provided for in the Letter Agreement.  (Vermilyea Surrebuttal, Prelim. Inj. Tr. 1168-70, November 30, 2007).   Mr. Vermilyea based his understanding that P&W was entitled to perform all engineering services on his stated assumption that the contract did ***not*** merely say that P&W "agrees" to provide the services subject to Jack Boykin having the final decision, but his understanding is directly contrary to the actual language of the agreement.  (Vermilyea Surrebuttal, Prelim. Inj. Tr. 1169-70, November 30, 2007.)  Mr. Vermilyea agreed that the plain language of the contract provides that Cello management will have the final decision on all matters, including engineering.  (Vermilyea Surrebuttal, Prelim. Inj. Tr. 1174-77, November 30, 2007).

70. During the course of the discussion of engineering plans, differences of opinion emerged between the P&W engineers and Jack Boykin, who is himself a chemical engineer. (Tr 529-531) (Landegger Direct, Prelim, Inj. Tr. 37, November 19, 2007). Mr. Boykin testified to certain difficulties he had experienced with the work of P&W engineers (Boykin direct, Prelim. Inj. Tr. 530-537, November 27, 2007). Mr. Boykin asserted his right under the contract to make all final decisions concerning the project. Mr. Landegger testified that P&W's participation became rather limited because, according to Landegger, Jack Boykin sought to limit what P&W was doing or what he would permit P&W to do. The disagreements over engineering occurred in May (Boykin direct, Prelim. Inj. Tr. 540, November 27, 2007). As a result, Mr. Boykin had gone back to the Washington group and asked them to supervise the overall engineering (Boykin direct, Prelim. Inj. Tr. 537, 538, November 27, 2007).

71. In his testimony, Mr. Vermilyea admitted that he has never run a plant that produces any kind of fuel, and has never participated in the design of even the paper mills with which is familiar. (Vermilyea Surrebuttal, Prelim. Inj. Tr. 1171-72, November 30, 2007.) He admitted that other engineers are competent to perform the design services he described. (Vermilyea Surrebuttal, Prelim. Inj. Tr. 1172, November 30, 2007.) He also admitted calculations about the financial operation of the plant could be done more accurately after the plant is built if it is allowed to go forward. (Vermilyea Surrebuttal, Prelim. Inj. Tr. 1172, November 30, 2007).

72. The original construction manager for ARP attempted to take charge of the project (Boykin Direct, Prelim. Inj. Tr. 542, 543, November 27, 2007). He indicated that he informed Jack Boykin that Mr. Boykin would have no authority and that he (P&W) would decide who would be the contractors and that he would fire anyone if the length of their shirt sleeves wasn't the same (Boykin Direct, Prelim. Inj. Tr. 542, November 27, 2007). Mr. Boykin rejected the proposal and explained to the construction manager he would not fire anyone without Mr.

31

Boykin's permission (Boykin Direct, Prelim. Inj. Tr. 542, 543, November 27, 2007). P&W still

has access to the project (Boykin Direct, Prelim. Inj. Tr. 543, November 27, 2007) and has

recommended a new gentleman acceptable to Mr. Boykin (Boykin Direct, Prelim. Inj. Tr. 543,

November 27, 2007).

73.  Mr. Boykin continued to meet with the P&W engineers. The latest meeting was on

October 1, 2007. After the meeting on October 1, 2007, Mr. Boykin believed that he had

reached an agreement with Mr. Vermilyea. (Boykin Direct, Prelim. Inj. Tr. 533, 534, November

27, 2007).

## G. Financing For the Bay Minette Plant

74.  Dr. Bransby had arranged introductions to possible sources of financing (Boykin

Direct, Prelim. Inj. Tr. 437, November 27, 2007). One of those companies was called Mag

Capital (Boykin Direct, Prelim. Inj. Tr. 437, November 27, 2007). A second was an Indiana

Group (Boykin Direct, Prelim. Inj. Tr437, 438, November 27, 2007). Dr. Bransby arranged the

introduction both with ARP and with Khosla Ventures (Boykin Direct, Prelim. Inj. Tr. 428,

November 27, 2007). Dr. Bransby is not being paid for his services. His work is considered

outreach and a part of his job (Bransby Direct, Prelim. Inj. Tr. 741, 742, November 28, 2007).

Dr. Bransby is an expert in the field of bioenergy (Bransby Direct, Prelim. Inj. Tr. 744,

November 28, 2007).

75.  From the outset of his relation to P&W, Mr. Boykin made it clear that the cost of

building an adequate plant would likely be $10,000,000.00 (Boykin Direct, Prelim. Inj. Tr. 450,

November 27, 2007). In early stages P&W engineers indicated a possible cost of

$14,000,000.00 (Boykin Direct, Prelim. Inj. Tr. 450 451, November 27, 2007). Later, Cello and

P&W discussed possible ways to reduce the costs of the construction of the initial plant (Boykin

Direct, Prelim. Inj. Tr. 450, November 27, 2007). The cost reduction measures, however, would

change the nature of the plant and eliminate some of the benefits such as being energy self

sufficient (Boykin Direct, Prelim. Inj. Tr. 451, November 27, 2007).  The estimated costs of

building the plant as originally planned is still $10,000,000.00 (Boykin Direct, Prelim. Tr.

453, November 27, 2007).  From the outset it has been clear that sources of financing for the

project would be required (Boykin Direct, Prelim. Inj. Tr. 452, 453, November 27, 2007).

     76.  On April 19, 2007, when the Option Agreement and Letter Agreement were signed,

Jack Boykin believed that he would be able to obtain a loan from the Federal Land Bank in the

amount of $10,000,000.00.  According to Mr. Boykin, Mr. Landegger was aware of the Federal

Land Bank loan application (Boykin Direct, Prelim. Inj. Tr. 496, November 27, 2007).  Mr.

Landegger never said anything to Mr. Boykin about his approval being required for financing

(Boykin Direct, Prelim. Inj. Tr. 497, November 27, 2007).  The fact that George Landegger knew

that Jack Boykin was negotiating for the Federal Land Bank Loan, and that additional financing

was needed, as evidenced by his letter dated April 19, 2007, to Jack Boykin indicating that, if for

any reason, the Federal Land Bank loan did not occur within 30 days that the two of them had

agreed to have further discussions concerning the matter of financing. (Cello Ex. 9)  Only

recently has Mr. Boykin learned that Mr. Landegger objects to him discussing the technology

with prospective lenders (Boykin Direct, Prelim. Inj. Tr. 497, November 27, 2007).  He has

discussed the technology to the extent necessary with the lenders all along (Boykin Direct,

Prelim. Inj. Tr. 497, November 27, 2007).  Federal Land Bank did not make the loan (Boykin

Direct, Prelim. Inj. Tr. 497, November 27, 2007).

     77.  Mr. Boykin testifies that he never told Mr. Landegger that he had personal funds

with which to build the plant; that from the beginning of the idea to build this plant he has been

trying to arrange third party financing; that he has approached over twenty different lending

institutions in the past two years, ten of which occurred in the last two years (Boykin Direct,

Prelim. Inj. Tr. 432, November 27, 2007).  The lending groups approached included insurance companies, investment banker groups and banks (Boykin Direct, Prelim. Inj. Tr. 431, November 27, 2007).  Most of the companies approached would have required that the Boykins give up their control of the business (Boykin Direct, Prelim. Inj. Tr. 431, 432, November 27, 2007). Many of them agreed that if the technology proves to be successful they would finance later plants (Boykin Direct, Prelim. Inj. Tr. 432, November 27, 2007).

78.  Despite his letter of March 7, 2007, (Cello Ex 8)  in which he indicated an ability to assist in obtaining loans for the building of plants and his letter of April 19, 2007,  (Cello Ex 9) further indicating that he would assist in obtaining loans or financing for the Bay Minette plant, there is no evidence that George Landegger or P&W provided any assistance to Jack Boykin for obtaining a loan of any type.  (Boykin Direct, Prelim. Inj. Tr. 500, November 27, 2007)

79.  After the loan from the Federal Land Bank did not materialize, Jack Boykin made exhaustive efforts to obtain conventional financing for the construction of the plant at Bay Minette, but was unable to do so.   (Boykin Direct, Prelim. Inj. Tr. 498; 431-432, November 27, 2007) .

### H. The July Khosla Proposal

80.     Khosla Ventures learned of Jack Boykin's work in the first part of 2007.  (Kaul Direct, Prelim. Inj. Tr.1062, November 30, 2007).  They met through Dr. David Bransby.  (Kaul Direct, Prelim. Inj. Tr.1063, November 30, 2007.)  Dr. Bransby described the Boykin technology to Khosla Ventures as producing fuel at much lower costs than anyone had done before.  (Kaul Direct, Prelim. Inj. Tr.1063, November 30, 2007).  Khosla representatives had a conference call with Jack Boykin after they were introduced.  Mr. Kaul has had primary responsibility for this relationship at Khosla Ventures.  (Kaul Direct, Prelim. Inj. Tr.1064, November 30, 2007).  Jack Boykin told them what his technology could accomplish in producing fuel for a dollar a gallon and what work he had done in building plants, but did not disclose any of the details of the technical process, the catalysts, the engineering specifications, or the parameters within which the process operated.  (Kaul Direct, Prelim. Inj. Tr.1065-66, November 30, 2007).  Khosla Ventures was interested in going forward, without knowing the details of the technology, based on the strength of the references and recommendations from others and their own assessment of Jack Boykin's knowledge and skill.  (Kaul Direct, Prelim. Inj. Tr.1067-70, November 30, 2007).

