**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PARSONS & WHITTEMORE,** | ) | |
| **ENTERPRISES CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO. 07-0743-CG-B** |
| **v.** | ) | |
| | ) | |
| **CELLO ENERGY, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This case is before the court on a motion for a preliminary injunction and two motions to dismiss. The motions to dismiss, to the extent that the court considers them at this juncture, are **DENIED**. The motion for a preliminary injunction is **DENIED** based on this court's conclusion that the movant did not establish that it will suffer an irreparable injury before this lawsuit can be resolved on its merits without such extraordinary relief. This order does not address the pending motion to place part of the record from the preliminary injunction hearing under seal. A separate order addressing that motion will follow.

### ALLEGATIONS AND PROCEDURAL HISTORY

Parsons & Whittemore Enterprises Corporation ("P&W") initiated this case by filing a complaint seeking injunctive and declaratory relief on October 16, 2007. (Doc. 1). The complaint alleges that Cello Energy LLC ("Cello," formerly known as Forest Energy Systems, LLC or "FES") owns research and production technology for manufacturing synthetic fuel from material such as wood chips, grasses, crop residues, and old tires, which the complaint refers to

1

as the "Technology."  (Doc. 1, ¶ 9).  P&W engaged in discussions with Cello regarding the

Technology and the parties signed a nondisclosure agreement on February 27, 2007, to aid in

those discussions.  (Doc. 1, ¶ 10).

Roughly two months later, P&W paid Cello $ 2.5 million in exchange for an option to

acquire a 33 1/3 % interest in Cello for an additional $ 10 million, to be exercised at some time

after the initial $ 2.5 million payment and before the expiration of 90 days after the first

commercial production and sale of fuel meeting certain standards.  (Doc. 1, ¶ 12).  The

agreement was memorialized in an Option Agreement and a separate Letter Agreement, both of

which are dated April 19, 2007.  (Doc. 1, ¶ 12).  In addition to describing the terms of P&W's

option, the Option Agreement and Letter Agreement afford P&W full and transparent disclosure

of the Technology pursuant to the February 27, 2007 nondisclosure agreement, provides that

P&W will supply engineering and construction management services at the first plant to make

fuel on a commercial scale with the Technology (the "Bay Minette plant" or "Bay Minette

project"), P&W will provide "cellulosic material containing raw material from trees and woody

shrubs for" the Bay Minette plant, P&W obtains certain minority shareholder rights, Cello

cannot sell, pledge, or otherwise transfer any equity interest in Cello, Cello cannot merge,

consolidate, dissolve, subdivide, combine, reclassify or recapitalize without P&W's approval,

Cello cannot sell or license most of its assets without P&W's approval, and Cello cannot sell,

license, assign, or otherwise transfer all or any part of the Technology without P&W's approval.

(Doc. 1, ¶ 13).

After executing the Option Agreement and Letter Agreement with P&W, Cello executed

three documents with which P&W takes issue.  First, on September 12, 2007, Cello executed a

Manufacturing and Financing Contract ("MFC") with a company called BioFuels Operating Company, LLC ("BioFuels").  (Doc. 1, ¶ 15).  Second, Cello executed restated articles of organization ("Restated Articles") on September 14, 2007, which the complaint alleges were filed on September 17, 2007.  (Doc. 1, ¶ 15).  Third, Cello executed an Operating Agreement on September 18, 2007.  (Doc. 1, ¶ 15).

According to P&W's complaint, the MFC purports to provide financing and operational services for the Bay Minette plant and two other plants, but is really a disguised equity transfer that gives BioFuels exclusive use of the Technology for 20 to 40 years and 49 % of the adjusted gross revenue from sale of the fuel manufactured at the plants.  (Doc. 1, ¶ 16).  BioFuels allegedly receives these benefits in exchange for a $ 12.5 million capital contribution it paid, the pledge of another $ 12.5 million to be paid upon commencement of construction of the second and third plants, and performance of certain operation and maintenance.  (Doc. 1, ¶ 16).

P&W alleges that the MFC interferes and conflicts with P&W's rights under the February 27, 2007, nondisclosure agreement, the Option Agreement, and the Letter Agreement in several ways.  (Doc. 1, ¶¶ 16 and 17).  P&W makes similar allegations about the Operating Agreement and the Restated Articles.  (Doc. 1, ¶¶ 18-22).  P&W also alleges that Jack W. Boykin ("Jack"), the individual at Cello who negotiated the agreements with P&W, is violating the section of the Letter Agreement that provides P&W will supply engineering, construction, and construction management services at the Bay Minette plant; Jack allegedly stated that he has selected third-party engineers to perform the engineering duties at the Bay Minette plant, that P&W may not contact the engineers, and that Jack's son, Allen W. Boykin ("Allen"), is managing construction of the Bay Minette plant.  (Doc. 1, ¶ 23).

3

The complaint asks the court to make several declarations and to order both preliminary and permanent injunctions.  In its requests for preliminary injunctions, P&W asks the court to do five things: (1) prohibit the defendants from performing under the MFC, (2) prohibit Cello from spending or committing money it received from BioFuels pursuant to the MFC, (3) prohibit Cello and the Boykin Family Trust, LLC ("Boykin Trust")[1] from breaching their obligations under the "P&W Agreements," (4) prohibit BioFuels from interfering with P&W's rights under the "P&W Agreements," and (5) prohibit the defendants from performing under the Operating Agreement and Restated Articles.  (Doc. 1, pp. 19-20).

Two days after filing its complaint, P&W filed a Motion for Preliminary Injunction and Motion for Expedited Hearing.  (Doc. 9).  The crux of the motion is contained in paragraph two, in which P&W characterizes its complaint as being "about the enforcement of P&W's rights under" the agreements described above.  (Doc. 9, ¶ 2).  P&W asserts that Cello and Boykin Trust breached the agreements with P&W by entering into the MFC and that Cello adopted its Operating Agreement and Restated Articles "so as to purportedly authorize the unlawful agreement with Bio[F]uels and other breaches of contractual obligations to P&W."  (Doc. 9, ¶ 2).

The parties filed several briefs and motions over the several weeks following P&W's motion for a preliminary injunction.  The defendants divided into two camps, with Cello, Boykin Trust, Jack, and Allen in one camp and BioFuels in the other.  Unless otherwise noted, the court will refer to the defendants in the first camp collectively as "Cello."  All of the defendants share

---

[1]The Boykin Trust, which is apparently controlled by Jack and Allen, is a signatory to the February 27, 2007, nondisclosure agreement, the Option Agreement, and the Letter Agreement.

similar interests in this case.  In fact, BioFuels is funding Cello's defense pursuant to a clause in the MFC.

There are several motions and briefs currently before the court, including: Cello's response to the motion for a preliminary injunction (Docs. 26 and 31), BioFuels' response to the motion for a preliminary injunction (Doc. 32), P&W's reply in support of its motion for a preliminary injunction (Doc. 41), BioFuels' motion to transfer or dismiss for improper venue (Doc. 20), P&W's response to BioFuels' motion to transfer or dismiss for improper venue (Doc. 30), Cello's motion to dismiss for lack of jurisdiction and other grounds (Docs. 24, 25, and 26), P&W's response to Cello's motion to dismiss (Doc. 40), and Cello's reply (Doc. 51).  In addition, George F. Landegger ("Landegger"), the chairman and president of P&W, filed a declaration and several exhibits (Docs. 42 and 43).

After the foregoing documents were filed, the court held what may have been the longest preliminary injunction hearing in its history on November 19, 20, 21, 27, 28, 29, and 30, 2007. While the hearing was ongoing, Cello filed a bench brief on whether P&W owns the Technology (Doc. 45), a bench brief on whether Cello is prohibited from disclosing its Technology (Doc. 46), and a brief on the availability of injunctive relief for contracts for personal services (Doc. 47).

At the conclusion of the final day of the hearing, the court granted an oral motion for the parties to file simultaneous briefs and proposed findings of fact and conclusions of law by December 14, 2007.  On December 14, 2007, BioFuels and Cello filed lengthy proposed orders (Docs. 50 and 52), Cello filed a post-hearing brief (Doc. 53), and P&W filed a motion to place part of the record under seal (Doc. 54).  P&W filed its lengthy proposed order one day late on

December 15, 2007 (Doc. 55). BioFuels responded to P&W's proposed order on December 18, 2007 (Doc. 56). Cello responded to P&W's motion to place part of the record under seal on December 19, 2007 (Doc. 57). On December 20, 2007, P&W replied "to certain comments" in BioFuels' proposed order. (Doc. 58).

