## Manufacturing and Financing Contract

This Manufacturing and Financing Contract ("Contract") for the financing and operation of plants for the manufacture of synthetic fuels is made and entered into this ___ day of September, 2007, (the "Effective Date") by and between Forest Energy Systems, LLC ("FES") and BioFuels Operating Company, LLC ("BioFuels").

### I.   The Parties

1.   FES is a limited liability company organized and existing under the laws of the State of Alabama.

2.   FES or its affiliates desire to have constructed and to have operated Plants for production of Synthetic Fuels using FES Technology.

3.   BioFuels is a limited liability company organized and existing under the laws of the State of Alabama.

4.   BioFuels or its affiliates have access to financial resources adequate to carry out the terms provisions and requirements of this Contract, including making commercially reasonable efforts to arrange financing for construction of Plants using the FES Technology pursuant to the terms of this Contract.

### II.   Definitions

For the purposes of this Contract, the following terms have the following meanings:

"Feedstock" means raw materials, chemicals and other materials, which are used as feed in a Plant, including but not limited to tires, plastics, agricultural products and residues, and cellulose-containing materials.

"FES Patent Rights" means past, present and future patents and patent applications in any country, which patents and patent applications are owned or controlled by FES, in which the claims of such patents or patent applications cover subject matter within the FES Technology.

USIDOCS 6155597v1



"FES Proprietary Information" means information and know-how developed or acquired by, or for the benefit of, FES relating to FES Technology, which will be made available to BioFuels, its affiliates, or a third party in connection with this Contract or the O&M Agreement, which is subject to Intellectual Property Rights owned, controlled, or acquired by FES.

"FES Technology" means technology developed or acquired by FES for the production of Synthetic Fuel by conversion of a Feedstock. FES Technology includes FES Proprietary Information and FES Patent Rights made available in accordance with this Contract. FES Technology also shall include any improvements or modifications that may be developed, acquired, realized or implemented hereafter, pursuant to this Contract.

"Gross Revenue" means payments and other compensation received from sale or other disposition of Output from a Plant.

"Intellectual Property Rights" means patents, patent applications, copyrights (whether registered or unregistered), trade secrets, know-how, and other intellectual property rights (other than trademarks and similar rights), whether protected, created, or arising under the laws of the United States or any other jurisdiction, including, but not limited to, any of the foregoing with respect to inventions, discoveries, methods, processes, compositions, or writings.

"O&M Agreement" means an Operating and Maintenance Agreement entered into between the parties or their respective affiliates in accordance with this Contract.

"Output" means Synthetic Fuel, metallic and non-metallic by-products, electric power, and any other product produced or generated in connection with the operation of a Plant, each of which is capable of use or sale, together with renewable energy certificates, green energy certificates, emission credits, emission offsets, and the like received in connection with a Project.

"Plant" means any facility engineered, constructed, or operated based on or using the FES Technology for the production of Synthetic Fuels, by-products, or electric power.

-2-

USDOCS 6353397v1

"Project" means the construction and operation of a Plant in accordance with this Contract, together with financing, engineering, permitting, and other associated activities.

"Project Debt" means debt incurred by FES or its affiliates through Lenders arranged by BioFuels or its affiliates to provide adequate funds to engineer, obtain governmental permits, construct, start-up, and initially operate a Project before sufficient Gross Revenue is expected to be generated to fund continued operation of the Project.

"Synthetic Fuel" means primarily hydrocarbon-based materials, which may contain oxygenated hydrocarbons, useful as fuel, which are derived from sources other than by direct conversion of crude petroleum or natural gas.

## III.   Use of FES Technology

1.     FES will make available to BioFuels and to BioFuel's Operating Company affiliates all FES Technology necessary and appropriate for the operation, and maintenance of the Plants constructed in accordance with this Contract and each O&M Agreement; provided, however, that FES Technology and FES Proprietary Information shall at all times remain sole property of FES during and after the term of the Contract and each O&M Agreement.

2.     Any additional Intellectual Property Rights, which are created or developed during the course of performance of this Contract or an O&M Agreement and which relate to the FES Technology is and shall become the sole property of FES. All inventions and discoveries made by BioFuels or an Operating Company, or by any of their respective officers, employees or agents, in connection with activities undertaken pursuant to this Contract or an O&M Agreement shall be promptly and fully made known to FES. BioFuels agrees to assign or cause to be assigned, and hereby assigns, all Intellectual Property Rights to such inventions and discoveries to FES, and agrees that any such officers, employees or agents will execute any necessary documentation, including but not limited to assignments, consents, affidavits, applications for Letters Patent in the United States of America and countries foreign thereto, and any papers that may be needed to perfect ownership of such Intellectual Property by FES. BioFuels agrees to create, and at all times maintain, contractual obligations and adequate procedures with its affiliates (including each Operating Company), and its and their

-3-

respective officers, agents and employees that will enable BioFuels to carry out the terms of this paragraph. For the avoidance of doubt, the parties acknowledge and agree that affiliates of BioFuels are or may be involved in the design, engineering, construction, financing, operation or management of biofuels production facilities using third-party technology, that any Intellectual Property Rights that are developed or becomes known to any such affiliate in connection with those activities shall not be subject to the provisions of this paragraph, and that prior to using any knowledge, processes, or products subject to such Intellectual Property Rights in connection with its performance under this Contract or an O&M Agreement BioFuels will (a) disclose the existence of any such Intellectual Property Rights to FES, and (b) use such Intellectual Property Rights only pursuant to a license or other form of appropriate agreement.

3.      All literary, artistic or other material (including but not limited to reports, computer programs, manuals, or photographs) created by BioFuels or its affiliates and their respective officers, employees, and agents solely in connection with performance of the Contract or an O&M Agreement are deemed works made for hire and shall belong exclusively to FES, with FES having the right to obtain and hold in its own name such copyrights. To the extent that any of said literary, artistic or other material may not, by operation of law, be works made for hire, BioFuels shall, upon a request by FES, assign to FES ownership of copyright in such material.

## IV.   The Projects

1.      The parties agree that pursuant to this Contract a minimum of three (3) Plants will be designed, engineered, constructed, operated, and maintained. Each Plant will constitute a separate Project. The parties acknowledge that FES including its affiliates is responsible for the design, engineering, and construction activities in a Project and BioFuels including its respective affiliates is responsible for financing, operation, and maintenance activities in each Project.

A. BioFuels agrees to pay to FES a project fee of $25 million to be used for the design, engineering, permitting, financing and construction of the first three Projects (the "Project Development Fee"). The Project Development Fee shall be paid in three installments. The first installment, in the amount of $12.5 million, shall be paid in full as of the Effective Date of this Contract, and shall be used by FES or its affiliates solely for the

-4-

design, engineering, permitting, and construction of the first Project. The second installment in the amount of $6.25 million shall be paid in full at such time as FES commences the design and engineering for the second Project, and shall be used by FES or its affiliates solely as equity in connection with the financing of the second Project. The third installment in the amount of $6.25 million shall be paid in full at such time as FES commences the design and engineering for the third Project, and shall be used by FES or its affiliates solely as equity in connection with the financing of the third Project.

B.     The first Project shall be constructed in accordance with the standards set forth in Exhibit A. All subsequent Projects pursued under this Contract shall be constructed in accordance with the standards set forth in Exhibit A, unless the parties specifically agree otherwise. The parties acknowledge and agree that the first, second, and third Projects are process demonstration plants, and that adjustments and/or modifications to the existing and subsequent Plants may be required to meet the requirements set forth in Exhibit A (which may be modified by mutual agreement of the parties). Thereafter, the parties agree that the commencement of design for the fourth and any subsequent Project (each such Project, an "Additional Project") shall occur only when the parties confirm that all prior Projects meet or exceed the standards set forth in Exhibit A ( the "Acceptance Criteria"), unless otherwise mutually agreed.

C.     In consideration of its payment of the Project Development Fee, BioFuels shall have the right, pursuant to the terms of this Contract and each O&M Agreement, to operate, maintain and manage any Plants that are designed, constructed or operated within twenty (20) years of the Effective Date of this Contract (such right, the "O&M Right"), subject to Par. IX.4. of this Contract.

D.     Upon expiration of the O&M Right, the parties agree to evaluate and seek to reach an agreement in good faith as to whether this Contract should be amended with respect to the construction and operation of any future Plants.

E.     FES will site, permit, design, engineer and construct each Plant, using and incorporating FES Technology and FES Proprietary Information in accordance with the standards set forth in Exhibit A. The first Plant shall be constructed on a 20 acre site owned by FES in Bay Minette, Alabama.

-5-

US1DOCS 6355597v1

FES' siting, permitting, design, engineering and construction of each Plant shall be performed in cooperation and coordination with BioFuels or its affiliates; provided, however, that the final decision on these matters shall be in the reasonable discretion of FES.

F.      (i) Without liability on the part of FES, and as further specified in the O&M Agreement, BioFuels or its affiliates shall use commercially reasonable efforts to arrange, directly, through an affiliate, or otherwise through other non-affiliated third party lenders (collectively, "Lenders,"), and make available to FES any and all financing necessary for the acquisition of equipment and the construction, testing, and start-up of operations of each Project. In connection with such financing, (a) FES or its affiliates shall contribute capital (as equity) into a Project in the amount set forth in Exhibit B (the "Project Company Capital"), and (b) BioFuels or its affiliates shall endeavor to obtain from Lenders traditional Project Debt financing, in the amount and at the interest rate range set forth in Exhibit B.

(ii) In order to arrange such financing, each Operating Company (as such term is defined below) may grant a security interest in its rights under an O&M Agreement to the Lender(s), as further specified in the O&M Agreement. In the event that the Lender(s) exercise its rights pursuant to any security agreement granting such security interest, the Lender(s) shall be entitled to exercise only such rights as are granted to the Operating Company pursuant to the O&M Agreement, which rights shall not include any rights in the FES Technology, FES Proprietary Information, or FES Patent Rights. Payment of the Project Debt shall eliminate any interest of the Lender(s) in the Project.

(iii) The loans for a particular Project may be secured by the physical assets of that Project, but there shall be no cross-collateralization of Projects. FES agrees that the Lender(s) may have a security interest in the specific Project for which Project Debt is obtained, and agrees that this security interest may consist of typical mortgages and security interests on the entire Project; provided, however, that the security interest shall not include any right or interest in the FES Technology, FES Proprietary Information, or FES Patent Rights.

(iv) FES agrees to execute all documents required to carry out the purpose and intent of this Contract that may be requested by the

-6-

Lender(s), to the extent such documents are consistent with such purpose and intent.

(v) Except by mutual agreement of the parties, no financing for a Project may require a guarantee or endorsement of the Project Debt by FES, BioFuels, or any of each of their respective affiliates, or by the individual or corporate owners of FES or BioFuels, that extends beyond the granting of a security interest in the physical assets of that Project or the O&M Agreement.

(vi) The documentation of any security interest in any Project assets and contract rights shall include the right (but without obligation) of FES to pay off the Project Debt and receive a full cancellation and release of any security interest and/or assignment of contract rights.

## V.    Operating and Management Agreement

1.    FES may for each Project form a different single purpose entity ("Project Company") in the form of a limited liability company in the State in which a specific Project is located. Each Project Company will be a wholly-owned subsidiary of FES. If FES does not form such a single purpose entity for a Project, FES will be considered the Project Company for such Project.

2.    Project Company shall own each Plant and all assets that are part of each Project, shall own or lease the property on which the Plant located, and shall insure and pay all applicable taxes imposed by any local and state authority on the the property and the physical assets of such Plant.

3.    BioFuels shall for each Project form a different single purpose entity ("Operating Company") in the form of a limited liability company in the State in which the specific Project is located. Each Operating Company shall be a wholly-owned subsidiary of BioFuels.

4.    Project Company and Operating Company shall enter into a separate O&M Agreement for each Project, identical in form and content as contained in Exhibit C hereto, except as may be modified to reflect any Project-specific terms or provisions set forth in this Contract. Project Company and Operating Company shall at all times be considered to be independent contracting parties, and nothing in this Contract or any O&M

-7-

Agreement shall be deemed to create a partnership or joint venture between Project Company and Operating Company, or any of their affiliates. Pursuant to the O&M Agreement, Operating Company shall (i) purchase all Feedstock for the Project, and (ii) operate, maintain, and manage the Project in accordance with recognized industry standards and governmental laws and regulations for efficiency, safety and environmental protection.

5.      Operating Company shall, upon substantial completion of each Plant (the date of which shall be confirmed in writing between Project Company and Operating Company), operate and manage the Plant on behalf of and for the benefit of Project Company. In connection with the above, Project Company shall provide Operating Company with all access that is reasonably necessary or appropriate for the performance of its rights and duties under the O&M Agreement including all operating instructions and training.

6.      FES shall provide Project Company and Operating Company with the FES Technology and FES Proprietary Information necessary or appropriate to allow Project Company and Operating Company to each perform its respective obligations under the O&M Agreement. This Contract and the O&M Agreement do not in any way assign, license or grant any rights to Project Company or Operating Company in the FES Technology or the FES Proprietary Information. Operating Company shall use the FES Proprietary Information solely for the purpose of operating and managing the Project, shall endeavor by all reasonable means to protect and maintain the FES Patent Rights and FES Proprietary Information, and shall not represent or state to anyone that it has acquired any interest in the FES Patent Rights, FES Proprietary Information, or FES Technology by virtue of the O&M Agreement.

7.      Operating Company shall have the right, acting in cooperation with and on behalf of Project Company, during the course of an O&M Agreement, to install additions, improvements or modifications to a Project constructed and operated pursuant an O&M Agreement, in order to:

    A.      decrease the costs of operating, and/or maintaining the Project; and/or

    B.      increase the safety, reliability, output, efficiency, and profitability of the Project.

-8-

US1DOCS 6355397v1

The parties shall reasonably cooperate with each other with respect the financing, design and construction of any such additions, improvements, or modifications; provided, however, that Project Company shall have ultimate right to approve or disapprove any such addition, improvement or modification which would either increase the amount of the Project Debt or require an appropriation from the Gross Revenue earned by the Project, provided further, however, that such approval may not be unreasonably conditioned, withheld or delayed.

8.    Operating Company or its affiliates shall contract for and procure all Feedstock, and electric power and other utilities, necessary for the operation of each Project.  For the First Project (Bay Minette), Operating Company shall purchase all wood chips, saw dust, and brushy wood materials used as Feedstock from the Alabama River Pulp Company at a price that is equal to its actual cost plus ten percent (10%); provided, however, that if either Operating Company or Project Company reasonably determines that such price is not competitive with other sources, the parties shall cooperate in determining alternate market rate sources of Feedstock for the First Project.

9.    Project Company will handle the sale of all of the Output of a Project constructed pursuant to an O&M Agreement, with the cooperation and assistance of the respective Operating Company.  The parties agree that both the quantity of and price charged for any Output that is sold from any Plant constructed pursuant to this Contract shall be determined by the applicable Project Company based on then-existing market conditions in cooperation and coordination with the applicable Operating Company with respect to production scheduling.  Project Company and Operating Company will seek in good faith to sell the Output from a Plant to qualified parties in a manner that reasonably maximizes the Gross Revenue received in connection with the Project.

10.    For accounting purposes, each Project shall be operated as a separate profit center.  Discrete accounting records will be maintained for each Project.  The proceeds of all sales of all Output shall be paid to Project Company (except to the extent otherwise required by any Lender), and placed into a clearing account for the Project generating the sales.  Project Company shall maintain books and records for the operation of the Project with the full cooperation and assistance of the Operating Company.  All sales of Output will require full payment of the invoiced amount within

-9-

forty-five (45) days, without any discount for early payment, and will be limited to buyers with adequate financial status to meet the required payment terms. Project Company shall pay out from the clearing account any and all revenue received from the sale of the Output of a specific Plant each month in the following order:

     A.    payment of utility and Feedstock expenses incurred in connection with the operation of the Project;

     B.    payment of principal and interest on any Project Debt for the Project.

     C.    payment to Project Company of 51% of any Gross Revenue remaining after payment of the expenses listed in V.10.A and B herein, to be its sole property; and

     D.    payment to Operating Company of the remaining 49% of any Gross Revenue remaining after payment of the amounts described in V.10. A and B herein as an O&M Fee.

11.    Operating Company shall pay from the O&M Fee all normal operating expenses (including normal maintenance expenses) of the Project from the O&M Fee, with the exception of utility and Feedstock expenses (which shall be paid in accordance with V.10.A above), and capital or maintenance upgrades to the Project (which shall be paid for by Project Company and may incur additional Project Debt). Operating Company shall maintain books and records, including but not limited to accounting records, with regard to the payment of any operating expenses for each Project, and shall maintain discrete accounting records pertaining to each Project. The parties shall freely and openly share all accounting data pertaining to each Project. All such records and books of account must be retained for at least three (3) years.

12.    At the request of a party to the O&M Agreement, the other party shall permit a mutually agreeable independent accountant selected by the requesting party (mutual agreement not to be withheld unreasonably) upon reasonable prior notice, to examine at reasonable intervals and during the regular business hours all records and books of account of the audited party relating to the O&M Agreement and the applicable Project. The requesting party is responsible for the expenses of the selected accountant. The right of

-10-

each party to audit the books and records of the other party shall be limited to the clearing account and books and records pertaining to the Project.

13.    It is the intent of the parties that any Federal or State tax credits or deductions generated, and any rebate or incentive payments made by any Federal or State agency, in connection with the ownership, construction or operation of, and manufacturing and sale of Output from any Project shall be treated as Gross Revenue for such Project. Any Federal or State grants, loans or loan guarantees issued in connection with the Project shall inure to the benefit of the Project. Any such grant shall be applied to Gross Revenue for such Project; and any such loan or loan guarantees shall be applied to Project Debt. The parties agree that to the extent necessary or desirable, the provisions of this paragraph shall be implemented on a three-year "look-back basis" (through a reconciliation process performed on an annual or other basis) by a qualified accountant that is mutually selected and paid for by the parties.

## VI.    Representations, Liabilities, Responsibilities, and Insurance

1.    FBS represents that, as of the Effective Date, it owns or controls FBS Technology, including FBS Patent Rights and FBS Proprietary Information and has the unencumbered right to provide such FBS Technology for operation of the Plants contemplated by this Contract. FBS represents that, as of the Effective Date, it has no knowledge of a claim made by a third party with respect to Intellectual Property Rights owned or controlled by a third party, which affects use of FBS Technology for the production of Output as contemplated under this Contract.

2.    BioFuels represents that BioFuels or its affiliates have or can acquire the knowledge and technical skills required for the operation of the Plants contemplated by this Contract. BioFuels further represents that BioFuels has at least twenty-five million dollars (US$25,000,000) in available capital to be used for the purposes of this Contract.

4.    Each Project Company is responsible for the design, permitting, construction, and ownership of its respective Plant and associated Project, and shall maintain or cause to be maintained sufficient comprehensive general liability, builder's risk, automobile, and workers compensation insurance to cover any loss, damage, claim, injury or other casualty of,

-11-

whatsoever kind or by whomsoever caused (irrespective of negligence or fault, whether sole, concurrent, active, passive, comparative, strict, contractual or vicarious) with respect to such design, permitting, construction and ownership of the Project. Such insurance shall cover all claims (including defense of such claims and attorney's fees and expenses) made against Operating Company or its affiliates, or any of its respective officers, directors, employees, or agents, and to their respective successors and assigns, with respect to such Plant.

5.    Each Operating Company is responsible for the operation and maintenance of its respective Plant, and agrees to maintain or cause to be maintained sufficient comprehensive general liability, operator's, automobile, and workers compensation insurance to cover any loss, damage, claim, injury or other casualty of whatsoever kind or by whomsoever caused (irrespective of negligence or fault, whether sole, concurrent, active, passive, comparative, strict, contractual or vicarious) with respect to such operation or maintenance of each Project. Such insurance shall cover all claims (including defense of such claims and attorney's fees and expenses) made against Project Company or its affiliates, or any of its respective officers, directors, employees, or agents, and to their respective successors and assigns, with respect to such Plant.

6.    Each party to an O&M Agreement agrees to provide evidence of required insurance coverage to the other party, and (to the extent permitted by law) to name the other party as an "additional insured" on each such insurance policy obtained by the party.

## VII.   Confidentiality

1.    With respect to the FES Proprietary Information, BioFuels agrees:

(a)    to treat as confidential the FES Proprietary Information that has or may hereafter be made available to it by FES, directly or indirectly;

(b)    to limit access to any FES Proprietary Information received from FES, directly or indirectly, to only those of its employees, officers, and directors, or to those employees, officers, and directors of each respective Operating Company, who

-12-

reasonably require such FES Proprietary Information for the purpose of this Contract, and who are obligated to maintain such FES Proprietary Information as confidential in the manner and to the extent provided hereunder;

(c)    not to disclose FES Proprietary Information received from FES, directly or indirectly, to any third party without the express, prior written authorization of FES; and

(d)    not to use FES Proprietary Information received from FES in any way other than for the purposes of this Contract.

2.    Nothing contained in this Contract in any way restricts or impairs a party's right to use, disclose, or otherwise deal with any information that:

(a)    at the time of disclosure is available to the public or thereafter becomes generally available to the public by any means through no act of the party receiving the disclosure;

(b)    was in its possession prior to the time of the disclosure hereunder; or

(c)    was independently made available to it as a matter of lawful right by a third party who does not have a restriction on use or disclosure.

3.    FES Proprietary Information may not be disclosed to other parties, including actual or prospective Lenders, contractors, vendors, and consultants without the prior written consent of FES, which shall not be unreasonably conditioned, withheld or delayed, and if disclosed shall only be disclosed under suitable confidentiality agreements approved by FES.

4.    The obligations of this Article continue in full force and effect notwithstanding the expiration or termination of this Contract.

### VIII.  Addresses and Notices

The addresses of the parties are as follows:

FES:

Forest Energy Systems, LLC.
P.O. Box 426
Montrose, Alabama 36559

-13-

USJDOCS 6353397v1

Attn:  Allen W. Boykin, President
Telephone: 251-626-7470
Facsimile:  251-626-2069

BioFuels:                      BioFuels Operating Company, LLC
                               3000 Sand Hill Road
                               Building Three, Suite 170
                               Menlo Park, California 94025
                               Attn: Doug Cameron, President
                               Telephone: (650) 376-8511
                               Facsimile: (650) 376-8561

Notices required or permitted to be given or submitted under this Contract
must be in writing and sent by express courier (e.g., Federal Express, DHL,
US Postal Express Mail) with signature receipt requested to the party
entitled to receive the notice or statement at its above address or at such
other address as may most recently have been notified by such party to the
other party.  Such notices alternatively may be given or made by facsimile at
the addressee's most recently-notified facsimile number with a confirmation
copy sent by express courier to the other party.  Notices are deemed given on
the date that they are actually received by the recipient as confirmed by a
signature receipt, confirmation facsimile, return e-mail, or similar
authenticable evidence.

## IX.   Term, Assignment, Termination and Severability

1.      The term of this Contract commences upon the Effective Date, and
unless extended or otherwise terminated in accordance with this Contract,
continues in full force for twenty (20) years from the Effective Date.

2.      If a party is in material breach of this Contract, the non-breaching
party may give written notice to the other specifying the particulars of such
breach.  If the breaching party has not rectified such breach within sixty (60)
days after such notice, the non-breaching party may terminate this Contract
by giving written notice thereof to the other party.

3.      This Contract shall be binding upon and shall inure to the benefit of
the parties hereto and their respective successors and assigns; any party may
assign this Contract, and this Contract shall survive any transfer or change in
the ownership of a Project; provided, however, that

-14-

US:DOCS 63:53:97v1

(a)    neither party may assign this Contract without the prior written consent of the other party, which consent shall not be unreasonably conditioned, withheld or delayed;

(b)    BioFuels shall provide FES with a ninety (90) day right-of-first offer in connection with any proposal by BioFuels to sell, assign, or transfer its interest in this Contract to an unrelated third party;

(c)    any permitted assignment of this Contract by FES to another party shall ensure, as a condition of such assignment, that the O&M Rights of BioFuels under this Contract will be maintained at no additional cost to BioFuels under terms and conditions no less favorable to BioFuels as those contained in this Contract and the then-existing O&M Agreements; and

(d)    any purported assignment of this Contract, except as permitted herein, is null and void.

4.    The parties acknowledge that Forest Energy has entered into a Letter of Understanding and Option Agreement (collectively, the "P&W Option"), both dated as of April 19, 2007, that provide certain rights to Parsons & Whittemore Enterprises Corp. ("P&W"). It is the intent of both parties that neither this Contract nor the O&M Agreement interfere with or otherwise conflict with the rights granted to P&W under the P&W Option. In the event that it is determined that there is such a conflict, then the P&W Option shall govern, and the parties to this Contract will renegotiate the term, provision, agreement or condition that is in conflict so as to achieve as nearly as possible the purpose and intent of this Contract.

5.    In connection with the execution of each O&M Agreement, FES and BioFuels agree that BioFuels, upon and after its formation, shall indemnify Project Company, FES, the Boykin Family Trust, its shareholders, Allen W. Boykin, and Jack W. Boykin (collectively, the "Indemnitees") from any claim by P&W alleging that the execution of the O&M Agreement constitutes a breach of the P&W Option, as further set forth in Exhibit D attached hereto (the "Indemnity").

6.    In the event that any provision contained in this Contract or the O&M Agreement is held to be invalid, illegal or unenforceable in any respect, such illegality or unenforceability shall not affect any other provision of this Contract or the O&M Agreement, which thereafter shall be construed as if such invalid, illegal or unenforceable provision had never been contained

-15-

herein; provided, however, that in lieu of such term, clause or provision that is held to be invalid, illegal or unenforceable, the parties shall add by mutual agreement as a part of this Contract or the O&M Agreement a term, clause or provision as similar in terms to such illegal, invalid or unenforceable term, clause or provision as may be possible, valid, legal and enforceable and to the extent the remaining provisions satisfy the purpose and intent of this Contract.

7.    This Contract shall be governed by and construed in accordance with the laws of the State of Alabama, excluding any choice of law rules which may direct the application of the laws of another jurisdiction. All judicial actions taken with respect to this Contract or any rights or obligations under this Contract must be brought in a State Court located in Baldwin County, Alabama, or in Federal Court located in Mobile, Alabama.

8.    If a dispute arises out of or in connection with this Contract between FES and BioFuels, such parties agree to attempt in good faith to resolve such dispute by negotiations between executives who have authority to settle the dispute in question within thirty (30) days after a notice of the dispute given by one party to the other party. Within sixty (60) days after the notice of the dispute and upon mutual agreement of FES and BioFuels, the parties may endeavor to settle the dispute by mediation administered by a mutually-agreed third party before initiating any other proceeding. Except as may be required by law, neither a party nor a mediator may disclose the existence, content, or results of any mediation hereunder without the prior written consent of both parties.

9.    This Contract may be executed in one or more counterparts, each of which will be deemed an original. Delivery of all pages of this Contract by facsimile transmission shall be effective as delivery of a manually executed counterpart.

10.    This Contract and the O&M Agreement contain the entire understanding of the parties hereto with respect to the development of Projects, and supersedes all prior understandings and proposals, whether written or oral, between the parties with respect to the Project.

11.    This Contract is not to be construed as granting or implying a grant of any license or other rights under Intellectual Property Rights owned or controlled by a party except as, and to the extent, expressly granted herein.

-16-

12.    This Contract may be amended or modified only by a written instrument, of equal formality signed by the duly authorized representatives of the respective parties.

13.    The headings used herein to identify Articles, Paragraphs, Exhibits and Attachments are used solely for the convenience of the parties and are not intended to be used in the construction or interpretation of the provisions of this Contract.

14.    If a party to this Contract agrees to waive any breach of any provision of this Contract by another party, such waiver does not excuse at any time other breaches of the same provision or breaches of any other provisions of this Contract.

15.    BioFuels and FES at all times are independent contracting parties. None of the parties to this Contract is or will be a partner, joint venturer, agent or representative of any other party under this Contract or the O&M Agreement. None of the parties to this Contract nor their respective affiliates have a right, power or authority to enter into any contract or incur any obligation, debt or liability on behalf of the other party or its respective affiliates, without the specific, written approval of such other party.

16.    This Contract has been made solely for the benefit of, and is binding on, the parties and their respective successors and assigns.

-17-

IN WITNESS WHEREOF, the parties have caused this Contract to be duly executed in their respective names by their duly authorized representatives as of the date and year first written above.

BioFuels Operating Company, LLC

By: _____
_____, President

Forest Energy Systems, LLC
By: _____
Allen W. Boykin, President

09/12/07

-18-

US1DOCS 6355597v1

## EXHIBIT A

It is the objective of the process and the Project to produce fuels which qualify as either Gasoline, #2 Diesel, or Standard Fuel Oil. The Projects shall produce fuels, electricity or other products from various raw materials including, but not limited to, tires, plastics, agricultural products and residues, and cellulose-containing materials.

The first Project shall be located at Bay Minette, AL, and shall be capable of producing approximately 20 million gallons of fuels per year.

The second Project and the third Project each shall be capable of producing at least 40 million gallons of fuels per year.

If a Project conforms to the standards, criteria and benchmarks set forth in the correspondence from FES to BioFuels or its affiliates, then that Project will have achieved the Acceptance Criteria.

-19-

US1DOCS 6335897v1

## EXHIBIT B
## ADDITIONAL COMMERCIAL TERMS

A. **Initial Project Development and Financing Terms**

    1.   Project cost is estimated at $12.5M.

    2.   Project Development Fee shall be the amount of $12.5M.

    3.   FBS Capital (comprised of the Project Development Fee) shall be the amount of $12.5M.

    4.   Project Debt shall be in an amount to be mutually determined, with an interest rate in a commercially reasonable range, based on market conditions.

B. **Construction of Additional Projects**

    1.   Second Project

        a.   Project cost is estimated at $25M.

        b.   Project Development Fee shall be the amount of $6.25M.

        c.   Project Capital (comprised of the Project Development Fee) shall be in an amount of $6.25M.

        d.   Project Debt shall be in an amount necessary to finance the construction of the Project, on terms to be mutually determined and with an interest rate in a commercially reasonable range, based on market conditions.

    2.   Third Project

        a.   Project cost is estimated at $25M.

        b.   Project Development Fee shall be the amount of $6.25M.

        c.   Project Capital (comprised of the Project Development Fee) shall be the amount of $6.25M.

USIDOCS 6355597v1

      d.    Project Debt shall be in an amount necessary to finance the construction of the Project, on terms to be mutually determined and with an interest rate in a commercially reasonable range, based on market conditions.

3.    <u>All Additional Projects after the Third Project</u>

      a.    Estimated Project cost will be mutually determined.

      b.    Project Debt shall be in an amount necessary to finance the construction of the Project, on terms to be mutually determined and with an interest rate in a commercially reasonable range.

      c.    Any required Project equity shall be comprised of a Project Development Fee (to be paid by BioFuels to FES, and used by FES as Project Capital) and FES Capital (to be paid by Forest Energy independent of any Project Development Fee), each of which shall be in an amount that is mutually determined; provided, however, that with respect to the sum of such respective amounts, the Project Development Fee shall comprise 49% and the FES Capital shall comprise 51% of such sum. The Parties agree to use commercially reasonable efforts to minimize the amount of Project equity that is required in connection with the development of any Additional Project, with the initial expectation that no more than 20% of the total cost of the Project shall be comprised of equity.

US1DOCS 6350897v1

## EXHIBIT C

## FORM OF O&M AGREEMENT

1.    Each Project shall be governed by a separate O&M Agreement, the sole parties to which shall be the specific Project Company and Operating Company.

2.    Each O&M Agreement shall be identical in form and content to the Contract, except as follows.

    a.    The provisions of the O&M Agreement shall be modified only to the extent necessary to reflect the specifics of and parties to each individual Project, and shall also include the following provisions.

        i.    Force Majeure.  As used in this Agreement, an "Event of Force Majeure" shall mean any act or event that prevents the affected Party from performing its obligations (other than the payment of money) under this Agreement or complying with any conditions required to be complied with under this Agreement if such act or event is beyond the reasonable control of, and does not arise out of the negligent act or omission of, the affected Party and such Party has been unable by the exercise of due diligence to overcome or mitigate the effects of such act or event.  If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of an Event of Force Majeure, that Party shall be excused from whatever performance is affected by the Event of Force Majeure to the extent so affected; provided, however, that: (a) the non-performing Party gives the other Party prompt written notice (but in any event no later than seven (7) days after the occurrence) describing the particulars of the occurrence; (b) the suspension of performance is of no greater scope and of no longer duration than is reasonably required by the Event of Force Majeure; and (c) the non-performing Party exercises all reasonable efforts to mitigate or limit damages to the other Party, and to continue to perform its obligations hereunder and to correct or cure the event or condition excusing performance.

        ii.    Limitation of Liability.  Notwithstanding anything to the contrary contained in this Agreement, neither Operating Company nor Project Company shall be liable, whether in contract, in tort, or otherwise, for any special, punitive, exemplary, indirect, incidental or consequential damages whatsoever, including but not limited to, loss of profits, business

-22-

interruptions and claims of customers or other third parties, for any reason whatsoever.

    b.    The provisions of the following Paragraphs and Exhibits in the Contract shall be modified or deleted as appropriate.

    i.    Paragraph IV.1 – references to multiple Projects, the Project Development Fee, and the O&M Right.

    ii.    Paragraph V.1 and .3 – references to formation of Project Company and Operating Company.

    iii.    Paragraph VI.1 – FES' representations in the contract will be binding on the Project Company, and Project Company shall also represent that FES has made available to Project Company all FES Technology necessary or appropriate for the design, engineering, permitting, construction, operation, maintenance and management of the Project.

    iv.    Paragraph VI.2 – Operating Company will represent that it has or can acquire the knowledge and technical skills required for the operation of the Project, and has adequate funds which can be used for the purposes of the O&M Agreement.

    v.    Paragraph IX.1 – the term of the O&M Agreement shall commence on and as of its effective date and shall expire on the last day of the calendar month in which the twentieth (20th) anniversary of the commercial operation of the Project occurs. Operating Company shall have the right to renew the O&M Agreement for four (4) five-year renewal terms each such option to be exercisable upon one (1) year's prior written notice to Project Company.

    vi.    Paragraph IX.5 – this Paragraph shall be omitted.

    vii.    Paragraph IX.7—the O&M Agreement shall be governed by the law of the State in which the Project is located.

    viii.    Exhibit A – this Exhibit will only provide details for the specific Project.

    ix.    Exhibit B – this Exhibit will only provide details for the specific Project.

-23-

    x.    Exhibit C – this Exhibit will be omitted.

    xi.    Exhibit D – this Exhibit will be omitted.

US1DOCS 6355397v1

## EXHIBIT D

## INDEMNITY

1.      BioFuels, upon and after its formation, shall indemnify, defend and hold harmless FES, the Boykin Family Trust, its shareholders, and Allen W. Boykin, and Jack W. Boykin (collectively, the "Indemnitees") from and against any and all liability, claims, damage, loss, or expense (including reasonable attorneys' fees) resulting from any claim by Parsons & Whittemore Enterprises Corp. ("P&W") alleging that the execution of the O&M Agreement constitutes a breach of the Option Agreement (a "Claim").

2.      The Indemnitees shall provide the BioFuels with written notice of any Claim by Parsons within ten (10) days of its receipt thereof.

3.      BioFuels shall control the defense and settlement of any Claim, using the qualified counsel of its choice.

4.      Indemnitees shall, at their sole cost and expense, provide reasonable assistance to BioFuels in connection with the defense of any Claim.

5.      Indemnitees shall have the right, at its sole cost and expense, to retain separate counsel to monitor BioFuels's defense of any Claim.

6.      BioFuels shall have the right to settle any Claim without the prior approval of Indemnitees, unless such settlement would materially prejudice or adversely impact Indemnitees, in which case Operating Company must obtain the prior approval of the Indemnitees (which approval shall not be unreasonably conditioned, withheld or delayed).

USDOCS 6355397v2