IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **PARSONS & WHITTEMORE** ) | |
| **ENTERPRISES CORPORATION,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO. 07-0743-CG-B |
| v. ) | |
| ) | |
| **CELLO ENERGY, LLC, et al.,** ) | |
| ) | |
| Defendants. ) | |

### ORDER

This diversity case comes before the court on the motions for judgment on the pleadings filed by BioFuels Operating Company, LLC ("BioFuels") and by Cello Energy, LLC f/k/a Forest Energy Systems, LLC, Boykin Trust, LLC, Jack W. Boykin, and Allen W. Boykin (collectively, "Cello"). (Docs. 143 and 146). The complaint in this case was amended with the court's leave while the motions for judgment on the pleadings were pending. (Doc. 158). Cello filed a renewed motion for judgment on the pleadings, which incorporated its prior motion for judgment on the pleadings by reference. (Doc. 179). BioFuels essentially did the same thing, but characterized its renewed motion as a motion to dismiss. (Doc. 180, p. 1 n.1; Doc. 255).

Cello asks the court to declare that an option to purchase an interest in Cello is invalid and to dismiss Counts One, Two, and Three of the complaint on the theory that those counts stand or fall with the option agreement. (Docs. 147 and 177). Cello's legal argument, however, is focused entirely on invalidating the option agreement. There are no arguments specifically addressing why Counts One, Two, and Three should be dismissed if the option agreement is invalid. Although BioFuels makes efforts to obtain a complete dismissal of all of the claims against it, it also focuses on invalidating the option agreement. (Docs. 143 and 180). In addition

to opposing the arguments that the option agreement runs afoul of the rule against perpetuities, P&W argues in the alternative that, if the option does violate the rule against perpetuities, it should receive a refund of what it paid to acquire the option.

In short, the motions are based on the argument that an option agreement at issue in this case violates Alabama's rule against perpetuities. This order will focus on those specific arguments.

I.      STANDARD OF REVIEW

The standards of review for FED. R. CIV. P. 12(b)(6) motions to dismiss and for FED. R. CIV. P. 12© motions for judgment on the pleadings are very similar. Rule 12(b)(6) of the Federal Rules of Civil Procedure is a means of asserting the defense of "failure to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6). Rule 12© provides that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." FED. R. CIV. P. 12©. A motion under either rule tests the legal sufficiency of the complaint.

At the outset, a complaint must comply with Rule 8(a)(2) in order to survive a Rule 12(b)(6) motion to dismiss. In order for a complaint to state a claim for relief under Rule 8(a)(2), it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" FED. R. CIV. P. 8(a)(2). "[T]he 'short and plain statement' must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346 (2005) (quotations and citation omitted). See also Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 n.3 (2007) ("Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement [in

Rule 8(a)(2)] of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.")

The complaint "does not need detailed factual allegations," but the rules call on the plaintiff to set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Id. at 1964-65. The "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" Id. at 1965. See also Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 974 (11th Cir. 2008) (same).

The court may grant the motion only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations, see Chepstow Ltd. v. Hunt, 381 F.3d 1077, 1080 (11th Cir. 2004), meaning that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 127 S. Ct. at 1969.

The court should accept all of the facts set forth in the complaint as true and view them in the light most favorable to the non-moving party. Chepstow, 381 F.3d at 1080. Still, "[p]leadings must be something more than an ingenious academic exercise in the conceivable" and "unsupported conclusions of law or of mixed law and fact are not sufficient to withstand a dismissal under Rule 12(b)(6)." Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1271 (11th Cir. 2004) (internal quotations and citations omitted). See also South Florida Water Management Dist. v. Montalvo, 84 F.3d 402, 409 n.10 (11th Cir. 1996) (Conclusory allegations and unwarranted deductions of fact are not deemed true on a motion to dismiss.).

Similarly, "[j]udgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any

judicially noticed facts." Hawthorne v. Mac Adjustment, 140 F.3d 1367, 1370 (11th Cir. 1998). The court should "accept the facts in the complaint as true and . . . view them in the light most favorable to the nonmoving party." Id.

Both Rule 12(b)(6) and Rule 12© allow this court to consider materials outside of the relevant pleadings if they are central to the plaintiff's claim and their authenticity is not disputed. Horsley v. Feldt, 304 F.3d 1125, 1134-35 (11th Cir. 2002) (discussing Rule 12(b)(6) and Rule 12© motions).

Although Eleventh Circuit precedent indicates that "[j]udgment on the pleadings is appropriate only when the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," Horsley, 304 F.3d at 1131, this element of the standard of review seems inconsistent with the recent Twombly decision, which "retired" the "no set of facts" language, Twombly, 127 S. Ct. at 1969, particularly in light of the similarity between a Rule 12(b)(6) motion and a Rule 12© motion. E.g. Davis, 516 F.3d at 974 n.43 (deciding that Twombly is "a further articulation of the standard by which to evaluate the sufficiency of all claims brought pursuant to Rule 8(a)"); Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (applying Twombly to a Rule 12© motion); Tucker v. Middleburg-Legacy Place, LLC, 539 F.3d 545, 549-50 (6th Cir. 2008) (same); Doe v. MySpace Inc., 528 F.3d 413, 418 (5th Cir. 2008) (same); Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 633 (7th Cir. 2007) (same).

Regardless, the holding in this order turns on the legal construction of an option agreement, so there is no need to decide definitively the post-Twombly vitality of the "no set of facts" language in a Rule 12© motion. See Whitehurst v. Wal-Mart Stores East, L.P., No. 07-15794, 2008 U.S. App. Lexis 24391, at *5 (11th Cir. Dec. 2, 2008) (post-Twombly decision

applying "no set of facts" language in a Rule 12© analysis without any citation to Twombly).

## II.    ALLEGATIONS AND TERMS OF THE OPTION AGREEMENT

The amended complaint ("complaint") alleges that P&W paid $2.5 million for, among other things, an option to acquire a 1/3 interest in Cello for the additional payment of $10 million. Around the time that P&W was negotiating and eventually purchased its option, the complaint alleges, Cello negotiated a deal with BioFuels and took other related actions that infringed on the option and other rights that P&W purchased for $2.5 million.

As set out in the language of the option agreement, the option is held by an "Option Holder," which is defined as "Parsons & Whittemore Enterprises Corp., a company owned or controlled by it, or a company the majority of which is owned or controlled by George F. Landegger[.]"  (Doc. 26-4, p. 2).[1]  The option is "transferable by the Option Holder or any successors or assigns."  (Doc. 26-4, p. 5, ¶ 14).

The option agreement provides that the Option Holder must exercise its option within an "Expiration Time."  The Expiration Time set forth in the agreement is, "any time after the date hereof and at or prior to three (3) months after the first commercial production and sale of fuels meeting the ASTM standards as set forth on Exhibit A for fuel oil, diesel fuel oil, and automotive spark-ignition engine fuel, whichever is later."  (Doc. 26-4, p. 2).

There are no provisions setting an outer limit on when the Option Holder may exercise its option if the three types of fuel are never produced or sold. There are also no provisions setting a date by which production and sale of the three types of fuel must occur. If the Option Holder

---

[1]A review of the option agreement shows that the option was to purchase a 1/3 interest in a company called "Forest Energy Systems LLC."  (Doc. 26-4).  There is no dispute that Cello and Forest Energy Systems LLC are the same company for purposes of this order.

wants to exercise the option, it must do so within three months of the first commercial production and sale of the three types of fuel, but there is nothing requiring the Option Holder to exercise the option if the three types of fuel are produced and sold.

### III.     RULE AGAINST PERPETUITIES ANALYSIS

The option agreement in this case gives P&W the option to purchase an interest in Cello. (Doc. 26-4). Cello is a limited liability company organized under the laws of the State of Alabama, with its principal place of business in Alabama, and with Alabama citizenship based on the Alabama citizenship of its members. (Doc. 158, pp. 3-4, ¶ 4). "An interest in a limited liability company is personal property." ALA. CODE § 10-12-6 (1975).

In Alabama, "[t]he common-law rule against perpetuities as to land shall be in full force and effect in this state so that the rule against perpetuities applicable to personal property and to land shall be the same." ALA. CODE § 35-4-4 (1975). "The common law rule against perpetuities provides that no interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest." Robertson v. Murphy, 510 So. 2d 180, 181 (Ala. 1987) (internal quotations and citations omitted). See also Dauphin Island Property Owners Asso. v. Callon Institutional Royalty Investors I, 519 So. 2d 948, 949 (Ala. 1988) (defining rule against perpetuities); Alabama Power Co. v. Lancaster, 497 So. 2d 468, 470 (Ala. 1986) (same); Shaffer v. Reed, 437 So. 2d 98, 99 (Ala. 1983) (same); Earle v. International Paper Co., 429 So. 2d 989, 991 (Ala. 1983) (same); First Alabama Bank v. Adams, 382 So. 2d 1104, 1107 (Ala. 1980) (same); Traywick v. Transcontinental Gas Pipe Line Corp., 170 So. 2d 802, 804 (Ala. 1965) (same); Rountree v. Richardson, 108 So. 2d 152, 154 (Ala. 1959) (same); Dozier v. Troy Drive in Theatres, Inc., 89 So. 2d 537, 543 (Ala. 1956) (same); Ramage v. First

Farmers & Merchants Nat'l Bank, 30 So. 2d 706, 711 (Ala. 1947) (same); Lyons v. Bradley, 53 So. 244, 246 (Ala. 1910) (same).

The rule against perpetuities is also referred to as "the rule against remoteness of vesting." Traywick, 170 So. 2d at 804; First Alabama Bank, 382 So. 2d at 1107. If an interest vests too remotely, it is "void ab initio." Earle, 429 So. 2d at 991. "The future interest is invalid unless it is absolutely certain that it must vest within the period of perpetuities. Probability of vesting, however great, is not sufficient. The certainty of vesting must have existed at the time when the instrument took effect[.]" First Alabama Bank, 382 So. 2d at 1107. Vested interests are not subject to the rule against perpetuities. Traywick, 170 So. 2d at 805; Earle, 429 So. 2d at 991; Lyons, 53 So. at 247.

> The policy behind the rule is to favor commerce and the circulation of property by preventing the right of absolute disposition from being tied up or restrained beyond a certain period, and it applies therefore to every description of property, whether real or personal, to every mode of limitation, and to every kind of interest or mode of enjoyment, whether legal or equitable.

Id. at 246 (internal citation and quotations omitted). The rule aims "to prevent property from being inalienable after a reasonable time[.]" Traywick, 170 So. 2d at 804-05. Unlike rules of construction, which operate to determine intention, the object of the rule against perpetuities "is to defeat intention." First Alabama Bank, 382 So. 2d at 1107; Earle, 429 So. 2d at 994.

When applying the rule against perpetuities, the court's first step is to interpret the instrument creating the challenged interest as though the rule against perpetuities did not exist. Having construed the instrument, the court then applies the rule "remorselessly." First Alabama Bank, 382 So. 2d at 1107; Earle, 429 So. 2d at 994. Still, if the instrument "is really ambiguous, and is fairly capable of two constructions, one of which would produce a legal result, and the

other a result that would be bad for remoteness, it is a fair presumption that the [drafter] meant to create a legal rather than an illegal interest." Earle, 429 So. 2d at 994.

The rule against perpetuities is often applied in the context of bequeathments of real property and other assets. Lyons, 53 So. at 245-46 (real and personal property and related income); First Alabama Bank, 382 So. 2d at 1106 (real and personal property). It is not limited to the standard inheritance context, however. It is also applied in commercial settings under Alabama law. Dozier, 89 So. 2d at 540-41 (real estate lease with a right to repurchase); Rountree, 108 So. 2d at 152-53 (same); Traywick, 170 So. 2d at 803-04 (sale of right of way easements); Earle, 429 So. 2d at 990-91 (sale of land and a portion of attached mineral interests); Alabama Power, 497 So. 2d at 469 (sale of land with reservation of an easement between companies); Dauphin Island, 519 So. 2d at 948-49 (sale by a property owner's association of royalty interest in minerals). The rule has also been applied to challenge a partnership agreement when a partner died intestate and his partnership interest passed to his son, Robertson, 510 So. 2d at 181, and, as the defendants in this case point out, to challenge a provision in a will creating an option to buy capital stock in a bank, Shaffer, 437 So. 2d 98.

The cases emphasize the importance of vesting. If a right to property vests upon conveyance or within the time provided by the rule against perpetuities, courts will uphold the right. This is true even if payment for a vested right or realization of the benefit of a vested right might occur far enough in the future that it would otherwise violate the rule against perpetuities. For example, the Dozier case held that a provision in a lease that gave the lessor a right to repurchase property did not violate the rule against perpetuities even though the repurchase might occur after the allowable period of time expired. Dozier, 89 So. 2d at 545-47. The portion

of the lease that the court specifically addressed in its discussion gave "the lessor a right to repurchase . . . on condition subsequent that if an assignee of the lease who purchases the property . . . shall undertake to sell it," or "if the property is used for any other commercial purpose than a drive-in-theatre." Id. at 545.

The court decided that, when a grantor of a property interest reserves for itself the right to repurchase the property in the future, the property interest that the grantor conveys to the grantee is a limited property interest that gives the grantor a presently-vested right to repurchase the property at some point in the future. Id. at 546 ("[I]f the stipulation by which the grantor is to have the privilege of a repurchase on the occurrence of the condition named is a limitation on the fee to be conveyed, presently vested, it has been held by this Court that such a limitation does not violate the rule against perpetuities, for a conditional reservation presently vested is not subject to that rule although exercisable on a contingency."). In other words, "the reservation of a right to repurchase creates a conditional fee, and is a presently reserved vested right in the grantor, although its exercise is dependent on a future contingency." Id. at 547. See also Rountree, 108 So. 2d at 154-56 (quoting Dozier for the rule that rights to repurchase do not violate the rule against perpetuities); Robertson, 510 So. 2d at 181-83 (The right to repurchase a partnership interest set out in a partnership agreement did not violate rule against perpetuities based on the analysis in Dozier and the conclusion that the right of first refusal "is excepted from the rule against perpetuities.").

Much as a vested right that only becomes relevant on the occurrence of a future event does not violate the rule against perpetuities, a vested right for which payment is due in the future also does not violate the rule against perpetuities. In Traywick, the plaintiff sold the

9

defendant easements in the form of a right of way for gas pipelines. Traywick, 170 So. 2d at 803. The agreements allowed the defendant to lay additional pipeline in the future at the cost of one dollar "per lineal rod of such additional line." Id. Rejecting the argument that the easements violated the rule against perpetuities, the court decided that the easements to lay future pipeline were vested at the time they were granted and that the future charges of one dollar per lineal rod of pipeline were provisions for future payment on the presently-vested easements. Id. at 804-08. In short, the court decided that the defendant had the right to lay additional pipeline when the agreements were made. The provisions stating that payment for the easements would be made later, if and when the defendant actually laid new pipeline, showed a fixed future time for paying for the easements, rather than a condition subsequent to obtaining the easements. Id. at 807-08. See also Dauphin Island, 519 So. 2d at 951 (A royalty interest in minerals that were not yet discovered or extracted did not violate the rule against perpetuities because the interest was immediately vested "even though uncertain in the enjoyment.").

On the other hand, the Supreme Court of Alabama specifically held that an option to purchase shares of stock is not a vested interest, subjecting such an interest to a rule against perpetuities analysis. In Shaffer, a will gave a devisee (and his heirs, executors, or assigns) the option to purchase stock. Shaffer, 437 So. 2d at 98. The option was challenged as violating the rule against perpetuities. As the court put it, "[t]he principal issue in this appeal is whether the grant of the options to purchase the stock created a vested interest and thereby avoided the rule. We say no." Id. at 99.

> The court started by distinguishing options to purchase from contracts to purchase.
> 
> An option to purchase property is a mere right given by the owner to the optionee, and does not constitute the optionee a purchaser of the property, and does not give

>him any right to or interest in the property until he accepts the privilege by exercising his right of option within the time specified.

Id. Elaborating, the court explained that "an option to purchase is a mere right to purchase within a limited time without any obligation of the optionee to purchase." Id. In contrast, a contract to purchase "creates an obligation to buy." Id. "An option to purchase becomes a contract to purchase only when exercised according to its terms." Id.

The court decided that the devisees had "no interest in the stock until they exercised their options to purchase." Id. Because the options were unlimited in duration, the court invalidated the stock options, specifically rejecting the argument that the options were "exercisable within a 'reasonable time[.]'" Id.

The Option Holder in this case has "a mere right to purchase within a limited time without any obligation of the optionee to purchase." Shaffer, 437 So. 2d at 99. As the Supreme Court of Alabama made clear in Shaffer, an option to purchase stock is subject to a challenge under the rule against perpetuities because the holder of the option lacks a vested interest in the stock until the option is exercised. Although perhaps unlikely, it is possible that Cello might not produce and sell all of the relevant types of fuel until long after the allowable time under the rule against perpetuities expires. Consequently, it is possible that the Option Holder's ownership interest in Cello would not vest because the option agreement does not require the Option Holder to exercise its option until the relevant fuels are produced and sold. This case falls squarely within Alabama's rule against perpetuities. The option is not valid under Alabama law.

P&W makes three resourceful, but ultimately unpersuasive, arguments that the rule against perpetuities should not apply to P&W's option. First, P&W argues that the rule against perpetuities does not apply to its option agreement. P&W relies on a provision of the

Restatement (First) of Property, which specifically excluded agreements concerning unissued shares or securities in corporations from the rule against perpetuities.[2]  P&W argues that this exception stems from the fact that applying the rule against perpetuities to commercial transactions involving such ownership interests would not serve its intended purpose of promoting commerce and does not fit neatly within the rule's initial application to family dispositions of assets.  As P&W illustrates in its brief, some jurisdictions other than Alabama follow the rationale that P&W advances.  This argument cannot prevail because it is not supported by Alabama law.  Alabama law applies the rule against perpetuities in commercial settings and has specifically applied the rule against perpetuities in Shaffer to invalidate options to purchase corporate stock.  After recognizing the rule's harsh consequences, the Supreme Court of Alabama explained, "[w]e have the rule in this jurisdiction, and as long as we have it, we must follow it."  Shaffer, 437 So. 2d at 99.

     Citing Dozier and Robertson, P&W tries to persuade the court that Alabama law is consistent with the law it cites from other jurisdictions by arguing that the Supreme Court of Alabama does not apply the rule against perpetuities when application of the rule would not favor commerce.  Although the opinions in Dozier and Robertson discuss the policy behind the rule against perpetuities and decline to invalidate rights to repurchase that might not be exercised within the time allowed by the rule, neither case says that the rule does not apply when it would hinder commerce.  Instead, the cases decide that rights to repurchase vest immediately, even though the holder of the vested right to repurchase might not exercise its right until some time in the distant future. Dozier, 89 So. 2d at 547 ("[W]e are standing by the principle . . . that the

---

[2] The parties recognize that the current Restatement contains no such exception.

reservation of a right to repurchase creates a conditional fee, and is a presently reserved vested right in the grantor, although its exercise is dependent on a future contingency."); Robertson, 510 So. 2d at 182-83 (finding that the preemptive right of first refusal in a partnership agreement was a vested right not subject to the rule against perpetuities).

To be sure, both cases use the policy behind the rule against perpetuities as an underpinning of their decisions, but neither case went so far as to say that the rule only applies when it advances commerce. Such a holding would arguably conflict with the decisions cited above that apply the rule against perpetuities in commercial settings. Further, there is no room for a policy argument that options to purchase an interest in a business entity should be treated like the rights to repurchase were treated in Dozier and Robertson. Shaffer squarely held that options to purchase interests in business entities are subject to the rule against perpetuities.

P&W's second argument is based on a theory of contractual interpretation and implicates this court's obligation to interpret the option agreement as though the rule against perpetuities did not exist before applying the rule "remorselessly." First Alabama Bank, 382 So. 2d at 1107; Earle, 429 So. 2d at 994. P&W asks the court to "read into the agreement a reasonable time for performance" of the production and sale of fuel, which would trigger P&W's obligation to exercise its option, or lose it, within three months.

Under Alabama law, if a contract does not specify a time for performance, "the law implies a reasonable time." Englund's Flying Service, Inc. v. Mobile Airport Authority, 536 So. 2d 1371, 1373-74 (Ala. 1988). In other words, "where a contractual obligation to perform exists, and no time is prescribed in the contract for performance, the law requires the obligated party to perform within a 'reasonable time.'" Lemon v. Golf Terrace Owners Ass'n, 611 So. 2d 263, 265

(Ala. 1992).  See also Hendrix, Mohr & Yardley, Inc. v. Daphne, 359 So. 2d 792, 796 (Ala. 1978) ("[W]hen an act is to be done, and no time is prescribed for its performance, the law requires it to be done within a reasonable time.").  P&W argues that the parties obviously intended for Cello to produce and sell all three of the types of fuel that trigger the Expiration Time within the time allowed by the rule against perpetuities.

It is true that Alabama law provides a mechanism for a party who is awaiting another party's performance under a contract to sue the loafing party for breaching the implied agreement to uphold its end of the bargain within a reasonable time.  Applying that rule in this case would be a stretch.  In contrast to the contracts at issue in the Englund's Flying Service, Lemon, and Hendrix, Mohr & Yardley cases, the option agreement in this case does not place Cello under an obligation to produce and sell fuel.  The option agreement is not a contract to provide a service, it is an instrument that allows the Option Holder to purchase an interest in Cello, as long as the Option Holder does so within three months of when Cello produces and sells three different kinds of fuel.  If Cello never succeeds in its efforts to produce and sell the three types of fuel, the Option Holder cannot sue Cello for that failure under the option agreement.

Without the contractual obligation to produce and sell fuel at all, there is no justification for applying the rule that a party who agrees to do an act must do so within a reasonable time. P&W is effectively asking the court to write a "sunset provision" into the option agreement despite the fact that there is nothing in the written agreement indicating that the parties intended to agree to such a provision.  Cf. State Farm Fire & Cas. Co. v. Shady Grove Baptist Church, 838 So. 2d 1039, 1043 (Ala. 2002) ("A contract of insurance, like other contracts, is governed by the

general rules of contracts. Insurance companies are entitled to have their policy contract enforced as written.") (internal quotations and citations omitted); Carpet Installation & Supplies v. Alfa Mut. Ins. Co., 628 So. 2d 560, 562 (Ala. 1993) ("If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties.").

In addition, the Alabama cases addressing the rule against perpetuities that the parties cite to the court do not support implying a "reasonable time" clause in the option contract. Shaffer reversed "a judgment holding that options, given under a will, to purchase shares of capital stock could be exercised within a reasonable time after the death of the testatrix, and therefore, did not violate the rule against perpetuities." Shaffer, 437 So. 2d 98. See also Earle, 429 So. 2d at 994 (The instrument must be ambiguous in order for the court to invoke an interpretation that takes the instrument outside of the rule against perpetuities.).

P&W's third argument is that the option agreement is circumscribed by the life of George Landegger.[3] The argument is based on the option agreement's definition of "Option Holder," which is: "Parsons & Whittemore Enterprises Corp., a company owned or controlled by it, or a company the majority of which is owned by or controlled by George F. Landegger[.]" Citing

---

[3]The parties do not argue that the option should be circumscribed by the corporate life of P&W. If true, this might validate the option if P&W has an indefinite corporate "life." The court does not specifically address this legal question because the parties do not raise it, but the court does note that several of the Alabama cases that the parties discuss and that this court cites in its order involved transfers to business entities. None of those decisions turned on whether the company's "life" was a relevant "life in being." E.g. Dauphin Island, 519 So. 2d at 951 (transfer between business entities did not violate the rule against perpetuities because it was "a vested interest even though uncertain in . . . enjoyment"). In addition, one of the cases that P&W cites in its brief holds that a "life in being must be a human life." Stuart Kingston v. Robinson, 596 A.2d 1378, 1383 (Del. 1991). The case specifically holds that "a corporation cannot be used as a measuring life for the purposes of the rule." Id. (citing Fitchie v. Brown, 211 U.S. 321 (1908)).

First Alabama Bank as Alabama authority, P&W argues that, even if the option as to P&W itself is invalid, the court should enforce the option as to "a company the majority of which is owned by or controlled by George F. Landegger."

In First Alabama Bank, a testator's will created two trusts, one of which created four categories of gifts with the funds held by that trust. First Alabama Bank, 382 So. 2d at 1106. First, the trust was to be used for the benefit of the testator's widow during her life. Second, the trust was to be used for the benefit of the testator's only daughter for her life. Third, the trust was to be used for the benefit of the testator's grandchildren for their lives. Fourth, when the grandchildren died, their individual shares of the trust were to be paid to their children, referred to as the testator's "descendants," when they reached the age of 21. Id.[4] The testator had two grandchildren when he died, but it was hypothetically possible that his only daughter, who was still alive at the time, could have more children in the future. Id.

Evaluating the trust, the court determined that the gifts to the widow and the daughter were valid because both of them were alive when the testator died, so their interests clearly would vest within 21 years of a life in being. Id. at 1108. The gifts to the grandchildren were also valid. The gifts to the two grandchildren who were alive when the testator died would vest, if at all, within their lifetimes; the gifts to any hypothetical grandchildren who were born to the testator's only daughter in the future would vest, it at all, within 21 years of the testator's

---

[4]In the event that the testator's widow outlived the testator's daughter, the testator's daughter would never receive a direct benefit from the trust. Instead, the testator's daughter's children, the testator's grandchildren, would realize their interest in the trust when the testator's widow died. The will also contained provisions for the contingency that the testator himself would outlive his wife. Id. at 1106-07. These contingencies are not relevant to the opinion. For the sake of simplicity, the language in this court's opinion will assume that the testator dies first, his widow dies second, his daughter dies third, and his grandchildren die next.

daughter's death.  Id.

The gifts to the descendants posed a more difficult question because some descendants held a valid gift and some held an invalid gift, depending upon whether their parents, who in turn were grandchildren of the testator, were living when the testator died.  The gift to the descendants who would be born to the testator's two living grandchildren were valid when considered in isolation because their shares of the trust would be known and vest when the two living grandchildren, the lives in being in their cases, passed away.  Id. at 1109.  On the other hand, the gifts to descendants born to any of the testator's hypothetical future grandchildren were not valid because those gifts could possibly vest more than 21 years after any life in being.  Id.  The court decided that the gifts to the descendants who were born to the two living grandchildren were valid, even though the gifts to the descendants of the hypothetical future grandchildren of the testator were not valid.  The rationale behind the decision was that the fractional interest the descendants of the two living grandchildren would eventually acquire would be set within the time provided by the rule against perpetuities.  In other words, the share of the trust that would vest to the descendants of the two living grandchildren could be ascertained, and would vest, within the time allowed by the rule against perpetuities.

Despite P&W's efforts to make it so, the rationale behind the First Alabama Bank case does not apply to the case at bar.  There is one option in this case.  It will vest, in its entirety, at one time to the Option Holder.  If a company owned or controlled by Mr. Landegger, of which P&W is one example, exercises the option, it will vest within the time allowed by the rule.  On the other hand, the option could go unexercised after the period allowed by the rule elapses and P&W, with another individual at its helm, could exercise it.  Rather than creating subclasses of

gifts and recipients, which was the case in First Alabama Bank, the option in this case is a single interest flowing to the Option Holder.

The distinction between the case at bar and the case before the court in First Alabama Bank is readily apparent when the First Alabama Bank case is compared to the Shaffer case. In Shaffer, a will gave the option to purchase stock to "Hugh Reed, Jr., his heirs, executors or assigns" the option to buy certain shares of stock at a price set out in the will. Shaffer, 437 So. 2d at 98.[5] Hugh Reed, Jr. was alive when the will went to probate, and had even exercised his option to purchase the shares at the time the Shaffer decision was issued. Id. Consequently, the gift would have been valid if it went to "Hugh Reed, Jr.," without reference to his "heirs, executors or assigns," but the court still invalidated the option. Much as the court in Shaffer did not divide "Hugh Reed, Jr., his heirs, executors or assigns," into four distinct subclasses, it is not appropriate to divide the Option Holder into distinct subclasses. There is one option in this case and it can only be exercised once. There are not subclasses that require distinct analyses in this case.[6]

## IV.   CONCLUSION

The motions are **GRANTED in part and DENIED in part**. P&W's option to purchase an interest in Cello is **void ab initio** because it violates Alabama's rule against perpetuities. The motions are otherwise **denied** because they either turn on arguments that were not fully developed in the motion at bar or they turn on issues that are not properly resolved on a motion

---

[5] The will provided a similar gift to another individual named Thomas Money. Id.

[6] In any event, the "Option Holder or any successors or assigns" may transfer the option, further undercutting P&W's argument that this option is personal to Mr. Landegger. (Doc. 26-4, p. 5, ¶ 14).

attacking the pleadings.

**DONE and ORDERED** this 7th day of February, 2009.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE