**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **PARSONS & WHITTEMORE** ) | |
| **ENTERPRISES CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NO. 07-0743-CG-B** |
| **v.** ) | |
| ) | |
| **CELLO ENERGY, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

This matter comes before the court on two motions for summary judgment.  One of the motions was filed by Cello Energy, LLC ("Cello"), Boykin Trust, LLC ("Boykin Trust"), Jack W. Boykin ("Jack"), and Allen Boykin ("Allen" and, collectively with Cello, the Boykin Trust, and Jack, "the Cello Defendants").  (Doc. 294).  That motion is fully briefed and ripe for ruling. (Docs. 319, 337, and 362).

The other motion was filed by BioFuels Operating Company, LLC ("BioFuels"), Khosla Ventures, LLC, Red Sky, LP, and Khosla Ventures II, LP (collectively, the "Biofuels Defendants").  (Doc. 292).  That motion is also fully briefed and ripe for ruling.  (Docs. 316, 336, and 361).

## I.    ALLEGATIONS

Plaintiff Parsons & Whittemore Enterprises Corporation ("P&W") brought several causes of action against the Cello Defendants and the Biofuels Defendants.  Counts One through Five include a claim for injunctive relief, two claims for declaratory relief, a request for a constructive trust, and a request for an accounting.  (Doc. 158, pp. 29-37).

Count Six alleges that Cello and the Boykin Trust breached a February 27, 2007,

nondisclosure agreement (the "Nondisclosure Agreement"), an April 19, 2007, letter agreement (the "Letter Agreement"), and an April 19, 2007, option agreement (the "Option Agreement" and, collectively with the Nondisclosure Agreement and the Letter Agreement, the "P&W Agreements") with P&W.  (Doc. 158, pp. 37-38).

Count Seven alleges that the Biofuels Defendants tortiously interfered with P&W's business relationship and contractual relationships pursuant to the P&W Agreements with Cello and the Boykin Trust.  (Doc. 158, pp. 38-39).

Count Eight alleges that the Cello Defendants committed fraud by misrepresenting certain facts prior to entering into and during the negotiation of the P&W Agreements.  (Doc. 158, pp. 40-42).

Count Nine alleges that the Cello Defendants committed suppression by witholding certain facts prior to and during the negotiation of the P&W Agreements. (Doc. 158, pp. 42-43).

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  As the Eleventh Circuit succinctly stated:

> A factual dispute is genuine only if "a reasonable jury could return a verdict for the nonmoving party."  United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (citation omitted).  The moving party bears the burden of proving that no genuine issue of material fact exists.  O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the district court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.

2

> 1999).  Assuming the moving party has met its burden, the non-movant must then
> show a genuine dispute regarding any issue for which it will bear the burden of
> proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553,
> 91 L.Ed.2d 265 (1986).

Info. Sys. and Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224-25 (11th Cir. 2002).

The purpose of summary judgment "is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied sub nom. Jones v. Resolution Trust Corp., 516 U.S. 817 (1995).

> In opposing a motion for summary judgment, "a party may not rely on his
> pleadings to avoid judgment against him."  Ryan v. Int'l Union of Operating
> Engrs, Local 675, 794 F.2d 641, 643 (11th Cir. 1986).  There is no burden upon
> the district court to distill every potential argument that could be made based
> upon the materials before it on summary judgment.  Blue Cross & Blue Shield v.
> Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990).  Rather, the onus is upon the parties
> to formulate arguments; grounds alleged in the complaint but not relied upon in
> summary judgment are deemed abandoned.  Road Sprinkler Fitters Local Union
> No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994)(citing
> Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986)), cert.
> denied, 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994).

Id. at 599.  The "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp., 477 U.S. 323.  The failure by the nonmoving party to make a sufficient showing on an essential element of its action entitles the moving party to judgment as a matter of law.  Id. at 323.

The court will recite the facts as they become relevant during the course of its legal analysis.

## III.   THE OPTION AGREEMENT

Count Six alleges that Cello and Boykin Trust breached, among other agreements, the Option Agreement.  (Doc. 158, pp. 37-38).

The Option Agreement, which is signed by Cello, the Boykin Trust, and P&W, is dated April 19, 2007. (Doc. 26-4, pp. 2 and 5). P&W paid $2.5 million to purchase the option. For the additional payment of $10 million, the Option Agreement purports to give an "Option Holder," which is defined as "Parsons & Whittemore Enterprises Corp., a company owned or controlled by it, or a company the majority of which is owned by or controlled by George F. Landegger," the option to purchase an ownership interest in Cello. (Doc. 26-4, p. 2).

In addition to purporting to give the Option Holder the option to purchase an interest in Cello, the Option Agreement gave the Option Holder, "[s]imultaneously with the payment of the $2.5 million price for this Option," "total and full transparent disclosure of" the "intellectual property relating to the technology for the production of fuels from various raw materials, including, but not limited to, tires, plastics, agricultural residues, [and] cellulose-containing materials," pursuant to the Nondisclosure Agreement. (Doc. 26-4, pp. 2-3). "Full disclosure includes, but is not limited to, detailed drawings and process descriptions, research reports and notes, trial and test results, pilot plant operating data and economic data, economic analysis, raw material and refined product market studies, third party product evaluations, and off take agreements." (Doc. 26-4, p. 2). The undertaking to provide disclosure of the technology "endures beyond the termination of this Option." (Doc. 26-4, p. 3).

The Option Agreement contains a paragraph entitled "Protective Covenants." (Doc. 26-4, p. 4). The beginning of the paragraph reads: "[u]pon the signing of this Option, the Option Holder will have the potential to become a minority shareholder of the Company." (Doc. 26-4, p. 4). The parties understand that minority shareholders are "inherently in a vulnerable position," so the parties agreed "that upon the signing of this Option, that certain customary

4

minority shareholder protections will become effective and the Option Holder shall immediately have all the rights of the Minority Shareholder (the "Minority Shareholder") as used in this paragraph."  (Doc. 26-4, p. 4).  The protections include restrictions on taking various actions with respect to "Common Stock" of Cello; restrictions on corporate actions like mergers; sale or licencing of most of Cello's assets; and sale, licensing, assignment or other transfer of any part of Cello's technology.  (Doc. 26-4, p. 4).  In addition to restricting Cello's activity, the paragraph gives "the Minority Shareholder" the right to chose four of the 12 members of Cello's board of directors, a right that the Minority Shareholder will have after the option is exercised "as if made a part of the articles and by-laws of the Company, which shall not be amended without Minority Shareholder approval."  (Doc. 26-4, p. 4).

The Option Agreement does not contain a severability provision.

The Cello Defendants offer several arguments in their efforts to obtain summary judgment on the claim that they violated the Option Agreement.  One argument is that the Option Agreement violates the rule against perpetuities.  This court already found that the option to purchase an interest in Cello is void because it violates the rule against perpetuities.  (Doc. 375).  No party argues that any of the obligations set out in the Option Agreement are enforceable if the option itself is void.  As such, the Cello Defendants' motion for summary judgment is **GRANTED** as to the claim in Count Six that the Cello Defendants breached the Option Agreement.


IV.     **THE LETTER AGREEMENT**

The Letter Agreement bears the same date as the Option Agreement, April 19, 2007.

(Doc. 26-5).  It confirms the parties' "mutual understanding of the business relationship among

our companies going forward."  (Doc. 26-5, p. 2).  P&W, Cello, and the Boykin Trust signed the

Letter Agreement.  (Doc. 26-5, p. 4).

In addition to confirming P&W's option to purchase an interest in Cello and Cello's

agreement to disclose its technology to P&W as set out in the Option Agreement, the Letter

Agreement provides for certain activities that are not discussed in the Option Agreement.  P&W

"agrees to provide engineering and construction services" for the Bay Minette plant at a price set

out in the Letter Agreement.  (Doc. 26-5, p. 3).  Specifically, P&W "agrees to provide"

construction management for the Bay Minette plant, "engineering management and detailed

engineering" for the Bay Minette plant, and engineering management for the reactor and

"subsequent portions" of the Bay Minette plant.  (Doc. 26-5, p. 3).  Cello "will have final

authority on all decisions regarding the project."  (Doc. 26-5, p. 3).  P&W also "agrees to

provide cellulose" at a specified price.  (Doc. 26-5, pp. 3-4).

The Cello Defendants argue that the Letter Agreement is void for indefiniteness.  The

question of "whether a writing fails for indefiniteness is properly a question of law."  White

Sands Group, L.L.C. v. PRS II, LLC, 998 So. 2d 1042, 2008 Ala. LEXIS 76, at *24 (Ala. 2008).

The Supreme Court of Alabama recently summarized the applicable law as follows:

> "To be enforceable, the [essential] terms of a contract must be sufficiently definite
> and certain, and a contract that "'leav[es] material portions open for future
> agreement is nugatory and void for indefiniteness'" . . . ."  "A lack of definiteness
> in an agreement may concern the time of performance, the price to be paid, work
> to be done, property to be transferred, or miscellaneous stipulations in the
> agreement."  "In particular, a reservation in either party of a future unbridled <u>right
> to determine the nature of the performance</u> . . . has often caused a promise to be
> too indefinite for enforcement."  Smith v. Chickamauga Cedar Co., 263 Ala. 245,
> 248-49, 82 So. 2d 200, 202 (1955) ("'A reservation to either party to a contract of
> an unlimited right to determine the nature and extent of his performance, renders

his obligation too indefinite for legal enforcement.'").

> "Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain."  "The terms of a contract are reasonably certain if they provide a basis for <u>determining the existence of a breach and for giving an appropriate remedy.</u>"

<u>Id</u>. at **19-20 (emphases and alterations in original, most citations omitted).

The contract in <u>White Sands</u> was void for indefiniteness for two reasons.  First, the price was uncertain because it was contingent on certain unspecified amenities in a development contemplated by the contract.  <u>Id</u>. at *21.  Second, no party to the contract unequivocally agreed to perform any of the essential terms of the contract.  <u>Id</u>. at *22.  The contract in the <u>Smith</u> case cited in <u>White Sands</u> provided that the first party was obligated "to furnish logs at such location for cutting by [the second party] in such quantities as [the first party] deems feasible and economical," and was held void for indefiniteness because it gave one party "'an unlimited right to determine' the extent of its performance with respect to the furnishing of logs, thereby rendering its obligation too indefinite for legal enforcement."  <u>Smith</u>, 82 So. 2d at 201-02.  The court in <u>Alabama Nat'l Life Ins. Co. v. National Union Life Ins. Co.</u>, 151 So. 2d 762 (Ala. 1963), held that a contract was void for uncertainty based on the theory that a contract is too indefinite if "no breach of a contract could be assigned which could be compensated by any criterion of damages furnished by the contract itself."  <u>Id</u>. at 766.  In <u>Drummond Co. v. Walter Indus.</u>, 962 So. 2d 753 (Ala. 2006), the court found that an agreement to extend leases "to the extent necessary to complete mining the strippable coal" was void for indefiniteness because it lacked a beginning date and ending date during which the agreement was effective.  <u>Id</u>. at 774.

The Letter Agreement, which "confirms [the parties'] mutual understanding of the

business relationship among [their] companies going forward," is too indefinite to enforce. (Doc. 26-5, p. 2).  Much of the Letter Agreement "confirms" portions of the Option Agreement. (Doc. 26-5, pp. 2-3, ¶¶1-4).  Paragraph 5 provides that Cello "undertakes to construct" the Bay Minette plant and to produce fuel there.  (Doc. 26-5, p. 3, ¶ 5).  Paragraphs 6 and 7 provide that P&W "agrees to provide" engineering and construction services and Cellulose containing raw material.  (Doc. 26-5, pp. 3-4, ¶¶ 6-7).  Both paragraphs provide formulas based on which prices for these goods and services should be ascertained, but neither paragraph provides a firm price and neither party shows how a firm price was, or could be, ascertained based on the formulas set out in the agreement.  For example, P&W is going to charge Cello "salary plus fringes plus 100%" for the use of its personnel.  (Doc. 26-5, p. 3, ¶ 6).  There is nothing showing how the P&W salaries should be determined, or setting parameters on the maximum or minimum salaries.

Specifically with respect to P&W's agreement "to provide engineering and construction services," the agreement gives Cello "final authority on all decisions regarding the project" and does not give P&W the exclusive right to provide engineering and construction services.  (Doc. 26-5, p. 3, ¶ 6).  Likewise, with respect to P&W's agreement "to provide cellulose containing raw material," there is nothing in the agreement discussing how much raw material P&W is required to supply or Cello is required to accept.  (Doc. 26-5, pp. 3-4, ¶ 7).  In fact, the agreement specifically envisions that Cello will have to look elsewhere to "source the balance of the needed raw materials directly."  (Doc. 26-5, p. 4, ¶ 7).

In short, the Letter Agreement gives the parties the unrestricted right to determine their future performance, it does not provide a basis for determining whether the contract was

breached or what the damages would be if it was breached, and many or all of the prices are effectively unspecified.  Finally, the Letter Agreement does not say when any of the activity it describes must start or stop.

The Cello Defendants' motion for summary judgment is **GRANTED** as to the claim in Count Six that the Cello Defendants breached the Letter Agreement because the Letter Agreement fails for indefiniteness.

## V.     THE NONDISCLOSURE AGREEMENT

### A.     The Agreement

In the February 27, 2007 Nondisclosure Agreement, Cello "agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement signed by an authorized representative of each party hereto."  (Doc. 26-3, p. 4, ¶ 6).

Recital D explains what the Nondisclosure Agreement means by "Process Information."

[Cello] is the owner of research and production technology developed over the span of 12 years.  The technology consists of chemical process procedures and a mechanical equipment system design, which together produce a specific blend of chemicals which may be used as a fuel source for diesel and gasoline type internal combustion engines and jet turbine type combustion engines.  This combination of chemical processes and mechanical processing system design will enable the Synthetic Fuels to be produced in a cost effective manner.  The chemical process and mechanical design is confidential and proprietary to [Cello] (the "Process Information").

(Doc. 26-3, p. 2, ¶ D).

Paragraph 1 defines "Cello Proprietary Information."

As used herein, "[Cello] Proprietary Information" means all business and technical information of any nature which has been, or is in the future, disclosed in writing or orally by [Cello], including:
     (a) pricing, schedules, suppliers, product plans, proposal information,

9

> product costs, and similar business data;
> (b) drawings, designs, specifications, "know-how", and similar technical
> data;
> (c) testing information, analysis reports; or analysis relating to the
> Synthetic Fuels or the process used to create the Synthetic Fuels;
> (d) testing information related to operation of the Synthetic Fuels Plan;
> (e) information disclosed under the prior NDA;
> (f) financing terms and conditions; and
> (g) patents and patent applications
>
> which is clearly designated at the time of disclosure as proprietary or confidential
> by stamp or legend or, if disclosed orally or visually, followed by a memorandum
> describing the information provided within ten (10) days of such disclosure.

(Doc. 26-3, p. 3, ¶ 1).

The Nondisclosure Agreement also specifically excludes certain information from its

restrictions.

> Proprietary Information protected under this Agreement shall not include
> information that (a) is or hereafter becomes available to the public through no
> fault or disclosure by the receiving party; (b) is known to the receiving party prior
> to disclosure or receipt from the disclosing party; (c) is disclosed with the prior
> written consent of the disclosing party; (d) is independently developed by the
> receiving party without reliance on the disclosing party's Proprietary Information;
> (e) is received by the receiving party from a third party reasonably believed by the
> receiving party to have a right to make such a disclosure; or (f) is disclosed
> pursuant to a valid order of the court or other governmental body.

(Doc. 26-3, p. 4, ¶ 5).

**B.      The Nondisclosure Agreement's Validity**

P&W and the Cello Defendants disagree about whether the Nondisclosure Agreement is

inoperative because of the merger clause in the Option Agreement.  The Option Agreement

includes a merger clause.  It says:

> Entire Agreement.  This Option contains the entire agreement between the parties
> with respect to the subject matter hereof and supersedes all prior and
> contemporaneous arrangements or undertakings with respect thereto.

(Doc. 26-4, p. 5).

Summary judgment is not granted based on this argument for several reasons.  First, this court has already determined that the Option Agreement is void.  (Doc. 375).  The parties do not discuss how a merger clause in a void Option Agreement can supercede the Nondisclosure Agreement.  Second, the Option Agreement incorporates the Nondisclosure Agreement by reference by calling for disclosure of technology "pursuant to the nondisclosure agreement entered into by the Company on February 27, 2007."  (Doc. 26-4, p. 2).  The Supreme Court of Alabama "recognized long ago that a contract may incorporate the terms of another document by reference."  McDougle v. Silvernell, 738 So. 2d 806, 808 (Ala. 1999).

Third, the Nondisclosure Agreement is collateral to the Option Agreement.  Although an agreement with a merger clause is considered to be the final agreement of the parties on the subject, Ex parte Palm Harbor Homes, Inc., 798 So. 2d 656, 660-62 (Ala. 2001), a subsequent Supreme Court of Alabama case, Ritter v. Grady Auto. Group, Inc., 973 So. 2d 1058 (Ala. 2007), clarifies the rule set out in Palm Harbor.  In Ritter, a plaintiff signed a purchase contract, a retail-installment contract, a power of attorney, an arbitration agreement, and an application for a certificate of title in order to purchase a car.  Id. at 1060.  The car allegedly malfunctioned during an accident.  Id.  The dealer moved to compel arbitration pursuant to the arbitration agreement after the plaintiff filed a lawsuit.  Id.

The plaintiff argued that the arbitration agreement was not enforceable because the purchase contract contained a merger clause.  Id. at 1061-62.  The court applied the rule that "[a] merger clause . . . does not bar evidence of contemporaneous collateral agreements between the parties."  Id. at 1062.  A contemporaneous agreement is beyond the scope of a merger clause if: (1) it is collateral in form to the agreement with the merger clause, (2) it does not contradict

11

express or implied provisions of the agreement with the merger clause, and (3) it is not an agreement that the parties would be expected to include in the document containing the merger clause. Id. at 1062, 1064. The court held that the arbitration agreement met all three prongs of the foregoing test.

First, the arbitration agreement was collateral in form to the purchase contract. Id. at 1063. The arbitration agreement was "not identical in nature to the purchase contract." Id. The purchase contract only covered the purchase of the car but the arbitration agreement governed "the relationship between the parties preceding and following the sale of the car." Id. In other words, the purchase contract did not deal with the subject matter of the arbitration agreement. Id. The court also found that "it is natural to enter into a separate arbitration agreement" because it covered disputes between the parties based on the purchase contract, the financing agreement, or other agreements or service contracts that the parties executed. Id. at 1063-64.

Second, the arbitration agreement did "not contradict provisions of the purchase contract." Id. at 1064. The purchase contract did not discuss arbitration, or any other dispute-resolution mechanism. Id.

Third, the court found that "'the parties would not ordinarily be expected to embody' the arbitration agreement in the purchase contract." Id. Even though "including an arbitration agreement within the purchase contract would have been proper, the agreements are not so related that one would expect them to be included in the same document." Id.

In this case, the Nondisclosure Agreement is collateral to the Option Agreement. First, the Nondisclosure Agreement is collateral in form to the Option Agreement. They are not identical in nature - the Option Agreement involves an option to purchase an interest in Cello

and provides certain corporate protections but the Nondisclosure Agreement focuses on confidentiality and an exchange of information.  (Docs. 26-3 and 26-4).  It is certainly "natural" to have separate agreements involving ownership acquisition and confidential exchanges of information.  The Nondisclosure Agreement, which is dated February 27, 2007, also governed the parties' relationship before they executed Option Agreement dated April 19, 2007.  (Docs. 26-3, p. 2 and 26-4, p. 2).  Second, nothing in the Nondisclosure Agreement contradicts the Option Agreement.  To the contrary, the Option Agreement is expressly consistent with the Nondisclosure Agreement because the Option Agreement specifically incorporates the Nondisclosure Agreement when the Option Agreement says that Cello "will provide total and full transparent disclosure of the entire [Cello] Technology as defined hereafter to the Option Holder and/or its affiliates pursuant ot the nondisclosure agreement entered into by [Cello] on February 27, 2007."  (Doc. 26-4, p. 2).  Third, although parties may do so if they chose to, they would not ordinarily be expected to include the terms of confidentiality and an exchange of scientific information in an option agreement.

The Cello Defendants argue that this court's analysis is inapposite because the Palm Harbor and Ritter cases focus on whether contemporaneous, as opposed to prior, agreements are subject to a merger clause.  The court finds nothing in either case specifically limiting their rationale or application to collateral agreements that are executed at the same time as the agreements containing the merger clauses.  The focus is on the collateral nature of the agreements, not on whether the earlier agreement was oral or written, or whether the earlier agreement was "contemporaneous" with the agreement containing the merger clause or was entered into earlier.  See Southern Guaranty Ins. Co. v. Rhodes, 243 So. 2d 717, 721 (Ala. Civ.

App. 1971) (explaining that the principle behind this rule, the parol evidence rule, "is that if parties negotiate, either by parol or memoranda," the contract integrates the negotiations, but that the "principle does not prohibit negotiation of more than one agreement at the same time, nor that one agreement may be reduced to writing and another be oral.  If such agreements are clearly collateral, separate and distinct as to subject matter there is no problem presented."); Palm Harbor, 798 So. 2d at 660 (referring to "prior or contemporaneous agreements"); Ritter, 973 So. 2d at 1062 ("A merger clause invokes the parol evidence rule, which precludes a court from considering extrinsic evidence of prior or contemporaneous agreements . . . .").  The court rejects this argument and finds that the Nondisclosure Agreement is valid.

### C.     Breach of the Nondisclosure Agreement

This is a breach of contract claim arising under Alabama law.  "To establish a breach-of-contract claim, a plaintiff must show (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." Ex parte Coleman, 861 So. 2d 1080, 1085 (Ala. 2003) (internal quotations omitted).

The Cello Defendants focus on the third element of the cause of action, arguing that there is no evidence that they violated the Nondisclosure Agreement.  A witness for the Biofuels Defendants testified that Jack did not disclose the technology because the agreement between Jack and the Biofuels Defendants "was that we would only get access to the technology necessary and appropriate in order for us to do our job under the MFC."  (Samir Kaul June 18, 2008, Deposition, p. 305).  This fact is disputed because that same witness testified that Jack provided him with "information regarding tests of independent labs . . . comparison of

technologies . . . and . . . the feasibility study." (Samir Kaul June 18, 2008, Deposition, pp. 337-39).  The Biofuels Defendants have received a comparative analysis and a feasibility study, both of which contain information regarding the technology.  (Landegger October 29, 2008, Deposition, Part I, pp. 185-89 and 199).  The Cello Defendants' motion for summary judgment is **DENIED** on the claim in Count Six that they breached the Nondisclosure Agreement.

## VI.    COUNTS EIGHT AND NINE - FRAUD AND SUPPRESSION

The Cello Defendants argue that P&W cannot recover for fraud or suppression because it did not conduct due diligence before entering into the agreements in this case.

With respect to the fraud count, Alabama statute provides that "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."  ALA. CODE § 6-5-101 (1975).  The Supreme Court of Alabama recently summarized the elements of this cause of action as "(1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damage as a proximate consequence."  McCutchen Co., Inc. v. Media General, Inc., 988 So. 2d 998, 1001 (Ala. 2008).

The Cello Defendants have not argued that summary judgment is due on the first, second, or fourth elements of a claim for fraud.  As for the third element of a fraud claim,

> the "reasonable-reliance standard" applies.  A purchaser's "reliance is reasonable in the absence of independent knowledge sufficient to arouse the purchaser's suspicion, and he is not obligated to make an independent investigation as to the truth of the seller's representations absent such knowledge."  "If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover."  While this Court has held that real estate brokers and salespersons may be held liable for representations they make to induce a purchaser to act, "'[i]f the

purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "<u>volunti</u> <u>non</u> <u>fit</u> <u>injuria</u>".'."

<u>Ex parte ERA Marie McConnell Realty, Inc.</u>, 774 So. 2d 588, 591 (Ala. 2000) (emphasis and internal citations removed).

The Cello Defendants argue that P&W's reliance was not reasonable because P&W did not conduct due diligence. They rely almost exclusively on an Eleventh Circuit Court of Appeals decision, applying Georgia law in a suppression case, <u>Williams v. Dresser Indus.</u>, 120 F.3d 1163 (11th Cir. 1997). The ruling does not stand for the position that a company necessarily cannot prevail on a fraudulent misrepresentation claim in a commercial case if the company does not conduct due diligence.

The plaintiffs in that case alleged that the defendants "fraudulently concealed information." <u>Id</u>. at 1165. They alleged that the defendants "had fraudulently induced [the plaintiffs to act] by concealing . . . information." <u>Id</u>. at 1166. The defendants' motion to dismiss claimed "that they had no duty to disclose" the information "because they had no fiduciary or confidential relationship with the [plaintiffs], and that an allegation of misrepresentation and concealment of a future event did not state a claim." <u>Id</u>. at 1167. The district court denied the motion to dismiss because "Georgia law imposed a duty to disclose material facts in light of either a confidential relationship or the particular circumstances of the case." <u>Id</u>. After a jury trial, the district court denied the defendants' motion for a directed verdict, which was based in part on the argument that the plaintiffs "failed to exercise due diligence." <u>Id</u>.

In its review of the case, the court of appeals found that the defendants did not have a duty to disclose facts to the plaintiffs because there was no confidential relationship between the

parties and because the particular circumstances of the case did not otherwise give rise to such a duty. Id. at 1168-1171. The court next addressed Georgia's law of reasonable reliance. It explained that "[w]here the party complaining of fraud fails to exercise any due diligence to discover the truthfulness of representations, there is no jury question." Id. at 1172. The court found that the plaintiff failed to exercise due diligence. Summarizing the opinion, the court concluded:

> In establishing a claim for fraudulent concealment, a plaintiff must prove that the defendant had a duty to disclose the concealed facts. The [plaintiffs] did not establish that they had a confidential relationship with the [defendants] or that the circumstances created a duty to disclose; moreover, they failed to exercise due diligence in investigating [the defendants's] general representations of [fact].

Id. at 1174.

Other than highlighting the fact that P&W and the Cello Defendants negotiated at arm's-length, the Cello Defendants do not come forward with any facts tending to show why P&W's reliance on any affirmative misrepresentations was unreasonable under Alabama law. The court is unaware of any Alabama authority that supports the broad legal rule on which the Cello Defendants rely, that parties to an arm's-length relationship must conduct due diligence before they can reasonably rely on representations made on the opposite side of the negotiating table. Without such a rule, the Cello Defendants' argument fails on the fraudulent misrepresentation claim because the Cello Defendants have not shown why P&W's reliance on any particular misrepresentations was unreasonable. The motion for summary judgment is consequently **DENIED** on Count Eight for fraudulent misrepresentation.

On the other hand, the Cello Defendants are correct that the facts do not support finding that they owed P&W a legal duty to support a suppression claim.

17

The elements of a suppression claim are (1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury.

Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C., 932 So. 2d 883, 891 (Ala. 2005).

The existence of a duty to disclose is a question of law for the court. Id. at 891. Under the suppression statute, a duty to speak arises if there is a confidential relationship between the parties or if there are "'special circumstances' mandating disclosure." State Farm Fire and Cas. Co. v. Owen, 729 So. 2d 834, 842 (Ala. 1998). The term, "special circumstances," allows courts to look into the facts surrounding an event to determine if a duty to speak is appropriate, even if there is no confidential relationship between the parties. Id. at 839. Courts consider several factors in their analysis:

(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.

Id. at 842-43.

There is no evidence of a confidential relationship between the parties in this case. The negotiations were at arm's-length. As the Supreme Court of Alabama recently provided:

"In commercial transactions involving parties to arm's length negotiations, however, a bright line rule generally applies: The parties have no general obligation to disclose, but each has an affirmative duty to respond 'truthfully and accurately' to direct questions from the other.

"Thus, Alabama law presumes that the parties are capable of handling their own affairs and guarding their interests by asking reasonably specific, direct questions that will satisfy their need for information. The parties decide what information they need, and the law protects their rights to receive it."

Freightliner, 932 So. 2d at 892 (quoting Shutter Shop, 114 F. Supp. 2d at 1225).

The court went on to describe its precedent as providing that, unless a party to an arm's-

length transaction makes a specific inquiry,  the other party has "no generalized obligation to disclose information regarding defects in similar products." Id. (citing Daimler Chrysler Corp. v. Morrow, 895 So. 2d 861 (Ala. 2004), Mason v. Chrysler Corp., 653 So. 2d 951 (Ala. 1995), and McGowan v. Chrysler Corp., 631 So. 2d 842 (Ala. 1993)).

The motion for summary judgment on Count Nine for suppression is **GRANTED** because the Cello Defendants did not owe P&W a duty of disclosure.

## VII.   COUNT SEVEN

Count Seven alleges tortious interference against the Biofuels Defendants.

In order to establish a prima facie case of intentional interference with a business or contractual relationship, there must be proof of each of the following:

> (1) The existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the defendant's interference.

S.B. v. St. James Sch., 959 So. 2d 72, 94 (Ala. 2006) (quotations omitted).

The Biofuels Defendants argue that they cannot be liable for tortiously interfering with the P&W Agreements because the agreements are void and the MFC does not interfere with the P&W Agreements.  (Doc. 316, pp. 2-3, 26-40; Doc. 361, pp. 8-23).  The arguments fail for various reasons.  First, the Nondisclosure Agreement is not void.  Second, there is no dispute that there was a business relationship, not just a series of contracts, between P&W and the Cello Defendants.  The complaint alleges that "BioFuels and Khosla Ventures intentionally, and without justification, interfered with P&W's business and contractual relationship with Cello and Boykin Trust, including attempts to draft around the express provisions of the P&W Agreements, and intentionally induced Cello and Boykin Trust to breach their contractual obligations with

19

P&W."  (Doc. 158, p. 39, ¶ 58).  P&W then specifically, and the court finds, correctly, argues that its claim for intentional interference does not depend on the existence of any particular contract.  (Doc. 336, p. 17 n.7).

BioFuels' focus on showing how the MFC does not interfere with the P&W Agreements is not sufficient to support a grant of summary judgment on this broadly-pleaded claim because the claim is not tied to proof that the MFC directly conflicts with the express terms of the P&W Agreements.  Because BioFuels has not advanced any other arguments in its favor on this issue, it has not shown the absence of a genuine issue of material fact on the tortious interference claim.

The Biofuels Defendants also argue that speculative damages cannot be recovered in Alabama.  P&W concedes that it cannot recover any lost profits damages because such damages are speculative.  (Doc. 336, pp. 39-40).  P&W argues, though, that it can prove that the Biofuels Defendants' interference will damage P&W, to some degree, and that the existence of an uncertain amount of damages precludes summary judgment.  Jamison, Money, Farmer & Co., P.C. v. Standeffer, 678 So. 2d 1061, 1067 (Ala. 1996) ("If the damage or loss or harm suffered is certain, the fact that the extent is uncertain does not prevent a recovery.").  See also Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931) ("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. . . . Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer

20

from making any amend for his acts.") and Money Back, Inc. v. Gray, 569 So. 2d 325, 327-28

(Ala. 1990) (recognizing that the foregoing rule from Story Parchment applies in Alabama).

The motion for summary judgement on Count Seven is **DENIED**[1].

## VIII.   THE Cello Defendants' MOTION FOR SUMMARY JUDGMENT ON COUNTS ONE, TWO, THREE, FOUR, AND FIVE

The Cello Defendants argue that they are due summary judgment on Counts One through

Five because those counts "are based upon rights and duties under the Option Agreement."

(Doc. 319, p. 20).  They also argue that Counts One through Five allege the breach of the Letter

Agreement.  (Doc. 319, p. 38).

Counts One, Two, and Three each arguably rely in part on concerns about disclosure of

the technology, which the Nondisclosure Agreement prohibits.  Accordingly, and to that extent

the Cello Defendants' motion for summary judgment on Counts One, Two, and Three is

**DENIED**.  On the other hand, Counts Four and Five both specifically concern themselves with

the Option and Letter Agreements which have been invalidated by the court.  The Cello

Defendants' motion for summary judgement on Counts Four and Five is therefore **GRANTED**.

## IX.   THE Biofuels Defendants' MOTION FOR SUMMARY JUDGMENT ON COUNTS ONE, TWO, AND FOUR

The Biofuels Defendants argue that Counts One, Two, and Four against BioFuels depend

on the validity of the Option Agreement.  (Doc. 316, pp. 23-26).   For the reasons stated above,

the court disagrees as to Counts One and Two and agrees as to Count Four.  The Biofuels

_____

[1] In another order filed this date on plaintiff's motion for summary judgment, the court found that P&W did not tortiously interfere with the Boykin defendants' relationship with BioFuels because P&W was not a stranger to that relationship between the Boykin defendants and BioFuels.  That argument was not raised in connection with the instant motion.

Defendants' motion for summary judgment on Counts One and Two is **DENIED**.  The Biofuels

Defendants' motion for summary judgment on Count Four is **GRANTED**.

X.     **CONCLUSION**

The Cello Defendants' motion for summary judgment is **GRANTED in part and**

**DENIED in part**.  It is **GRANTED as to Counts Four, Five, Six as to the Option Agreement**

**and the Letter Agreement; and Nine**.  It is **DENIED as to Counts One, Two, Three and Six**

**insofar as they pertain to the Nondisclosure Agreement; and Eight.**

The Biofuels Defendants' motion for summary judgment is **GRANTED in part and**

**DENIED in part**.  It is **GRANTED as to Count Four**.  It is **DENIED as to Counts One, Two,**

**and Seven**.

**DONE and ORDERED** this 7th day of May, 2009.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE