**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **PARSONS & WHITTEMORE** ) | |
| **ENTERPRISES CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NO. 07-0743-CG-B** |
| **v.** ) | |
| ) | |
| **CELLO ENERGY, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

This matter comes before the court on plaintiff Parsons & Whittemore Enterprises

Corporation's ("P&W") motion for partial summary judgment on the amended counterclaim

("counterclaim") filed by Cello Energy, LLC ("Cello"), Boykin Trust, LLC ("Boykin Trust"),

Jack W. Boykin ("Jack"), and Allen W. Boykin ("Allen") (collectively the "Boykin

defendants"). (Docs. 178, 300, and 318). The motion is briefed and ripe for ruling. (Docs. 333

and 360). For the reasons set forth below, the motion is **GRANTED** in part and **DENIED** in

part.

## I.   SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As the

Eleventh Circuit succinctly stated:

> A factual dispute is genuine only if "a reasonable jury could return a verdict for
> the nonmoving party." United States v. Four Parcels of Real Property, 941 F.2d
> 1428, 1437 (11th Cir. 1991) (citation omitted). The moving party bears the

> burden of proving that no genuine issue of material fact exists. O'Ferrell v.
> United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument
> of the moving party, the district court must view all evidence in the light most
> favorable to the non-moving party, and resolve all reasonable doubts about the
> facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir.
> 1999). Assuming the moving party has met its burden, the non-movant must then
> show a genuine dispute regarding any issue for which it will bear the burden of
> proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553,
> 91 L.Ed.2d 265 (1986).

Info. Sys. and Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224-25 (11th Cir. 2002).

The purpose of summary judgment "is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied sub nom. Jones v. Resolution Trust Corp., 516 U.S. 817 (1995).

> In opposing a motion for summary judgment, "a party may not rely on his
> pleadings to avoid judgment against him." Ryan v. Int'l Union of Operating
> Engrs, Local 675, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden upon
> the district court to distill every potential argument that could be made based
> upon the materials before it on summary judgment. Blue Cross & Blue Shield v.
> Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties
> to formulate arguments; grounds alleged in the complaint but not relied upon in
> summary judgment are deemed abandoned. Road Sprinkler Fitters Local Union
> No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994)(citing
> Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986)), cert.
> denied, 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994).

Id. at 599. The "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. 323. The failure by the nonmoving party to make a sufficient showing on an essential element of its action entitles the moving party to judgment as a matter of law. Id. at 323.

## II.     FACTS

### A.     Negotiations Between P&W and Cello

In early 2007, P&W and Cello began discussing a business venture to pursue the commercial development of technology for the production of synthetic fuel.  (Doc. 178, p. 3, ¶ 13).  P&W was seeking to expand its business interest into alternative fuels and had an informal biorefinery work group working on getting more value from trees.  (Matheson Depo., pp. 143-44; Vermilyea Depo., pp. 103-04; Landegger 6/10/08 Depo., pp. 9-10, 14).  Landegger felt that, if successful, Cello's technology had the potential to be "a breakthrough of the first order." (Landegger 6/10/08 Depo., pp. 11-12).

Landegger sent Jack a draft letter of intent on February 21, 2007.  (Doc. 322-10).  P&W offered to purchase a one-third interest in Cello for $12.5 million, subject to a sixty-day due diligence period that "may involve experimental test runs."  (Doc. 322-10, p. 3, ¶¶1 and 2, p. 5, ¶ 9).  Jack did not agree to the terms of the February 21, 2007 draft letter of intent, in part because he did not want to allow P&W to use outside consultants and in part because he felt the letter precluded him from talking with other lenders or sources of financing during the due diligence period.  (Jack 10/23/08 Depo., Part I, pp. 189-193, 220-21; Jack 10/24 Depo., Part II, pp. 90-91). Jack was negotiating with other potential investors at the time and did not want to have to terminate those negotiations.  (Jack 10/23/08 Depo., Part I, pp. 220-21).

Jack sent P&W a draft nondisclosure agreement to govern the parties' discussions going forward with respect to the technology on February 26, 2007.  (Doc. 322-11).  Paragraph six of the draft nondisclosure agreement that Jack sent to P&W included a sentence providing that Cello "agrees not to disclose the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuel without a written modification of this Agreement."  (Doc. 322-11, p. 5, ¶ 6).  P&W reviewed and revised the draft

nondisclosure agreement.  One of the revisions changed the foregoing sentence to read that Cello "agrees not to disclose to third parties the Process Information or any other [Cello] Proprietary Information relating to the technical process for creating the Synthetic Fuels without a written modification of this Agreement."  (Doc. 26-3, p. 4, ¶ 6, emphasis supplied).  Landegger knew that the addition of "to third parties" changed the document from enabling Jack safely to give P&W information about his technology to prohibiting Jack from telling anyone else about the technology.  (Landegger 10/30/08 Depo., Part II, pp. 80-82).

P&W, through Landegger, sent the revised draft of the nondisclosure agreement to Jack via e-mail dated February 27, 2007.  (Doc. 301-2, p. 20).  Landegger did not specifically negotiate the changes he made to the draft nondisclosure agreement, but his e-mail did explain that he was sending his "re-draft of the Non-Disclosure Agreement" and invited Jack to call Landegger "should [Jack] need to discuss any of the changes."  (Doc. 301-2, p. 20; Landegger 6/11/08 Depo., Volume II, pp. 402-03).  Jack's signature on the nondisclosure agreement is dated February 27, 2007.  (Doc. 26-3, p. 6).  Jack did not know that the words "to third parties" were added to the nondisclosure agreement that he signed.  (Jack 10/23/08 Depo., Part I, p. 258). Had he known about the change, Jack would not have signed the nondisclosure agreement.  (Jack 10/24/08 Depo., Part II, pp. 94-95).  The fully-executed agreement is between Cello, Boykin Trust, P&W, and a company called "Alabama River Pulp Company, Inc."  (Doc. 26-3, p. 2). Landegger signed on behalf of P&W and Alabama River Pulp Company, Inc.  Jack signed on behalf of Cello and the Boykin Trust.  (Doc. 26-3, p. 6).  This order will refer to the February 27, 2007 nondisclosure agreement as the "Nondisclosure Agreement."

P&W knew that the first plant to use the technology, which was to be built in Bay

4

Minette, Alabama (the "Bay Minette Plant"), would need financing.  (Matheson Depo., pp. 125-27 and 318).  Landegger wrote Jack on March 7, 2007, outlining P&W's experience in the relevant industry and its ability to obtain financing.  (Doc. 322-13).  Although the March 7, 2007, letter describes several plants with which P&W had been involved around the world (Doc. 322-13), P&W built the most recent of the plants listed in the letter between 1980 and 1985. (Landegger 10/30/08 Depo. Part II, p. 75).

P&W eventually offered Cello a $2.5 million non-refundable payment in return for, among other things, an option to purchase a one-third interest in Cello.  (Doc. 26-4, p. 2).  Cello and P&W executed an Option Agreement dated April 19, 2007 (the "Option Agreement") and a Letter Agreement dated April 19, 2007 (the "Letter Agreement" and, collectively with the Option Agreement and the Nondisclosure Agreement, the "P&W Agreements").  (Docs. 26-4 and 26-5).  Jack signed the Option Agreement and the Letter Agreement on behalf of Cello and the Boykin Family Trust.  (Doc. 26-4, p. 5; Doc. 26-5, p. 4).

The parties discussed how to finance the Bay Minette Plant on more than one occasion both before and after they executed the Option Agreement and Letter Agreement.  (Jack 10/23/08 Depo. Part I, pp. 189-193).  Prior to executing the agreements, Jack told P&W that he intended to fund construction of the Bay Minette Plant on his own and to obtain a loan from the Federal Land Bank.  (Doc. 296-18).  In a letter dated April 19, 2007, Landegger told Cello that "we will counsel together regarding alternate sources of financing to implement the project" if funds from the Federal Land Bank are not available.  (Doc. 296-18).  Jack and Landegger spoke before Landegger sent his April 19, 2007 letter.  (Doc. 296-18).  Jack says he told Landegger that he would not sign the Option Agreement until he had the money from the Federal Land

Bank loan in his possession.  (Jack 6/24/08 Depo., Volume I, pp. 233-35).  Landegger

purportedly told Jack that Landegger would help Jack obtain financing, possibly from Goldman

Sachs.  (Jack 6/24/08 Depo., Volume I, p. 236).  Landegger testified that it was "wishful

thinking" for Jack to expect he could obtain the loan he wanted because the technology was

unproven.  (Landegger 6/10/08 Depo., p. 168).

     Jack was unable to obtain a loan from the Federal Land Bank and the parties continued to

discuss alternate sources of financing.  (Jack 6/24/08 Depo., p. 238).  During that process, P&W

"performed extensive research on the availability of grants, loan guaranties, and other incentives

from the United States Department of Energy and the United States Department of Agriculture

that could be used to finance all or some part of construction of the Cello plant at Bay Minette."

(Doc. 301-3, p. 22, ¶ 10).  Still, Landegger did not speak with any sources of financing or any

banks with which Jack was negotiating, and he did not call upon any of his friends in the

banking industry.  (Landegger 10/29/08 Depo., Part I, p. 143; Landegger 6/10/08 Depo. pp. 268-

69, 638).  On July 11, 2007, Jack sent Landegger a draft of "the conditional agreement" that the

United States Department of Agriculture forwarded to Cello.  (Doc. 350-2).  Landegger

forwarded the document to his in-house counsel, asking him to "see what inconsistencies exist, if

any, with our agreement as to what security interest [Cello] can grant to third parties."   (Doc.

350-2)

    **B.**    **The Option Agreement and the Letter Agreement**

     The Option Agreement and the Letter Agreement are dated April 19, 2007.  (Docs. 26-4

and 26-5).  Both are signed by P&W, Cello, and Boykin Trust.  P&W paid Cello $ 2.5 million

for the Option Agreement.  It provides P&W, a company owned or controlled by it, or a

company the majority of which is owned or controlled by Landegger (the "Option Holder"), the

option to purchase a 33.33 % interest in Cello for the additional purchase price of $ 10 million

within a specified period of time.  (Doc. 26-4, p. 2).  In a prior order, this court ruled that the

option to purchase an ownership interest in Cello is void because it violates Alabama's rule

against perpetuities.  (Doc. 375).

The Option Agreement also provides P&W with "full transparent disclosure" of what it

calls the "[Cello] Technology".  (Doc. 26-4, p. 2).  The "[Cello] Technology" is defined as "the

intellectual property relating to the technology for the production of fuels from various raw

materials, including, but not limited to, tires, plastics, agricultural residues, [and] cellulose-

containing materials."  (Doc. 26-4, pp. 2-3).  The Option Agreement provides that "[f]ull

disclosure includes, but is not limited to, detailed drawings and process descriptions, research

reports and notes, trial and test results, pilot plant operating data and economic data, economic

analysis, raw material and refined product market studies, third party product evaluations, and

off take agreements."  (Doc. 26-4, p. 2).

The Option Agreement also includes a paragraph containing protective covenants, which

it describes as "certain customary minority shareholder protections."  (Doc. 26-4, p. 4).  The

protective covenants provide that Cello's stock may not be sold, pledged, otherwise transferred,

issued, or redeemed.  The Option Holder's approval is required for various corporate actions by

Cello, including merger, consolidation, dissolution, or recapitalization.  (Doc. 26-4, p. 4).  The

Option Holder's approval is also required for any sale, licensing, assignment, or other transfer of

the technology.  Finally, the Option Holder may select four out of 12 members of Cello's board

of directors.  (Doc. 26-4, p. 4).

The Letter Agreement references the Option Agreement and the disclosure of the technology to P&W.  (Doc. 26-5, pp. 2-3).  The Letter Agreement also says that P&W "agrees to provide engineering and construction services" at the Bay Minette Plant, and to provide cellulose containing raw material for the Bay Minette Plant.  (Doc. 26-5, pp. 3-4).

Boykin Trust is the only member, or owner, of Cello.  (Doc. 26-6, p. 8; Doc. 26-7, p. 4).  Allen is a member of the Boykin Trust.  (Doc. 158, p. 4, ¶ 5; Doc. 178, p. 2, ¶ 5).  The only managers of Cello are Jack and Allen.  (Doc. 26-6, p. 8).

### C.      Cello's and P&W's Post-Agreement Activities

P&W's chief financial officer ran financial projections on a four million gallon plant.  (Sweeney Depo., pp. 32-33).  P&W's leadership received the projections on May 23, 2007.  (Doc. 334-10).  Even though the Option Agreement only gave P&W the option to purchase a 1/3 ownership in Cello, the projections contemplated four different percentages of P&W ownership – 33%, 49%, 67%, and 80%.  (Doc. 334-10).  P&W was planning to wait until Jack decided on his own that he could not obtain the financing he needed and then P&W was going to try to renegotiate its deal with Cello.  (323-5; Matheson Depo., pp. 273-74).  The record shows P&W's projections about the economics of a renegotiated deal.  (Docs. 334-10 and 335-14).

On April 20, 2007, Jack met with a representative of Khosla Ventures ("Khosla"), a venture capital firm from the Silicon Valley that has interests in several alternative fuel projects.  (Jack 6/25/08 Depo., pp. 517-18).  Khosla provided Jack with a term sheet before his meeting with the Khosla representative, on April 17, 2007.  (Kaul Depo., pp.158-59).  On May 24, 2007, after having meetings and communicating with Khosla, Jack provided Khosla with a Letter of Understanding outlining a proposed agreement.  (Jack 10/23/08 Depo., Part I, pp. 306-07).  On

May 29, 2007, after more negotiating, Jack sent Khosla a signed letter of understanding, accompanied by a note stating that "[m]y agreement and signature is [sic] subject to [Cello's] resolution of third party option agreement, which we have discussed.  We will begin immediately to review this option."  (Doc. 291, p. 14; Kaul Depo., pp. 275-76).  The signed letter of understanding provided for, among other things, the establishment of a joint venture company for the development of a cellulosic fuels project in Bay Minette, to which Khosla would contribute $25 million for a 49% share of the joint venture company.  (Doc. 291, pp. 15-19).

Khosla subsequently made a different offer to the Boykin defendants, which was memorialized in a second draft letter of understanding.  (Plaintiff's Exhibit 20 to Preliminary Injunction Hearing).  Under the terms of the second draft letter of understanding, an affiliate of Khosla would contribute $25 million to an affiliate of Cello in return for 49% of adjusted gross revenue remaining after certain expenses, from the first plant and all future plants, and would manufacture cellulosic fuel as an agent of Cello and its affiliate.  (Plaintiff's Exhibit 20 to Preliminary Injunction Hearing).

An e-mail circulated at P&W on July 30, 2007, outlining the terms of a possible new deal with Cello.  (Doc. 335-3).  That same day, Cello sent P&W a copy of Cello's second draft letter of understanding with Khosla.  (Plaintiff's Exhibit 20 to Preliminary Injunction Hearing).  At a subsequent meeting, P&W told Jack that the terms of Cello's second draft letter of understanding with Khosla would violate the P&W Agreements and, with emphatic clarity, explained that P&W did not approve of them.  (Landegger 11/19/07 Preliminary Injunction Testimony, pp. 58-64; Jack 6/24/08 Depo., Volume I, pp. 255-57, 261-63).  Landegger presented Jack with a 10-point new proposal on August 3, 2007.  (Doc. 323-6).  The new proposal restructured the Option

9

Agreement and envisioned a business venture that would include the construction and operation of 25 plants in addition to the Bay Minette Plant. (Doc. 323-6). The parties did not enter into the deal outlined in P&W's August 3, 2007, proposal.

Khosla and the Boykin defendants redrafted their agreement, which they executed in its final form as the Manufacturing and Financing Contract ("MFC") between Cello and the BioFuels Operating Company, LLC ("BioFuels") on September 12, 2007. (Doc. 26-8, p. 19). Section III of the MFC is entitled "Use of [Cello] Technology." It provides that Cello will make available to BioFuels and to BioFuels' Operating Company affiliates all of the technology necessary and appropriate to operate and maintain the synthetic fuel plants. (Doc. 26-8, p. 4). The technology, along with additional intellectual property rights "created or developed during the course of performance of" the MFC or an operating and maintenance agreement will remain or become the "sole property" of Cello. (Doc. 26-8, pp. 4-5).

Section IV of the MFC is entitled "The Projects." (Doc. 26-8, p. 5). In that section of the MFC, Cello and BioFuels agree that three plants will be designed, engineered, constructed, operated, and maintained. (Doc. 26-8, p. 5). Cello and its affiliates are responsible for the design engineering, and construction activities for each plant and BioFuels with its affiliates are responsible for financing, operation, and maintenance at each plant. (Doc. 26-8, p. 5). BioFuels agrees to pay Cello $25 million to construct the first three plants, with the initial payment in the amount of $12.5 million due at the effective date of the MFC, the second payment in the amount of $6.25 million due when Cello commences design and engineering for the second plant, and the remaining $6.25 million to be paid when Cello commences design and engineering for the third plant. (Doc. 26-8, pp.5-6). Although the first $12.5 million was due when the MFC was

signed (Doc. 26-8, p. 5), Jack has testified that BioFuels will not provide the remaining financing until the resolution of this lawsuit.  (Jack 10/24/08 Depo., Part II, p. 80).  Still, the MFC provides that the remaining financing is not due at this time, a fact that Jack acknowledged during the course of this litigation.  (Doc. 26-8, p.6; Jack 10/24/08 Depo., Part II, p. 78).

Section V of the MFC, entitled "Operating and Management Agreement," provides that Cello, either directly or through a wholly-owned subsidiary, will own each plant, own or lease the property on which the plant is located, insure it, and pay specified taxes.  (Doc. 26-8, p. 8). BioFuels will create a wholly-owned subsidiary for each plant, which will purchase all of the feedstock, electric power, and other necessary utilities for the plant and operate, maintain, and manage it.  (Doc. 26-8, pp. 8-10).  Subject to certain parameters, the MFC requires the BioFuels subsidiary in charge of the Bay Minette Plant to purchase all wood chips, saw dust, and brushy wood materials used as feedstock from Alabama River Pulp Company.  (Doc. 26-8, p. 10).  Cello agrees to provide BioFuels' subsidiary with the technology it needs to perform its obligations under the MFC, but the MFC states that Cello does not assign, license, or grant any rights in the technology.  (Doc. 26-8, p. 9).  Under the MFC, the BioFuels subsidiary is to use the technology only to operate and manage the plant.  (Doc. 26-8, p. 9).

Paragraph 10 of the "Operating and Management Agreement" section of the MFC discusses accounting.  It provides that, after the payment of certain expenses, Cello or its subsidiary will receive 51% of the remaining gross revenue and that BioFuels' subsidiary will receive the remaining 49% of the gross revenue for each plant.  (Doc. 26-8, pp. 10-11).  The MFC also contains a section entitled "Confidentiality," which addresses the parties' treatment of the technology.  (Doc. 26-8, pp. 13-14).

Finally, the MFC provides for the possibility that the MFC may conflict with the Letter Agreement and Option Agreement.  The MFC says that it is not intended to "interfere with or otherwise conflict with the rights granted to P&W under the P&W Option.  In the event that it is determined that there is such a conflict, then the P&W Option shall govern, and the parties to this Contract will renegotiate the term, provision, agreement or condition that is in conflict so as to achieve as nearly as possible the purpose and intent of this Contract."  (Doc. 26-8, p. 16). During the course of Jack's negotiations with Khosla, he explained that he "had obligations under the option that [he] had to meet those obligations and that [he] couldn't do anything that would cause [him] to violate the option agreement."  (Jack 6/24/08 Depo., Volume I, p. 614). The MFC also includes an indemnity provision, in which BioFuels agrees to indemnify the Boykin defendants from certain claims P&W might allege.  (Doc. 26-8, p. 16).

P&W employees exchanged e-mails on September 24, 2007, indicating that P&W wants "to block [Jack's] plans to buddy up with Khosla."  (Doc. 335-8).  They recognized that there might be some benefits with having Khosla on the project, so they contemplated "focusing on how to make the deal better rather than how to trash it."  (Doc. 335-8).  On September 26, 2007, P&W's legal counsel sent a letter to BioFuels, asserting that the MFC violated P&W's agreements with Cello and expressing P&W's interest in protecting its contractual benefits with Cello.  (Doc. 335-4).

On October 9, 2007, BioFuels filed a declaratory judgment action in the United States District Court for the Southern District of New York, seeking a declaration that the MFC did not violate the Option Agreement.  (Doc. 301-4, pp. 2-6).  P&W did not learn that the MFC was signed until October 10, 2007.  (Landegger 11/19/07 Preliminary Injunction Testimony, p. 74).

12

P&W filed this lawsuit on October 16, 2007.

## III.    COUNT FOUR - INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

The Boykin defendants allege a claim for intentional interference with business relations in Count Four of their counterclaim.  (Doc. 178, pp. 28-29).  They allege that P&W interfered with (1) Jack's, Allen's, and the Boykin Trust's relationship with Cello by "attempt[ing] to displace the rightful owners of Cello and the Technology," (2) that P&W interfered with the Boykin defendants' relationship with BioFuels (3) and that P&W interfered "with existing and potential vendors, employees and customers."  (Doc. 178, p. 29, ¶¶ 61 and 62).

> In order to establish a prima facie case of intentional interference with a business or contractual relationship, there must be proof of each of the following:
>
>> (1) The existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the defendant's interference.

S.B. v. St. James Sch., 959 So. 2d 72, 94 (Ala. 2006) (quotations omitted).

> After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a third party, i.e., a stranger to the contract with which the defendant allegedly interfered.  This is so, because a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract.

Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So. 2d 1143, 1153 (Ala. 2003) (quotations and citations omitted).  A party who is not a party to a contract is not necessarily a "stranger" to the contract.  Id.  "When tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not

recognized." Id. (quotations omitted).

> [A] plaintiff asserting a tortious-interference claim bears the burden of proving that the defendant is a "third party" or "stranger" to the contract or business relationship with which the defendant allegedly interfered. A defendant is a party in interest to a relationship if the defendant has any beneficial or economic interest in, or control over, that relationship.

Id. at 1154 (citations omitted).

A party defending a tortious interference claim may argue, as an affirmative defense, that its actions were justified. Id. at 1153.

### A.   P&W's Interference With Jack's, Allen's, and the Boykin Trust's Relationship with Cello

One argument that P&W advances in favor of summary judgment on this element of the interference claim is based on the assertion that P&W cannot be liable for intentionally interfering with Jack's, Allen's, and the Boykin Trust's relationship with Cello because P&W was not a "stranger" to the relationships. (Doc. 318, p. 15).

In Alabama, a "party to a particular contract cannot, as a matter of law, be liable for tortious interference with that contract." Bama Budweiser v. Anheuser-Busch, 611 So. 2d 238, 247 (Ala. 1992). Likewise, a party to "[interdependent] contractual relations" with different "rights and duties between different sets of parties to a multiparty contract" cannot be liable for interference. Ex parte Blue Cross & Blue Shield, 773 So. 2d 475, 480 (Ala. 2000). The party asserting the tortious interference claim bears the burden of establishing that the party defending the claim "is a 'third party' or 'stranger' to the contract or business relationship with which the defendant allegedly interfered." Waddell & Reed, 875 So. 2d at 1154.

The Waddell & Reed case explains various ways a defendant may be a party in interest to a business relationship. "A defendant is a party in interest to a relationship if the defendant has

any beneficial or economic interest in, or control over, that relationship." Id.

> One is not a stranger to the contract just because one is not a party to the contract, as it has been held that the alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the agent for one of the parties to the contract of insurance (i.e., the underwriter), and all the purported acts of interference were done within the scope of the interferer's duties as agent.

Id. (quotations omitted).

Further narrowing the category of parties that are subject to liability for this tort, the

Waddell & Reed went on to explain:

> that all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership were not strangers, i.e., the purchaser of a radio station was not a stranger to the contractual relations between the radio station's seller and the seller's lenders. Thus, in order for a defendant to be liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract.

Id. at 1154-55. (quotations omitted, emphasis in original). The court summarized as follows:

> "[A] defendant is not a 'stranger' to a contract or business relationship when: (1) the defendant is an essential entity to the purported injured relations; (2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations."

Id. at 1156 (citations omitted, alteration in original).

After setting out the foregoing summary, the court reiterated that a party cannot be liable for interference unless it is "a stranger to both the contract and the business relationship giving rise to and underpinning the contract." Id. at 1157. It further explained that "[a] person with a direct economic interest in the contract is not a stranger to the contract. Parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or

business relationships." Id. at 1157 (emphasis omitted).  A defendant cannot be found liable for interfering with a contract as long as the defendant is essential to the allegedly injured relation "arising from interwoven contractual arrangements that include the contract."  Id.

Alabama courts have applied this elaborate rule of law to find that Anheuser-Busch was a party to a contract between a party that purchased a beer distributorship and the party that sold the distributorship because the buyer and seller could not have completed the sale without Anheuser-Busch's approval, Bama Budweiser, 611 So. 2d at 247; that an insurance company was a party to multiparty contractual relations between a dentist and his insured patients because the dentist and his patients contracted together in reliance on the insurer's interdependent contractual obligation to pay for dental services, Blue Cross & Blue Shield, 773 So. 2d at 480; and that a business-owner's father, who had no job title at the business, was not an owner or employee of the business, did not regularly work at the business, was not paid by the business, but who helped the business owner interview employees, fired at least two employees, helped his son find financing to purchase the business, described himself as the "agent" of the business, and informed employees that the business was not going to provide them with an agreed-upon equity interest in the business, could not be liable for interfering with the contract between the business and an employee he fired because he was acting as the agent of his son or of his son's business when he fired the employee, Parsons v. Aaron, 849 So. 2d 932 (Ala. 2002).

In Bellsouth Mobility, Inc. v. Cellulink, Inc., 814 So. 2d 203 (Ala. 2001), the court found that a cell phone service and equipment supplier was a party to the contractual relationship between its sales agent and a retail store where the sales agent set up sales kiosks.  The supplier and the sales agent entered into an agreement specifically addressing the sales agent's agreement

with the retail store in which the supplier agreed to furnish the kiosks and to pay the rent due the retail store for the kiosks.  Id. at 208-09.  The sales agent agreed with the supplier that the sales agent would execute a lease with the retailer and assign the lease to the supplier if the sales agent ceased operating at the location covered by the lease.  Id. at 209.  Also, the agreement between the supplier and the sales agent included a clause in which the supplier agreed to pay the retailer a percentage of the sales that were made at the kiosk in the retailer's store.  Id. at 209.  The lease agreement that the sales agent executed with the retailer specifically provided that the supplier would pay the fixed rent and percentage commission due on the kiosks.  Id.

After the agreement between the supplier and the sales agent was signed and the lease between the sales agent and the retailer was signed, the supplier entered into a separate agreement with the retailer which allowed the supplier to staff kiosks at the retailer's stores with the supplier's own employees.  Id. at 209-10.  In the meanwhile, the sales agent was having trouble making its quotas with the supplier.  Id. at 210.  The retailer ordered the sales agent to vacate its kiosks at the retailer's stores pursuant to a 90-day cancellation clause in the lease.  Id. at 209-10.  The sales agent sued the supplier for interfering with the sales agent's relationship with the retailer.  Id. at 210.

Although the supplier was not a party to the lease agreement between the sales agent and the retailer, the court found that the supplier could not be liable for interference based on the theory that, "[w]hen tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized."  Id. at 212 (quotations and citation omitted).  Relying in particular on the Bama Budweiser case, the

17

court held that the sales agent and the retailer could not have entered into their lease agreement without the supplier's approval, that the supplier was a party to every cell phone subscription that the sales agent sold from its kiosk at the retailer's store, and that the lease agreement with which the supplier allegedly interfered set out rights and obligations between the supplier and the retailer. Id. at 214. As a consequence, the supplier was not a stranger to the relationship between the sales agent and the retailer. Id.

More recently, the Supreme Court of Alabama applied the rule in Tom's Foods, Inc. v. Carn, 896 So. 2d 443 (Ala. 2004). In that case, a company called "Tom's Foods" had agreements with a company called "Dixie" for Dixie to distribute Tom's Foods products in vending machines. Id. at 446. Dixie financed some of its vending machines through Tom's Foods, pledging all of Dixie's vending machines, office equipment, trucks, inventory, and cash proceeds as collateral. Id. Tom's Foods assigned the notes and security agreements to Stephens Diversified Leasing, Inc., which eventually changed its name to "STI." Id. at 446-47. The assignment gave STI a right of recourse against Tom's Food if Dixie defaulted. Id. Later, Dixie leased additional vending machines from STI, which gave STI a right to repossess the equipment if Dixie defaulted and precluded Dixie from transferring the machines without STI's consent. Id. at 447. Dixie acknowledged that Tom's Foods was STI's agent for enforcing the terms of the lease. Id.

Dixie defaulted on its obligations in late 1996. Id. STI asked Tom's Foods to repossess the vending machines, which Tom's Foods began to do on February 19, 1997. Id. 447-48. Duke learned about Dixie's problems and negotiated an oral agreement in February 1997 with Dixie to purchase Dixie's accounts and equipment. Id. at 448. Duke began servicing Dixie's customers

while Duke was working to obtain financing in order to maintain the accounts.  Id. at 448-49.

Tom's Foods opposed Duke's activities, expressed its intent to repossess Dixie's vending

machines, and began its repossession efforts.  Id. at 449-50.

Duke accused Tom's Foods of interfering with its agreement with Dixie to purchase the

vending machines.  The Supreme Court of Alabama held that Tom's Foods was not a stranger to

the agreement between Duke and Dixie.  First, Tom's Foods, Dixie, and STI were parties to

comprehensive, interwoven contracts that gave Tom's Foods an economic interest in the

relationship between STI and Dixie.  Id. at 455.  Second, Tom's Foods was acting as STI's agent

when it was repossessing Dixie's vending machines.  Id.  Third, Tom's Foods was not a stranger

to the business relationship between Dixie and STI because Tom's Foods helped create that

relationship.  Id.  Finally, Duke was acting as Dixie's agent when it was servicing Dixie's

accounts with the vending machines at issue and "stood in Dixie's shoes and had no more right

to retain the vending machines than did Dixie."  Id.  Based on "these facts, Tom's Foods, STI,

Dixie, and Duke were all parties to an interwoven set of contracts and business relationships,"

precluding Tom's Foods' liability for interference.  Id.

The Boykin defendants cite to Peacock v. Merrill, Civ. A. 05-377BHC, 2005 WL

2739138 (S.D. Ala. Oct. 24, 2005), in which the court denied a Federal Rule of Civil Procedure

12(b)(6) motion to dismiss an intentional interference with a business relationship claim.  The

plaintiff accused the defendants, who were "Directors, Managing Members, Officers, Members,

and Shareholders and/or Interest Holders" of certain companies of acting in "their individual

capacities for their own benefit and on their own behalf" when they "fraudulently and

improperly" purchased the plaintiff's interest in those companies, thereby "divesting [the

plaintiff] of her interest in those companies." Id. at *1.  The court found that, assuming the defendants were acting in their individual capacities when they committed their alleged misdeeds, they could be strangers to the plaintiff's relationship with the companies because "[a] shareholder's relationship with the company in which they maintain an interest . . . is not inextricably intertwined or necessarily dependent on another individual's similar relationship with that company.  Id. at *2.

The Peacock case is inapposite because the evidence shows that no party was acting in its individual capacity during negotiations with P&W.  The Boykin Trust owns Cello.  Jack and Allen own and run the Boykin Trust.  The Boykin Trust was a party to the Nondisclosure Agreement, the Letter Agreement, and the Option Agreement with P&W.  The court finds that P&W was not a stranger to Jack's, Allen's, or the Boykin Trust's relationship with Cello. P&W's motion for summary judgment on the claim that P&W interfered with Jack's, Allen's, and the Boykin Trust's relationship with Cello is **GRANTED**.

## B.    P&W's Interference With the Boykin Defendants' Relationship With BioFuels

P&W argues that, even though it is not a party to any agreements between the Boykin defendants and BioFuels, it is not a stranger to the relationship between those parties.  As set forth above, P&W may avoid liability on the claim that it interfered with the relationship between the Boykin defendants and BioFuels even if P&W is not, in the strict sense, a party to that relationship.  At the time BioFuels and Cello executed the MFC, P&W had already executed the Option Agreement and the Letter Agreement.  The MFC, the Option Agreement, and the Letter Agreement address the same basic activities of financing, utilizing, and profiting from, the technology that Jack and Allen created to produce synthetic fuel.  The MFC specifically

20

mentions the agreements between P&W and the Boykin defendants and provides for the contingency that P&W might sue to protect its interests under those agreements.

P&W was not a stranger to the business relationship that gave rise to the MFC between BioFuels and Cello.  Waddell & Reed, 875 So. 2d at 1155 ("the defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract").  BioFuels' relationship with Cello is interwoven with P&W's relationship with Cello.  Id. at 1156 ("[A] defendant is not a 'stranger' to a contract or business relationship when: . . . or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations.").  Id. at 1156   At the time P&W took the actions it did, it thought it stood in a position to acquire an ownership interest in Cello for a predetermined, fixed price.  The value of that option would rise or fall depending on whether the MFC inured to the benefit of Cello.  Also, an important common thread running through all of the agreements in this case is access to, and the ability to exploit, the technology that Jack and Allen developed and to provide other services to the Bay Minette Plant.  P&W's motion for summary judgment is **GRANTED** as to the claim that P&W interfered with the Boykin defendants' relationship with BioFuels because P&W was not a stranger to that relationship, either.

 **C.** **P&W's Interference With the Boykin Defendants' Relationship with Existing and Potential Vendors, Employees and Customers**

P&W advanced several arguments in favor of its motion for summary judgment on this element of the interference claim.  The Boykin defendants did not respond to those arguments.  Summary judgment is **GRANTED** as to those claims because the Boykin defendants abandoned them.  Resolution Trust, 43 F.3d at 599 ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed

abandoned.").

## IV.     COUNT TWO - FRAUDULENT MISREPRESENTATION

Count Two broadly alleges that P&W made material misrepresentations to the Boykin defendants.  (Doc. 178, p. 27).  P&W identifies three misrepresentations in the body of its brief - P&W misrepresented that minority shareholder protections in the Option Agreement were "customary," P&W misrepresented its capability and willingness to help Cello find funding to construct the Bay Minette Plant, and P&W misrepresented its capability and willingness to help construct plants and to procure and provide raw materials and services on a highly competitive basis.  (Doc. 318, p. 28).  P&W argues in favor of summary judgment on all three of the foregoing alleged misrepresentations.  The Boykin defendants' response argues against summary judgment on the claims that P&W made misrepresentations with respect to financing and P&W misrepresented its construction and engineering capabilities.  (Doc. 333, pp. 29-32).

### A.     The "Customary" Protections Misrepresentation

The motion for summary judgment is **GRANTED** as to the allegation that P&W misrepresented whether minority shareholder protections in the Option Agreement were "customary" because the Boykin defendants abandoned it.

### B.     The Funding Misrepresentations

The counterclaim alleges that P&W represented that it:

had the capability and willingness to assist in obtaining financing for Cello and the Bay Minette Plant . . . . Specifically when Cello and Jack Boykin hesitated to enter into a transaction with P&W due to the fact that financing had not been approved, Landegger represented to him verbally and in writing that P&W would assist Cello and the Boykins to obtain financing from his many sources if Cello was unsuccessful in obtaining financing from the Federal Land Bank within 30 days.

22

(Doc. 178, p. 20, ¶ 20).  The allegation is based in part on a letter that Landegger sent to Jack in which Landegger stated that he "agreed that we will counsel together regarding alternate sources of financing to implement the project" if the funds from the Federal Land Bank were not available.  The letter followed a conversation between Jack and Landegger on April 19, 2007.  According to Jack, Landegger told him that Landegger would help Jack obtain financing, possibly from Goldman Sachs, after Jack told Landegger that he wanted to have the loan proceeds from the Federal Land Bank before signing the Option Agreement.

> The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation.  To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive.

Waddell & Reed, 875 So. 2d at 1160 (quotations and citation omitted).

"[I]n promissory fraud, the material existing fact that is misrepresented is the defendant's state of mind, when the defendant represents that he intends to perform some act although he does not in fact intend to perform it."  Hammonds v. Turnipseed, 709 So. 2d 39, 41 (Ala. Civ. App. 1997) (quotations omitted).  "Intent is an act or emotion of the mind seldom, if ever, capable of direct proof, but is determined by such just and reasonable deductions from the acts and facts presented as the guarded judgment of a reasonably prudent and cautious man would draw therefrom."  Bracewell v. Bryan, 329 So. 2d 552, 554 (Ala. Civ. App. 1976) (quotations omitted).  The Boykin defendants can try to show that P&W intended to deceive them through circumstantial evidence of events that occurred either before or after the alleged misrepresentations were made.  Byrd v. Lamar, 846 So. 2d 334, 343 (Ala. 2002).

23

The facts show that Landegger knew that obtaining financing would be difficult, that he never spoke with any sources of financing, and he did not call on any banking friends to help Cello obtain a loan.  Also, even though Landegger held the opinion that financing would be particularly difficult to come by without proof that the technology would work, Landegger made efforts to impede Cello's ability to disclose the technology to potential sources of financing. P&W did internal research regarding possible sources of financing and asked Jack whether he had looked at certain sources of funding, but it is far from clear that these efforts are all that P&W told Jack it would do.

In short, the record does not show that Landegger counseled with or helped Cello obtain financing and that Landegger took the position that the agreements between P&W and Cello would hinder Cello's efforts to obtain financing.  The parties argue about whether the fraud claim turns on whether P&W was successful in obtaining financing but, without any evidence tending to show that P&W made any efforts, other than internal research that it expected would not uncover sources of financing because the technology was unproven and not subject to disclosure, arguments about whether the efforts were effective are not relevant.

P&W also cites <u>C & C Products, Inc. v. Premier Industrial Corp.</u>, 275 So. 2d 124 (Ala. 1972), and a concurring opinion in <u>Hunt Petroleum Corp. v. State</u>, 901 So. 2d 1 (Ala. 2004), for the general rule that plaintiffs cannot make tort claims out of breach of contract cases.  P&W does not show that Landegger's purported representation that he would help the Boykin defendants obtain financing was a contractual obligation, or explain why the representation would not fall into the category of cases known as "fraud in the inducement."  <u>See</u> <u>Hunt Petroleum</u>, 901 So. 2d at 9-13 (Houston, J., concurring) (explaining the difference between fraud

in the inducement and fraud in the performance of a contract).  The court rejects this argument on summary judgment.

For the foregoing reasons, the motion for summary judgment is **DENIED** on the claim that P&W made a fraudulent misrepresentation with respect to Landegger's comments on financing.

### C.      The Construction and Provision of Raw Materials and Services Misrepresentations

P&W argues that no fraud claim should survive based on P&W's purported misrepresentations regarding whether the prices it charged were competitive because the Letter Agreement explains that P&W was going to charge salary plus fringes plus 100% for its personnel and cost plus 10% for raw materials.  (Doc. 318, pp. 39-40).  The Boykin defendants could have determined whether those rates were competitive before entering into the Letter Agreement, P&W argues.  The Boykin defendants do not respond to this argument at all. Summary judgment is **GRANTED** on this element of the fraud claim because the Boykin defendants abandoned it.

The Boykin defendants rely on a March 7, 2007, letter that Landegger sent to Jack to support their claim that P&W misrepresented its construction capabilities.  (Doc. 333, pp. 7-9, 31-32).  The letter explains:

> Parsons & Whittemore has completed 60 forest product projects in 28 countries and has used a wide assortment of both wood and non-wood raw materials in the production of pulp and paper.
>
> You may find the attached brochure of interest in its description of the turnkey operations we have been involved with in North America, Latin America, Western Europe, Asia, Eastern Europe, and Africa.  In addition to the fibers specifically mentioned on page 4, we have built mills in Argentina, Cuba, Ethiopia, Thailand, India, Vietnam and Egypt using sugar case bagasse as raw

material, and mills in Hungary, Algeria, Tunisia and Greece using wheat straw as raw material. A list of the locations, many of which were quite challenging, that we have successfully worked in is shown on pages 34 and 36 of the attached brochure.

***

Finally, these many mills in different places all required financing, in some cases the use of export credit facilities, in other cases, loans from insurance companies, banks and/or pension funds. We have also worked with various merchant banks over the years in organizing financing and feel relatively comfortable that we could play a positive role in assisting the financing of the rapid expansion of this new technology.

(Doc. 322-13).

The Boykin defendants argue that the letter is fraudulent for several reasons, but there is nothing in the record to show that the statements in the letter are false. Without proof of a false statement, the Boykin defendants do not have a claim for fraudulent misrepresentation. The motion for summary judgment on this claim is **GRANTED**.

## V.   COUNT THREE - FRAUDULENT CONCEALMENT/SUPPRESSION

The Boykin defendants claim that Landegger fraudulently suppressed the fact that he added the language "to third parties" to what became the final draft of the Nondisclosure Agreement, among other changes he made, and sent his revised version to Jack without drawing Jack's attention to this specific change. P&W submitted evidence that the draft agreement was sent via e-mail to Jack with a cover letter explaining, in general terms, that Landegger made various changes to the draft agreement. Jack does not dispute that he received the document at issue via e-mail, but he does not recall, and therefore denies, that he received the cover sheet. (Jack's Depo, pp. 252 and 256). No party disputes that Jack would not have agreed to the "to third parties" language had he noticed it, that the inserted language altered the agreement, or that

the new language was visibly apparent in the agreement Jack signed.  The record also shows that

Jack had told Landegger that he would not agree to a similar provision in a prior draft agreement

that hindered his ability to share his technology with other companies.

> The elements of a suppression claim are (1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury.

Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C., 932 So. 2d 883, 891 (Ala. 2005).

The existence of a duty to disclose is a question of law for the court.  Id. at 891.  Under

the suppression statute, a duty to speak arises if there is a confidential relationship between the

parties or if there are "'special circumstances' mandating disclosure."   State Farm Fire and Cas.

Co. v. Owen, 729 So. 2d 834, 842 (Ala. 1998).  The term, "special circumstances," allows courts

to look into the facts surrounding an event to determine if a duty to speak is appropriate, even if

there is no confidential relationship between the parties.  Id. at 839.  Courts consider several

factors in their analysis:

> (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.

Id. at 842-43.

There is no evidence of a confidential relationship between the parties in this case.  As

the Supreme Court of Alabama recently provided:

> "In commercial transactions involving parties to arm's length negotiations, however, a bright line rule generally applies: The parties have no general obligation to disclose, but each has an affirmative duty to respond 'truthfully and accurately' to direct questions from the other.
>
> "Thus, Alabama law presumes that the parties are capable of handling their own affairs and guarding their interests by asking reasonably specific, direct questions

27

that will satisfy their need for information.  The parties decide what information they need, and the law protects their rights to receive it."

Freightliner, 932 So. 2d at 892 (quoting Shutter Shop, 114 F. Supp. 2d at 1225).

The court went on to describe its precedent as providing that, unless a party to an arm's-length transaction makes a specific inquiry,  the other party has "no generalized obligation to disclose information regarding defects in similar products."  Id. (citing Daimler Chrysler Corp. v. Morrow, 895 So. 2d 861 (Ala. 2004), Mason v. Chrysler Corp., 653 So. 2d 951 (Ala. 1995), and McGowan v. Chrysler Corp., 631 So. 2d 842 (Ala. 1993)).

Consistent with Alabama's precedent, the Boykin defendants may only overcome summary judgment if Jack made a specific inquiry.  The evidence shows either that Jack received Landegger's draft of the Nondisclosure Agreement with an e-mail, generally alerting Jack to the presence of changes and inviting Jack to call Landegger if he had any questions, or that Jack received the draft agreement without any additional communication from Landegger at all.  Landegger bore no duty to disclose in either scenario because there is no evidence that he made any affirmatively false statements or that Jack asked Landegger whether he inserted the specific, or similar, language at issue.

The motion for summary judgment is **GRANTED** on the suppression claim because P&W did not have a duty to disclose.

## VI.    COUNT SIX - BREACH OF CONTRACT

Count Six alleges that P&W breached the Option Agreement, the Letter Agreement, and the Nondisclosure Agreement, in which P&W expressly or impliedly contracted to act in good faith and use its best efforts to help Cello accomplish the aims of those agreements by attempting to misappropriate Cello's technology and other business opportunities, interfering with and

delaying Cello's plans to use the Technology, and asserting ownership rights over and attempting to convert Cello's technology.  (Doc. 178, p. 31, ¶¶ 70 and 71).

P&W argues that they are not accused of breaching any particular contractual obligation and that the allegation that they are acting in bad faith is not actionable in a breach of contract claim.  Lake Martin/Alabama Power Licensee Ass'n v. Alabama Power Co., 601 So. 2d 942, 945 (Ala. 1992) ("[T]here is no good faith contractual cause of action, . . . that means that bad faith is not actionable absent an identifiable breach in the performance of specific terms of the contract.").  The Boykin defendants do not point to terms in the agreements that P&W violated or attempt to undermine P&W's legal authority.  They argue that P&W's conduct hindered the purpose of the agreements.  Summary judgment is **GRANTED** on this count because there is no evidence before the court to show that P&W breached any contractual obligations.

## VII.   COUNT ONE - REFORMATION AND RESCISSION

In Count One, the Boykin defendants ask the court to strike the words "to third parties" from the Nondisclosure Agreement, rescind the Option Agreement, rescind the Letter Agreement, and grant other appropriate relief.  (Doc. 178, p. 27).

The motion for summary judgment is **MOOT** as to the Option Agreement and the Letter Agreement.  The court found that the Option Agreement is void in its order on the motions to dismiss and for judgment on the pleadings. (Doc. 375).  The court also found that the Letter Agreement is void in its order entered this date addressing the other motions for summary judgment filed in this case.  The motion is **GRANTED** as to the request for "other appropriate relief" because that claim is abandoned.

As to the request to strike the words "to third parties" from the Nondisclosure

Agreement, P&W asserts that it is due summary judgment to the extent that the claim is based on allegations of fraud.  (Doc. 318, pp. 1-2 & 28 n.7).  In response, The Boykin defendants argue that a court can grant reformation only when a party fraudulently inserts a provision in a contract.  (Doc. 333, pp. 34-35).  P&W replies that "[f]or the same reasons that P&W is entitled to summary judgment on the claim for fraudulent suppression . . . summary judgment is also appropriate on this claim" for reformation of the Nondisclosure Agreement.  (Doc. 360, pp. 23-24).  The motion is **GRANTED** as to this aspect of Count One because the motion was granted on the suppression claim.

## VIII.   CONCLUSION

P&W's motion for partial summary judgment on the Boykin defendants' counterclaim is **GRANTED** in part, **DENIED** in part and **MOOT** in part.   As to Count One of the counterclaim, the motion is **MOOT** in part and **GRANTED** in part.  As to Count Two of the counterclaim, the motion is **DENIED** as to whether Landegger's comments on financing constitute fraudulent misrepresentation, and otherwise **GRANTED**.  As to Count Three of the counterclaim, the motion is **GRANTED**.  As to Count Four of the counterclaim, the motion is **GRANTED**.  And as to Count Six[1] of the counterclaim, the motion is **GRANTED.**

**DONE and ORDERED** this 7th day of May, 2009.

/s/ Callie V. S. Granade_____
CHIEF UNITED STATES DISTRICT JUDGE

---

[1] The motion for partial summary judgment did not address Counts Five or Seven of the Counterclaim.