81.  Mr. Kaul testified that Khosla Ventures usually takes an equity interest in the companies in which it invests, and has to take great care to protect confidential information.  (Kaul Direct, Prelim. Inj. Tr.1056-60, November 30, 2007.)  Khosla Ventures initially proposed acquiring an equity interest, but was informed that no equity interest in the company was available.  (Kaul Direct, Prelim. Inj. Tr.1070-72, November 30, 2007.)  After learning that no equity interest was available, Khosla Ventures went back to the drawing board to see if there were other ways in which they could work with Cello, and proposed the idea of an operating and maintenance agreement.  (Kaul Direct, Prelim. Inj. Tr.1072-75, November 30, 2007.)  Jack Boykin indicated that the first proposal, sent in July, would not work, after which Cello and

35

Khosla Ventures continued to negotiate.  (Kaul Direct, Prelim. Inj. Tr.1075-76, November 30, 2007).  The initial proposal differed in several material respects from the final MFC.  (Kaul Direct, Prelim. Inj. Tr.1075-78, November 30, 2007).

82.  On or about July 27, 2007, FES, received a proposal from Khosla Ventures (Khosla) for an *Operating and Management Agreement* that would provide the funds for the construction of the Bay Minette plant.  Mr. Boykin testified that he received a proposal from Khosla in the last few days of July (Boykin Direct, Prelim. Inj. Tr. 504, November 27, 2007).  He sent it on to George Landegger on July 30, 2007, and communicated to Mr. Landegger that this may be a financing method and that it looked very, very good (Boykin Direct, Prelim. Inj. Tr. 504, November 27, 2007).  He did not accept the proposal as worded and suggested to Mr. Landegger that they discuss the matter (Boykin Direct, Prelim. Inj. Tr. 505, November 27, 2007) at a Cello Board Meeting that had already been scheduled for the following day, July 31, 2007, in New York.  (Cello Ex. 13) FES, had previously received and rejected proposals from Khosla that would have involved the granting of an equity interest in FES, stating as the reason for rejecting those proposals that the proposals were not permitted under the terms of the Option Agreement.  (Boykin Direct, Prelim. Inj. Tr. 438; Landegger Direct, Prelim. Inj. Tr. 70, 72).

83.  The Khosla proposal provided the opportunity building of numerous plants (Boykin Direct, Prelim. Inj. Tr. 505, November 27, 2007).  Mr. Boykin made it clear to Khosla that he would keep his obligations under the Option Agreement (Boykin Direct, Prelim. Inj. Tr. 505-06, November 27, 2007).  The information sent to Mr. Landegger about the Khosla proposal included the proposal itself and an executive summary of the proposal (Boykin Direct, Prelim. Inj. Tr. 506, November 27, 2007).  Nothing about the proposal was held back from Mr. Landegger (Boykin Direct, Prelim. Inj. Tr. 50.64, November 27, 2007).  The meeting had already

36

been planned in New York before the Khosla proposal was received (Boykin Direct, Prelim. Inj. Tr. 506-507, November 27, 2007).

84.   At the meeting, Mr. Landegger objected the proposal, and Mr. Boykin was quite surprised (Boykin Direct, Prelim. Inj. Tr. 507, November 27, 2007). Mr. Landegger responded with vulgarity by saying "I will be Khosla" and "I can do this to you if you are going to let them" (Boykin Direct, Prelim. Inj. Tr. 506, November 27, 2007). The meeting was on July 31, 2007 (Boykin Direct, Prelim. Inj. Tr. 508, November 27, 2007)

## **I. The Landegger Proposal**

85.   George Landegger testified that at the meeting in New York on July 31, 2007, he informed Jack Boykin that Boykin had no right to enter into the agreement with Khosla without Landegger's approval.  (Landegger Direct, Prelim. Inj. Tr. 70, 72, November 19, 2007)   George Landegger stated that he indicated to Jack and Allen Boykin that he did not think the proposal was advantageous to FES, and confirmed that he told them that if they wanted a Khosla, he would be Khosla. (Landegger Direct, Prelim. Inj. Tr. 61, November 19, 2007)

86.   Three days later, on August 3, 2007, George Landegger on behalf of P&W made an offer to these defendants that would modify the Option and Letter Agreement.  (Boykin Direct, Prelim. Inj. Tr. 508, November 27, 2007; Cello Ex. 14, paragraph 5).  That proposal was not at all like the Khosla proposal (Boykin Direct, Prelim. Inj. Tr. 508, November 27, 2007).  Instead of paying $10,000,000.00 for the Option, P&W would pay $1.00 for the Option.  (Cello Ex. 14, paragraph 2).  Instead of acquiring a one third interest in Cello, P&W would acquire a 49% interest in Cello.  Instead of Cello building the plant at Bay Minette, a different entity called NEWCO would build the plant at Bay Minette.  (Cello Ex. 14, paragraph 5).  P&W would own 51% and Cello would own 49% of NEWCO.  (Cello Ex. 14, paragraph 2).  Instead of Jack Boykin having the right to make all final decisions concerning the plant at Bay Minette,

construction of the plant at Bay Minette would be controlled by P&W.  (Cello Ex. 14, paragraph 6)  The proposal would have given Mr. Landegger 80% of the earnings (Boykin Direct, Prelim. Inj. Tr. 509, November 27, 2007).

87.  In addition to the attempted take-over of the project and renegotiation of the Option Agreement as described in the preceding paragraph, George Landegger's new proposal would authorized P&W to construct twenty-five plants on its own, pursuant to licenses from FES. FES's rights under the Option would be to receive a one time payment of $500,000 and 20 cents per gallon of fuel as royalty.  (Boykin Direct, Prelim. Inj. Tr. 508, 509, November 27, 2007; Cello Ex. 14, paragraph 8).

88.  Mr. Boykin rejected the August 3, 2007 proposal to renegotiate the Option by telephone.  (Boykin Direct, Prelim. Inj. Tr. 509-10, November 27, 2007).  Mr. Boykin made a counter-proposal to Mr. Landegger in a letter dated September 10, 2007.  (Cello Ex. 15).  The letter outlines the proposal which, if accepted, would have allowed the parties to go their separate ways with P&W having the right to use the technology to build 25 plants of its own.  In response to the September 12, 2007, proposal Mr. Landegger requested figures for a much reduced cost of building a plant that was not in keeping with the original plans for a Bay Minette project. (Boykin Direct, Prelim. Inj. Tr. 514, November 27, 2007).  (Those figures have been used in evidence out of context.)

89.  To the extent that P&W was to be treated as a shareholder, Mr. Boykin felt that P&W should have a reciprocal responsibility that a shareholder would have to a company (Boykin Direct, Prelim. Inj. Tr. 517, 518, November 27, 2007).  Mr. Boykin did not feel that Mr. Landegger had Cello's interest in mind in rejecting the Khosla proposal and making the proposal that he made on August 3, 2007 (Boykin Direct, Prelim. Inj. Tr. 517, 518, November 27, 2007).

## J. The Manufacturing and Financing Contract

90.  After P&W attempted to block the July Khosla proposal, FES undertook to negotiate the Operating and Managing Agreement proposed by Khosla with representatives with Khosla Ventures to arrive at a contract that would not violate the Option Agreement and Letter Agreement with P&W.  (Boykin Direct, Prelim. Inj. Tr. 511, 512, November 27, 2007).  On September 12, 2007, FES, entered into a Manufacturing and Financing Contract ("MFC") with BioFuels, an affiliate of Khosla Ventures.  (Cello Ex. 17).  Pursuant to the MFC, BioFuels agreed to pay a $12,500,000.00 project fee to be used for the construction of the plant at Bay Minette.  (Cello Ex. 17, p. 4).  BioFuels agreed to operate that plant and future plants to be constructed and to recruit the staff for the operation of that plant and future plants.  (Cello Ex. 17, p. 10).  For its services, BioFuels is to be paid 49% of the revenues remaining after payment for debt service, utilities and raw materials.  From the 49%, BioFuels is to pay all operating costs of the plant.  The MFC specifically incorporates by reference the Option Agreement and Letter Agreement, and provides that if there is any conflict between the MFC and those documents, the terms, provisions and conditions of those documents are to govern.  (Cello Ex. 14, p. 15)  Mr. Boykin testified that he  made certain that the MFC protected the rights of the Option holder  by providing that if there was any conflict, the Option Agreement would govern (Boykin Direct, Prelim. Inj. Tr. 519, November 27, 2007).

91.  The MFC makes no provision for BioFuels to receive shares or any equity in FES.  It makes no provision for any right on the part of BioFuels to appoint anyone to a Board of Directors or to have any other governance rights in FES.  It provides that FES Proprietary Information (which includes the technology) is not to be disclosed to other parties. (Cello Ex. 17, pp. 12-13).

92.  The MFC provides that the proprietary information is to be disclosed to BioFuels only to the extent necessary to allow it to operate the plants.  (Cello Ex. 17, p. 3).  It specifically

provides that BioFuels may not use the technology for any purpose other than to operate plants for FES.  (Cello Ex. 17, p. 3).

93.  While BioFuels has the right to assign its ***contract rights*** under the LLC to obtain financing, it does not have the right to assign any ownership interest in the Process Information and Boykin technology as security for any loan.  The rights of any assignee of contract rights will be limited to the rights of BioFuels, which means that the technology can be only used by the lender to operate the plant ***for Cello***.  (Cello Ex. 17, p. 6).

94.  Mr. Boykin testified that under the MFC, BioFuels would provide the labor management to operate the plant and will pay all of the costs of operating the plant and carry the production costs and receivables (Boykin Direct, Prelim. Inj. Tr. 519, 520, November 27, 2007).  They will maintain the plant and may be required to put in additional capital (Boykin Direct, Prelim. Inj. Tr. 520, November 27, 2007).  Under the MFC, Cello remains responsible for the construction of the plants and will own the plants totally independently of BioFuels (Boykin Direct, Prelim. Inj. Tr. 520, November 27, 2007).  BioFuels has no significant participation in the construction of the plant (Boykin Direct, Prelim. Inj. Tr. 520, November 27, 2007).  BioFuels will only become involved under the MFC at the time of start up.  (Boykin Direct, Prelim. Inj. Tr. 520, November 27, 2007).  During the period of construction, BioFuels will not have any access to the technology.  After the plant is completed Cello will train BioFuels people the same as they would have trained their own people if they had hired its own people to operate the plant (Boykin Direct, Prelim. Inj. Tr. 520, 521, November 27, 2007).  Their only access to technology after it is completed will be to the extent necessary to carry out the operation of the plant.  That does not include access to the actual chemisty (Boykin Direct, Prelim. Inj. Tr. 521, November 27, 2007).  Under the MFC, BioFuels cannot release any information outside of the plant project itself.  (Boykin Direct, Prelim. Inj. Tr. 521, November 27, 2007).  BioFuels' only responsibility

for the construction of the plant other than providing funds (which they have already done). (Boykin Direct, Prelim. Inj. Tr. 521, November 27, 2007). BioFuels' money will be used to construct the plant (Boykin Direct, Prelim. Inj. Tr. 521, 522November 27, 2007), but the plant is constructed debt free; there is no mortgage (Boykin Direct, Prelim. Inj. Tr. 522, 523, November 27, 2007). BioFuels receives no income until there are sales of products (Boykin Direct, Prelim. Inj. Tr. 522, November 27, 2007).

95. Mr. Boykin testifies that he provided Mr. Landegger with a signed copy of the MFC at the board meeting of September 19, 2007, at time of the dove hunting trip (Boykin Direct, Prelim. Inj. Tr. 538, 539, November 27, 2007). At the time that he handed the agreement to Mr. Landegger, Mr. Landegger stated that "nobody would do this" (Boykin Direct, Prelim. Inj. Tr. 539 November 27, 2007).

96. Howard Rockman, the intellectual property expert, testified that the MFC here at issue does not assign or license or otherwise transfer any technology from Cello to Biofuels. (Rockman Direct, Prelim. Inj. Tr. 999–1000; Rockman Cross, Prelim. Inj. Tr. 1016–19, November 30, 2007). It provides that Biofuels will operate the plant after Cello builds it, will not receive any license, assignment, or other transfer of intellectual property, will receive only such information as is necessary to operate the plant and will be under an obligation of confidentiality as to any information disclosed. (Rockman Direct, Prelim. Inj. Tr. at 1000–1001, November 30, 2007). This type of arrangement is not uncommon, and is not a transfer of the technology in any sense. (Rockman Direct, Prelim. Inj. Tr. at 1001–1002, November 30, 2007). In substance and in form, it is not a license. (Rockman Direct, Prelim. Inj. Tr. at 1002–1003, November 30, 2007).

97. Rockman further explained that a patent conveys an exclusive right, the right to exclude, to prevent others from practicing the technology. (Rockman Direct, Prelim. Inj. Tr.

41

996–97, November 30, 2007).  An assignment is a transfer of all of one's rights under the patent, conveying to the assignee the exclusive right, that is, the right to prevent others from using the technology by suing them for patent infringement.  (Rockman Direct, Prelim. Inj. Tr. 997, November 30, 2007).  A license grants to another the right to practice the technology and use the intellectual property for the licensees own benefit or purposes, in that licensees have the right to go out and sell the product, to manufacture the product, in some cases sublicense others to do it.. (Rockman Direct, Prelim. Inj. Tr. 997–98, November 30, 2007).  A license permitting a licensee to set up business for himself and manufacture a product to sell himself is different from a service contract in which the manufacturer makes the product for the patentee to sell.  (Rockman Direct, Prelim. Inj. Tr. 998–99, November 30, 2007).

### K. The Testimony Of Experts Concerning Equity

98.  The Court heard extensive testimony from Dave G. Borden and Dr. Robert McLeod as experts.  Both a qualified as experts and have impressive credentials.  Their testimony centered on the nature of the MFC.  Mr. Borden contended that the MFC is a disguised equity. After testifying generally about the nature of debt and equity financing (McLeod Direct, Prelim Inj. Tr. 881-884, November 29, 2007), Dr. McLeod testified that he had examined the MFC.  Dr. McLeod expressed the opinion that the MFC does not provide BioFuels with an equity ownership in Cello.  (McLeod Direct, Prelim Inj. Tr. 885, November 29, 2007).  He explained that there is no ownership position in Cello, no voting rights, no ability to elect to have people on the Board of Directors, no participation in the increase or appreciation in value of Cello, and in the event it is sold, there is no distribution to BioFuels.  (McLeod Direct, Prelim Inj. Tr. 885, November 29, 2007).

42

99. On cross-examination, when asked whether there were any characteristics of equity found in the MFC, Dr. McLeod testified that there were not. He testified that it is basically a contractual relationship. (McLeod Direct, Prelim Inj. Tr. 906, November 29, 2007).

100. On re-direct, Dr. McLeod confirmed the absence of any characteristics of equity, one at a time. (McLeod Redirect, Prelim Inj. Tr. 966-67, November 29, 2007).

101. The issue to be decided by the Court at this time is whether or not to halt the construction of the plant. It is clear that a determination of whether or not the MFC creates some kind of equity interest can await a final hearing, if a final hearing is necessary.

## L. The Cello Governance Documents

102. P&W requested that Boykin Trust, LLC, adopt an Operating Agreement for Cello. (Cello Ex. 12) The initial request was for corporation documents rather that limited liability company documents and was clearly inappropriate. (Cello Ex. 12) Counsel for Parsons & Whittemore Enterprises Corporation pointed out that the Operating Agreement would need to provide for managers. (Cello Ex. 12) In a letter dated September 11, 2007, Mr. Landegger pointed out that, apparently, Boykin Trust was the sole member of FES, and it would be necessary that Boykin Trust adopt the Operating Agreement. (Cello Ex. 16) He suggested that Jack Boykin turn documents suggested by P&W attorneys over to Mr. Boykin's own counsel to prepare the necessary documents. The letter made no mention of any right of approval by George Landegger or any expectation that the documents would be tendered to him for approval. The Option Agreement and Letter Agreement imposed no such requirement. In fact, the Option Agreement specifically provides, "This Option does not entitle the Option Holder as a holder hereof to any voting rights as a shareholder of the Company prior to exercise hereof." (Cello Ex. 10, paragraph 5). Despite the September 11 letter and the provisions of the Option, Mr.

43

Landegger insists that the Operating Agreement and Articles of Organization could not be adopted without his prior approval.  (Landegger Direct, Prelim. Inj. Tr. 54, November 19, 2007).

103.  At the time that the Option Agreement and Letter Agreement were signed the Articles of Organization of FES did not provide for management by managers.  On September 17, 2007, FES, filed amended Articles of Organization effecting several perfunctory changes in the Articles of Organization.  (Cello Ex. 18) First, Articles of Amendment changed the name of FES, to Cello Energy, LLC, because of a possible conflict with another LLC in the State of Arizona with the same name and a similar business description of purpose.  (Cello Ex. 18) Secondly, the Articles of Amendment fully stated the business purpose of the LLC which would include among other things the types of agreements that had been entered into with P&W. Thirdly, the Articles of Amendment provided that the entity was to be managed by managers. (Cello Ex. 18)

104.  On September 18, 2007, Boykin Trust, LLC, the sole member of Cello, adopted an Operating Agreement for Cello.  (Cello Ex. 19) The Operating Agreement designated Jack Boykin and Allen Boykin as managers of the company.  Although, the Alabama Limited Liability Company Act makes no provision for a Board of Directors and does not define the rights, duties and responsibilities of either directors or a Board of Directors, the Operating Agreement provided for a Board of Directors for Cello.  (Cello Ex. 19, p. 5)

105.  The Operating Agreement specifically provides that if and when the Option is exercised that P&W would have the right to appoint full persons to the Board of Directors of Cello, and that the Boykin interest would have the right to appoint eight members to the Board of Directors. (Cello Ex. 19, pp. 5, 6).

106.  The Operating Agreement also incorporated by reference the Option Agreement and Letter Agreement.  The Operating Agreement provides that in the event of a conflict

between the requirements of the Option Agreement and Letter Agreement and the terms of the Operating Agreement, the requirements of the Option Agreement and Letter Agreement will govern.  (Cello Ex. 19, p. 3).

## M. Status of the Construction

107.  Jack Boykin testified that the plant at Bay Minette is being built at Bay Minette Airport Industrial Park (Boykin Direct, Prelim. Inj. Tr. 426, November 27, 2007).  The property has been cleared and Cello has purchased the buildings and approximately 60% of the equipment that goes into the building (Boykin Direct, Prelim. Inj. Tr. 426, November 27, 2007).  The equipment will be assembled and constructed by the manufacturers and probably delivered in February.  Construction will be completed during March, April and May (Boykin Direct, Prelim. Inj. Tr. 426-427, November 27, 2007).

108.  According to Mr. Boykin, an office building is being built separately from the plant (Boykin Direct, Prelim. Inj. Tr. 427, November 27, 2007).  The persons selected to build the office gave the best price (Boykin Direct, Prelim. Inj. Tr. 427, November 27, 2007).  The Company building the office is properly licensed (Boykin Direct, Prelim. Inj. Tr. 427-428, November 27, 2007).

109.  Mr. Boykin states that the ground clearing has occurred and costs a great deal less than bids received from the Monroeville area (Boykin Direct, Prelim. Inj. Tr. 428, November 27, 2007).  Bids from the Monroeville area were obtained by ARP engineers.  The local company is doing the work less expensively (Boykin Direct, Prelim. Inj. Tr. 428, 429, November 27, 2007).

## N. The Risk of Disclosure of Technology

110.  At the present time, no one other than Mr. Boykin and P&W knows the chemistry that is involved in the process for conversion of cellulosic materials and tires into fuel.  (Boykin Direct, Prelim. Inj. Tr. 462, November 27, 2007).  The chief scientist for P&W knows the

45

technology, and anybody he has informed knows the technology.  (Boykin Direct, Prelim. Inj. Tr. 462, November 27, 2007).  The technology has also been disclosed to the patent attorneys (Boykin Direct, Prelim. Inj. Tr. 462, November 27, 2007).  Cello has not disclosed its technology to anyone else and has no intention of doing so (Boykin Direct, Prelim. Inj. Tr. 462, November 27, 2007).  Mr. Boykin describes himself as a fanatic about protecting the technology (Boykin Direct, Prelim. Inj. Tr. 463, November 27, 2007).  The patents will fully disclose the technology to anyone who is interested on November 4, 2008.

### O.  P&W Will Not Suffer Irreparable Harm

111.  Mr. Borden pointed out that the Cello interests were at risk concerning the performance of the technology (Borden Direct, Prelim. Inj. Tr. 281, November 21, 2007).  He pointed out that P&W had paid $2,500,000.00 for the Option and that the $2,500,000.00 would be at risk based on the performance of the technology and the cost of construction.  Mr. Borden argued that because the MFC does not create personal liability for Cello and increased the risk to P&W.  Nothing in the Option Agreement or Letter Agreement actually required personal liability.   (Borden Direct, Prelim. Inj. Tr. 282-284, November 21, 2007).

112.  Dr. McLeod testified that if Dave Borden's testimony about shifting risk profile had anything to do with equity, there would be a shift in risk profile any time anyone takes out an insurance policy.  (McLeod Direct, Prelim. Inj. Tr. at 885-886, November 29, 2007).  Dr. McLeod testified that when you look at the project fee that is being paid by BioFuels, the MFC basically benefits P&W.

113.  Mr. Borden also testified that the risk to P&W was not increased by the MFC:

> Q:  And how is their interest and their risk affected by MFC?
> A.  With respect to the MFC there is really no change.  P&W has got $2,500,000.00 invested with Cello and still has the Option to contribute an additional $10,000,000.00 to get up to a 33% interest in Cello.

46

(Borden Direct, Prelim. Inj. Tr. 285, November 21, 2007).

114. Mr. Borden admitted on cross examination that if the construction of the plant goes forward, Mr. Landegger can await the successful operation of the plant to determine whether or not to exercise his Option (Borden Cross, Prelim. Inj. Tr. 320-321, November 21, 2007).

115. He admitted that if the technology proves to the unsuccessful, P&W will lose only the $2,500,000.00 option money (Borden Cross, Prelim. Inj. Tr. 322, November 21, 2007); Cello and the Boykins will lose whatever they have vested in it. (Borden Cross, Prelim. Inj. Tr. 322, November 21, 2007). He admitted that there is no way to calculate the damage to P&W if someone else arrives at the technology before the plant is put into operation (Borden Cross, Prelim. Inj. Tr. 323, 324, November 21, 2007). He admitted that he had made no effort to calculate what P&W stands to lose if the plant is delayed (Borden Cross, Prelim. Inj. Tr. 325, November 21, 2007).

116. Mr. Borden admitted that P&W is not currently funding the construction (Borden Cross, Prelim. Inj. Tr. 340, November 21, 2007). Mr . Borden admitted that if venture is unsuccessful, BioFuels is far more at risk than P&W. (Borden Cross, Prelim. Inj. Tr. 343, November 21, 2007). He admitted that as a general proposition it is true that it's better to be first in bringing new technology to the market place (Borden Cross, Prelim. Inj. Tr. 343, 344, November 21, 2007).

117. Concerning the possibility of delay of the plant Mr. Borden testified as follows:

"Q. One of the things that a delay in getting into the ground can do is throw off the financial projections as to whether the project is going to be successful financially or not?
A. It could. Obviously, I think all parties would have an interest in moving this forward as quickly as they can

(Borden Cross, Prelim. Inj. Tr. 344, November 21, 2007).

118.  Mr. Boykin testified that P&W would benefit from the construction of the plant; that they would be hurt by stopping the construction of the plant (Boykin Direct, Prelim. Inj. Tr. 546, November 27, 2007).  If the plant is stopped there will be no return on P&W's investment (Boykin Direct, Prelim. Inj. Tr. 546, November 27, 2007).  Mr. Boykin testified that if P&W were able to demonstrate that there had been any breach of any agreement either concerning the engineers or raw materials that is a matter that can be reduced to damages (Boykin Direct, Prelim. Inj. Tr. 548, 549, November 27, 2007).

119.  Dr. David Bransby believes that the negative consequences to everybody that would result on stopping work on the plant are huge.  He believes stopping the work will have a harmful effect on P&W.  He believes this because we are dealing with the first of that kind of plant here.  If this one is delayed, then, every other plant is going to be delayed by the same amount of time (Bransby Direct, Prelim. Inj. Tr. 773, 774, November 28, 2007).

120.  Mr. Kaul testified that the investment by Khosla Ventures and Biofuels does not diminish but enhances the value of P&W's stake in Cello, as does the capacity of those companies to arrange funding for additional subsequent expansion.  (Kaul Direct, Prelim. Inj. Tr. 1112–19, November 30, 2007).  He also testified that the MFC does not run afoul of any right of P&W to perform engineering services, because P&W does not have that right under its contract and because BioFuels is not involved in any way in the construction of the plant,  (Kaul Direct, Prelim. Inj. Tr. 1106, November 30, 2007.) and that the MFC does not impair P&W's rights under the letter agreement to provide feedstock, and instead calls for Cello to acquire feedstock from P&W.  (Kaul Direct, Prelim. Inj. Tr. 1107-08, November 30, 2007).

## P. Cello Will be Harmed by a Preliminary Injunction

121.  The harm to Cello in the event that the construction of the plant is halted will be enormous according to Mr. Boykin (Boykin Direct, Prelim. Inj. Tr. 548, November 27, 2007).

For each day that the plant is not constructed someone else is going to.  A Dutch company is trying to build a cellulose fuel plant in the United States (Boykin Direct, Prelim. Inj. Tr. 548, November 27, 2007).  Cello has bought equipment and has sent out orders and paid down payments.  If construction is stopped the vendors will take the stuff that has been ordered and sell it to somebody else and Cello will lose money.  Cello will have difficulty going back to the same vendors later.  The buying process is technically difficult.  If the construction is stopped basically Cello will be put out of business (Boykin Direct, Prelim. Inj. Tr. 548, 549, November 27, 2007).

    122.  Mr. Boykin testified that the loss of revenue from delay of the plant would amount to $140,000.00 per day.  Delay would also delay the commencement of the two additional plants that are planned under the MFC (Boykin Direct, Prelim. Inj. Tr. 549, November 27, 2007).  If the preliminary injunction is granted, Cello may even lose its opportunity to do business with BioFuels (Boykin Direct, Prelim. Inj. Tr. 550, November 27, 2007).  BioFuels has already indicated that it would hold up on the two additional plants until the litigation is resolved.  (Boykin Direct, Prelim. Inj. Tr. 551, November 27, 2007).  The Washington Group has notified Cello that it will withdraw its services because of the litigation (Boykin Direct, Prelim. Inj. Tr. 551, November 27, 2007).  This is a significant loss because the Washington Group is a national firm that could have provided services for many plants (Boykin Direct, Prelim. Inj. Tr. 551, November 27, 2007).  Although Mr. Boykin knew of the existence of P&W's BioFuel plant at the time he entered into the Option Agreement, he now has concerns about their competition if Cello is forced out of business (Boykin Direct, Prelim. Inj. Tr. 543, November 27, 2007).  Under the terms of the Option, that company could potentially exercise the Option.  He is also concerned about a man named Ben Thorpe whom he believes to be a competitor and who has seen information about the technology through P&W (Boykin Direct, Prelim. Inj. Tr. 552-54, November 27, 2007).  Mr. Boykin is concerned about the possibility of P&W disclosing

information about the technology to others (Boykin Direct, Prelim. Inj. Tr. 553, 554, November 27, 2007).

123.  Mr. Rockman, the patent attorney, testified that an injunction to delay construction of the plant would irreparably harm Cello.  (Rockman Direct, Prelim. Inj. Tr. 994–95, November 30, 2007).  Cello would not be able to work with and further develop its technology.  (Rockman Direct, Prelim. Inj. Tr. 995, November 30, 2007.)  It is very important to get as much market lead time as possible with a new technology for various reasons, including brand recognition. (Rockman Direct, Prelim. Inj. Tr. 993-94, November 30, 2007).

124.  Mr. Kaul testified that in markets for developing technologies such as alternative fuels, it is very important to be first to market.  (Kaul Direct, Prelim. Inj. Tr. 1060–61, November 30, 2007).  The first to market will have a competitive advantage in customers switching over, in recruiting top people, and in acquiring first rights on resources.  (Kaul Direct, Prelim. Inj. Tr. 1061, November 30, 2007.)

125.  Mr. Rockman testified that actually bringing the plant on-line will involve some additional research and development to straighten out any kinks in the process, so the process will probably have a little tweaking before it actually produces a product, but by November 2008 that technology is going to be open to the world.  (Rockman Direct, Prelim. Inj. Tr. 995, November 30, 2007.)  Competitors can see the patent description, and others in the field will be jumping on this technology.  (Rockman Direct, Prelim. Inj. Tr. 995, November 30, 2007.)  Those competitors may include not only small entrepreneurs, such as the parties to this suit, but also big the oil companies with vast cash reserves, which companies are also heavily involved in coming up with renewable fuels also.  (Rockman Direct, Prelim. Inj. Tr. 995, November 30, 2007.)  If such competitors see this technology from the patent publication and they start working on this technology, while at the same time Cello is enjoined from working on the project, it would be

destructive of Cello's capabilities of entering the market at all while others with deep pockets are out there flooding the market with technology that Dr. Boykin developed.  (Rockman Direct, Prelim. Inj. Tr. 995-96, November 30, 2007.)  An injunction would therefore be seriously harmful to the interests of Cello and probably would be detrimental to the interests of P&W because of its contractual rights and position as a potential minority member.  (Rockman Direct, Prelim. Inj. Tr. 995-96, November 30, 200795.)

126.  Ryan Katofsky is an expert in the bioenergy market.  He testified that he has never in his career seen the level of interest that there is today in alternative fuels.  (Katofsky Direct, Prelim. Inj. Tr. at 809, November 28, 2007).  He attributes that to a convergence of factors.  High oil prices creates an economic environment for biofuels development.  "There is a whole energy security aspect that it associated with the dependence on oil."  Climate change is also a factor. The employment potential associated with renewable energy is an important factor for sparking the interest.  (Katofsky Direct, Prelim. Inj. Tr. at 809-810, November 28, 2007).

127.  Mr. Katofsky indicated that historical production of traditional biofuels has been food-based.  Current legislation places greater emphasis on second-generation technologies that do not require a food base and that would employ biomass.  (Katofsky Direct, Prelim. Inj. Tr. at 813-14, November 28, 2007).

128.  According to Mr. Katofsky, a number of companies are deeply involved in biofuels technology:

> Q   I'd like to direct your attention to the chart entitled
> Leading Companies Developing Advanced Biofuels Technologies.
> Is that the chart you prepared?
> A   That is.
> Q   Would you briefly describe for the Court what you've done
> on that chart?
> A   Sure.  I've identified -- and this is not an exhaustive
> list, I would point out.  But here are six companies who I

think of as being at a fairly advanced stage of commercial
demonstration.  So these are all companies that are either
constructing projects or are very close to breaking ground on
what we would call first commercial plants.  And without going
through all the details, in the interest of time, there are
some important things to note about these companies.

First of all, they are not just American companies,
but they are international companies as well:  Choren and Iogen
and Abengoa are European and Canadian companies.

POET, Verenium, and Range Fuels, of course, are U.S.
companies.  And the other important note is that these
companies tend to have fairly significant backing, whether it's
from venture capital, like Khosla Ventures backing Range Fuels;
or in the case of Choren Industries, which is a German company,
Shell, Volkeswagon, and Daimler are all investors in this
technology.

In the case of Iogen, Shell and Goldman Sachs and
Petro-Canada have made investments in these companies.

So these are generally well-funded companies.  Some of
these companies have also received Department of Energy
grants.  There was 385 million dollars of grants awarded -- I
believe it was earlier this year or late last year -- and these
companies are all aggressively pursuing commercialization of
their technologies.

(Katofsky Direct, Prelim. Inj. Tr. at 816-17, November 28, 2007).

129.  Mr. Katofsky believes that an injunction would have a serious impact on Cello:

Q   Assume hypothetically with me that the Court were to issue
an injunction and that the injunction remained in place for a
year to two to get to trial and any appeals.  Do you have an
opinion as to the likely effect on Cello and Cello's ability to
develop the technology if the construction were enjoined?
A   I do.  I think that that type of a delay would be very
significant in terms of maintaining that competitive position
relative to these other companies that are aggressively
pursuing commercialization.
Q   Explain to the Court why you have that opinion.
A   Well, the process of commercialization is not a linear
process.  So research and development can occur over many, many
years.  Once you successfully demonstrate that first plant, the
rollout or the deployment of that technology can occur
relatively quickly, and in fact it is likely to occur
relatively quickly.  We see markets like this that are sort of
prime, you know, the pump is primed on these markets, they are
ready, they are ready to grow.  And if you have a viable

technology and you've demonstrated that technology , you have the ability to move quickly and gain scale and, you know, essentially pull ahead of companies that are farther behind in the commercialization process.  So because of that nonlinearity effectively delays at this stage of commercialization can have a significant impact.

Q  Does your opinion include the likelihood that other companies that are competing in the same or similar biofuels markets will be able to gain a lead over Cello?

A  Yes, it does.

(Katofsky Direct, Prelim. Inj. Tr. at 821-22, November 28, 2007).

130.  Mr. Katofsky clearly expressed the consequential effects of delay on a business like

Cello:

Q  All right.  Now, did you make an assumption yesterday about the amount of delay that you anticipated and the consequence as to the amount of a particular day or were you assuming that there would be consequences if there were delay of only a day?

A  Clearly if there was a delay of a day, that would not be consequential.

Q  Okay.

A  Given, however, where the market is, where I expect the market to be going, I don't see any advantage from a delay of any length of time.  Obviously if it's a day or two days, that's, you know, "in the noise," so to speak.  But when you get beyond, you know, small amounts of time like that, then delays become more consequential.

Q  Okay.  Well, what was your assumption as to the amount of delay?

A  I believe we talked about a one- or two-year delay in the direct testimony.

Q  Okay.  All right.  And if the delay were less than that, then that may affect the consequences that you're talking about; is that right?

A  It may.  But I think it's very hard to say.  When a project is delayed or when a company is delayed, it's hard to say what condition that company may be in afterwards.  It's hard to say if a delay of, say, three or six months instead of a delay of one or two years, if that leads to other factors that further that delay.  So, you know, a shorter delay can turn into a longer delay.  I mean, once you start that or once you get into that situation, it's really hard to say, you know, if you will ever get, say, back on track.

53

(Katofsky Direct, Prelim. Inj. Tr. at 855-56, November 28, 2007).

131. Dr. David Bransby testified that the competition related to this type of technology is extreme. He believes that oil companies will quickly become involved in BioFuels and that the competition will now begin to move very rapidly (Bransby Direct, Prelim. Inj. Tr. 770, 771, November 28, 2007).

132. Dr. Robert McLeod expressed the opinion that based on his review of the materials involved in the case, which he identified in his testimony, and hearing the testimony in the courtroom, that options for financing for Cello were very limited. Cello had been turned down for requests for conventional financing. Dr. McLeod was of the opinion that this is not an area where banks get involved because it involves unproven technology. (McLeod Direct, Prelim. Inj. Tr. 876-877, November 29, 2007). The existence of judgments would impair the ability of Cello to obtain financing. (McLeod Direct, Prelim. Inj. Tr. 877, November 29, 2007). This would be true, even if the financial difficulties were brought about by matters without the control of the individual involved, such as hurricanes. (McLeod Direct, Prelim. Inj. Tr. 877, November 29, 2007).

133. Jack Boykin testified that the defendants Jack Boykin and Allen Boykin do not have the funds with which to build the plant by themselves (Boykin Direct, Prelim. Inj. Tr. 430, November 27, 2007). They cannot build the plants without a source of funding (Boykin Direct, Prelim. Inj. Tr. 430, November 27, 2007). It is almost impossible to finance new technologies through debt such as bank loans, beause most banks require greater capitalization and a lower level of risk. (Vermilyea Surrebuttal, Prelim. Inj. Tr. 1065, November 30, 2007).

134. Dr. McLeod was of the opinion that a delay brought about by an injunction could have a very significant negative impact on the impact of the project. (McLeod Cross, Prelim. Inj. Tr. 901, November 29, 2007). He indicated that some of the factors involved would basically

54

render the company worthless in the event of the issuance of a preliminary injunction. (McLeod Cross, Prelim. Inj. Tr. 902, November 29, 2007).

## Q. The Public Will Be Harmed by An Injunction

135.  In the course of Dr. David Bransby's testimony the plaintiff stipulated as follows:

> MR. BOYD:  Your Honor, we're certainly willing to stipulate, if it will shorten this, that Dr. Bransby is an expert in this area and that there is a high national important interest in biofuels and moving the production of biofuels forward.  If there's more that you would like for us to stipulate to, we'll consider it.  And that if the technology works, that it is a very important technology for that purpose.

(Bransby Direct, Prelim. Inj. Tr.768-769, November 28, 2007).

136.  Mr. Boykin testified that the public will be adversely affected by stopping the construction of the plant.  The plant will be of significant benefit to the local economy and Bay Minette.  Cello will be buying products off of 40,000 acres of land.  The plant will employ about 35 employees and others will be employed in the service industry supplying the plant.  The fuel will be much less expensive than the products that are currently available (Boykin Direct, Prelim. Inj. Tr. 554, 555, November 27, 2007).

He testified that there will be a huge overall public benefit to this technology as an alternative energy source.  This product would actually eliminate the problem of import without removing food from the table (Boykin Direct, Prelim. Inj. Tr. 555, November 27, 2007).

137.  Mr. Boykin testified that the Bay Minette plant would create a market for timber growers and local farmers (Boykin Direct, Prelim. Inj. Tr. 421, November 27, 2007).  The process can also use certain waste products which will benefit cities and towns (Boykin Direct, Prelim. Inj. Tr. 421, November 27, 2007).

138.  Mr. Katofsky believes that an injunction will harm the public:

Q   In your opinion would an injunction against the
construction of the Cello plant adversely impact any public
interest?
A   I think it would.  I think in terms of Alabama it would
have a fairly direct impact.  And the way I look at this
problem at sort of a more macro level, these are very, very
large problems that we're trying to solve with biofuel
technologies.  And the more arrows in the quiver that we have,
the more likely we are to succeed in solving these problems.
Q   What other specific public interests, aside from jobs in
Alabama, would you see being impacted by an injunction
adversely?
A   I would see just in general, you know, the delay in
deployment of viable technology is going to potentially slow
the overall growth of this, of this biofuels market.
Q   In your view would there be an impact on the ability of the
United States to reduce its dependence on foreign oil?
A   I think that's a distinct possibility, yes.
Q   And reduce its current account deficit in the area of
international trade?
A   It's all related.  I mean, the more oil you can displace,
the better, the bigger impact you have on those issues.
Q   And finally, what about the environmental impact?
A   This one for me is very significant.  I think climate
change, in particular, is a growing issue and I think there's
growing recognition at all levels of government that this is an
issue that needs to be tackled, it's a long-term issue.  And we
need to really get going and work on solving this problem, and
this is one way to address that.
Q   The Cello plant is?
A   Yes.

(Katofsky Direct, Prelim. Inj. Tr. 828-829, November 28, 2007).

139.  Dr. David Bransby testified that the public will be adversely affected by stopping

the construction of the plant.  There are taxes to be generated by the plant, salaries to jobs of

people who will work at the plant, market of biomass to the plant.  Dr. Bransby has published

economic models on production and delivery of feed stocks, switch grasses and other feed stocks

through a processing plant.  He has developed an economic model for that.  He has studied the

market in Baldwin County, Alabama.  He is of the opinion that the lost market to farmers for a

three month delay would be about $1,200,000.00.  If there is a six month delay it will be double

56

that.  He believes that as soon as the word gets out that there is a cellulosic plant in Alabama that can produce biofuels that are similar to what we're getting from fossil fuel at a lower cost it is going to bring the cost of oil down.  Even if it brought the price down by $1.00 per barrel, it is worth billions of dollars down the road (Bransby Direct, Prelim. Inj. Tr 776, 777, November 28, 2007).

140.  Mr. Kaul testified that one reason Biofuels opposes the preliminary injunction is because of the strong public interest now in renewable fuels.  (Kaul Direct, Prelim. Inj. Tr. 1118–19, November 30, 2007).  If construction goes forward P&W's legitimate interests will only be enhanced.  (Kaul Direct, Prelim. Inj. Tr. 1119-20, November 30, 2007.)  Biofuels wants this construction to go forward, with the money Biofuels has contributed, even while this challenge is being maintained.  (Kaul Direct, Prelim. Inj. Tr. 1119-20, November 30, 2007.)  On the other hand, if the injunction is granted Cello will suffer irreparable harm not only in terms of construction delays but also in the impairment of its intellectual property.  (Kaul Direct, Prelim. Inj. Tr. 1120-22, November 30, 2007.)  A preliminary injunction could be fatal to this project. (Kaul Direct, Prelim. Inj. Tr. 1120-22, November 30, 2007.)

## ANALYSIS OF FACTS AND CONCLUSIONS OF LAW

141.  The preceding paragraphs provide a summary and digest of the facts necessary to decide the issues involved in connection with P&W's request for a preliminary injunction.  The paragraphs that follow will analyze those facts and discuss the applicable law.

142.  The decision to grant or deny a preliminary injunction is a matter within the discretion of the district court and is reviewable only for abuse of discretion.  *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988).  A district court may issue a preliminary injunction where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened

injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir. 1992); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" as to each of the four prerequisites. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (internal citations and quotations omitted); *see also, Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion). Before analyzing the four prerequisites, there is a threshold issue with which the Court must deal.

### I.  If P&W Has The Governance Rights In Cello It Asks This Court To Enforce, Then There Is No Diversity Subject Matter Jurisdiction.

143.  As a threshold matter, this court must decide the pending questions of subject matter jurisdiction ***before*** reaching the preliminary injunction question. Defendants argue that there can be no diversity subject matter jurisdiction over a claim of one asserting governance rights in an Alabama limited liability company, because if that party has governance rights it is to that extent defined as a member of the company under Alabama law and therefore lacks diversity of citizenship. Defendant's motion to dismiss and brief in support (Docket Items 24–25) more fully set forth this and other bases for the conclusion that the Court lacks or should decline to exercise jurisdiction over this civil action.

144.  Case law clearly requires that before addressing Plaintiff's requested relief, the Court must consider the question of subject matter jurisdiction. *See Doe v. Federal Aviation Administration*, 432 F.3d 1259, 1264 (11th Cir. 2005) ("Because we resolve this dispute on

jurisdictional grounds, we do not address the FAA's claim that the district court erred by misapplying the legal standards for issuance of a preliminary injunction."); *see also*, *Mickens v. Tenth Judicial Circuit*, 181 Fed. Ap. Plaintiff's Exhibit. 865, 874–75 (11th Cir. 2006) ("[W]e need not determine whether the district court abused its discretion in denying the Mickens's motion for a preliminary injunction because, as discussed above, the district court lacked subject matter jurisdiction . . . ."). A court lacking subject matter jurisdiction of a claim can do nothing with that claim but dismiss it. *Rhodes v. United States,* 760 F.2d 1180, 1186 (11th Cir. 1985) ("It is, however, too clear for argument that a court not having subject-matter jurisdiction of a money claim, or authority to transfer it to another court having such jurisdiction, can do nothing with it but dismiss it.").

145. A limited liability company is a citizen of each state of which a "member" of the company is a citizen. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) ("[F]or purposes of diversity of citizenship, a limited partnership is a citizen of each state in which any of its partners, limited or general, are citizens. . . . like a limited partnership, a limited liability company is a citizen of any state of which a member of the company is a citizen.").

146. Alabama defines a "member" of a company as one having "some governance rights of a membership interest," and in turn defines "governance rights" as "[a]ll a member's rights as a member of a limited liability company except financial rights, including without limitation, the rights to participate in the management of the limited liability company and to bind the limited liability company as provided in Section 10-12-21." ALA. CODE § 10-12-2(g), (j); *see also*, *Clement Contracting Group, Inc. v. Coating Systems, L.L.C.*, 881 So. 2d 971, 972 (Ala. 2003) ("The Alabama Limited Liability Company Act, § 10-12-1 *et seq.*, Ala. Code 1975, defines a 'member' as '[a] person reflected in the required records of a limited liability company as the

owner of some governance rights of a membership interest in the limited liability company,' §
10-12-2(j) . . . .").

147.   P&W and Cello agree that P&W has limited governance rights in Cello even before
P&W exercises its option, as reflected in paragraph eight of the Option Agreement (Pl.'s Ex. 10).
That Option Agreement may therefore be considered an operating agreement for the company, in
that it is an agreement specifying the governance rights of a member.  ALA. CODE § 10-12-2(k)
(defining an operating agreement as a "written agreement of the member or members governing
the affairs of a limited liability company and the conduct of its business.").  Even if the Option
Agreement itself were not to be an "operating agreement" under Alabama law, the separate
Operating Agreement (Pl.'s Ex. 27) that Cello adopted (in part in response to the request from
P&W for an Operating Agreement) also acknowledged P&W's governance rights and included
the Option Agreement as an attachment.  The governance rights making P&W a "member" of the
company are therefore duly "reflected in the required records" of the company.  *See* ALA. CODE
§ 10-12-2.

148.   Because the required records of the company reflect that P&W has governance
rights, P&W is therefore a member.  Because P&W is a member, Cello is deemed a citizen of the
same state(s) as P&W and complete diversity is lacking.  The case is therefore due to be
dismissed for lack of subject matter jurisdiction, as reflected in the order of the court also issued
today.

149.   Even if P&W were not already a member of Cello under Alabama law because of
its governance rights, P&W might at any time exercise its option and become a member, thus
depriving this court of subject matter jurisdiction.  The exercise of jurisdiction in declaratory
judgment such as this is discretionary, as the Supreme Court recently reiterated:

> Whether to entertain plaintiff's suit under the declaratory judgment act is discretionary.  "The Declaratory Judgment Act provides that a court "***may*** declare the rights and other legal relations of any interested party," 28 U.S.C. § 2201(a) (emphasis added), not that it ***must*** do so.  This text has long been understood "to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995); *see also, Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95, n. 17 (1993); *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494–496 (1942).

*MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 776 (2007).  The Court concludes that it would not be prudent to undertake a declaration of the parties rights in a context in which one party could unilaterally seek to divest the court of subject matter jurisdiction at any time, and dismisses the case also on that additional basis, also.

## II. Analysis of Facts and Application Law in Light of the Four Prerequisites for a Preliminary Injunction.

150.  The court turns now to the four prerequisites for a preliminary injunction.  "In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion."  *Canal Authority of Florida. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974); *accord, Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001) ("We add that a preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites."); *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983); *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) ("Because a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion.").

151.  A preliminary injunction is an extraordinary remedy, available when a legal right has been infringed for which there is no adequate legal remedy and which will result in irreparable injury if the injunction is not granted.  *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005).  The critical factor in a *preliminary* injunction, in contrast to a *permanent* injunction entered after a full and fair trial and after discovery, is preserving the Court's ability to render a meaningful decision on the merits.  *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974) ("Thus only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction.").  Much of P&W's evidence is simply irrelevant to that question.  Concerns over the availability of an "exit strategy" or the possibility that Biofuels might be able in the future to assert governance rights in Cello, or that P&W's "potential business opportunities" about Cello "going public, merging, or selling itself" (Docket Item 41, Pl.'s Reply Defs' Resp. Mot. Prelim. Inj. at 30) can be fully remedied after a full and fair trial on the merits by judicial decree delineating Biofuels contractual rights, or lack thereof, and the membership interest P&W will have in Cello if and when it exercises its option.

## III.  P&W Has Failed to Prove That It is Likely to Succeed on the Merits.

152.  P&W makes the following allegation in its complaint:

P&W invested $2.5 million and promised conditionally to invest another $10 million in FES, now Cello, for the exclusive right to participate with the Boykin defendants in the commercial development of technology that allows the production of synthetic fuel from cellulosic and polymer-based material.  After accepting P&W's investment, the Boykin defendants entered into an agreement with Biofuels, the effect of which would be to provide BioFuels access to the technology that was the basis for P&W's investment, and a disguised equity in Cello, all in violation of Cello's obligations to P&W it made with P&W before and at the time.  The Boykin defendants then unilaterally, and without notice to P&W, changed the articles of organization of Cello and caused Cello to adopt an operating agreement consistent with Cello's agreement with Biofuels but in violation of P&W's rights under P&W's agreements with Cello.  P&W asks the court to enjoin the

defendants from violating P&W's rights under P&W's agreements and to declare any provision of the restated articles of organization, the operating agreement, and the agreement between Cello and Biofuels null and void to the extent that it violates or conflicts or interferes with P&W's rights under P&W's agreements with Cello.

The complaint goes on to allege facts that P&W contends demonstrate these broad allegations.

153.   Most of the evidence by P&W seemed to address the likelihood of success on the merits of the case.   George Landegger testified extensively about his intentions in entering into the various agreements.   Like the complaint, he asserted that he had bargained for exclusive rights to work with the Boykins to commercialize their technology as noted in the findings of fact.   He complained of disclosure of negotiations and fears about the disclosure of the technology.   He testified to his belief that Cello could not enter into the MFC with BioFuels without his permission.   P&W's expert testified that the MFC granted to Biofuels a disguised equity interest.   P&W also claimed that it was being deprived of the opportunity to do the engineering and construction work for the Bay Minette Project.

154.   First, the court addresses P&W's claim to have made a $2.5 million investment in Cello.   P&W actually purchased an option, which will not become an "investment" unless and until the option is exercised.   It also claimed that it "conditionally promised" to pay an additional $10 million.   It did not promise to pay $10 million, conditionally or otherwise.   There is no condition that can occur that will obligate P&W to pay $10 million.   Exercise of the option is at the sole election and discretion of P&W.

155.   P&W claims that in exchange for the $2.5 "investment" and the "conditional promise to pay an additional $10 million," it was to obtain "the exclusive right to participate with the Boykin defendants in the commercial development of technology that allows the production of synthetic fuel from cellulosic and polymer-based material."   The documents as executed do no bear out that claim.   Neither the Option Agreement nor the Letter Agreement as executed by the

63

parties says anything about an "exclusive right to participate with the Boykin defendants in the commercial development of the technology". The word *exclusive* does not appear in those documents. Such important matters cannot be left to inference. The plain meaning of the documents governs.

156. As noted in the findings of fact, the provisions of the Letter Agreement about engineering services and construction services dealt only with the Bay Minette Plant. P&W has no right to participate in the engineering and construction of any additional plants. P&W paid $2.5 million for the opportunity to acquire a one third interest in Cello, and must pay an addition $10 million to do so. The money paid and (at the election of P&W) to be paid is to acquire that one-third interest--not to acquire an "exclusive right to participate with the Boykin defendants in the Commercial development" of their technology. The Option Agreement and Letter agreement expressly do not grant to P&W any interest in the technology, and make it clear that the technology is the sole property of Cello. There is nothing in either the Option Agreement or Letter Agreement that would obligate Cello to contract exclusively with P&W for engineering services or construction services after the Bay Minette Plant, nor to buy all feedstock from P&W.

157. The claim of exclusivity is apparently based on the provision in paragraph 6 of the February 27 Nondisclosure Agreement, which purports to provide that Cello cannot disclose its technology to third parties. Regardless of whether that provision is enforceable, the circumstances under which it came to be in the Nondisclosure Agreement, fully described in the findings of fact, hardly support the conclusion that it can be the basis for a claim of an "exclusive right to participate with the Boykin defendants in the development" of their technology. The Boykins did not even know that it was in the document at the time the document was signed. The provision was not discussed and negotiated. There was no payment for the Nondisclosure Agreement. The purpose of the Nondisclosure agreement was to enable the parties to discuss the

project.  The project was building of a plant in Bay Minette.  Mr. Rockman's testimony, as discussed in the finds of fact is highly persuasive of the fact that the paragraph is ambiguous. That ambiguity is not likely to lead to the conclusions that the parties intended that P&W acquire exclusive rights.

158.  As detailed in the findings of fact, CPA Dave Borden argued that the MFC constituted a disguised equity in Cello, but that testimony was rebutted by the Dr. Robert McLeod, a well qualified expert, who pointed out that the MFC contains none of the characteristics of equity.  P&W is contending that the MFC means something other than what it says, and the burden will be on them in a final hearing to prove that to be the case.

159.  P&W claims that the MFC interferes with its rights under the Option and Letter Agreement.  The MFC obligates BioFuels to use its best efforts to arrange financing for plants and to staff and operate plants.  It will not construct or have any ownership interest in the plants. The Option Agreement and Letter Agreement do not provide for P&W to do any of the things that BioFuels will do under the MFC.

160.  P&W argues that it is being denied the right to provide the engineering and construction services for the Bay Minette plant.  As pointed out in the findings of fact, the paragraphs in the Letter Agreement dealing with engineering and construction services went through several drafts in the process of negotiation.  The initial draft provided that P&W *undertakes* to provide that services.  The executed agreement provided that P&W *agrees* to provide the services, but also added the provision that FES management had final authority on all decisions.  The Letter Agreement did not say that FES was obligated to employ P&W for the engineering and construction services.  The Letter Agreement required Jack Boykin to remain as Chairman and CEO of Cello—which vested in him the ultimate decision making power for the management of Cello.

65

161.  Finally, P&W complains that complains that Cello Amended its governance documents.  P&W claims that it had a right to review and approve or disapprove of those documents.  Suffice to say that the Amendment of the Articles of Organization was necessary to carry out the terms of the Option Agreement.  The adoption of an operating agreement was contemplated by the Letter Agreement, and specifically requested by George Landegger in his letter of September 11, although the April 19 Letter Agreement did not technically require the inclusion of the rights of the minority shareholder in an operating agreement until after the exercise of the Option.  The letter of September 11 made no request that Mr. Landegger be allowed to review and approve or disapprove the Operating Agreement.  The Letter Agreement contains no such requirement.  The Letter Agreement actually states that P&W has no voting rights in Cello until it exercises the option.

### IV.  P&W Has Failed to Prove that It Will be Irreparably Harmed by The Construction of the Plant at Bay Minette.

162.  P&W's claims concerning the harm that it believes it will suffer in the absence of a preliminary injunction have been stated above in the discussion of the likelihood of success on the merits, and will not be repeated here.  The Motion for preliminary injunction talks of irreparable harm resulting from possible disclosure of the technology by Cello to BioFuels.  It also alleges in general terms that the defendants are interfering with its rights pursuant to the Option Agreement and Letter Agreement.

163.  As indicated in the findings of fact, there is no evidence that Cello has yet revealed its technology to BioFuels.  Even if it had revealed the technology, BioFuels is obligated to maintain the information in confidence pursuant to the MFC, and to use the information only to operate plants for Cello.  Since BioFuels is not involved in building the plant, the plant can be built without disclosing the information to Biofuels.

164.  In any event, P&W has no right to operate the plant, and it will be necessary for Cello to disclose enough of the technology to whomever it employs or contracts with to build the plants.  The protective covenants contained in the Option Agreement certainly were not intended to allow P&W to prevent Cello from hiring anyone to operate plants.  The Nondisclosure Agreement, for the purpose of allowing the parties to talk, could not have been intended to give P&W the right to choose who would run the plants in derogation of the majority and management rights of Cello as described in the Option Agreement and Letter Agreement.  Even if the technology were shown to BioFuels, that would not constitute "irreparable harm" to P&W.  The Nondisclosure Agreement opredated the option and was not incorporated into it.  It is a contract between separate entities, not a part of minority shareholder rights.  If there were a violation, there is an adequate remedy at law and no need for injunctive relief.  This court is mindful of the fact that the public will receive the information on November 4, 2008.

165.  With regard to the alleged interference of the MFC with the contractual rights of P&W, the documents are what they are, and they may require interpretation, although the defendants have offered credible evidence that there is no conflict between the documents as noted in the findings of fact.  If there are conflicts, those matters can be given careful attention in a trial on the merits.  But at this time everyone involved appears to be at considerable risk if the project is delayed.  The contracts are signed, BioFuels has put up its money, and the project is started.  There is no apparent reason to conclude that the alleged interference will be increased or aggravated in any way by construction of the plant.  This Court has plenary equity power to fashion an appropriate remedy and to grant whatever relief the law provides, with regard to the alleged interference, after a trial on the merits.

166.  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of

irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *quoting*, *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission* , 259 F.2d 921, 925 (D.C. Cir. 1958) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."); *accord*, *United States v. Jefferson County*, 720 F.2d 1511, 1520 (11th Cir. 1983) ("Even if they eventually prevail on the merits, they will have suffered no injury that could not adequately be compensated through an award of back pay and seniority points along with compelled future promotion.").

167.  P&W's asserted inability to do engineering and construction does not entitle it to injunctive relief under Alabama law, ALA. CODE § 8-1-41 (1975); *George Moulton, Inc. v. Langan*, 285 Ala. 427, 435–36 (Ala. 1970) (holding that no injunction is available to compel performance of any continuous duty).  To the extent P&W's business opportunity depended on a contractual obligation not enforceable with an injunction, that business opportunity also cannot be protected by an injunction.  P&W cannot receive an injunction, let alone a preliminary injunction, to give it "an opportunity to develop a particular level of expertise in an arena that is a growth and expanding opportunity."  Such opportunities and obligations, even where they exist (and here there was no such obligation), are not enforceable with injunctions.

168.  Based on the Court's findings as set forth above (particularly that Cello has not disclosed any trade secret information to Biofuels and will not do so while building this plant), P&W has failed to show that it is likely to prevail on its claim that Cello is violating an obligation of confidentiality to P&W under the Nondisclosure Agreement. The documents in this case were attached to the Complaint without any request for protection and are now public records.  Based on the Court's findings above, (particularly the fact that the Letter Agreement obligates P&W to make engineering services available but does not require Cello to accept or use those services) P&W has failed to show that it is likely to prevail on its claim that Cello has

breached P&W's commercial contractual rights under the Letter Agreement. Based on the Court's findings as set forth above (particularly the fact that P&W's limited governance rights under the Option Agreement have been protected by Cello in its dealings wit Biofuels), P&W has failed to show that it is likely to prevail on its claim that Cello has breached P&W's governance rights under the Option Agreement. Because P&W has not shown a substantial likelihood of success on the merits, it is on that basis not entitled to receive a preliminary injunction. Likewise, the plaintiff has failed to establish any irreparable harm that it will suffer.

### V.  P&W Has Failed to Prove that The Harm that Would be Caused to Cello By A Preliminary Injunction is Outweighed by Harm to P&W in the Absence of an Injunction.

169.  When considering a preliminary injunction (which issues before the entire case has been fully and fairly heard), great care must be taken to assure that the power of a court to require or deter action does not result in unwarranted harm to the defendant or the public. *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005) ("However, in issuing such an order before the entire case has been fully and fairly heard, great care must be taken to assure that the power of a court to require or deter action does not result in unwarranted harm to the defendant or the public.").

170.  Because, as the court has found, the evidence at the preliminary injunction hearing established that Cello is likely to be irreparably harmed if the Court enters a preliminary injunction to delay construction of the plant, and that irreparable harm to Cello greatly outweighs any harm to P&W by allowing construction to go forward, P&W is also on that basis not entitled to a preliminary injunction.

### VI.   P&W Has Failed to Prove that The Public Will Not be Harmed by a Preliminary Injunction.

171.   The tremendous public policy importance of renewable energy sources is beyond dispute.  Congress has expressly found "that it is in the national security and economic interest of the United States to foster greater efficiency in the use of available energy supplies and greater use of renewable energy technologies."  42 U.S.C. § 120001(a); *see also,* 7 U.S.C. §§ 8101–8109; 22 U.S.C § 2151d(a)(1)(D)(2); 42 U.S.C. § 5301(c)(9); 42 U.S.C.A. § 5551; 22 U.S.C.A. § 2151d(a)(1)(D)(2).  In Alabama, too, the legislature has expressly found "that the development, management and efficient use of energy resources and the conservation of energy is of prime importance in an era of rising costs, foreign dependence and uncertain supplies" and has established a state Department of Energy in part "to encourage and assist the development, the use of renewable energy resources, demonstration, and placement in the marketplace of viable, alternative energy sources, more efficient uses of energy sources and other appropriate technology."  ALA. CODE § 41-6A-2 (2000).

172.   While there is also a public interest in protecting trade secrets and enforcing contracts, those are essentially private rights.  The public interest in the vindication of private rights is equally applicable to both sides of any suit.  The only truly ***public*** interest here at issue is the development of renewable energy, and entry of a preliminary injunction would be contrary to that public interest.  The stipulations made by the plaintiff appear to concede this point.  Because P&W has failed to prove that a preliminary injunction here would not be contrary to the public interest, for that reason also the preliminary injunction is denied.

### VII.  If The Court Imposes A Preliminary Injunction It Should Be Conditioned On P&W Posting Security Of At Least Fifty To One Hundred Million Dollars.

173.  The Court can issue a preliminary injunction only if the movant gives security in an amount adequate to pays costs and damages the enjoined party may sustain if it is found to have been wrongully enjoined.  FED. R. CIV. PROC. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order *only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."); *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 314 (1999) ("Rule 65(c) provides that an applicant for a preliminary injunction *must* obtain security . . . .") (emphasis added); *Edgar v. MITE Corp.*  457 U.S. 624, 649 (1982) ("Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully."); *see also*, *Weaver v. School Bd. of Leon County*, No. 05-10828, 2006 WL 858510, *2 n.3 (11th Cir. 2006) ("Rule 65(c) requires the injunction applicant to post security sufficient for payment of costs and damages as may be incurred or suffered by the party determined to have been enjoined wrongfully."); *Piambo v. Bailey*, 757 F.2d 1112, 1143 (11th Cir. 1985) (following 10th Circuit law regarding "the absolute nature of Rule 65(c)'s bond requirement" noting that "before a court may issue a preliminary injunction, a bond *must* be posted." (emphasis in original").

174.  The amount of the bond is subject to the Court's discretion.  Based on the findings as set forth above, and in particular the essentially unrebutted evidence about the actual cost Cello is likely to incur, the Court finds and concludes that even if any preliminary injunction

71

were to issue, P&W would be required to post a bond of one hundred million dollars

($100,000,000).

Respectfully submitted,


*/s/ Philip D. Segrest, Sr.*
HON. PHILIP D. SEGREST, SR. (SEGRP6870)
dale.segrest@segrestlaw.com
PHILIP D. SEGREST, JR. (SEGR8056)
philip.segrest@segrestlaw.com

*/s/ Forrest S. Latta*
FORREST S. LATTA (LATTF0526)
fsl@bowronlatta.com
MICHAEL D. STRASAVICH (STRAM9557)
mds@bowronlatta.com
**Counsel for Defendants Cello Energy, LLC;
Boykin Trust, LLC; Jack W. Boykin and
Allen W. Boykin**

**OF COUNSEL:**
THE SEGREST LAW FIRM
Post Office Box 780791
Tallassee, AL 36087-0791
334.252.0036 (Voice)
334.252.0037 (Facsimile)

BOWRON, LATTA & WASDEN, P.C.
Post Office Box 16046
Mobile, AL 36616-6046
251.344.5151 (Voice)
251.344.9696 (Facsimile)

Julian B. Brackin, Jr., Esq.
BRACKIN , MCGRIFF AND JOHNSON, P.C.
Post Office Box 98
Foley, AL 36536-0098
251.943.4040 (Voice)
251.943.6140 (Facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 14th day of December, 2007, filed a copy of the foregoing pleading using the CM/ECF system which will send notice to all counsel of record:

David Boyd, Esq.
W. Joseph McCorkle, Jr., Esq.
BALCH & BINGHAM
Post Office Box 78
Montgomery, AL 36101-0078
dboyd@balch.com
jmccorckl@balch.com
**Counsel for Plaintiff**

John Eric Getty, Esq.
BALCH & BINGHAM
Post Office Box 306
Birmingham, AL 35201-0306
egetty@balch.com
**Counsel for Plaintiff**

John N. Leach, Jr., Esq.
HELMSING, LEACH, HERLONG, NEWMAN & ROUSE, PC
Post Office Box 2767
Mobile, AL 36652-2767
jnl@helmsinglaw.com
**Counsel for Plaintiff**

William C. Roedder, Esq.
Russel P. Myles, Esq.
McDowell, Knight, Roedder & Sledge, LLC
Post Office Box 350
Mobile, AL 36601-0350
broedder@mcdowellknight.com
rmyles@mcdowellknight.com
**Counsel for**
**Biofuels Operating Company, LLC**

W. Joseph McCorkle, Jr.
Balch & Bingham
P.O. box 78
Montgomery, AL 36101
jmccorkl@balch.com

Richard A. Johnson
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
60 State Street
Boston, MA 02109
Richard.johnston@wilmerhale.com

David William Bowker
399 Park Avenue
New York, NY 10022
David.bowker@wilmerhale.com

David Michael Burkoff
399 Park Avenue
New York, NY 10022
David.burkoff@wilmerhale.com

/s/  Philip D. Segrest, Sr.

73