Although this matter is currently before the court on the motion for a preliminary injunction, the court will first address some of the more threshold arguments in BioFuels' motion to transfer or dismiss and Cello's motion to dismiss. A preliminary recitation of the court's findings of fact will aid in the analysis of all of the motions on which the court will rule in this order.

## FACTS

### Cello, Jack, and The Technology

Cello is a limited liability company organized under the laws of the State of Alabama. Until it filed its Restated Articles on September 17, 2007, and October 9, 2007, it was called Forest Energy Systems, LLC. Jack, a citizen of the State of Alabama, is Cello's chief executive officer. Jack graduated from Auburn University as a chemical engineer. After graduating from Auburn, Jack became an officer in the Navy and then held several jobs in his field of chemical engineering, at least some of which gave him occasion to build and operate chemical manufacturing plants in the United States and abroad.

Over a period of several years prior to the events giving rise to this litigation, Jack and his son Allen, who is also an Alabama citizen, developed a process for the conversion of cellulosic material into fuel. Jack and Allen assigned this process, also called the "Technology" or "Process Information," to Cello.

6

Jack testified that he first started thinking about the technology in the early 1990's.  He developed the technology over a period of eight to nine years at considerable expense.  In 2003 and 2004, Jack built a demonstration ("semiworks") plant in Prichard, Alabama, in order to demonstrate that the Technology he developed did indeed produce fuel.  Jack testified that Hurricane Ivan destroyed the uninsured semiworks plant in 2004.  Jack undertook to build a replacement plant, but his efforts ceased after Hurricane Katrina damaged his replacement facility.

The testimony tends to show that the Technology, if it becomes commercially viable, is expected to benefit from several qualities.  For example, it differs from ethanol, another alternative source of fuel, in the senses that the Technology does not use food oil and is compatible with currently-used engines and storage systems.  It is "anhydrous," meaning that its process to make fuel does not require water-based solvents or large amounts of water.  The capital costs of producing fuel with the Technology are expected to be relatively low, giving the Technology the potential to produce fuel and gasoline at a much lower cost than other alternatives.  In addition, the raw materials, or "feedstock," to make the fuel would be locally-grown, reducing America's dependence on foreign sources for fuel.  The parties testified to other potential advantages of the Technology, but the thrust of the concept is that all of the parties agree that, if successful, the Technology could be a "breakthrough of the first order," "revolutionary," and even Nobel Prize material.

Although the Technology has not been put to use in a full-scale, commercial, plant, and there is a possibility that it will not become commercially viable, the parties presented evidence tending to show that Jack and his science are credible and that the Technology has the potential

to succeed.

Jack needed financing to bring the Technology to market.  Dr. David Bransby ("Bransby"), a professor at Auburn whom Jack met through the then-president of Auburn in 2006, offered to help Jack find the financing he needed.

***Cello's Involvement with P&W***

Bransby initiated Jack's discussions with P&W by putting him in touch with Greg Martin ("Martin") at Alabama River Pulp ("ARP").  ARP, which is based in Alabama, is one of a number of subsidiaries that P&W owns.  P&W is a Delaware corporation with its principal place of business in New York.  Landegger is the chairman, chief executive officer, and a shareholder of P&W.  Landegger characterized himself as responsible for all that "P&W does or fails to do."

On February 12, 2007, ARP and Cello signed a nondisclosure agreement with the stated purpose of "enabling Recipient [defined as ARP and its representatives, associates, subsidiaries, and affiliates] to have some basic understanding of [Cello's] program."  (Doc. 26-2, p. 2).[2] Landegger testified that Jack considered his Technology to be confidential, prompting Jack's request for the February 12, 2007 nondisclosure agreement.

Jack met with ARP representatives, including Landegger, shortly after the parties executed the February 12, 2007 nondisclosure agreement.  Jack conceptually introduced Landegger to the work Jack was doing in the biofuels area.  Landegger testified that Jack

---

[2]The documents referenced in this order were introduced into evidence during the preliminary injunction trial.  For ease of reference, this order refers to them as they appear in the collection of exhibits that Cello filed in support of its motion to dismiss and its response to the motion for a preliminary injunction.  (Doc. 26).  The page numbers on the original documents conflict with the page numbers as they appear in the docketed text in the court's electronic filing system.  The citations in this order refer to the page numbers as they appear in the docketed text in the court's electronic filing system.

explained that he, along with Allen, invented a system whereby cellulosic material of various kinds, including woody material and tire pieces, could be processed rather inexpensively into transportation fuel such as gasoline or diesel that qualifies as proper fuel under the American Standard Testing method. Landegger was interested. Not only was the Technology a potential breakthrough, it was a good strategic match with P&W's engineering, construction, operating, and process capabilities. It was also a "fascinating and potentially extraordinary diversification" for P&W.

Jack and Landegger spoke alone after the meeting. Jack told Landegger that he spent $25 million of his own money developing the Technology over a period of years. Landegger indicated that he was inclined to invest $ 12.5 million into Jack's efforts to bring his Technology to market. Jack wanted to build the first plant in Bay Minette, Alabama, not far from ARP's location. P&W, Cello, ARP, and Boykin Trust eventually signed a second nondisclosure agreement on February 27, 2007. (Doc. 26-3).

Discussions between the parties to the February 27, 2007 nondisclosure agreement continued, culminating in execution of the Option Agreement and Letter Agreement between Cello, Boykin Trust, and P&W. Both agreements are dated April 19, 2007. After the Option Agreement and Letter Agreement were signed, P&W and Cello undertook to patent the Technology. Provisional patent applications for the Technology were made in May 2007.[3] The non-provisional patent application was filed with the United States Office of Patents and Trademarks in June or July 2007. Jack testified that all of the essential information about the

---

[3]There was conflicting testimony about whether Jack attempted to make provisional patent applications in September 2006. The court need not decide whether Jack attempted to make these earlier applications.

Technology is completely revealed in the patent applications; nothing was left out.  The Technology and Process Information described in the patent applications will enter the public domain 18 months after the provisional applications were filed - in November 2008.

At the present time, the only parties that know the Technology are Jack, P&W, and some of their agents.  The chief scientist for P&W, and anybody to whom he may have disclosed the Technology, knows it.  The attorneys who helped prepare the patent application know the technology.  Jack describes himself as "a fanatic" about protecting the Technology.  As such, Cello has not disclosed the Technology other than to P&W, and it has no intention of making any additional disclosures.

***Cello's Involvement with BioFuels***

In addition to putting Jack in touch with P&W, Bransby also put him in touch with a company called "Khosla Ventures" in early 2007.  During a conference call between Jack and representatives for Khosla Ventures, Jack explained that he could produce fuel for a dollar per gallon, but did not disclose the details of his technical process, the catalysts, the engineering specifications, or the parameters within which the process operates.  Although Khosla Ventures did not know the details of the technology, it wanted to move forward with Jack for several reasons.  After much negotiation, Cello and BioFuels, a subsidiary of Khosla Ventures, entered into the MFC on September 12, 2007.  Shortly thereafter, Cello filed its Restated Articles and executed the Operating Agreement.

***The Bay Minette Plant***

The Bay Minette plant is expected to be the first plant to produce fuel on a commercial scale with the Technology.  If the Bay Minette plant is successful, the parties intend to build

10

more plants throughout the country.  On the other hand, the parties will likely view an unsuccessful Bay Minette plant as a poor reflection on the Technology itself, or of its commercial viability, leading the parties to abandon further efforts to bring the Technology to market.

Construction of the Bay Minette plant is currently underway.  Jack estimated that the Bay Minette plant will be built by May 2008 and that it will be fully operational by June 2008.  Allen is the construction supervisor at the Bay Minette plant.

### *The Central Documents for Purposes of this Order*

The Option Agreement and the Letter Agreement are dated April 19, 2007.  Both are signed by P&W, Cello, and Boykin Trust.  P&W paid Cello $ 2.5 million for the Option Agreement.  It provides P&W, a company owned or controlled by it, or a company the majority of which is owned or controlled by Landegger (the "Option Holder"), the option to purchase a 33.33 % interest in Cello for the additional purchase price of $ 10 million within a specified period of time.  (Doc. 26-4, p. 2).  At the time it was executed, the Option Agreement also provided P&W with "full transparent disclosure" of the Technology.  (Doc. 26-4, p. 2).  The Option Agreement also includes a paragraph containing protective covenants.  (Doc. 26-4, p. 8).  The protective covenants provide that Cello's stock may not be sold, pledged, otherwise transferred, issued, or redeemed.  The Option Holder's approval is required for various corporate actions by Cello, including merger or consolidation, or any sale, licensing, assignment, or other transfer of the Technology.  Finally, the Option Holder may select four out of 12 members of Cello's board of directors.  (Doc. 26-4, p. 4).

The Letter Agreement references the Option Agreement and the disclosure of the

11

Technology to P&W.  (Doc. 26-5, pp. 2-3).  The Letter Agreement also says that P&W "agrees to provide engineering and construction services" at the Bay Minette plant, and cellulose containing raw material for the Bay Minette plant.  (Doc. 26-5, pp. 3-4).

The Option Agreement and the Letter Agreement both provide for the confidentiality of the Technology.  In so doing, they reference the February 27, 2007, nondisclosure agreement. (Doc. 26-4, p. 2-3; Doc. 26-5, p. 3; and Doc. 26-3).  The February 27, 2007, nondisclosure agreement itself incorporates the February 12, 2007, nondisclosure agreement.  (Doc. 26-3, p. 5; Doc. 26-2).  The parties dispute the meaning of some of the terms of the nondisclosure agreements, and whether they expired by the terms of paragraph entitled "Entire Agreement" in the Option Agreement.  (Doc. 26-4, p. 5).

Cello filed its Restated Articles on September 17, 2007, and on October 9, 2007.  (Doc. 26-6, pp. 5-8).  Among other changes, the Restated Articles changed Cello's business purpose from broadly engaging in "any lawful act" to engaging in "any lawful act" including various specified activities pertaining to "developing and promoting renewable energy sources;" "building, having built, owning, and/or operating" fuel plants; developing, promoting, and securing intellectual property; and contracting with others to produce synthetic fuels and operate synthetic fuel plants.  (Doc. 26-6, pp. 2, 7).  The Restated Articles replaced the requirement for unanimous written consent of the members to permit admission of additional members with a provision allowing "[t]he member or members of [Cello] can admit one or more additional members."  (Doc. 26-6, pp. 3, 8).  The Restated Articles named Jack and Allen as the only two managers of Cello and vested them with authority to manage Cello pursuant to an Operating Agreement.  (Doc. 26-6, p. 8).

Cello executed an Operating Agreement on September 18, 2007. (Doc. 26-7). For purposes of this order, it suffices to say that the Operating Agreement contains numerous clauses pertaining to the membership in, and management and operation of, Cello.

Finally, Cello and BioFuels executed the MFC. (Doc. 26-8). Cello's signature is dated September 12, 2007. (Doc. 26-8, p. 19). Section III of the MFC is entitled "Use of [Cello] Technology." It provides that Cello will make available to BioFuels and to BioFuels' Operating Company affiliates all of the Technology necessary and appropriate to operate and maintain the synthetic fuel plants. (Doc. 26-8, p. 4). The Technology, along with additional intellectual property rights "created or developed during the course of performance of" the MFC or an operating and maintenance agreement will remain or become the "sole property" of Cello. (Doc. 26-8, pp. 4-5).

Section IV of the MFC is entitled "The Projects." (Doc. 26-8, p. 5). In that section of the MFC, Cello and BioFuels agree that three plants will be designed, engineered, constructed, operated, and maintained. (Doc. 26-8, p. 5). Cello and its affiliates are responsible for the design engineering, and construction activities for each plant and BioFuels with its affiliates are responsible for financing, operation, and maintenance at each plant. (Doc. 26-8, p. 5). BioFuels agrees to pay Cello $25 million to construct the first three plants, with the initial payment in the amount of $12.5 million due at the effective date of the MFC, the second payment in the amount of $6.25 million due when Cello commences design and engineering for the second plant, and the remaining $6.25 million to be paid when Cello commences design and engineering for the third plant. (Doc. 26-8, pp.5-6). BioFuels has already made its initial $12.5 million payment.

Section V of the MFC, entitled "Operating and Management Agreement," provides that

13

Cello, either directly or through a wholly-owned subsidiary, will own each plant, own or lease the property on which the plant is located, insure it, and pay specified taxes.  (Doc. 26-8, p. 8). BioFuels will create a wholly-owned subsidiary for each plant, which will purchase all of the feedstock, electric power, and other necessary utilities for the plant and operate, maintain, and manage it.  (Doc. 26-8, pp. 8-10).  Subject to certain parameters, the MFC requires the BioFuels subsidiary in charge of the Bay Minette plant to purchase all wood chips, saw dust, and brushy wood materials used as feedstock from ARP.  (Doc. 26-8, p. 10).  Cello agrees to provide BioFuels' subsidiary with the Technology it needs to perform its obligations under the MFC, but the MFC states that Cello does not assign, license, or grant any rights in the Technology.  (Doc. 26-8, p. 9).  Under the MFC, the BioFuels subsidiary is to use the Technology only to operate and manage the plant.  (Doc. 26-8, p. 9).

Paragraph 10 of the "Operating and Management Agreement" section of the MFC discusses accounting.  It provides that, after the payment of certain expenses, Cello or its subsidiary will receive 51% of the remaining gross revenue and that BioFuels' subsidiary will receive the remaining 49% of the gross revenue for each plant.  (Doc. 26-8, pp. 10-11).  The MFC also contains a section entitled "Confidentiality," which addresses the parties' treatment of the Technology.  (Doc. 26-8, pp. 13-14).

Finally, for purposes of this order, the MFC provides for the possibility that the MFC may conflict with the Letter Agreement and Option Agreement and includes an indemnity provision, in which BioFuels indemnifies Cello and related entities from certain claims by P&W. (Doc. 26-8, p. 16).

**CELLO'S MOTION TO DISMISS**

14

Cello moved to dismiss this case on November 6, 2007 (Docs. 24, 25, and 26).  P&W responded on November 15, 2007.  (Doc. 40).  Cello replied after the preliminary injunction hearing concluded on December 14, 2007.  (Doc. 51).

Cello and P&W argue several issues in the course of their briefing.  Cello argues that this court lacks subject matter jurisdiction over the case.  This case made its way to federal court based on diversity jurisdiction.  Cello says that there is no diversity jurisdiction because P&W effectively is a member of Cello and because ARP, which shares Alabama citizenship with many of the defendants, is an indispensable plaintiff under FED. R. CIV. P. 19.  Cello argues that Alabama's "door-closing statute" precludes P&W from bringing its claim because P&W is not registered to do business in Alabama.  Necessarily retreating somewhat from its argument that there is no diversity jurisdiction here because P&W is effectively a member of Cello, Cello argues that P&W cannot interfere with Cello's business decisions in this suit because P&W is not a member of Cello.  Cello argues that this court should abstain from hearing the case under the Declaratory Judgment Act because of the New York action and because Cello filed an action in the Circuit Court of Baldwin County seeking, among other things, its own dissolution.  Cello also argues for dismissal of this case on its merits for several reasons on pages 24-29 of its brief.  P&W disagrees with Cello on all accounts.

The court will not address the substantive arguments that Cello makes on pages 24-29 of its brief in this order on the motion for a preliminary injunction, but it will address the remaining, more threshold, arguments.  Those threshold arguments are rejected.  The parties are free to raise the substantive arguments that this order does not address in future motions.

In addition, the court notes that some of the sections of the motion to dismiss depend on

material outside of the complaint that is not central to the claim at issue.  The court will treat

those portions of the motion as though they were filed as motions for summary judgment, as

opposed to motions to dismiss.  See Day v. Taylor, 400 F.3d 1272, 1275-1276 (11th Cir. 2005).

## I.    P&W IS NOT A MEMBER OF CELLO

This court's subject matter jurisdiction is premised on 28 U.S.C. § 1332, the diversity

jurisdiction statute.  In relevant part, the statute provides this court with original jurisdiction over

actions between citizens of different states when the sum or value of the matter in controversy

exceeds $ 75,000.  28 U.S.C. § 1332(a).  The statute requires complete diversity between the

plaintiff, P&W, and all of the defendants.  See Lincoln Prop. Co. v. Roche, 546 U.S. 81, 89

(2005).  That is, "the citizenship of every plaintiff must be diverse from the citizenship of every

defendant."  Legg v. Wyeth, 428 F.3d 1317, 1321 n.2 (11th Cir. 2005).  The district court "has

the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the

complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or

(3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."

McElmurray v. Consolidated Government of Augusta-Richmond County, 501 F.3d 1244, 1251

(11th Cir. 2007) (internal quotations and citations omitted).

P&W is a corporation.  The diversity statute provides that a corporation is a citizen both

of the state of its incorporation and also of the state in which it "has its principal place of

business."  28 U.S.C. § 1332(c)(1).  P&W is incorporated in Delaware and has its principal place

of business in New York, making it a citizen of those two states.

None of the defendants are alleged to be Delaware or New York citizens.  Because there

does not appear to be a question that the amount in controversy exceeds $ 75,000, this would

presumably end the inquiry. Cello, a limited liability company, argues to the contrary. It points out that, because it is a limited liability company, it is a citizen "of any state of which a member of the company is a citizen," Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C., 374 F.3d 1020, 1022 (11th Cir. 2004), and argues that, by virtue of some of P&W's positions in this litigation, P&W is effectively a member of Cello.

The definitions section of the Alabama Limited Liability Company Act clearly defines membership in a limited liability company as "[a] person reflected in the required records of a limited liability company as the owner of some governance rights of a membership interest in the limited liability company." ALA. CODE § 10-12-2(I) (1975). Cello's articles of organization do not list P&W, or any other entity from Delaware or New York, as a member. (Doc. 26-6); neither does Cello's Operating Agreement. (Doc. 26-7). Therefore, P&W is not a member of Cello, and Cello is not a citizen of Delaware or New York. The motion to dismiss because Cello shares the same citizenship as P&W is **DENIED**.

## II.    ALABAMA RIVER PULP IS NOT AN INDISPENSABLE PARTY.

Cello argues that ARP, a citizen of Alabama, is an indispensable party under FED. R. CIV. P. 19. The rule was recently amended to provide:

(a) Persons Required to Be Joined if Feasible.

(1) Required Party.   A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

>> (I) as a practical matter impair or
>> impede the person's ability to protect
>> the interest; or
>>
>> (ii) leave an existing party subject to
>> a substantial risk of incurring double,
>> multiple, or otherwise inconsistent
>> obligations because of the interest.

***

> (b) When Joinder Is Not Feasible.  If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.  The factors for the court to consider include:
>
>> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>>
>> (2) the extent to which any prejudice could be lessened or avoided by:
>>
>>> (A) protective provisions in the judgment;
>>>
>>> (B) shaping the relief; or
>>>
>>> (C) other measures;
>>
>> (3) whether a judgment rendered in the person's absence would be adequate; and
>>
>> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

FED. R. CIV. P. 19.

> Addressing the predecessor to the current Rule 19, the Eleventh Circuit held:
>
> Rule 19 states a two-part test for determining whether a party is indispensable. First, the court must ascertain under the standards of Rule 19(a) whether the person in question is one who should be joined if feasible.  If the person should be joined but cannot be (because, for example, joinder would divest the court of jurisdiction) then the court must inquire whether, applying the factors enumerated in Rule 19(b), the litigation may continue.

<u>Focus on the Family v. Pinellas Suncoast Transit Authority</u>, 344 F.3d 1263, 1279-1280 (11th Cir. 2003) (citation omitted).  The recent changes to Rule 19 do not detract from the foregoing interpretation of the rule's proper, two-part, application.

ARP is not a required party under Rule 19(a).  The crux of this lawsuit is whether the defendants are violating P&W's rights under the April 19, 2007 Letter Agreement and Option Agreement.  The parties to both of those agreements are Cello, Boykin Trust, and P&W.  The court can cure any violation of P&W's rights under the agreements without P&W's subsidiary, ARP, as a party.  Further, disposing of this action in ARP's absence will not impede its ability to protect any interest or create a substantial risk of double, multiple, or inconsistent obligations for any existing party to the case.  Under Rule 19 and Eleventh Circuit precedent, if ARP is not a required party under Rule 19(a), it is not an indispensable party under Rule 19(b).  The motion to dismiss because ARP is an indispensable, non-diverse party is **DENIED**.

## III.   THE "DOOR-CLOSING" STATUTE DOES NOT PRECLUDE P&W FROM PURSUING THIS LITIGATION BECAUSE THE TRANSACTION AT ISSUE INVOLVES INTERSTATE COMMERCE.

The Alabama Code includes what is commonly referred to as a "door-closing statute," which provides:

> A foreign corporation transacting business in this state without a certificate of authority or without complying with Chapter 14A of Title 40 may not maintain a proceeding in this state without a certificate of authority.  All contracts or agreements made or entered into in this state by foreign corporations prior to obtaining a certificate of authority to transact business in this state shall be held void at the action of the foreign corporation or by any person claiming through or under the foreign corporation by virtue of the contract or agreement; but nothing in this section shall abrogate the equitable rule that he who seeks equity must do equity.

ALA. CODE § 10-2B-15.02(a) (1975).[4]  If the door-closing statute would apply in state court, a federal court sitting in diversity must apply it as well.  Associates Capital Services Corp. v. Loftin's Transfer & Storage Co., Inc., 554 F2d 188, 189 (5th Cir. 1977).[5]

Once a party presents evidence that a foreign corporation does not have a certificate of authority to transact business in Alabama, as Cello did when it filed Exhibit J in support of its motion (Doc. 26-11), the foreign corporation assumes the burden of establishing that it is exempt from the door-closing statute by showing that its activities are interstate in nature.  Casa Invs. Co. v. Boles, 931 So. 2d 53, 58 (Ala. Civ. App. 2005).  One way a foreign corporation may carry its burden is by establishing that the activity at issue is interstate, as opposed to intrastate, in nature.  If the activity is interstate in nature, the Commerce Clause of the United States Constitution precludes application of the state statute.  Id. at 58.

The Eleventh Circuit succinctly explained the analysis as follows:

First, we determine whether Alabama courts, applying the statute, would refuse the foreign corporation's request to enforce the contract.  See Aim Leasing Corp. v. Helicopter Medical Evacuation, Inc., 687 F.2d 354, 357 (11th Cir. 1982).  If we conclude that Alabama courts would close their doors to the foreign corporation, then we must examine the burden such a closing would place on interstate commerce: we will not enforce the forum-closing statute if its enforcement in a particular case would unduly burden interstate commerce in violation of the federal commerce clause.  Id.

S&H Contractors, Inc. v. A.J. Taft Coal Co., Inc., 906 F.2d 1507, 1509-10 (11th Cir. 1990).

---

[4]The door-closing statute has changed somewhat over time.  Some of the cases the parties cite and on which this order relies interpret a former version of the statute, which was codified at ALA. CODE § 10-2A-247(a) (1975).  The differences between the former version of the door-closing statute interpreted in those cases and the version that applies in this case have no bearing on the court's analysis or on the outcome of this order.

[5]Fifth Circuit cases decided before October 1, 1981, are treated as Eleventh Circuit precedent.  Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Alabama courts will not enforce a foreign corporation's contract if the foreign corporation was not properly registered with the state at the time the contract was entered and it was conducting business of an intrastate nature in Alabama pursuant to the contract.  Id. at 1510, citing Sanwa Business Credit Corp. v. G.B. "Boots" Smith Corp., 548 So. 2d 1336, 1337 (Ala. 1989).  If this court concludes that Alabama courts would refuse to enforce P&W's contracts, it:

> must examine the burden placed on interstate commerce by enforcing Alabama's forum-closing statute in this case.  Our analysis of this issue is guided solely by federal constitutional law; therefore, [any] previous holding that, under state law, this transaction is intrastate in nature, does not affect our analysis of the constitutionality of enforcing the forum-closing statute in this case.
>
> ***
>
> When we are faced with state regulation of such a transaction . . . we ask . . .: Does the regulation, as applied to the transaction at issue, unduly burden interstate commerce?  The Supreme Court has held that a state's forum-closing statute does not unduly burden interstate commerce when the foreign corporation has "'localized its business'" in the state and when it is not entering the state "'to contribute to or to conclude a unitary interstate transaction.'"

S & H Contractors, 906 F.2d at 1511 (emphasis in original).

The court in S & H Contractors concluded that the Supreme Court and the Eleventh Circuit consider "the permanence and scope of  relationships between the foreign corporation and the forum state" and "whether the intrastate transaction is an essential element of an interstate transaction" when considering whether a foreign corporation has localized its business in a state.  Id.

P&W relies on two contracts to make its case: the Letter Agreement and the Option Agreement.  The agreements contemplate P&W's involvement in the construction of the Bay Minette plant in Alabama, but they do so in contemplation of a much larger, national project. There is no question that the Option Agreement is intended to give P&W the option to purchase

an interest in a business with projected national operations.  The Letter Agreement refers to the

Option Agreement and also contains provisions regarding the Technology and any other

intellectual property, whether it already exists or will be created in the future.

 The court doubts that the Alabama state courts would refuse to hear this case.  As

illustrated in Wise v. Grumman Credit Corp., 603 So. 2d 952 (Ala. 1992),

> In almost every instance where the courts have applied these provisions to bar an
> action, the case has involved the performance of some type of service or labor
> within the state other than service or labor that could reasonably be argued to be
> incidental to an interstate sale.

Id. at 953.  Consistent with the court's observation in Wise, the door-closing statue is often

implicated when a party sues on a contract for an isolated intrastate construction project.  See

Sanjay, Inc. v. Duncan Constr. Co., 445 So. 2d 876 (Ala. 1983); Green Tree Acceptance, Inc. v.

Blalock, 525 So. 2d 1366 (Ala. 1988); Cmty. Care of Am. of Ala. v. Davis, 850 So. 2d 283 (Ala.

2002); Brown v. Pool Depot, Inc., 853 So. 2d 181 (Ala. 2002) (all holding that isolated

construction projects or the provision of labor in the state of Alabama invoke the door-closing

statute).  The agreements at issue in this case involve more than an intrastate construction project

or "some type of service or labor within the state other than service or labor that could

reasonably be argued to be incidental to an interstate sale."

 Even if Alabama courts would be disinclined to hear the case, application of the door-

closing statute would unduly burden interstate commerce in this instance under S & H

Contractors.  Most notably, the intrastate aspects of the contracts, including construction of the

Bay Minette plant, are "essential element[s] of an interstate transaction."  S & H Contractors 906

F.2d at 1511.  P&W did not involve itself with Cello for the purpose of building a single plant.

P&W involved itself with Cello to have an interest in numerous plants across the country -

possibly two plants per state.  Construction of the Bay Minette plant, and its commercial success, is an essential element to the grander interstate transaction at issue in the contracts.  Cello's motion to dismiss the case because P&W is precluded from bringing suit on the contracts at issue is **DENIED** because the contracts are interstate, rather than intrastate, in nature.

## IV.   P&W IS BRINGING A SUIT FOR BREACH OF CONTRACT, NOT A DERIVATIVE ACTION.

Although P&W has not identified its lawsuit as a derivative action, Cello characterizes it as derivative in nature.  According to the Alabama Limited Liability Company Act, a plaintiff in a derivative action "shall be a member at the time of bringing the action or have succeeded to the right of a member."  ALA. CODE § 10-12-25(b) (1975).  Cello concludes that the court should dismiss P&W's case because it is not a member of Cello.  P&W candidly concedes that it cannot bring a derivative action against Cello but points out that it has not done so.

The court agrees with P&W.  This lawsuit is not an action by a member of a limited liability company, brought "in the right of a limited liability company to recover a judgment in its favor."  ALA. CODE § 10-12-25(a).  Rather, this lawsuit is an action in the right of P&W, which is not a member of Cello, brought to prevent Cello and BioFuels from interfering with P&W's contractual rights.  Cello's argument argues apples in a case of oranges.  The motion to dismiss on these grounds is **DENIED**.

## V.   THE COURT WILL NOT ABSTAIN FROM HEARING THIS CASE.

Cello argues that this court should abstain from hearing P&W's case.  In short, Cello points out that the court has discretion to abstain from hearing declaratory judgment actions and that this court should take advantage of its discretion because of two "parallel" proceedings: a declaratory judgment action BioFuels filed in the Southern District of New York and a case

Cello filed in the Circuit Court of Baldwin County.  The court will address the impact of

BioFuels' case in New York below, in the context of BioFuels' motion to transfer or dismiss this

case.

Cello says that its state court action "seeks, among other things[,] the possible judicial

dissolution of Cello Energy, LLC, a statutory remedy that is reserved exclusively for decision by

the Alabama state courts."  (Doc. 25, p. 23).  "That is, even if P&W proved jurisdiction and

standing in this court, a ruling from this [c]ourt could not resolve the issue of dissolution, which

may render moot any construction of the Option Agreement," Cello argues.  (Doc. 25, p. 23).

P&W responds to say that this court should not abstain because P&W did not file a

declaratory judgment action.  Rather, P&W seeks injunctive relief in addition to declaratory

relief.  P&W continues to argue that, if Cello re-filed its state court action before this court, this

court could exercise jurisdiction over that action because it seeks more than simply Cello's

dissolution.  P&W does not argue that this case and the state case are not "parallel" or that, if the

court agrees that the declaratory claims should be dismissed because they are parallel to the

claims in Cello's state court action, P&W's claims for injunctive relief should survive.  Cello's

reply focuses on whether P&W's claim for injunctive relief precludes the court from declining

jurisdiction under the Declaratory Judgment Act and on whether this court could entertain

Cello's dissolution action if Cello re-filed it in this court, arguing that federal courts abstain from

addressing the issue of corporate dissolution.

For starters, all of the cases Cello cites for the proposition that federal courts should

abstain from hearing cases for the dissolution of corporations are inapposite.  No party in this

federal action is seeking dissolution of any corporation or, more to the point, of any limited

24

liability company.  The court is not in a position to abstain from a hypothetical federal dissolution action that does not exist.

On the other hand, the court is in a position to decide whether it will abstain from the case that is pending before it.  As the parties recognize, the standard for abstention is different in cases for declaratory judgments than it is in "coercive" cases.  Broadly put, federal courts are more likely to abstain from hearing a declaratory judgment action based on the standards articulated in <u>Brillhart v. Excess Ins. Co. of America</u>, 316 U.S. 491 (1942), <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277 (1995), and their progeny than they are to abstain from hearing a coercive action based on the standards set forth in <u>Colorado River Water Conservation Dist. v. U.S.</u>, 424 U.S. 800 (1976), and its progeny.  P&W's claim does not fall neatly into either category.  It seeks affirmative relief in the form of preliminary and permanent injunctions and also seeks several judicial declarations.

Another court in this judicial district recently addressed a similar situation.  <u>Lexington Ins. Co. v. Rolison</u>, 434 F. Supp. 2d 1228 (S.D. Ala. 2006).  The plaintiff in the <u>Rolison</u> case, an insurer, filed a declaratory judgment action against, among others, two insureds, seeking a declaration of rights under an insurance policy.  <u>Id</u>. at 1231.  One of the insureds filed a two-count counterclaim against the insurer, seeking damages.  The other of the two insureds was a plaintiff in a later-filed Alabama state court action, also seeking affirmative relief against, among others, the insurer.  <u>Id</u>.  The insured who filed the state court action moved the federal court to abstain from hearing the case in favor of allowing the state court to resolve the issues.

Analyzing whether to abstain from the case, the federal court in <u>Rolison</u> recognized that the plaintiff's claims before it were declaratory in nature but the counterclaims against the

plaintiff were coercive in nature.  It recognized that the Eleventh Circuit has not had occasion to

decide what district courts should do when entertaining a motion to abstain from hearing a case

that contains both declaratory and coercive claims.  Id. at 1236.  Analyzing the issue with the

benefit of a persuasive analysis in ITT Industries, Inc. v. Pacific Employers Ins. Co., 427 F.

Supp. 2d 552 (E.D. Pa. 2006), the Rolison court identified "three distinct, emergent lines of

precedent" that shed light on what it characterized as an "esoteric subject."  Rolison, 434 F.

Supp. 2d at 1236.

> One approach identified by ITT is to find that the Wilton/Brillhart discretionary
> standard is per se supplanted by the harsher Colorado River test whenever an
> action includes both declaratory and non-frivolous coercive claims.  A second is
> to proclaim that exercise of jurisdiction is mandatory (subject only to Colorado
> River constraints) if the coercive claims can exist independently of requests for
> declaratory relief, such that they could persist and survive even if the declaratory
> claims vanished.  The third avenue, championed by a number of courts, is simply
> to "look[] to the 'heart of the action' to determine if the standard of Wilton or that
> of Colorado River should apply."  Under that standard, "if the outcome of the
> coercive claims hinges on the outcome of the declaratory ones, Wilton's standard
> governs; conversely, if the opposite applies, Colorado River's standard controls."

Rolison, 434 F. Supp. 2d at 1236-37 (internal citations omitted, alteration in original).

The Rolison court decided that the "heart of the action" test was the most favorable of the

three alternatives for several reasons and emphasized that "[o]ne of the most desirable features of

the 'heart of the action' rule is its flexibility, as it allows district courts to treat different cases

differently based on the fundamental character of a particular action."  Id. at 1237-38.  The heart

of the action before the Rolison court was a declaratory judgment action because the initial

complaint was for declaratory relief only, one of the defendants later filed a counterclaim

seeking money damages derivative of and intertwined with the declaratory relief sought in the

initial complaint, the counterclaim turned on interpretation of the document at issue in the

declaratory claims, and the counterclaims could be fully litigated in the parallel state action.  Id. at 1238.  After applying the Wilton/Brillhart factors and related Eleventh Circuit precedent to determine whether abstention was appropriate in the declaratory action before it, the Rolison court dismissed the entire case, including the coercive claims, without prejudice.  The court in the ITT case on which Rolison relied, stayed the case before it for similar reasons.  The ITT case was more similar to the case before this court than it was to the case before the court in Rolison in one particularly noteworthy respect.  In Rolison, the complaint contained only claims for declaratory relief; the claims for coercive relief were alleged in a counterclaim.  In ITT and in the case before this court, the plaintiff's complaint seeks declaratory and coercive relief.

This court will apply the same test as did the Rolison court.  If the outcome of the claims for injunctive relief turn on the outcome of the claims for declaratory relief, the court will decide whether to abstain under the more permissive analysis that applies to declaratory judgment actions.  If the opposite applies, it will decide whether to abstain under the analysis of Colorado River and its progeny.

The bulk of the facts P&W alleges in support of all of its claims for relief focus on allegations that the MFC between Cello and BioFuels, Cello's September 18, 2007 Operating Agreement, and Cello's Restated Articles interfere with P&W's contractual relationships with Cello.  The coercive claims for injunctive relief seek to enjoin Cello and BioFuels from performing under the MFC, to enjoin Cello from breaching its agreements with P&W, to enjoin BioFuels from interfering with P&W's contractual rights, and to enjoin Cello and BioFuels from performing under the Operating Agreement and Restated Articles.

The declaratory claims ask the court to declare that the MFC, or certain portions of it,

27

violate P&W's contractual rights, that Cello cannot perform under the MFC without breaching

its contractual obligations to P&W, and to declare that the Operating Agreement and the

Restated Articles, or portions of them, null and void because they violate P&W's contractual

rights with Cello.

Because the bulk of the claims for injunctive relief are grounded in the allegations that

the MFC, Cello's Operating Agreement, and Cello's Restated Articles conflict with P&W's

contractual rights, which are the subjects of the claims for declaratory judgments, the "heart of

the action" is a declaratory judgment action.  The court recognizes that a small portion of the

facts supporting the claims for injunctive relief arguably do not implicate the MFC, Cello's

Operating Agreement, or Cello's Restated Articles, but "[o]ne of the most desirable features" of

the standard the court applies in this case is that it gives the court the flexibility to look to "the

fundamental character" of P&W's complaint which, the court holds, is a declaratory judgment

action for purposes of the abstention Cello seeks.  Rolison, 434 F. Supp. 2d at 1237-38.  The

Court will therefore determine whether to abstain from hearing this case based on the relatively

more permissible standard used in declaratory judgment actions.

The Eleventh Circuit addressed the issue of abstention in the declaratory judgment

context for the first time in Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1329 (11th

Cir. 2005).  After discussing Wilton and Brillhart, the Ameritas case set forth nine factors for

district courts to consider:

> (1) the strength of the state's interest in having the issues raised in the federal
> declaratory action decided in the state courts;
>
> (2) whether the judgment in the federal declaratory action would settle the
> controversy;

(3) whether the federal declaratory action would serve a useful purpose in clarifying the legal relations at issue:

(4) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" - that is, to provide an arena for a race for <u>res judicata</u> or to achieve a federal hearing in a case otherwise not removable;

(5) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction;

(6) whether there is an alternative remedy that is better or more effective;

(7) whether the underlying factual issues are important to an informed resolution of the case;

(8) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and

(9) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

<u>Id</u>. at 1331.  The Eleventh Circuit characterized its nine factors as "guideposts."  The court instructed that the guideposts are not absolute and that no single one of them is controlling.  <u>Id</u>.

P&W does not directly address these factors.  Cello asserts that "[a]ll of these factors weigh in favor of declining jurisdiction," but does not explain the facts, as they relate to all of the factors, that cause it to reach this conclusion other than to argue that the legal documents will be evaluated under Alabama law and that the state court has exclusive authority to dissolve Cello. (Doc. 25, p. 23).

The court finds that factors 2, 3, 4, 7, and 8 weigh against abstention, that factor 9 weighs in favor of abstention, and that factors 1, 5, and 6 carry little weight one way or the other in this case.  Specifically weighing against abstention: a judgment in this court would settle the controversy between the parties, the federal declarations the parties seek would clarify the legal

relations between the parties in a useful way, there is no indication that P&W filed its action here

to get a jump on the race to res judicata or to achieve a federal hearing in an otherwise

unremovable case, and, although the underlying factual issues are important to an informed

resolution of this case, neither the state court nor the federal court is in a better position to

evaluate them.

Weighing in favor of abstention: there may be a close nexus between the facts and state

law, particularly in the context of contractual interpretation, but federal courts sitting in diversity

consider the law of the states in which they sit as a matter of routine.  This factor weighs in favor

of abstention, but only slightly.  Finally, Cello has not shown why the state of Alabama has a

particularly strong interest in resolving the issues before this court (as opposed to the issues

before the Circuit Court of Baldwin County), that the continuation of this case would create any

undue friction between the state and federal courts, or that the alternative remedy sought in state

court will more effectively resolve the dispute before this court.

Cello's motion for this court to abstain jurisdiction is, therefore, **DENIED**.

<h2 style="text-align:center">BIOFUELS' MOTION TO TRANSFER OR DISMISS</h2>

BioFuels moved to transfer or dismiss this case for improper venue on November 6,

2007.  (Doc. 20).  In short, BioFuels cites Manuel v. Convergys Corp., 430 F.3d 1132 (11th Cir.

2005), to support its argument that this case should be transferred or dismissed pursuant to the

"first-filed rule" because BioFuels filed a declaratory judgment action in the United States

District Court for the Southern District of New York (the "New York action") against P&W one

week before P&W filed the action before this court.  BioFuels quotes Manuel for the proposition

that, when two actions in separate federal courts involve overlapping issues and parties, the

federal courts apply a presumption that the forum where the first suit was filed will hear the case. (Doc. 20, p. 7). BioFuels cites the district court case, <u>Marietta Drapery & Window Coverings Co., Inc. v. North River Ins. Co.</u>, 486 F. Supp. 2d 1366 (N.D. Ga. 2007), for the two related propositions that (1) the court presiding over the first-filed case, in this case the court presiding over the New York action, should decide whether both the New York case and the case before this court may proceed and (2) this court should transfer the case before it to the Southern District of New York to determine which of the two cases should proceed. (Doc. 20, p. 7). BioFuels' motion also identifies, and argues against application of, an exception to the first-filed rule. According to <u>Manuel</u>, BioFuels recognizes, when the first-filed action is a declaratory judgment action filed in apparent anticipation of the second-filed action, courts sometimes disregard the first-filed rule. (Doc. 20, pp. 7-8). BioFuels argues against the application of this exception to the first-filed rule for several reasons.

P&W responded to BioFuels' motion on November 15, 2007. (Doc. 39). The response relies on <u>Ven-Fuel, Inc. v. Department of the Treasury</u>, 673 F.2d 1194 (11th Cir. 1982), for the proposition that the first-filed rule should not apply in this case because the New York action is entirely defensive, was filed in anticipation of P&W's action, and is incomplete because it omits Cello and Boykin Trust as parties. P&W also argues that none of the other factors that bear on a motion to transfer venue support transferring this case to the Southern District of New York. (Doc. 39, pp. 2-3).

In <u>Manuel</u>, a plaintiff employee brought a declaratory action in the state of Georgia on April 20, 2004, seeking a declaration that a noncompetition agreement to which he was a party was illegal, invalid, and unenforceable. <u>Manuel</u>, 430 F.3d at 1134. The defendant employer

removed the case to the Northern District of Georgia on May 10, 2004, and, that same day, brought its own suit in Ohio state court for breach of the noncompetition agreement and misappropriation of trade secrets.  Id.  The employer also filed a counterclaim in the Georgia action for misappropriation of trade secrets and subsequently moved the Georgia court to defer ruling on a  motion for summary judgment the employee filed pending resolution of the case in Ohio state court.  Id.  The Georgia court denied the motion to defer ruling and granted the employee's motions for summary judgment and to dismiss the employer's counterclaim.  Id.

On appeal, the Eleventh Circuit described the first-filed rule as follows:

Where two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit under the first-filed rule.  We are no exception. Moreover, we require that the party objecting to jurisdiction in the first-filed forum carry the burden of proving "compelling circumstances" to warrant an exception to the first-filed rule.  Id.

Id. at 1135 (citations omitted).  The Manuel court relied on Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 675 F.2d 1169 (11th Cir. 1982), to support its conclusion that the Eleventh Circuit is no exception to the first-filed rule and also quoted Ven-Fuel for the proposition that one of the factors it considers when determining whether to dismiss a first-filed declaratory judgment action is if it was filed in anticipation of the second action.  Manuel, 430 F.3d at 1135. The court continued to explain that an anticipatory declaratory judgment action will not necessarily be dismissed, but that a district court can consider many equitable factors when deciding whether to entertain the first-filed declaratory judgment action.  Id. at 1135-36.  The court affirmed the decision not to dismiss the first-filed declaratory judgment action for several reasons, including that the first-filed action was not improperly anticipatory or the product of improper forum shopping.  Id. at 1136-37.

32

If the facts were somewhat reversed, and the action pending before this court was the first-filed declaratory judgment action and the action pending in New York was filed second, Manuel would be more instructive.  This court is presiding over the second-filed case, not a first-filed declaratory judgment action, and Manuel does not plot a course of action for the court to follow.  Eleventh Circuit precedent addressing the factual scenario before this court is sparse.  P&W points to the Ven-Fuel case in support of its argument against applying the first-filed rule.  The Ven-Fuel decision addressed a first-filed case too, however, so the Ven-Fuel case offers no more guidance on what a court presiding over a second-filed case is supposed to do than does Manuel.  It held that:

> In its discretion, a district court may decline to entertain a declaratory judgment action on the merits when a pending proceeding in another court will fully resolve the controversy between the parties.  One equitable consideration in such decision is whether the declaratory judgment action was filed in apparent anticipation of the other pending proceeding.

Ven-Fuel, 673 F.2d at 1195 (citations omitted).

The parties have not directed the court to any Eleventh Circuit precedent addressing what a court in this district should do if it is presiding over a lawsuit filed after a potentially anticipatory declaratory judgment action is already pending in another district.  The Haydu case cited in the Manuel opinion appears to be the Eleventh Circuit case most closely on point.  In that case, the appellee filed a complaint in Florida state court on January 10, 1979, against the appellant alleging negligence, fraud, and breach of fiduciary duties in the handling of stock option accounts ("Case 1").  Haydu, 675 F.2d at 1171.  The stock option agreements provided that disputes between the parties should be handled through arbitration.  Id.  The appellant removed the case to the Southern District of Florida on February 5, 1979, but the case was

remanded on February 17, 1979.  Id.  After remand, the appellant moved to compel arbitration.
The state court denied the motion on July 2, 1979, and ordered a trial.  Id.

After Case 1 was remanded, the appellant filed a separate petition to compel arbitration
in the Southern District of Florida ("Case 2").  Id.  The district court presiding over Case 2
ordered the matter to arbitration on July 11, 1979.  Id.  The July 11, 1979, order compelling
arbitration in Case 2 obviously conflicted with the July 2, 1979, state court order in Case 1.  The
state court vacated its July 2, 1979, order, but reinstated it on November 7, 1979.  Id.  The
district court in Case 2 enjoined Case 1 from proceeding on January 11, 1980.  Id.  Similarly, the
federal court of appeals stayed Case 2 on December 17, 1979, pending the appellee's appeal of
the July 11, 1979, order in Case 2.  Id. at 1171-72.  The federal court of appeals remanded the
case, instructing the district court in Case 2 to dismiss the action unless the July 2, 1979, state
court order in Case 1 did not rule on the federal arbitration claims and did not have final effect
under Florida law.  Id. at 1172.  On remand, the district court dismissed Case 2 after determining
that Case 1 finally disposed of the federal arbitration claim.  Id.

In other words, Case 2 was a second-filed action seeking to compel arbitration.  The
issues and parties in Case 2 overlapped with the issues and parties in Case 1.  As the Eleventh
Circuit described the two cases, the appellee "start[ed] a three-year journey to nowhere through
the state and federal courts" when she filed Case 1 on January 10, 1979.  Id. at 1173.  The cases
"proceeded on parallel tracks for three years.  All that has been accomplished is a state court
order denying arbitration and a federal court order compelling it."  Id. at 1174.

The Eleventh Circuit affirmed dismissal of Case 2, in part based on principles of comity.
As the court explained, when two courts have the same lawsuit, one court generally must yield

34

jurisdiction to the other. Id. at 1173. The court held that the federal court presiding over Case 2 should yield for several reasons. First, to avoid having two courts resolve a fractioned dispute, a court with "jurisdiction over all matters in dispute should have jurisdiction of the case." Id. The state court in Case 1 had jurisdiction over the entire matter but the federal court in Case 2 only presided over part of the matter, favoring resolution of the case through Case 1. Second and third, Case 1 had prior jurisdiction and the convenience of the parties was equivalent in state and federal courts. Id. Fourth, principles of federalism called for federal courts to "'tread lightly' when a state proceeding is already underway." Id.

Fifth and finally, "practicality dictate[d] a relinquishment of jurisdiction." Id. at 1174. Several factors played into this final consideration. First, three years of litigation in the two courts had accomplished nothing more than conflicting orders about whether the case should be tried or arbitrated. Id. Second, the case was filed in state court first and, absent "compelling circumstances, the court initially seized of a controversy should be the one to decide the case." Id. (citation omitted). No such compelling circumstances existed for the federal court to decide the case, especially in light of the facts that the federal court had the opportunity to decide Case 1 when it was removed before Case 2 was filed but decided to remand the case instead, the state court had actively processed the case, including issuing a judgment against the appellant on liability, and the state court trial on damages was scheduled to go forward within a week of the appellate opinion. Id. "Although comity is clearly a discretionary judicial concept, the concerns embodied therein and the equities asserted here compel a state court resolution of this matter." Id.

To the extent that BioFuels' motion to transfer this case to New York pursuant to the

35

first-filed rule should be considered in light of the comity factors addressed in <u>Haydu</u>, only one of the factors is in BioFuels' favor - the New York action was filed prior to this action.  On the other hand, this court appears to have jurisdiction over the entirety of the dispute between the parties while the New York action only addresses part of the overall dispute, suggesting that this court should retain jurisdiction over the case under the first factor from <u>Haydu</u>.

Perhaps more to the point, on December 18, 2007, P&W received an extension of time to answer or otherwise plead in the New York action so that it would have the benefit of a ruling on its motion for a preliminary injunction and BioFuels' motion to transfer before responding to the complaint in that case.  Considering the practicality factor addressed in <u>Haydu</u>, the parties to this case put on several days of testimony during the preliminary injunction hearing before this court.  Transferring the case now would delay a ruling on the preliminary injunction.  If the New York court decided to consolidate the case pending before this court with the New York action, the New York court would either have to rule on the motion for a preliminary injunction without the benefit of hearing the live testimony that this court heard or order another preliminary injunction hearing in New York before ruling on the motion.  Under either scenario, transferring the case now is not practical.

The weight of the factors found in <u>Haydu</u> suggests that this court should not yield jurisdiction and neither of the Eleventh Circuit cases on which the parties rely apply to the court presiding over a second-filed case.  In light of the foregoing, the court is disinclined to transfer the case at this time.  <u>Marietta Drapery</u>, the district court case from the Northern District of Georgia on which BioFuels relies, does not persuade the court to the contrary.

In <u>Marietta Drapery</u>, two insurers filed a declaratory judgment action against their

insured in the Southern District of Illinois on June 28, 2006. <u>Marietta Drapery</u>, 486 F. Supp. 2d
at 1368. The insured filed an overlapping action against the insurers in Georgia state court in
November 2006, which the insurers subsequently removed to federal court and moved to dismiss
under the first-filed rule. <u>Id</u>. at 1167-68. Rather than dismiss the second-filed suit, the Georgia
court transferred it to Illinois. It quoted a Fifth Circuit Court of Appeals case, <u>Cadle Co. v.
Whataburger of Alice, Inc.</u>, 174 F.3d 599 (5th Cir. 1999), for the explanation that the first-filed
"rule rests on principles of comity and sound judicial administration and serves to maximize
judicial economy and minimize embarrassing inconsistencies by prophylactically refusing to
hear a case raising issues that might substantially duplicate those raised by a case pending in
another court." <u>Marietta Drapery</u>, 486 F. Supp. 2d at 1369 (internal quotations omitted).
<u>Marietta Drapery</u> cited <u>Cadle</u> again, along with some district court cases and another case from
the Fifth Circuit, for the proposition that the court presiding over the first-filed case not only
presumptively hears the case on the merits, but also should be the court to determine if the
second suit should proceed, be dismissed or stayed, or whether the two cases should be
consolidated and, if so, in which court. <u>Id</u>. at 1369-70. According to <u>Cadle</u>, the second court
should transfer its case to the first court to make this determination. <u>Id</u>. at 1370, citing <u>Cadle</u>,
174 F.3d at 606.

Other district court cases in this circuit, decided both before and also after the <u>Cadle</u> case
on which the <u>Marietta Drapery</u> case relies, have chosen different courses of action in similar
situations. The defendant in <u>BellSouth Advertising & Publishing Corp. v. Real Color Pages,
Inc.</u>, 792 F. Supp. 775 (M.D. Fla. 1991), brought a declaratory judgment action against the
plaintiff in <u>BellSouth</u> in the Fort Myers Division of the Middle District of Florida at 2:36 p.m. on

August 23, 1991.  Id. at 779.  At 4:23 p.m. on August 23, 1991, the plaintiff filed the BellSouth case in the Jacksonville Division of the Middle District of Florida, bringing eight counts, including unfair competition and trademark infringement.  Id.  On the plaintiff's motion, the second court entered a temporary restraining order on August 30, 1991.  On September 9, 1991, the court held a hearing on the plaintiff's motion for a preliminary injunction.  Id.  Part of the defendant's opposition to the motion for a preliminary injunction included an argument that the first-filed rule applied to the case and that the court should deny the request for injunctive relief and allow the Fort Myers Division to resolve the litigation.  Relying on Hop-In Food Stores, Inc. v. S & D Coffee, Inc., 642 F. Supp. 1106 (W.D. Va. 1986), and Ven-Fuel, the court found that the Fort Myers declaratory judgment action was filed in anticipation of the BellSouth suit and declined "to deny injunctive relief or dismiss this action because of the pendency of the Ft. Myers action."  Id. at 786.  The court granted the preliminary injunction.

The court in Kate Aspen, Inc. v. Fashioncraft-Excello, Inc., 370 F. Supp. 2d 1333 (N.D. Ga. 2005), presided over a second-filed case in which the plaintiff before it sought a temporary restraining order.  In brief, the plaintiff accused the defendant of copyright infringement and unfair competition.  Id. at 1335.  After the plaintiff sent the defendant multiple "cease-and-desist" letters, the defendant filed a suit on April 7, 2005, in the Southern District of New York, seeking a declaration that the plaintiff's copyrights were invalid and unenforceable.  Id. at 1336.  Plaintiff filed its suit in the Northern District on Georgia on April 19, 2005.  Id.

After a hearing, the Georgia court denied the motion for a temporary restraining order for two reasons.  First, it held that the plaintiff had not met the standard temporary restraining order requirement of showing it was substantially likely to succeed on the merits.  Id. at 1336-38.

Second, the court denied the motion based on the first-filed rule.  Relying on Haydu and citing City of New York v. Exxon Corp., 932 F. 2d 1020, 1025 (2d Cir. 1991), the Georgia court held that the New York court, where the case was first filed, should decide if the first-filed rule should apply.  Kate Aspen, 370 F. Supp. 2d at 1338.  The court denied the motion for a temporary restraining order and stayed the action pending a decision from the Southern District of New York as to whether the first-filed rule applied to the cases.  Id. at 1339.

In another case, the plaintiffs and one of several defendants to an action moved the Middle District of Florida to stay a case because it duplicated a proceeding pending in the District of the Virgin Islands.  Government of Virgin Islands v. Neadle, 861 F. Supp. 1054, 1055 (M.D. Fla. 1994).  The Florida court held that it had discretion to stay the case before it in an effort to avoid duplicative litigation, conflicting rulings, and confusing piecemeal resolutions. Id.  Finding that the case before it was a subset of the action pending in the Virgin Islands, the court stayed the case before it until resolution of the Virgin Islands case.  Id. at 1056.

Considering the absence of binding precedent on the issue, the approaches taken by other district courts in this circuit facing situations similar to the one at bar, and the status of the litigation before this court and of the New York action, the court declines to dismiss this case or to transfer the case to New York at this time.  The court also declines to stay this action at this time.  No party has asked for a stay and, from a practical perspective, any motion BioFuels may wish to file in the New York action based on the first-filed rule is likely to be resolved before the litigation in this case will further advance in any significant way.  The motion to transfer or dismiss is, therefore, **DENIED**.

## THE MERITS OF THE MOTION FOR A PRELIMINARY INJUNCTION

The decision to grant or deny a preliminary injunction is a matter within the discretion of the district court; a court of appeals will review an order granting or denying a preliminary injunction only for an abuse of the district court's discretion.  McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998).  The extraordinary remedy P&W seeks is only available when a legal right has been infringed for which there is no adequate legal remedy.   Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1127 (11th Cir. 2005).  A district court may issue a preliminary injunction where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  Robertson, 147 F.3d at 1306.  "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" as to each of the four prerequisites.  Id.  (internal citations and quotations omitted); see also Suntrust Bank v. Houghton Mifflin Co., 252 F.3d 1165, 1166 (11th Cir. 2001) ("We add that a preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites.").

A plaintiff seeking a preliminary, as opposed to a permanent, injunction must show that the irreparable injury will occur "during the pendency of the suit" unless the preliminary injunction issues.  Alabama v. United States Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005).  In other words, the possibility that P&W will suffer an irreparable injury at some point after the conclusion of this case does not justify the issuance of a preliminary injunction - P&W must show that the injury will occur while this case is ongoing, before the parties and

court can obtain a final decision on the merits.

P&W has not persuaded the court that it will suffer an irreparable injury during the pendency of this lawsuit unless the preliminary injunction issues.  The court finds that the potential for injury at this stage of the litigation can be broken down into the following basic categories: (1) injury flowing from disclosure of the Technology, (2) injury flowing from P&W's loss of the opportunity to construct the Bay Minette plant, which would allegedly hinder its ability to learn how the plants operate and allegedly decrease the chances that the Bay Minette plant will be adequately constructed, and (3) injury flowing from dilution of P&W's interest in Cello.

P&W's concern with regard to disclosure of the Technology stems primarily from the provision in the MFC that gives BioFuels access to the technology that is necessary and appropriate for the operation and maintenance of the plants.  The evidence presented during the hearing showed that BioFuels has not received access to any of the Technology to date and that, in the event that BioFuels does receive access to the Technology, none of the other companies with which BioFuels is affiliated will share in that knowledge.  There is no evidence to suggest that any entity other than BioFuels will ever receive access to the Technology.  There is no evidence that BioFuels will receive access to the technology before the plant is built.  Further, BioFuels will not be able to use the Technology for any purpose other than the operation and maintenance of the plants.  Finally, all of the technology will become public knowledge through the patent process in November of this year.  In the event that P&W ultimately is able to end BioFuels' involvement with Cello in its entirety, any Technology to which BioFuels previously had access will be in the public domain.  The court is not persuaded that P&W will suffer an

41

irreparable injury during the pendency of this lawsuit due to the potential disclosure of the

Technology to BioFuels pursuant to the MFC.

P&W also has not persuaded the court that it will suffer an irreparable injury if it loses

the opportunity to participate in the construction of the Bay Minette plant.  First, the evidence

presented during the hearing suggests that P&W will have unfettered access to the construction

process.  Jack testified that he would allow P&W to observe the construction in any way P&W

felt was appropriate.  Second, there is insufficient evidence to show that the Bay Minette plant is

a doomed project if an entity other than P&W constructs it.  Although there is evidence that the

parties disagree about certain aspects of the construction, there is also evidence to suggest that

both parties are capable of properly building a plant.  Whatever entity actually builds the plant

will be under Jack's watch.  If P&W takes advantage of its opportunity to keep abreast of the

construction status, there is no reason to believe that it will not be able to voice suggestions or

concerns to Jack or to the construction company.  Cello's management has final authority on all

decisions regarding the construction of the Bay Minette plant pursuant to paragraph six of the

Letter Agreement in any event.

Finally, to the extent that P&W's interest in Cello is diluted by the MFC, that dilution is

compensable if P&W prevails on the merits.  The MFC gives BioFuels a portion of the gross

revenue generated at any given plant, including the Bay Minette plant.  If P&W prevails on the

merits of this case, it can quantify its damages in this regard by determining what revenue, if

any, Cello generated in the interim and how much Cello paid BioFuels.  The lost business

opportunity that success on the merits may entitle P&W to recover is likewise subject to

determination at a future date, and will depend, ultimately on the success of the Technology and

operation of the Bay Minette plant.

The motion for a preliminary injunction is **DENIED**.

**DONE and ORDERED** this 25th day of January, 2008.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE